```
 1                    UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
 2
    UNITED STATES OF AMERICA,
 3                                      Criminal Case
                    Plaintiff(s),       No. 23-00105 (JEB)
 4          v.
                                        Washington, D.C.
 5  KENDRID KHALIL HAMLIN,

 6                  Defendant(s).       April 14, 2023

 7  --------------------------------------------------------

 8                         STATUS CONFERENCE
                  BEFORE THE HONORABLE JAMES E. BOASBERG
 9                 UNITED STATES DISTRICT CHIEF JUDGE

10  APPEARANCES:

11  FOR THE PLAINTIFF(S):    Joshua A. Gold, Esquire
                             Alexander Schneider, Esquire
12                           United States Attorney's Office
                             District of Columbia
13                           601 D Street Northwest
                             Washington, DC 20001
14

15  FOR THE DEFENDANT(S):    Kathryn D'Adamo Guevara, Esquire
                             Public Defender's Office
16                           625 Indiana Avenue Northwest
                             Suite 550
17                           Washington, D.C. 20004

18

19

20  REPORTED BY:             Tammy Nestor, RMR, CRR
                             Official Court Reporter
21                           333 Constitution Avenue Northwest
                             Washington, D.C. 20001
22                           tammy_nestor@dcd.uscourts.gov

23

24

25
```

Government Exhibit

**2**

1:23-mj-00150

1   The following proceedings began at 3:00 p.m.:

2           THE COURT:  Good afternoon, everybody.

3           THE COURTROOM DEPUTY:  Good afternoon.  We are here

4   today for a status hearing in criminal case 23-105, United

5   States of America versus Kendrid Khalil Hamlin.

6           Beginning with counsel for the government, please

7   approach the lectern and identify yourself for the record.

8           MR. GOLD:  Good afternoon, Your Honor.  Josh Gold on

9   behalf of the United States.  And I'm joined by Special

10  Assistant United States Attorney Alexander Schneider.

11          THE COURT:  Welcome, both of you.

12          MS. D'ADAMO GUEVARA:  Good afternoon, Your Honor.

13  Kathryn D'Adamo Guevara on behalf of Mr. Hamlin from the Office

14  of the Federal Defender.

15          THE COURT:  Thank you.  Good afternoon.

16          Mr. Hamlin, good afternoon to you, sir.

17          THE DEFENDANT:  Good afternoon.

18          We are here today for a bond review in this matter.  I

19  think, first of all, since now the case has been indicted, why

20  don't we arraign Mr. Hamlin.

21          THE COURTROOM DEPUTY:  Your Honor, let the record

22  reflect counsel has been provided a copy of the three-count

23  criminal indictment.

24          Mr. Kendrid Khalil Hamlin, you are hereby charged:

25  Count 1 18 U.S.C. 351(e), assault on a member of Congress, and

1    Count 2 through 3, 22 D.C. Code 405(b), assault on a law

2    enforcement officer.

3            For the purposes of today's hearing, how do you wish

4    to plea?  And do you waive formal reading of the charges?

5            MS. D'ADAMO GUEVARA:  Your Honor, Mr. Hamlin would

6    like to enter a plea of not guilty at this time, and he does

7    waive a formal reading of the indictment.

8            THE COURT:  Thank you so much.

9            You may have a seat, Mr. Hamlin.

10           Let me first commend both sides for your fine briefing

11   on this issue, particularly in short order.  I know the time

12   frame has been compressed, and there's certainly some

13   interesting issues and I appreciate everybody's valuable

14   submissions.  It certainly sharpened the issues for me.

15           Ms. Guevara, why don't I start with you if I could ask

16   some questions, if that's okay.

17           MS. D'ADAMO GUEVARA:  Yes, Your Honor.

18           THE COURT:  So if we look at 18 U.S.C. 3142(f)(2)(A),

19   you agree that the government's burden is to prove this case

20   involves a serious risk the defendant will flee.  That's sort

21   of the threshold question, right?

22           MS. D'ADAMO GUEVARA:  Yes.

23           THE COURT:  And so, you know, under Singleton, for

24   example, this is usually not a terribly involved inquiry,

25   right?

1          MS. D'ADAMO GUEVARA:  I would suggest that the statute

2     demands that we do have an inquiry into whether the government

3     has proven that.  Otherwise, just by a proffer, we would be

4     assuming that sort of step one of that process has been

5     summarily met.

6          THE COURT:  We are here proceeding by proffer on both

7     sides, right?  But the question is how searching is such an

8     inquiry or whether it's not a terribly significant hurdle for

9     the government to overcome to get into the four-factor test.

10         But regardless of its sort of level of scrutiny there,

11    why don't you think that there is a serious risk of flight

12    here?

13         MS. D'ADAMO GUEVARA:  Your Honor, as we lay out in our

14    brief, the legislative history of the Bail Reform Act with

15    respect to what constitutes a serious flight, our reading

16    really contemplates something beyond the conduct alleged here,

17    which is -- and we have to take Mr. Hamlin's circumstances into

18    account -- an individual who is mentally ill, presumably

19    unmedicated, homeless, and thus, failing to appear for court.

20         And whether -- I don't believe there's any affirmative

21    evidence that those failures to appear were intentional for the

22    purposes of evading prosecution.  Rather, the circumstances of

23    his life that are known to the government and to the defense

24    and that were present in this case suggest something more

25    complex there.

1          THE COURT:  We don't have any evidence either way,

2    right?  I agree with you that we have evidence that he has

3    mental health issues and homelessness issues.  Entirely agree.

4          MS. D'ADAMO GUEVARA:  Yes.

5          THE COURT:  But you are not saying that you have

6    evidence or that you are proffering that on each of these

7    occasions that he failed to appear, it was involuntary?  You

8    are simply saying the government isn't showing the contrary?

9          MS. D'ADAMO GUEVARA:  That's correct, Your Honor.

10          THE COURT:  But you would agree that I can consider

11    failures to appear when I consider the flight, the risk of

12    flight at this threshold inquiry, right?

13          MS. D'ADAMO GUEVARA:  I think so, Your Honor, but

14    there is a distinction here because if Congress intended it

15    just to be a risk of flight and not a serious risk of flight, I

16    think the threshold question would be easily met here.

17          In looking at the legislative history, you see

18    Congress citing to the case, I believe it's Abrams, in which

19    that individual was moving money overseas, making moves to

20    actually affirmatively flee the jurisdiction for the purpose of

21    prosecution, obtaining a false identity.

22          Those conditions are in sharp contrast to what we

23    understand of Mr. Hamlin, who has resided in the D.C. DMV area

24    his entire life.  His entire family; mother, father, siblings,

25    grandmother, everyone is here.  He has never left, to my

knowledge, in the last eight years of the history pointed to by

the government, never left this area.

          And so, you know, what we do see in examining the

history is a clear failure -- inability or failure for him to

obtain appropriate services for his different conditions.

          So I think in this context, it's distinct.  Serious

risk, again, and the idea of actual flight implies something

more volitional and --

          THE COURT:  But let me stop you for a second.  And I

appreciate that there's a difference between a risk of flight

and a serious risk of flight.  And I agree with you that

serious is in the statutory language, and we shouldn't forget

that.

          MS. D'ADAMO GUEVARA:  Right.

          THE COURT:  But if, as you have just said, that I can

consider failures to appear, how can 26 not rise to the level

of seriousness?

          MS. D'ADAMO GUEVARA:  Again, I think we have to -- if

we are going by proffer here from both sides, you know, there

is some grace, I think, and that is -- and the circumstances of

Mr. Hamlin are sort of supported by the circumstances here,

that he's suffering from mental illness, he's unhoused.  It's

clear he's not getting the services and the medication and the

help that he needs.

          So I think even if we find here that the government

1    has met that there's a serious risk of flight, even if it be

2    by, you know, for some reason the conditions here failing in

3    some way that we proposed, I think the next inquiry is are

4    there a series of conditions that can mitigate those concerns

5    and that can reasonably assure his appearance in Court and the

6    safety of the community.

7            THE COURT:  Okay.  So if we get over the initial

8    hurdle and can then move to the 3142(g) factors, what I think I

9    am hearing, but I don't want to put words in your mouth, is

10   that you are unlikely to win after an assessment of those

11   factors, but that I should nonetheless go on to look at the

12   question of whether there are conditions that will reasonably

13   assure his appearance and safety because that's also statutory.

14   Is that a fair characterization of your argument or not?

15           MS. D'ADAMO GUEVARA:  Not necessarily.  I think we

16   would urge the Court adopt the Third Circuit sort of approach

17   in Himler, you know, where it's saying to the extent we are

18   examining the four factors, it's in the context of whether

19   those four factors suggest that that serious risk of flight

20   cannot be mitigated by conditions, and so --

21           THE COURT:  Okay.  Let's take for a minute the Third

22   Circuit framework that I am not allowed to consider

23   dangerousness.  First Circuit also.  But on the three other

24   factors, nature and circumstances of the offense, weight of the

25   evidence, and the history and characteristics, don't those all

1  favor detention?

2         MS. D'ADAMO GUEVARA:  I would argue they do not.

3  First we have an offense here that is not detention eligible in

4  (f)(2)(A).  That's clear.  We have an offense for which the

5  maximum penalty is, yes, ten years, but the guideline range is

6  quite low beginning at a zero to six range at that point.

7         In terms of if we want to talk about the circumstances

8  of the offense, we have laid out our argument that, you know,

9  the complaint in this case has made multiple statements to

10 various news sources that suggest that perhaps the encounter

11 here, the physicality of the encounter, was initiated by the

12 complainant.

13        So I don't think we necessarily have a set of facts

14 here where the accused is alleged to have affirmatively sought

15 out to attack and harm someone.

16        If we are talking about nature of the offense, we have

17 an individual who is unhoused, who clearly needs to use a

18 bathroom, asks to use a bathroom, and then a physical affray

19 happens when the complainant appears -- feels frightened by the

20 circumstances.  I'm not saying falsating that feeling, right?

21        So when we move then to the weight of the evidence, as

22 we go through in our brief, reiterate those same issues, again,

23 there is not a case --

24        THE COURT:  Right, but he's been indicted now, so

25 that -- you have to put that on the scales in terms of the

1    weight of the evidence, right?

2           MS. D'ADAMO GUEVARA:  Sure.  I mean, as you know, Your

3    Honor, the grand jury process is a secret process.  We are not

4    permitted to engage in any cross-examination or provide any

5    counter arguments in that process.  So I would say it's still a

6    fairly, you know, nominal standard.  Mr. Hamlin is still

7    presumed innocent at this stage.

8           You know, the injuries in this case were limited.

9    There's no suggestion that in any way the congresswoman was

10   targeted.  In fact, I think all parties agree that he was

11   completely unaware of who this individual was.

12          And so, you know, when we really distill this, if we

13   control for or address the fact that Mr. Hamlin was unhoused at

14   the time, the fact that he appears to have been unmedicated at

15   the time, suffering from the impacts of self-medication in the

16   wake of that lack of medication on a cold winter morning, and

17   we have a very structured environment where psychiatric

18   services are engaging with him frequently through the ACT team

19   at least threes times a week, we have him in a completely

20   structured environment where he is escorted a few blocks from

21   the residence --

22          (There was an interruption by the court reporter.)

23          THE COURT:  I think you said something a few blocks

24   from the residence.

25          MS. D'ADAMO GUEVARA:  He's escorted a few blocks from

1    the residence to the treatment aspect of the center.  He would

2    be inside that center all day.  That's my understanding, that

3    at least four to five group meetings happen where they are

4    monitored at all times, not permitted to leave.  And they're

5    escorted at all times.

6         We have the psychiatric side of supports.  There's

7    both internal staff within Samaritan Inns in the form of a

8    nurse who does biweekly check-ins as well as a therapist who is

9    able to independently check in outside of the groups.

10        Mr. Hamlin, we called the Access Helpline through --

11        (There was an interruption by the court reporter.)

12        MS. D'ADAMO GUEVARA:  Oh, sure.  Sorry.

13        We have the D.C. Department of Behavioral Health's

14   Access Helpline is a place you can call to connect an

15   individual with a core service agency.  Core service agencies

16   are behavioral health organizations that receive various

17   sources of funding including from the city of D.C.  Their

18   entire purpose is to provide mental health assistance in

19   various levels of intensity to district residents.

20        THE COURT:  But it's true that it's not a secure

21   facility inasmuch as he could leave if he wanted?

22        MS. D'ADAMO GUEVARA:  It is -- yes, there is no

23   multiple set of locks barring his exit.  There are security

24   cameras at the exits that are monitored, it's my understanding

25   at all times.  Again, there are sort of monitors with

1    individuals at all times.

2          In my experience with Samaritan Inns, they have been

3    willing upon the signing of a release by individuals in their

4    residence to communicate immediately to both the Court and to

5    pretrial services in the event that an individual leaves the

6    residence without authorization.

7          So, you know, we have the set of circumstances that

8    would control for lack of housing, which I think influenced

9    this incident very much so.  We have a certain source of

10   psychiatric care and medication through connection with the

11   Department of Behavioral of Health's core service agency.

12         Beyond that, there is something called the ACT team,

13   Assertive Community Treatment team, that is a kind of a more

14   focused outreach-oriented division of the core service agency

15   that actually conducts affirmative outreach to individuals who

16   have been unhoused and who suffer from serious mental illness.

17         That means those individuals are expected to come to

18   Mr. Hamlin at Samaritan Inns to monitor his progress, help

19   ensure that he's connected to psychiatric, you know, visits and

20   appointments, ensure that he's getting his medication, and

21   getting any necessary cognitive behavioral based therapy as

22   well.

23         So I think the plan that we have here mitigates any

24   concerns about risk of flight, whether it rises to the level of

25   seriousness or not.  And it's my understanding that Mr. Hamlin

1   has never had such a combination of circumstances in this

2   context that could permit him to comply, you know, with the

3   Court's orders.

4         THE COURT:  Okay.  Thank you very much.

5         Mr. Gold, let me ask you this.  Let's assume that I

6   found the Third and First Circuit's analysis compelling to the

7   extent that I don't believe dangerousness is appropriately

8   considered as one of the factors once I get over the threshold.

9   Does that mean you lose or not?

10        MR. GOLD:  No, Your Honor, that doesn't.

11        THE COURT:  Why not?

12        MR. GOLD:  Because even without dangerousness, looking

13   at the other three factors and looking specifically at what we

14   would say is the most important factor with respect to

15   Mr. Hamlin, which is the history and characteristics, there's

16   no combination of conditions based on the evidence before you

17   that can ensure his appearance at court.

18        And if you look, Your Honor, and I know you have

19   experience in superior court, and so I note that --

20        THE COURT:  A lot of years in superior court.

21        MR. GOLD:  Yes, Your Honor.  I note that timeline that

22   we put in our briefing that starts in 2015 and runs through the

23   present.

24        And what you will see is that there have been lots of

25   judges in D.C. superior court, lots of pretrial officers, and

1  excellent defense counsel who have argued very similar

2  arguments to what has been made here.

3        Mr. Hamlin has been released in very serious cases,

4  cases where a victim was shot, cases where someone -- you know,

5  it was an invasion into someone's home, assault cases.  He's

6  been released in these cases on GPS, on HISP, in the

7  specialized supervision unit.

8        In one instance, it was a release with an order

9  because he had not yet been connected to mental health services

10 to immediately go, I guess, to the Urgent Care at the superior

11 court or connected to superior court so that they could get the

12 assessment so that would help with connection to mental health

13 services and, you know, his participation in SSU.

14        And the next day, I believe it's the next day or in

15 very short order, a bench warrant is issued because the

16 defendant doesn't follow through and --

17        THE COURT:  So the defense argument here is, look, he

18 had -- we agree that it wasn't simply personal recognizance in

19 some of the earlier cases, but this is a whole different level

20 and that should give me, the Court, assurance that he will

21 reappear.  So why isn't that right?

22        MR. GOLD:  So for two reasons, Your Honor.  Actually,

23 if you look at Samaritan Inns, as great of a facility as it is

24 in general for the community, it does neither to assure

25 Mr. Hamlin's appearance in court or the safety of the

1   community.

2          If you look, it is at its website and based on

3   conversations with the intake officer there, it is a facility

4   that is primarily focused on treating addiction.

5          That is their focus.  That's what their website talks

6   about almost exclusively.  It doesn't refer to itself as a dual

7   diagnosis facility on its website; although, I think there's an

8   understanding that addiction and mental health often go hand in

9   hand.

10          But you don't have an in-house psychiatrist or doctor

11   who is on site who is able to prescribe medication.  You have a

12   nurse that comes twice a week but that doesn't have the ability

13   to prescribe medication.

14          There is no enhanced assurances that he would be

15   taking his medication such that the mental health aspect of

16   this, which I think both parties agree, more than addiction has

17   played a role in the criminal misconduct as well as the failure

18   to appear in court.  There's not assurances that that will be

19   dealt with.

20          But beyond that, and we talk about this in our brief

21   and Your Honor just alluded to it, this isn't a secure

22   facility.  So we put -- if we put Mr. Hamlin on a GPS as he's

23   been put before, there's nothing to stop him from walking out.

24   I mean, there is people monitoring him, and there's security

25   cameras at the door, but he could walk out.  And as we, you

1    know, gave as a hypothetical in our briefing, on a Friday

2    afternoon, not long after this hearing, after pretrial has

3    left, after the Court has left for the weekend, he could

4    abscond.

5            They learn that.  They try to contact the pretrial

6    services officer.  At best, the pretrial services officer gets

7    that word to the Court by Monday.  You have, and I spoke to

8    pretrial about this, you have about 36 hours if you charge --

9    if your bracelet is fully charged on GPS where it would, you

10   know, still have charge so that they could locate him.  But by

11   Monday or by the time a hearing was set or a warrant was

12   issued, we might not know where Mr. Hamlin is.

13           And that's especially concerning here because, as we

14   detailed, time and time again, it hasn't been a situation, as

15   defense counsel and the defendant has suggested in the past,

16   where, you know, Mr. Hamlin's just out there ready to be picked

17   up and so, you know, the marshals just go and find him and he's

18   brought back.

19           No.  What happens and what's happened in the past is

20   there's additional offenses committed with additional victims.

21   These aren't petty offenses.  They are violent offenses and

22   violent felonies on his record.

23           THE COURT:  Okay.

24           MR. GOLD:  Your Honor, I just would note the

25   government's objection -- I mean not objection, but our

1  disagreement with Your Honor as to whether dangerousness could

2  be considered.

3          THE COURT:  That, I understand.

4          Okay.  Thanks so much, Mr. Gold.

5          All right.  So here's my ruling and analysis:

6          First of all, I must find as a threshold matter that

7  the government has sufficiently shown that this case involves a

8  serious risk that defendant will flee and, therefore, warrants

9  a pretrial detention hearing pursuant to 18 U.S.C., Section

10 3142(f)(2)(A).

11         I agree with the defense that it does require serious

12 risk of flight and not simply a risk of flight.  But in looking

13 at that question, I believe it is appropriate for the Court,

14 and the defense also concedes at this point, to consider

15 failures to appear.

16         Both Magistrate Judge Harvey in United States versus

17 Anderson, 177 F.Supp.3d 458 so found, as did the Ninth Circuit

18 in United States versus Santos Flores, 794 F.3d 1088.

19         In addition, under United States versus Singleton, 182

20 F.3d 7, the D.C. Circuit agreed that the Court should not hold

21 an intensive hearing within a hearing at this threshold stage.

22 So as I mentioned to Ms. Guevara, to have 26 bench warrants

23 shows a serious risk of flight.

24         In addition, although the defense says that the

25 defendant hasn't fled the jurisdiction, that, of course,

depends on how one defines jurisdiction.  He has, in fact, been
arrested multiple times outside the district in Maryland and
Virginia so that to the extent if one drew -- or one defined
flight somewhat more narrowly as leaving the district, he's
certainly done that.

But at the end of the day, given the extremely large
number of failures to appear, I believe that the threshold
requirement of a serious risk of flight has been met, which
then leads me to assess the 3142(g) factors.

The first is the nature and circumstances of the
offense charged.  Here the defendant is charged with punching a
congresswoman in the face, grabbing her, fleeing only when she
poured hot coffee on him, and then biting two officers during
his arrest.

Now, I agree with the defense that this is not a case
involving weapons, guns, knives, or very serious injury, but it
is a ten-year offense, and the behavior is certainly troubling.
So I think the factor, if not decisively in the government's
column, does still fall there.

The second factor is the weight of the evidence and
the fact that the defendant has been indicted at this point
means that the weight of the evidence is strong here.  There's
also video of what occurred.  But the fact that the grand jury
has found by probable cause that he has committed the offense,
that the weight of the evidence also is in the government's

1    column.

2          The third factor is history and characteristics of the

3    defendant.  And that breaks down into multiple different

4    questions, and I'll group them as we go through.

5          The first is the character, physical and mental

6    condition of the defendant, family ties, and residence.  So

7    it's certainly true that he has family ties here in the

8    district, but he's so had for a long time and that hasn't

9    helped him get to court or avoid prior criminal activity.  And

10   given the fact that he has serious mental health issues, that

11   also doesn't weigh in his favor.

12          Employment and financial resources.  He's not

13   employed, and he is homeless and has no stable resources in his

14   life.  That counts against him.

15          Past conduct and criminal history very strongly weighs

16   against him.  His long record is extremely worrisome.  He has

17   prior convictions for APO, robbery, assault, theft, attempted

18   robbery, petit larceny, and these have all been accumulated at

19   the age of 26.

20          Drug or alcohol use.  He also has drug issues.

21          And then a final factor is record concerning

22   appearance at court proceedings.  That's not a flight question.

23   That's a record concerning appearance.  And as Mr. Gold

24   observed, I have, indeed, spent a long time in superior court,

25   eight and a half years, in fact, and yet, this defendant's

record of failing to appear is one of the worst I have seen.
It's sort of mind-boggling the number of times he's failed to
appear.

So the question -- so even if I don't get to
dangerousness, even considering these three factors, then I
need to look at whether there are conditions of release that
will reasonably assure the appearance of the person as required
and the safety of any other person in the community.

The defense argues that enrollment in the Samaritan
Inn program would assure that appearance. And it's certainly
stronger supervision than he's had before, but again, as the
government argues in its brief, the fact that he's been under
high intensity supervision, GPS monitoring, and the specialized
supervision unit multiple times in the last several years and
has failed all of those does not give me great faith that this
step will be appropriate, and particularly given that it's not
a secure facility and the defendant could simply leave causes
me great concern.

I mean, I think the government does a very good job
setting forth the timeline from July 2015 to February 2023 of
the defendant's failures to appear and his crimes, and it's
just exceedingly worrisome. And so even if I don't consider
dangerousness, even if I follow the First and Third Circuits'
approaches, I don't find there are any conditions that would
reasonably lead to his appearance or to keep the community

1    safe.

2         And I will just say alternatively that I don't agree

3    with the Third Circuit's and First Circuit's approach, that I

4    actually find that Judge Nichols's analysis in Curzio,

5    C-U-R-Z-I-O, which is No. 21-41, and the Tenth Circuit decision

6    in Plata, P-L-A-T-A, Hernandez, the 2019 case, and Judge

7    Hogan's decision in Karni, K-A-R-N-I, 298 F.Supp.2d 129, all

8    favor using dangerousness in the analysis, and I agree with

9    those cases.  And so, therefore, I would consider

10   dangerousness.

11        And, of course, considering dangerousness makes this

12   even an easier case for detention.  But as I have said, I don't

13   need to consider it in order to detain the defendant.

14        Therefore, having considered the factors as I have, I

15   will order the defendant detained without bond.

16        Okay.  Do you want to -- shall we pick -- since we

17   have arraigned him and it's now my case, shall we pick a date

18   for status?  Ms. Guevara, how much time would you like for the

19   next status?

20        MS. D'ADAMO GUEVARA:  Your Honor, we have repeatedly

21   asked for an offer from the government.  We have not received

22   them.  So as soon as they can get us that offer and we have

23   enough time to consider it, we would like to come back.

24        THE COURT:  Mr. Gold, do you have a sense of that?

25        MR. GOLD:  Your Honor, we would request two to three

1    weeks to make the offer and get it to Ms. Guevara and for her

2    to consider it with her client.

3              THE COURT:  All right.  Okay.  Why don't I set a

4    status in about -- I can do it in three and a half weeks.  So I

5    could do the -- I can do May 9, 10 -- May 9 through 12.  Any of

6    those days?  Ms. Guevara, how do any of those work with your

7    schedule?

8              MS. D'ADAMO GUEVARA:  That works for the defense, Your

9    Honor.

10             THE COURT:  Mr. Gold?

11             MR. GOLD:  Your Honor, we would request the 10th.

12             THE COURT:  Okay.  I've got to impanel a grand jury,

13   so I could do it in the afternoon.  I could do 2:00 on the

14   10th.  Ms. Guevara, can you do that?

15             MS. D'ADAMO GUEVARA:  Yes, Your Honor.

16             THE COURT:  Mr. Gold?

17             MR. GOLD:  That works for the government.

18             THE COURT:  All right.  That will be in person.

19             Any objection to excluding time in the interim,

20   Ms. Guevara?

21             MS. D'ADAMO GUEVARA:  No, Your Honor, not at this

22   time.

23             THE COURT:  I find it is in the interest of justice to

24   exclude time under the Speedy Trial Act between today and

25   May 10 given a lack of objection from the defense and so that

1    the government can make a plea offer that the defense can

2    consider.

3            Any other issues anybody wants to address today,

4    Mr. Gold?

5            MR. GOLD:  No, Your Honor.

6            THE COURT:  Ms. Guevara?

7            MS. D'ADAMO GUEVARA:  No, Your Honor.

8            THE COURT:  Thanks so much, everyone.  Have a nice

9    weekend.

10           (The hearing concluded at 3:33 p.m.)

11                             - - -

12                   C E R T I F I C A T E

13

14           I hereby certify that the foregoing is an

15   accurate transcription of the proceedings in the

16   above-entitled matter.

17

18

19   7/6/23                  s/ Tammy Nestor
                             Tammy Nestor, RMR, CRR
20                           Official Court Reporter
                             333 Constitution Avenue NW
21                           Washington, D.C. 20001
                             tammy_nestor@dcd.uscourts
22

23

24

25