**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| v. | ) | **No. 1:23-cr-00229-CJN** |
| | ) | |
| **TAYLOR TARANTO** | ) | |
| | ) | |
| **Defendant** | ) | |
| | ) | |

## APPEAL OF MR. TARANTO'S DETENTION

Taylor Taranto, through his undersigned counsel, respectfully submits this appeal of the Magistrate Judge's order detaining him pretrial and respectfully requests that this Court release him pursuant to the Bail Reform Act, 18 U.S.C. § 3142 and *United States v. Salerno*, 481 U.S. 739 (1987). As outlined in our previous memorandum and supplement in support of release, Mr. Taranto is an honorably discharged veteran of the U.S. Navy who served in combat in Iraq, has no criminal record, extensive family support, and engages regularly with established medical and mental health providers through the Department of Veterans Affairs located in Washington state.

At his initial appearance on June 30, 2023, the government sought preventative detention under 18 U.S.C. 3142(f)(2)(A) on the basis that Mr. Taranto poses a "serious risk" of flight. Section 3142(b) states that the Court "shall order the pretrial release of [Mr. Taranto] on personal recognizance . . . unless" there are absolutely no conditions of release that would ensure Mr. Taranto's appearance at court. It is the government's burden to show by a preponderance of the evidence that Mr. Taranto is a serious risk of flight and that no set of conditions can reasonably assure his future appearance in court, requiring his detention pretrial.

The government cannot meet that burden here. Because there are a combination of conditions that will reasonably ensure his appearance and ensure the safety of the community,

Mr. Taranto should be released home to his family in Washington state, with conditions to continue with mental health treatment.

## I.        Background

Mr. Taranto was originally charged by Complaint and associated warrant issued on June 29, 2023 with four misdemeanor offenses relating to his alleged participation over two and a half years ago in the events on January 6, 2021 at the Capitol. Those charges are: 1) knowingly entering or remaining in any restricted building or grounds without lawful authority pursuant to 18 U.S.C. § 1752(a)(1); 2) disorderly and disruptive Conduct in a restricted building or grounds pursuant to 18 U.S.C. § 1752(a)(2); 3) disorderly Conduct on Capitol Grounds pursuant to 40 U.S.C. § 5104(e)(2)(D); and 4) Parading, Demonstrating, or Picketing in a Capitol Building pursuant to 40 U.S.c. § 5104(e)(2)(G).

On July 12, 2023, the Government filed an Indictment charging Mr. Taranto with those same four misdemeanors relating to events on January 6, 2021, as well as two additional D.C. code charges concerning alleged conduct from June 29, 2023: 1) carrying a pistol without a license under DC Code § 22-4504(a)(1) and 2) possession of a large capacity magazine in violation of DC Code § 2506.1(b).[1] Upon information and belief, those items were recovered from a locked bag inside Mr. Taranto's vehicle after it was searched without warrant, and were lawfully purchased.

Mr. Taranto has no criminal record and is likely facing a probationary sentence even if convicted at trial.

## II.       Legal Standard

---

[1] Counsel will note that there are clear joinder issues here which may be litigated promptly.

Consistent with the presumption of innocence and the Eighth Amendment prohibition against excessive bail, the Bail Reform Act of 1984 provides that a defendant should be released pending trial on personal recognizance or "subject to the least restrictive further conditions, or combination of conditions that . . . will reasonably assure the appearance of the person as required and the safety of any other person and the community."  18 U.S.C. § 3142(b) and (c)(1)(B).  The Supreme Court has explained:  "In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception."  *Salerno*, 481 U.S. at 755; *see also United States v. Singleton*, 182 F.3d 7, 9 (D.C. Cir. 1999) ("Detention until trial is relatively difficult to impose.").  "Nothing in this section shall be construed as modifying or limiting the presumption of innocence."  18 U.S.C. § 3142(j).

As a general rule, courts should refuse to release defendants on bail "[o]nly in rare circumstances," and "only for the strongest of reasons."  *United States v. Motamedi*, 767 F.2d 1403, 1405, 1406 (9th Cir. 1985) (Kennedy, J.).  "It is only a 'limited group of offenders' who should be [detained] pending trial."  *United States v. Shakur*, 817 F.2d 189, 195 (2d Cir. 1987) (quoting S. Rep. N. 98-225 at 7 (1984), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3189).  Any "[d]oubts regarding the propriety of release should be resolved in favor of the defendant." *Motamedi*, 767 F.2d at 1405. The potential penalties for this offense also favor release.  *See United States v. Vazquez-Benitez*, 919 F.3d 546, 551 (D.C. Cir. 2019) (finding factor in favor of release because exposure to a sentence to 12-months is a "relatively low penalty").  It is the government's burden to demonstrate either by a preponderance of the evidence that the defendant is more likely than not to flee.  *See United States v. Jessup*, 757 F.2d 378, 384 (1st Cir. 1985) (Breyer, J.); *see also United States v. Vortis*, 785 F.2d 327, 328–29 (D.C. Cir. 1986) (per curiam).

**III.    The Government Has Not Met Its Burden to Demonstrate that Mr. Taranto is a "Serious Risk of Flight."**

First, it is important to note that preventative detention is not available to the court under the dangerousness finding, but only as a serious risk of flight. The plain language of the statute only permits detention at the Initial Appearance when the defendant poses a "*serious* risk" of flight, § 3142(f)(2)(A) (emphasis added). Ordinary "risk of flight" is not a factor in § 3142(f). There is some risk of flight in every criminal case; "serious risk" of flight means something more. According to a basic canon of statutory interpretation, the term "*serious* risk" means that the risk must be more significant or extreme than an ordinary risk. *See, e.g.*, *Corley v. United States*, 556 U.S. 303, 314 (2009); *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 698 (noting interpretation of statute should be reluctant to treat statutory terms as surplusage).

The BRA's legislative history makes clear that detention based on serious risk of flight is only appropriate under "extreme and unusual circumstances.[2] For example, the case relied on in the legislative history as extreme and unusual enough to justify detention on the grounds of serious risk of flight involved a defendant who was a fugitive and serial impersonator who had failed to appear in the past, and had recently transferred over a million dollars to Bermuda. *See Abrahams*, 575 F.2d at 4. The government must demonstrate that the risk of flight in a particular case rises to the level of extreme or unusual, and no such showing has been made here.

In addition, a defendant should not be detained as a "serious risk" of flight when the risk of non-appearance can be mitigated by conditions of release. The only defendants who qualify for detention under § 3142(f)(2) are those who are "[t]rue flight risks"—defendants the government can prove are likely to willfully flee the jurisdiction with the intention of thwarting

the judicial process.[3] As stated below, the Government has not met its burden of proving that the risk of non-appearance in this case cannot be mitigated by conditions of release.

In order to detain an individual pursuant to 18 USC §3142(f)(2)(A), the Bail Reform Act requires that a judge find "by clear and convincing evidence" that "no condition or combination of conditions will reasonably assure the safety of any other person and the community." In determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community, a judge may take into account the available information concerning: 1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release." See 18 USC § 3142(g). Only if "the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, such judicial officer shall order the detention of the person before trial." 18 USC §3142(e).

In other words, in order to hold Mr. Taranto, the court must first find that the Government has met its burden of showing that Mr. Taranto poses a "serious" risk of flight. If the Court finds that Mr. Taranto indeed poses a serious risk of flight, the Court must then determine whether there is a combination of conditions that will reasonably assure the

---

[3] *See, e.g.,* Lauryn Gouldyn, *Defining Flight Risk*, 85 U. Chi. L. Rev. 677, 724 (2017). This rule is sound policy, as the risk of a defendant becoming either a "local absconder" (who intentionally fails to appear but remains in the jurisdiction), or a "low-cost non-appearance" (who unintentionally fails to appear), can be addressed by imposing conditions of release like electronic monitoring, GPS monitoring, and support from pretrial services. *See* Gouldyn, 85 U. Chi. L. Rev. at 724.

appearance his appearance as required and the safety of any person and the community, in light of the four factors cited in subsection (g) of the Bail Reform Act.

Application of the fourth § 3142 (g) factor is unsettled in this circuit.  The government argues that the fourth factor is equally relevant to the Court's determination, regardless of whether the detention hearing is triggered by subsection (f)(1)(A) relating to dangerousness or (f)(2) relating to serious risk of flight.  The circuits that have analyzed the issue have concluded that once a detention hearing is triggered by (f)(2), an individual's potential dangerousness does not factor into the detention decision but is limited to determining what release conditions may ameliorate any concerns. Based upon the text of the statute, the Supreme Court's interpretation of that statute, and Congress' intent, if in fact the Court finds that Mr. Taranto poses a "serious risk" of flight, this Court should reject the government's broad interpretation of the Bail Reform Act and limit its analysis to whether the government has proven that there are no conditions or set of conditions that reasonably assure that Mr. Taranto will appear in court.

Mr. Taranto should be released on conditions because there is not a "serious risk that the [defendant] will flee" the jurisdiction under § 3142(f)(2)(A). Mr. Taranto has zero criminal history, a history of honorable service and discharge from the U.S. Navy, a supportive family network back in Washington state, and strong mental health services in place through the Department of Veterans Affairs. Mr. Taranto is a loving father, husband and son who owns a home in Washington state with his wife of 15 years. His mother, father, sibling, children, and other members of his extended family reside in Washington state.

Furthermore, the lack of prosecutorial urgency over the past *two and a half years* to charge Mr. Taranto for misdemeanors that allegedly occurred on January 6, 2021 belies the

Government's assertions that he is both a flight risk and/or dangerous. While the Government has subsequently added two DC Code firearm and ammunition related counts, notably the Government has *not* charged Mr. Taranto with any threats-related offenses despite their initial attempts to characterize him as threatening. Indeed, investigation and the Government's own prosecutorial decisions reveal that the Government cherry-picked information and purported statements that mischaracterize and misconstrue the facts and Mr. Taranto himself in an attempt to paint him as threatening when he quite simply is not. Lastly, even if convicted of the charged offenses, Mr. Taranto, of *zero* criminal history, is facing likely guidelines of probation in this case. As further discussed below, the determinative factors of pretrial release weigh overwhelmingly in the favor of Mr. Taranto's release.

        *A.*      *The Nature and Circumstances of the Offense*

To begin, the offenses for which Mr. Taranto was charged are not detention eligible pursuant to 18 U.S.C. § 3142, reflecting Congress' determination that such offenses should typically result in pretrial release.  The Government has primarily mentioned perceived erratic behavior leading up to his arrest as the basis for requesting detention. However, the facts remain the same: Mr. Taranto stands charged with four misdemeanor offenses, a firearm licensure and ammunition offense, and no prior criminal history. While the Government makes reference to Mr. Taranto being sought after, the complaint and arrest warrant in this case were not issued until June 29, 2023, the same day Mr. Taranto was arrested (and upon information and belief, while he was already in custody).

Furthermore, there were several representations and concerns at the outset of this case that have since been revealed to be untrue, namely that: 1) there were explosives in the vehicle; 2) Mr. Taranto trespassed at an elementary school; 3) Mr. Taranto was a fugitive; and 4) Mr. Taranto had made a number of threats to Government officials. The Government has since

clarified and/or investigation has revealed that 1) there were no explosives in the vehicle; 2) Mr. Taranto attended a film screening pursuant to a lawfully obtained permit at an elementary school; 3) the arrest warrant for January 6, 2021 related events was not issued until mere hours before his arrest on June 29, 2023; and 4) his alleged words and actions do not constitute threats carrying criminal liability.

The fourth point is perhaps the most salient. Since Mr. Taranto's initial appearance, the Government has presumably had the opportunity to review extensive evidence in this case and make decisions about additional charges in this case. Critically, despite piecemeal characterizations of statements of Mr. Taranto that the Government has claimed were of a threatening nature in their detention memo and at prior hearings, the Government has not filed *any* charges pertaining to threats against government officials or anyone else. The most logical conclusion is that they have realized—as the defense has argued from the beginning after analyzing available source material–that any words spoken by Mr. Taranto do not carry criminal liability.

Furthermore, in order to substantiate their request to detain Mr. Taranto, who has zero criminal history and a stable home in Washington state, the Government has repeatedly suggested that Mr. Taranto was a fugitive or actively "frustrating" efforts to locate him— allegations which are belied by the simple facts surrounding this case and by the discovery recently provided to the defense. Rather, a warrant for Mr. Taranto's arrest for January 6, 2021 related misdemeanors was not issued until June 29, 2023, the day of his actual arrest in this case. Based on the discovery produced by the Government, it appears it was issued only a few hours before his actual arrest. When Mr. Taranto was arrested, he was unarmed and compliant with law enforcement when asked to stop. He has been detained since that time, for the last month.

Additionally, internal law enforcement documents turned over to the defense in discovery on July 21, 2023 confirm that the FBI had been aware of Mr. Taranto's identity and participation in the Capitol events as far back as June 2021, when a confidential source sent that information via a tip line to the FBI. Just two months later, in August 2021, Mr. Taranto was named as a co-Defendant in a civil suit filed by Officer Jeffrey Smith's widow for alleged actions relating to January 6, 2021. Importantly, in that lawsuit Mr. Taranto is not accused of touching or making contact with Officer Smith in any way, nor is he charged with any assaultive conduct here. Internal law enforcement documents further reveal that the FBI put together a dossier of Mr. Taranto's full identity, address, and other information shortly after the lawsuit and related press issued. Law enforcement documents reveal that the FBI occasionally generated updates to his file since that time as well. For example, the discovery turned over on July 21, 2023 reveals that law enforcement requested Mr. Taranto's military records as far back as June 2022, as well as records pertaining to his [lack of] criminal record and lawfully obtained firearms shortly thereafter.[4]

The Government *did* charge named co-defendant in the civil suit, David Walls-Kaufman, back in July 2022 with misdemeanor offenses relating to January 6, 2021. Importantly, the Government, upon reviewing the voluminous video footage, determined that they did not have

---

[4] Those military records reveal a history of exemplary and dedicated service to the U.S. Navy for over six years, along with two years of reservist service, with Mr. Taranto receiving a number of awards, reflected on his certificate of release from active duty in 2010, including but not limited to: the Navy Expeditionary Medal; Global War on Terrorism Service Medal; Armed Forces Service Medal; Joint Meritorious Unit Commendation.; National Defense Service Medal; Iraq Campaign Medal.

sufficient evidence to charge Mr. Walls-Kaufman with assaulting an officer or anyone else – as is also the case with Mr. Taranto.[5]

Yet even though Mr. Taranto has been identified as connected to January 6th since at least June 2021, the government only requested charges against Mr. Taranto on June 29, 2023, over two and a half years after January 6, 2021. The fact that the FBI was aware of and (according to government representations made in court) actively surveilling Mr. Taranto throughout this time indicates that the Government clearly did not think he was a danger such that they felt compelled to issue a warrant for his arrest sooner. Indeed, Mr. Taranto is no fugitive: rather, he has remained in plain sight.

The Government has admitted they have been surveilling Mr. Taranto, who was by their own admission frequently livestreaming and posting his exact whereabouts for the last several years. Law enforcement was also aware of Mr. Taranto's presence and location in Washington, DC this past June due to his participation at the Freedom Corner vigil –a vigil which was often overseen by MPD officers and took place directly on DC Jail premises. Furthermore, according to multiple sources, his van was parked overnight literally across the street from the DC jail on most nights since his arrival in DC.

The truth is that the Government had ample opportunity to issue a warrant and arrest Mr. Taranto since at least June 2021. The fact that they failed to do so undermines the Government's assertions that he is both a flight risk and a danger.

The circumstances surrounding the newly added DC Code firearm and ammunition charges also do not support detention. The firearms were allegedly recovered inside a locked bag

---

[5] See https://www.washingtonpost.com/dc-md-va/2023/06/13/capitol-rioter-lawsuit-police-suicide/; see also https://www.nbcnews.com/politics/justice-department/judge-questions-dojs-handling-jan-6-rioter-scuffled-officer-died-suici-rcna82979.

found inside what law enforcement has identified as Mr. Taranto's van. The firearms were not on

Mr. Taranto's person, and at no time has the Government alleged that he has brandished, used, or

threatened use of a firearm, not in general, not near former President Obama's house, nor on

video. The Government also does not allege that the firearms were unlawfully obtained. There is

also an open legal question as to whether law enforcement was permitted to search Mr. Taranto's

van without a warrant – a warrant they ultimately did obtain the following day after their initial

search. Lastly, as discussed above, even if Mr. Taranto were convicted of the principal offenses

in the indictment, he would likely be eligible for probation and release from incarceration. All of

these facts and factors mitigate in favor of release.

      *B.*     *The Weight of the Evidence*

      The weight of the evidence is the least important factor for the Court to consider but there

is nothing about the evidence that lends support to the assertion that Mr. Taranto is a serious risk

of flight. Mr. Taranto has been available and in plain sight for the last two and a half years. The

Government admits that they had been surveilling Mr. Taranto since well before June 29, 2023,

and were aware that he was attending nightly protests at the DC Jail, and that he had attended the

sentencing of Mr. Walls-Kaufman in mid-June. They were also aware that he was a Defendant in

a civil suit and appearing in that capacity since 2021. Furthermore, Mr. Taranto has otherwise

resided in the same house in Washington with his wife since 2010. While the Government

contends that Mr. Taranto has essentially been absconding from them, their own detention memo

and discovery reveals the opposite is true.

      *C.*     *The History and Characteristics of Mr. Taranto*

      Mr. Taranto's history and characteristics demonstrate that there are conditions of release

that can reasonably assure his appearance and protect the community. Since his initial

appearance, counsel has had the opportunity to speak with a number of individuals who know

Mr. Taranto well, including his parents, wife, and mental health clinician. By all accounts, Mr. Taranto is a loving and engaged father who has actively worked to address mental health issues that began after trauma experienced during his military service.

Mr. Taranto has lived in Washington state his entire life, except for his honorable years of service in the United States Navy. He has a strong family support network in Washington state, where he owns a home with his wife of 15 years. His mother, father, sibling, and many other members of his extended family also reside in Washington State. His wife journeyed across the country at a moment's notice to accompany Mr. Taranto back home to Washington. His family misses him dearly and stands ready to support him back home.

Mr. Taranto enlisted in the Navy in August of 2004. During his time in the Navy, he specialized in cryptologic technology, worked in naval construction, and was deployed to Iraq, where he drove in combat convoys. After serving for six years and another two years in the reserves, Mr. Taranto was honorably discharged. Mr. Taranto, like many veterans, returned to civilian life with significant trauma.  However, Mr. Taranto has worked diligently to treat the trauma that he endured. He is connected with a mental health therapist and psychiatrist in Washington state through the Department of Veterans Affairs, with whom he has been working for over a decade. Counsel has spoken with one of his mental health providers, who indicated he was doing well and stable in Washington state prior to coming to Washington, DC. Mr. Taranto receives active additional assistance from the VA, as well as SSDI benefits as a result of his service-related disability.

     D.     *The Nature and Seriousness of the Danger to Any Person or the Community Posed by Mr. Taranto's Release*

The dangerousness analysis "does not turn on any generalized, backward-looking assessment" of the offender or the crime.  *Munchel*, 991 F.3d at 1286 (Katsas, J., concurring).

"Instead, it turns on a specific, forward looking assessment of whether" the individual "currently pose[s] an unmitigable threat to public safety." *Id.* The government has not and cannot provide specific evidence to support a finding that Mr. Taranto poses an unmitigable threat to public safety.

The Government does not claim Mr. Taranto has ever engaged in assaultive conduct. Moreover, initial fears about explosives in the van or that Mr. Taranto was armed while in Kalorama were untrue. Discovery has confirmed, as Counsel has represented in Court, that the firearms allegedly recovered from Mr. Taranto's van (initially searched without a warrant) were secured in a locked bag. He is charged with an offense that does not permit preventative detention and the proposed conditions address any hypothetical concerns.

Mr. Taranto is not a danger. He is a loving father, son and husband, and he should be released back to his family. Upon return to Washington, he will reengage with his long-term mental health providers for support.

## IV.    Mr. Taranto's Temporary Presence in DC Does Not Suggest He is a Flight Risk.

The government wrongly suggests that Mr. Taranto's presence in DC weighs in favor of detention. Mr. Taranto came to Washington, D.C. to review footage that he hoped would prove his innocence in the civil lawsuit filed by Officer Smith's widow. The allegations that he contributed to an officer's death –which now appear to be belied by the evidence— understandably caused him considerable stress, particularly in light of his own history of military service. Mr. Taranto in no way hid or concealed the fact that he was in DC, despite law enforcement's alleged "frustrated" attempts to locate him. As the Government has conceded, Mr. Taranto posted widely across his social media accounts indicating where he was, which was often *right at the DC jail*. Numerous witnesses have come forward to confirm that Mr. Taranto was known to frequent the January 6th "Freedom Corner" vigil, which is right outside the D.C.

Jail on jail premises over the past month and a half. There was reportedly often a MPD officer overseeing events there.

Additionally, Mr. Taranto recently attended the sentencing hearing of his co-defendant, David Walls-Kaufman, and he even interacted with U.S. Marshals while there. If law enforcement was tracking his whereabouts and concerned about a need to detain him, as they now claim, they could have easily issued a warrant sooner and located Mr. Taranto. Mr. Taranto has at all times made his whereabouts known; yet law enforcement did not perceive a danger sufficient for swift action.

The government also suggests that Mr. Taranto left Washington state impulsively, but as discussed in detail below, Mr. Taranto had a clear and lawful goal in coming to DC: to review the tapes of January 6th that Speaker McCarthy that he had promised to disseminate. Mr. Taranto was well within his constitutional right to engage in interstate travel and come to Washington, DC. Once here, Mr. Taranto did demonstrate stability. As numerous individuals can attest, Mr. Taranto frequented the same areas and had residential continuity while in D.C. He temporarily resided in his van, as he is allowed to do. Upon return to Washington state, he will return to the stability he has long enjoyed, to live in the house he owns and has lived in with his wife of over 15 years.

## V.  Mr. Taranto Did Not Delete or Destroy Evidence as the Government Attempts to Suggest.

The government has repeatedly suggested that Mr. Taranto and/or his family or *someone* affiliated with him has intentionally deleted or destroyed potential evidence from his social media accounts. First, to the extent the privacy settings were changed from public to private on a given account, that is fully within an account holder's rights to do so, particularly given overwhelming media interest in this case. Furthermore, as discussed by a well-followed

livestreamer who has been closely tracking the cases of January 6th, it appears that Mr. Taranto's YouTube channel was shut down by the platform itself, as potentially other accounts of his have as well.[6] Mr. Taranto has been in custody since his arrest and has had no access to any of these accounts since his arrest. Any suggestion that he has tampered with or destroyed evidence is patently false.

**VI.    Mr. Taranto's Purported Statements Constitute Protected Speech and Do Not Constitute Threats, as Evidenced by the Government's Non-Pursuit of Any Threats-Related Charges.**

The government has tried to argue that Mr. Taranto should be treated differently from other misdemeanor defendants due to what amounts to his political speech. Rather than contextualize his content, with an eye towards the very permissive nature of the First Amendment, the government has cherry-picked words and phrases to argue that Mr. Taranto is threatening political actors. This claim is unsubstantiated and untrue, as evidenced by the Government's non-pursuit of any threats-related charges against Mr. Taranto.

First, Mr. Taranto, by no means whatsoever, "breached" an elementary school. Mr. Taranto did attend an authorized film screening hosted by an organization called "Make America Safe Again" at Piney Branch Elementary School in Takoma Park on a weekend. Montgomery County, where Piney Branch is located, allows individuals and groups to use its public facilities. The organization, Make America Safe Again, followed the appropriate steps and submitted a request to screen a film at the school, through the Office of Community Use of Public Facilities.[7]

---

[6] See @JustALazyGamer, "Freedom Corner Used Against Taylor Taranto," YouTube, July 7, 2023, https://www.youtube.com/watch?v=U3ZeCTm8jMw (29:55).

[7] Asbury, Nicole, "Man with guns near Obama home entered a Montgomery school for Jan. 6-related film, Washington Post, July 6, 2023 https://www.washingtonpost.com/education/2023/07/06/montgomery-school-taylor-taranto-jan6/. See also attached Permit attached as Exhibit A.

In fact, according to Christine Oberdorf, the Principal of Piney Branch, the group followed the "established protocols and procedures for community use through that the office."[8] The request was approved, and the organization was permitted to be on the campus of Piney Branch Elementary School. The event took place, and there was no reported criminal activity. Even the Takoma Park Police Department confirmed this, as it issued a news release saying that there were no calls about burglary, trespass, or suspicious situations, and that "there is no active threat against any facility in the City or the community."[9] Moreover, Mr. Taranto did not even organize this event at an elementary school. He was only an attendee, and thus not privy to the specifics of the permission to be on the school's grounds. Mr. Taranto did not breach the school as alleged by the government, nor did he actually threaten Representative Raskin—as evidenced by both his plain words and the Government's non-pursuit of any threats related charges in this case.

Mr. Taranto also did not threaten Speaker McCarthy. Mr. Taranto simply attempted to contact Speaker McCarthy in order to view the January 6th footage which the Speaker suggested were exculpatory, and was encouraged by the Speaker himself.[10] In February of 2023, Speaker McCarthy granted Tucker Carlson, the former primetime Fox News host, access to the security footage from January 6th. U.S. Capitol Police Chief Tom Manger confirmed this—that the Capitol Police released the footage to the Speaker who then gave access to Carlson.[11] Speaker McCarthy, in a phone interview on the matter, said, "I promised…I was asked in the press about

---

[8] *Id.*

[9] *Id.*

[10] Broadwater, Luke & Jonathan Swan, "In Sharing Video with Fox Host, McCarthy Hits Rewind on Jan. 6," *New York Times,* February 22, 2023, https://www.nytimes.com/2023/02/22/us/politics/tucker-carlson-jan-6-mccarthy.html

[11] By Grayer, Annie, Jamie Gangel, Alayna Treene & Hannah Rabinowitz, "McCarthy gives Tucker Carlson access to January 6 Capitol security footage, sources say," February 21, 2023, https://www.cnn.com/2023/02/20/politics/kevin-mccarthy-tucker-carlson-january-6 footage/index.html

these tapes, and I said they do belong to the American public."[12] Mr. McCarthy made public

statements that suggested his belief that the tapes belong to American citizens and should be

publicly released.

Furthermore, according to the *New York Times,* Speaker McCarthy has said that he

intended to make the footage from January 6 even more available than before.[13] For example, in

March of 2023, McCarthy expressed that he would grant other news agencies access to the

tapes.[14] This has not yet happened, and several outlets are even suing for access.[15] Further

demonstrating the lack of accessibility to the January 6 footage, Representative Marjorie Taylor

Greene tweeted in May of 2023:

> "A lot of people are asking me when we are going to release the J6 video tapes…
> Remember when Tucker Carlson released video footage especially about Jacob Chansley
> and everyone found out and couldn't deny the TRUTH that the guy did absolutely
> NOTHING WRONG but walk in the Capital wearing a costume and a crazy bull horned
> hat? And Tucker was also able to show that Brian Sicknick was not killed on J6 by
> protestors like ALL the Democrats and the media told you. Yes well the rest of the
> footage needs to be released to THE PEOPLE because it's hard to lie to people all the
> time when they can go look at it and form their own opinion…We need to release the J6
> tapes to a public on line source so that everyone knows what did and didn't happen, we
> need to restore fair justice, and American can move on."[16]

---

[12] Broadwater, Luke & Jonathan Swan, "In Sharing Video with Fox Host, McCarthy Hits
Rewind on Jan. 6," *New York Times,* February 22, 2023,
https://www.nytimes.com/2023/02/22/us/politics/tucker-carlson-jan-6-mccarthy.html
[13] *Id.*
[14] Pengelly, Martin, "McCarthy: January 6 tapes to be 'slowly' rolled out at networks besides
Fox News," March 12, 2023, https://www.theguardian.com/us-news/2023/mar/12/kevin-
mccarthy-jan-6-footage-tucker-carlson-fox-news
[15] Polantz, Katelyn, "Media organizations sue for Capitol Hill surveillance tapes that McCarthy
gave to Fox News," *CNN News*, April 12, 2023,
https://www.cnn.com/2023/04/12/politics/media-organizations-sue-surveillance-tapes/index.html
[16] Marjorie Taylor Greene (@mtgreenee), *Twitter*, May 7, 2023
https://twitter.com/mtgreenee/status/1655318430935916551?s=20

With public figures, like Representative Greene, calling for the release of footage, Mr. Taranto was merely following up on this perceived right, in hopes that the footage, which he had yet to view himself, would exonerate him for alleged actions associated with Officer Jeffrey Smith.

While the government alleges that Mr. Taranto threatened Speaker McCarthy, his language far from qualifies as an imminent threat or advocacy of violence. See *Brandenburg v. Ohio*, 395 U.S. 444 (1969). Mr. Taranto's speech, if anything, is more properly classified as political hyperbole, in which he has attempted to bring attention to issues pertaining to the events of January 6th and conspiracy theories surrounding the same. See e.g. *Watts v. United States*, 394 U.S. 705 (1969) (Petitioner's remark at small public gathering that, if inducted into Army and "[made] to carry a rifle, the first man I want to get in my sights is L.B.J.," held to be crude political hyperbole which, in light of its context, did not constitute a knowing and willful threat against the President within the coverage of 18 U.S.C. § 871(a)).

The government also alleges that Taranto was trying to trespass on private property when he was apprehended near the reported residence of Former President Obama and Former White House Chief of Staff John Podesta – whose address had been shared publicly on TruthSocial by Former President Trump.[17] Yet, Mr. Taranto was not trying to go on or into private residences, was unarmed, and upon information and belief was at no time on restricted property –as evidenced by the fact that the Government has not brought any charges for trespass related to this event. Instead, Mr. Taranto referenced in a tongue-in-cheek manner the possibility of there being tunnels, a reference to QAnon theories that there are tunnels beneath Washington, DC connected

---

[17] See e.g. https://www.washingtonpost.com/politics/2023/07/06/trump-truth-social-obama/.

to homes of notable politicians involving child trafficking rings.[18] Noticeably, there is no language about bursting down doors and breaking into widows. Mr. Taranto's livestream focuses on the possibility of tunnels existing, *not* on entering the domiciles of Former President Obama and John Podesta.

Additionally, Mr. Taranto's citations to the "First Amendment" or "free speech" also furthers an understanding of Mr. Taranto's intent. The government suggests that Mr. Taranto thought his invocation of the First Amendment "absolved him from any trespass." This is incorrect. Rather, the First Amendment protects Mr. Taranto's discussion and critique of his political subjects, even of the President of the United States. See *Watts v. United States*, 394 U.S. 705 (1969). The First Amendment also allows for Mr. Taranto to livestream and expose subjects in public places. When referencing getting "the shot" or "an angle," Mr. Taranto is simply referring to livestreaming, videotaping, and photography. This is particularly clear when he says, "[j]ust trying to get an angle, for First Amendment, free speech," as quoted in the government's detention memorandum.

Mr. Taranto's language is protected, and there is no tangible threat present. If the government thought there was a credible threat, particularly against former President Obama, then they would have brought charges relating to the same. The government hasn't done so because Mr. Taranto's language is protected First Amendment speech and his actions do not carry criminal liability.

Regarding the livestream video supposedly filmed near the NIST building, it is important to point out that Government Counsel has not actually reviewed the video nor have they been

---

[18] See https://www.motherjones.com/politics/2019/07/why-are-right-wing-conspiracies-so-obsessed-with-pedophilia/; see also https://ellacruz.org/2018/05/10/inside-obamas-kalorama-mansion-secret-tunnels-and-a-war-room/.

able to retrieve it. It is Counsel's understanding from Government Counsel that the video was apparently viewed at the time of its livestream by law enforcement surveilling Mr. Taranto, who supposedly took notes. That agent's notes have in turn been translated into the Government's selective representations about alleged content in that video, which cannot be confirmed. Given the great number of representations by law enforcement in this case that have at this point been contradicted or since proven false, Counsel simply does not believe the Court should credit the Government's selective recounting of the NIST video's purported contents.

Lastly, the government points to Mr. Taranto's usage of social media as evidence that he is engaging in conduct like that surrounding January 6th. As he is permitted and empowered to do so under the First Amendment, Mr. Taranto has shared his thoughts and opinions publicly on an array of topics, some of which is clear hyperbole. Though the government may not recognize or agree with what Mr. Taranto has posted, he is well within his Constitutional rights to critique authority, and investigate and call attention to so-called "conspiracy theories." See e.g., *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964). His actions are protected First Amendment activity, he is not a danger, and he simply should not be detained.

## VII.  This Court Should Follow the First and Third Circuits Analysis and Determine that the Government Cannot Rely Solely Upon Dangerousness for the Court to Grant a Hold under 3142 (f)(2)(a).

The Government continually suggests that upon their motion pursuant to § 3142(f)(2)(A), the Court is immediately required to consider all four (g) factors—and specifically the fourth factor, which analyzes the "nature and seriousness of [a person's] dangerousness"—even though the detention hearing should first require a determination that that the Government has proven by preponderance of the evidence that Mr. Taranto poses a *serious* risk of flight. In so doing, the Government thus suggests that once a detention hearing is held after a government proffer, the

analysis for a dangerousness hold is no different from the analysis for a flight hold. But such an interpretation makes little sense given how explicitly and narrowly the BRA permitted preventive detention based upon dangerousness.

Moreover, the result would be absurd.  The government would then be entitled to a hearing after a proffer for a serious risk of flight; the Court could find that there was no risk of flight at all but still detain the defendant based upon a finding of dangerousness, even though the charged offense did not qualify for a dangerousness hold.

But even if the government successfully convinces the Court that it is correct in all of its legal positions, the Court still cannot detain Mr. Taranto.  The government has not proven that Mr. Taranto actually is a serious risk of flight and the government still fails in demonstrating by clear and convincing evidence that the conditions proposed cannot actually reasonably assure his appearance in court and the safety of the community.  *See United States v. Runsdorf*, No. 22-8015-WM, 2022 WL 303548, at *4 (S.D. Fla. Jan. 24, 2022) ("This threshold inquiry of whether a detention hearing can be held at all is distinct from the separate (and later inquiry whether there are conditions of release that would reasonably assure a defendant's appearance in court and the safety of the community.").

The Government correctly notes that there is no binding precedent applicable to this issue. However, the two circuits that have thoroughly analyzed the issue disagree with the government's interpretation of the BRA.[19] Simply put, the government's interpretation would craft a Trojan Horse exception to the Bail Reform Act that would allow a court to preventatively

---

[19] In addition, in a case that did not squarely involve a request for detention because of flight, the Fifth Circuit found that "a defendant's threat to the safety of other persons or to the community, standing alone, will not justify pre-trial detention. *United States v. Byrd*, 969 F.2d 106, 109-10 (5ᵗʰ Cir. 1992); *see also United States v. Giordano*, 370 F.Supp.2d 1256, 1262-63 (S.D. Fla. 2005) (holding that the "'dangerousness'" prong for pretrial detention under section 3142(e) only applies to cases that arise under section 3142(f)(1).").

detain an individual based upon "dangerousness" with any proffer of a serious risk of flight.[20]
This interpretation is not what the BRA says and is certainly not what the legislature intended in
reforming the federal bail statute.

The Third Circuit's in-depth analysis in *United States v. Himler*, 797 F.2d 156, 160 (3d
Cir. 1986) exposes the flaws in the government's logic. Noting that prior to the BRA, preventive
detention for dangerousness was only available in capital cases, the court held that the BRA does
not "authorize[] pretrial detention upon proof of danger to the community other than from those
offenses which will support a motion for detention." *Id. Himler's* reasoning was three-fold.
First, Congress had the opportunity to authorize pretrial detention in any case where a defendant
has a criminal record but declined to do so.  Second, Congress constructed a "narrowly-drafted
statute with the pretrial detention provision addressed to the danger from a 'small but identifiable
group of particularly dangerous defendants.'" *Id.* (citations omitted).  Third, Congress applied
*Salerno's* long-held principle that "[p]retrial detention may not be considered except under
carefully specified circumstances." *Id.*  "Therefore it is reasonable to interpret the statute as
authorizing detention only upon proof of a likelihood of flight, a threatened obstruction of justice
or a danger of recidivism in one or more of the crimes actually specified by the bail statute." *Id.*

The Third Circuit's interpretation of the BRA is particularly reasonable because it
allows for the Court to consider the danger a person may present to the community but "only in
setting conditions of release," an interpretation consistent with the structure of the BRA.  This

---

[20] For example, consider an individual who once was late to a status hearing because of transportation
issues.  The court there would issue a bench warrant and upon arrival of the individual, have that bench
quashed.  In a subsequent misdemeanor possession of marijuana on federal property case, the government
would be permitted to request a hold under 18 U.S.C. (f)(2) alleging a serious risk of flight.  The
government could then pivot at the detention hearing and allege dangerousness and potentially
preventively detain the individual, even though possession of marijuana is not one of the charges under
the narrow exceptions of (f)(1)(a).

tracks the legislative purpose of the BRA which was to make additional offenses available for pretrial detention and amend the previous bail statute so that if "a judicial officer finds that release on personal recognizance or unsecured appearance bond will not provide the requisite assurances, the judicial officer must impose the least restrictive bail conditions necessary to assure appearance and safety." *Id.* at 159. Thus, whereas under the previous bail statute, "bail and other conditions of release were imposed solely to assure the appearance of the accused in court," the BRA permitted the use of conditions to reasonably assure the safety of the community even where the statute does not authorize detention based upon a finding of dangerousness.

This court is also further guided by the Supreme Court in *Salerno* that found that the BRA "carefully limits the circumstances under which preventive detention may be sought to the most serious crimes." *United States v. Salerno*, 481 U.S. 739 (1987). The First Circuit thus concluded: "[W]here detention is based on dangerousness grounds, it can be ordered only in cases involving one of the circumstances set forth in §3142(f)(1)." *United States v. Ploof,* 851 F.2d 7 (1st Cir. 1988). It added:

> We believe, however, the structure of the statute and its legislative history make it clear that Congress did not intend to authorize preventive detention unless the judicial officer first finds that one of the § 3142(f) conditions for holding a detention hearing exists. To conclude otherwise would be to ignore the statement in the legislative history that the "circumstances for invoking a detention hearing in effect serve to limit the types of cases in which detention may be ordered prior to trial."

*Id.* at 11 (citations and quotations omitted).

The court in *United States v. Gibson* offers a textualist approach in reaching the same conclusion. 384 F. Supp. 3d 955, 964 (N.D. Ind. 2019). In *Gibson*, the Court noted that subsection (f) states that the court should determine both the appearance of the defendant and the safety of the community. But whereas subsection (f)(1) comports with either purpose,

subsection (f)(2)(A) does not:

> [T]here is no rational supporting the application of the safety to the community mandate to (f)(2)(A)'s language. The specific clause 'serious risk of flight' controls over the general inquiry into both risk of flight and danger to the community, especially since the (f)(2)(A) criterion appears merely to restate the historic ground for detention that existed prior to the 1984 enactment of the Bail Reform Act, which did not allow for a consideration of danger to the community.

*Id.* at 963.

*Gibson* notes the inherent attractiveness of the government's interpretation – it is certainly safer for the community, and for a judge, if everyone who shows a modicum of dangerousness is incarcerated. But like this Court, *Gibson* was constricted by constitutional mandates and the text of the Bail Reform Act itself: "[The government's] broad reading of the Bail Reform Act has the potential to apply the Act to a nearly limitless range of cases, thereby raising constitutional concerns under the Due Process Clause of the Fifth Amendment and the Eighth Amendment's ban on excessive bail." *Id.*

*United States v. Chavez-Rivas* also relies upon the text of the BRA combined with the constitutional concerns articulated in *Salerno*. 536 F. Supp. 2d 962, 967 (E.D. Wis. 2008). There, the court noted that the "conclusion that [a court] could detain as a danger a defendant not falling within §3142(f)(1) seem at odds with Congress's language and with the Supreme Court's narrow interpretation of the Act  (citing *Salerno*, 481 U.S. at 747) ("The Bail Reform Act carefully limits the circumstances under which detention may be sought to the most serious of crimes.")).[21]

## VIII.   Detaining Mr. Taranto as a Serious Risk of Flight is Not Only Legally Unsupported, But Also Harmful and Unnecessary.

---

[21] Even if the Court agrees with the government's interpretation of the Bail Reform Act, the government has not demonstrated by clear and convincing evidence that Mr. Taranto poses a danger to the community, with the conditions proposed by the defense.  It is indisputable that the nature of the offense here does not connote the narrow category of serious offenses eligible for detention under the BRA.

At this point, Mr. Taranto has been held at the DC Department of Corrections for a month in extremely concerning conditions. A week into his detention, he was transferred from DC's Central Detention Facility to Central Treatment Facility (CTF) to the so-called "January 6th" block where other individuals awaiting trial in January 6, 2021 cases are held. Mr. Taranto was promptly threatened and reportedly moved into protective custody within the same block. He was released into the pod a few days later, where he was promptly physically attacked by inmates on the pod. Since that time, DC DOC has responded by placing Mr. Taranto in protective custody "for his safety and security." Functionally, this means Mr. Taranto is in solitary confinement, confined to his cell for days at a time without access to a tablet or reliable means of communicating with Counsel or his family. Counsel has requested that the Marshals relocate him either to a non-J6 pod in CTF or to a facility outside of DC DOC such as Alexandria Detention Center, but they have refused.

Numerous courts have analyzed the question of whether solitary confinement violates the Eighth Amendment's protection against cruel and unusual punishment. *See Whitley v. Albers*, 475 U.S. 312, 319 (1986) (holding that "harsh 'conditions of confinement' may constitute cruel and unusual punishment unless such conditions 'are part of the penalty that criminal offenders pay for their offenses against society'"). *See also Rhodes v. Chapman,* 452 U.S. 337, 347 (1981) (stating that there is no static "test" by which courts determine whether conditions of confinement are cruel and unusual, for the Eighth Amendment "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society").

Here, Mr. Taranto has been placed in solitary confinement because he was the *victim* of a physical attack that left him bruised, in pain, and sore. Such actions defy logic, particularly when Mr. Taranto is being held pretrial when he is presumed innocent of the charged offenses.

A.     *Detention can have disastrous consequences on an individual's life.*

Congress was correct to cabin pretrial detention to "extreme and unusual circumstances," because even very short periods of detention have been shown to seriously harm defendants. In addition to the trauma and danger inherent in a jail stay,[22] jails' physical and mental health screenings and treatment offerings are often woefully inadequate.[23] Such harms are exacerbated for individuals like Mr. Taranto who has experienced prior trauma. Research shows that incarceration is far more dangerous and harmful to individuals suffering from documented mental health issues.[24] In Mr. Taranto's case, he is in need of proper care and support which is simply unavailable at the D.C. Jail. Given his history, or lack thereof, for Mr. Taranto, his detention is punitive.

B.     *Many Conditions of Release Have Been Proven to Effectively Manage Ordinary Risk of Flight or Nonappearance.*

Any concerns the Court may have about local nonappearance can be allayed by imposing any number of conditions of release that have been shown empirically to reduce the risk of local nonappearance. For example, a study conducted in New York state courts found that text message reminders were able to reduce failures to appear by up to 26%, translating to 3,700 fewer arrest warrants per year.[25] Holistic pre-trial services focused on providing social services

---

[22] See Allen J. Beck, et al., *Sexual Victimization in Prisons and Jails Reported by Inmates, 2008–09*, Bureau of Justice Statistics (2010), 22–23, archived at https://perma.cc/H33S-QFPK; Margaret Noonan, et al., *Mortality in Local Jails and State Prisons, 2000–14—Statistical Tables*, Bureau of Justice Statistics 8 (2016), archived at https://perma.cc/B9CN-ST3K.

[23] *See* Laura M. Maruschak, et al., *Medical Problems of State and Federal Prisoners and Jail Inmates*, Bureau of Justice Statistics 9, 10 (2015), archived at https://perma.cc/HGT9-7WLL (comparing healthcare in prisons and jails).

[24] See Quant, Karen, "Research Roundup: Incarceration Can Cause Lasting Damage to Mental Health," Prison Policy Institute, May 13, 2021 (available at https://www.prisonpolicy.org/blog/2021/05/13/mentalhealthimpacts/).

[25] *See* Brice Cooke et al, *Text Message Reminders Decreased Failure to Appear in Court in New York City*, Abdul Latif Poverty Action Lab (2017), archived at https://perma.cc/JCW7-JVZW.

and *support* to clients also reduce the risk of non-appearance across all risk levels in state

systems.[26] Beyond the traditional role of Pretrial Services, this could include providing funding

for transportation to court and assisting clients in finding stable housing, employment or

education.[27] Moreover, scholars and courts agree that electronic monitoring is especially

effective at reducing risk of flight.[28]

IX.    **Statistics Showing that It Is Extremely Rare for Defendants on Bond to Flee or Recidivate Demonstrate that Mr. Taranto Does Not Pose A Serious Risk of Flight or Danger to the Community.**

In this case, this Court should be guided by Administrative Office of the Courts statistics

showing that nearly everyone released pending trial appears in court and does not reoffend. In

fact, in 2019, 99% of released federal defendants nationwide appeared for court as required and

98% did not commit new crimes on bond.[29] Significantly, this near-perfect compliance rate is

equally evident in federal districts with very high release rates and those with very low release

---

[26] *See generally* Christopher Lowenkamp and Marie VanNostrand, *Exploring the Impact of Supervision on Pretrial Outcomes*, John and Laura Arnold Foundation, Special Report (2013), archived at https://perma.cc/R3F3-KZ76.

[27] *See generally* John Clark, *The Role of Traditional Pretrial Diversion in the Age of Specialty Treatment Courts: Expanding the Range of Problem-Solving Options at the Pretrial Stage*, Pretrial Justice Institute (2007), archived at https://perma.cc/5C8C-7HJK.

[28] *See, e.g.*, Samuel R. Wiseman, *Pretrial Detention and the Right to the Monitored*, 123 Yale L. J. 1344, 1347–48 (2014) ("Increasingly sophisticated remote monitoring devices have the potential to sharply reduce the need for flight-based pretrial detention . . . . [T]he question of finding other ways of ensuring a non-dangerous defendant's presence at trial is one not of ability, but of will. . . ."); *id.* at 1368– 74 (citing studies in both European and American contexts to demonstrate that electronic monitoring is at least as effective as secured bonds at deterring flight, and that it comes at far reduced cost to both the defendant and the government); *United States v. O'Brien*, 895 F.2d 810, 814–16 (1st Cir 1990) (describing reduction in flight rate from monitoring program and concluding that "evidence concerning the effectiveness of the bracelet alone [] arguably rebuts the presumption of flight").

[29] Ex. 1, AO Table H-15 (Dec. 31, 2019), *available at* Mot. for Bond, *United States v. Rodriguez*, No. 19-CR-77 (E.D. Wis. Apr. 2, 2020), ECF No. 41, Ex. 1, archived at https://perma.cc/LYG4-AX4H (showing a nationwide failure-to-appear rate of 1.2% and a rearrest rate of 1.9%).

rates.[30]  Even in districts that release two-thirds of all federal defendants on bond, fewer than 1%

fail to appear in court and just over 2% are rearrested while released.[31]  The below chart reflects

this data:



Despite the statistically low risk of recidivism that defendants like Mr. Taranto pose, the

government recommends detention in 71% of cases.[32]  Mr. Taranto should be released because

the government has not presented evidence that shows that he would be among the

approximately 2% of defendants who commit another crime while on pretrial release.

---

[30] The districts with the highest and lowest release rates were identified using the version of AO Table H-14A for the 12-month period ending December 31, 2019.  *See* Ex. 2, AO Table H-14A (Dec. 31, 2019), https://perma.cc/32XF-2S42.  The failure-to-appear and rearrest rates for these districts were calculated using Exhibit 1, AO Table H-15.  The districts with the lowest release rates in 2019 were, from lowest to highest, S.D. California, W.D. Arkansas, E.D. Tennessee, S.D. Texas, E.D. Missouri, N.D. Indiana, E.D. Oklahoma, W.D. Texas, W.D. North Carolina, C.D. Illinois; the districts with the highest release rates are, from lowest to highest, E.D. Michigan, E.D. Arkansas, D. New Jersey, E.D. New York, D. Maine, D. Connecticut, W.D. New York, W.D. Washington, D. Guam, D. Northern Mariana Islands.  *See* Ex. 2.
[31] *See* Exs. 1 and 2.
[32] *See* Ex. 3, AO Table H-3 (September 30, 2021), *available at* https://www.uscourts.gov/sites/default/files/data_tables/jb_h3_0930.2021.pdf.

**X.      Mr. Taranto Should Be Released Because There Are Conditions That Will Reasonably Assure Appearance and Safety.**

Mr. Taranto should be released because there are conditions that will reasonably assure the safety of the community and Mr. Taranto's appearance in court. A defendant cannot be detained "unless a finding is made that no release conditions 'will reasonably assure . . . the safety of the community'" and the defendant's appearance in court. *United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1986) (quoting 18 U.S.C. § 3142(e)).  Here, the government has not carried its high burden and Mr. Taranto should not be detained.

Mr. Taranto, an honorably discharged veteran, has no criminal history and is charged with four misdemeanor offenses related to the events on January 6, 2021 as well as two additional possessory firearms-related offenses. The fact that law enforcement waited over two years and a half years, despite surveilling Mr. Taranto throughout that time, as well as the Government's non-filing of any threats related charges, indicates that the Government's concerns over dangerousness are unfounded. For the foregoing reasons, Mr. Taranto respectfully requests that this Court release him.

The following conditions of release under § 3142(c)(1)(B), and any other conditions the Court deems necessary, will reasonably assure Mr. Taranto's appearance in court and the safety of the community:[33]

- Return to Washington state with his wife Erica Taranto;

- Ongoing engagement with mental health service providers;

- Reporting on a "regular basis" to Pretrial Services Agency or some other agency, *id*. § 3142(c)(1)(B)(vi);

- Refrain from "any use of a narcotic drug or other controlled substance . . . without

---

[33] Counsel may supplement this motion with additional information prior to the next hearing.

a prescription," *id*. § 3142(c)(1)(B)(ix).

## XI.     Conclusion

For the foregoing reasons, Mr. Taranto respectfully requests that this Court release him as

noted above with conditions.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
Kathryn D'Adamo Guevara
Assistant Federal Public Defender
625 Indiana Ave., N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500