UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CASE NO. 1:23-cr-229-CJN |
| | : | |
| TAYLOR FRANKLIN TARANTO, | : | |
| | : | |
| Defendant. | : | |

## GOVERNMENT'S RESPONSE TO DEFENDANT'S APPEAL OF DETENTION ORDER

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in opposition to the defendant's appeal of his detention order by U.S. Magistrate Judge Zia M. Faruqui.  July 12, 2023, Minute Entry.  The government requests that the following points and authorities, as well as any other facts, arguments and authorities presented at the detention hearing, be considered in the Court's determination, and incorporates by reference the arguments and information previously provided in its prior filings on this matter including its Memorandum in Support of Pretrial Detention (ECF No. 8), and its Supplemental Memorandum in Support of Pretrial Detention (ECF No. 12).

## PROCEDURAL HISTORY

At the defendant's initial appearance on June 30, 2023, the government orally moved for his detention pending trial pursuant to 18 U.S.C. § 3142(f)(2)(A) (Serious Risk of Flight). The defendant objected to the hearing on that basis. Magistrate Judge Harvey overruled the objection and granted the government's request for a detention hearing. June 30, 2023, Minute Entry.

The parties appeared for detention proceedings on July 5, July 6, and July 12, 2023.  At the July 12, 2023, hearing before Magistrate Judge Faruqui, the Court granted the government's motion for detention.  The main issue before the Court was a legal one – whether detention was available based on danger to the community pursuant to 18 U.S.C. § 3142(e)(1) if the basis for the

1

detention motion was made under 18 U.S.C. § 3142(f)(2)(A) (Serious Risk of Flight).  Magistrate Judge Faruqui ruled that he could detain the defendant on the basis of a safety risk to the community.  In making this finding, Judge Faruqui specifically relied on this Court's holding in *United States v. Curzio*, No. 21-cr-041, as well as Chief Judge Boasberg's ruling in *United States v. Hamlin*, No. 23-CR-00195.[1]

Magistrate Judge Faruqui's decision, both as to the law and the analysis of dangerousness was correct.  The Court should deny the defendant's appeal and affirm Magistrate Judge Faruqui's Order for Detention.[2]

## FACTUAL BACKGROUND

On June 28, 2023, the defendant, Taylor Franklin Taranto, began live streaming on a publicly available YouTube channel.  During the stream, he was in his van, a 2000 black Chevrolet Express G1500, and stated he was in Gaithersburg, Maryland, headed to the National Institute of Standards and Technology ("NIST").  He made several statements indicating that he intended to blow up his vehicle at NIST, including a statement that he had a detonator, that he was on a "one way mission," and that the vehicle was self-driving so he would not have to be anywhere near it when it "went off."[3]

On June 29, 2023, the United States District Court for the District of Columbia issued an arrest warrant based on a complaint charging Taranto with multiple crimes related to his

---

[1] Full transcripts of both decisions are contained within the record as exhibits attached to the government's Supplemental Memorandum, ECF No. 12.

[2] A full transcript of Magistrate Judge Faruqui's decision from July 12, 2023 was requested at an expedited rate, however as of the date of filing it has not been received.

[3] Notably, NIST has a nuclear reactor on its property. *See* https://www.nist.gov/news-events/news/2023/03/nrc-authorizes-restart-nist-research-reactor#:~:text=The%20NIST%20reactor%20is%20used,all%20times%20during%20the%20event nt

participation in the attack on the United States Capitol on January 6, 2021. Later that same day, Taranto again began to livestream. He was again in his van, this time driving in a residential area of Washington D.C. During the video, Taranto stated he was traveling on "Belmont Road" which is in the Kalorama neighborhood.

Eventually Taranto exited from the van and began walking through the neighborhood as he continued to stream. While walking, he made several concerning statements regarding the residences in the area, saying that he was looking for "entrance points," that he had "control" of the block and "had them surrounded" and that he was going to find a way to the "tunnels underneath their houses." He also repeatedly stated that he was trying to get a "shot" and that he wanted to get a "good angle on a shot." The neighborhood where Taranto was located contains a restricted area monitored by the United States Secret Service. While walking, Taranto encountered, and attempted to evade, Secret Service officers who were attempting to monitor and detain him. Taranto was ultimately arrested after a short foot pursuit in a wooded area near Rock Creek Parkway.

Law enforcement located Taranto's van a short distance away. Based on the nature of Taranto's earlier threats, the FBI's bomb squad and Metropolitan Police K9 Officers were deployed to the vehicle. One of the K9's alerted on the van for the presence of gunpowder. A search of the vehicle revealed hundreds of rounds of nine-millimeter ammunition and two firearms inside.

Law enforcement records show that Taranto has 20 firearms registered to him. Two of those firearms, a Smith and Wesson M&P Shield, serial number LFK6710, and a Ceska 9mm CZ Scorpion E3, serial number C193454, were seized from Taranto's van. To date, the remaining 18 guns are at large; law enforcement has neither custody of those guns nor knowledge of their

whereabouts.

On June 30, 2023, agents executed a search warrant for Taranto's vehicle and devices and seized two cellular phones pursuant to a warrant.[4]  Inside the van, law enforcement found numerous items including the firearms mentioned above, hundreds of rounds of nine-millimeter ammunition, a steering wheel lock, and a machete.  They also located indicia that Taranto was living in the van, including a mattress, clothing, and personal items.  Evidence relevant to Taranto's participation in the January 6 breach of the Capitol was also recovered, including a hat identical to the one that USCP surveillance footage captured in a recording of Taranto's entrance into the Capitol building.

## I.      Capitol Siege - January 6, 2021

On January 6, 2021, Taranto attended a rally in Washington D.C. near the Washington Monument shortly before travelling to the Capitol grounds and unlawfully entering the building. At approximately 2:33 p.m., the Upper West Terrace doors were breached by rioters.  By approximately 2:38 p.m., Taranto joined a mob of people streaming into the Capitol.  Video shows that Taranto entered the building wearing a dark jacket and baseball cap and carrying a black cane with a pointed handle.  He moved through various areas of the building and ultimately arrived at the entrance to the Speaker's Lobby around 2:42 p.m.  Around this time, a rioter attempted to jump through a glass window and was shot by a United States Capitol Police Officer.  In the wake of the shooting, multiple members of law enforcement arrived and began moving the crowd,

---

[4] On Friday, June 30, 2023, Magistrate Judge Harvey approved search warrant 23-SW-211 which allowed the government to search Taranto's vehicle and electronic devices. The search of Taranto's electronic devices has continued since the original detention hearings and is still ongoing. The government further continues to review its holdings to determine whether the defendant violated 18 U.S.C. § 1512(c)(2), and will explore charges under 18 U.S.C. § 875(c) for the apparent threatening language issued by the defendant.

including Taranto, toward the exits.  Several members of the crowd were aggressively yelling, pushing, and refusing to follow officers' directions to leave.  Next to the exit, Taranto and multiple other rioters, including a male identified as David Walls-Kaufman (who has been convicted and sentenced for his conduct on January 6, 2021[5]), scuffled with police officers.  Taranto left the building at approximately 2:56 p.m., but remained on the Capitol grounds, moving to the East side of the building where he gathered with other rioters.

After January 6, 2021, Taranto continued to post statements about his involvement at the Capitol that day.  For example, on July 15, 2021, Taranto posted a Facebook video of himself, in the Capitol on January 6, in which he stated, "So we're in the Capitol building….legislative building…we just stormed it."  The video is accompanied by a caption which states, "This is me 'stormin' the capitol' lol I'm only sharing this so someone will report me to the feds and we can get this party rolling!"

On June 17, 2023, a video interview of Taranto was posted online.  The video is titled "Exclusive Taylor Taranto talks about being on scene when Ashli Babbitt got shot."  Taranto was interviewed on camera for approximately two hours.  During the interview, Taranto discussed being inside the Capitol on January 6 and reviewed video footage of himself from that day and narrated what he was doing and what was happening around him in the footage.  The interview host and Taranto spent a considerable amount of time dissecting footage of Ashli Babbitt being shot, and Taranto endorsed a conspiracy theory that Babbitt's death was a hoax and that the first responders and people in the crowd around her were actors.

At various times since January 6, Taranto utilized multiple types of media platforms to post content, much of which, until recently, was open for public viewing and easily accessible. These

---

[5] *See United States v. Walls-Kaufman*, 22-CR-216 (JMC) (D.D.C.).

accounts include(d) Facebook, YouTube, Truth Social, Parler, and Telegram. Taranto used these platforms to express his thoughts on a wide-ranging number of topics, most of which were focused on January 6, a belief that the 2020 election was fraudulent, and an endorsement of theories that "QAnon" followers promote. Through his social media, Taranto explicitly stated that he does not believe the United States Government is legal and does not believe that his home state of Washington has a valid constitution.

## II.      Presence in Washington D.C., Threats, and Weapons - June 2023

According to Taranto's wife, he came to Washington D.C. in about May 2023 in response to Speaker of the House Kevin McCarthy's offer to produce January 6 video.[6] Taranto claimed to be living in his van in videos posted to social media. A search of the van, which is now in the custody of law enforcement, revealed a mattress and toiletries. The government has no evidence that Taranto had a fixed address in the Washington, D.C. area.

After arriving in Washington, D.C., Taranto consistently appeared at so-called Freedom Corner[7], "protested" at various other locations, spoke and gave interviews about his participation on January 6, and consistently live streamed and posted videos espousing numerous conspiracy theories. Below is a summary, but by no means an exhaustive list, of Taranto's most concerning statements and activities with related to specific locations, members of Congress, and other

---

[6] In his appeal, Taranto argues that his home in Washington State provided support and a stable environment which he speculates would reduce the risk that he would flee or endanger the public. Taranto has also previously argued that, while home, he was receiving medical and therapeutic services to treat his mental health. Whatever it may have offered, Taranto chose to leave this environment, remaining with no fixed address in this District and its environs for more than a month with no indication of any effort or plan to return to Washington State. Moreover, the argument that Taranto would not only transform into less of a risk in another location but also honor restrictions to remain there from a distant court whose authority he disputes is a proposal that strains credulity.

[7] "Freedom Corner" refers to a location near the D.C. Jail where supporters of incarcerated January 6 defendants gather.

political figures.

**June 2023 – "Freedom Corner"**

Since coming to Washington D.C., Taranto has been a regular fixture at "Freedom Corner." According to those that routinely gather there, Taranto was banned from the area for his offensive conduct toward other protestors.  It has also been reported that he was displaying erratic and incoherent behavior.[8] Attempts to locate Taranto at Freedom Corner leading up to his arrest on June 29, 2023 were unsuccessful.[9]

**June 18, 2023 – Elementary School and Threats Against Congressman Raskin**

On Sunday, June 18, 2023, Taranto used his YouTube channel to livestream himself and several other people at an elementary school in Takoma Park, Maryland. The video, entitled "Piney Branch Elementary School J6th presentation (NOT for kids!)" which is several hours long, depicted Taranto and his associates walking around the school, entering the gymnasium, and using a projector to display a film related to January 6.

In a livestream, where Taranto answered questions from his internet audience, he stated that he specifically chose the elementary school for its proximity to Congressman Jamie Raskin's home and that he was targeting Raskin because "he's one of the guys that hates January 6 people, or more like Trump supporters, and it's kind of like sending a shockwave through him because I did nothing wrong and he's probably freaking out and saying shit like, 'Well he's stalking me.'"

---

[8] *See* "Man arrested with guns near Obama's house had been acting erratically." Washington Post, June 30, 2023.  https://www.washingtonpost.com/dc-md-va/2023/06/30/obama-house-arrest-taranto-jan6/ (last checked August 1, 2023) (quoting Freedom Corner demonstrators who described Taranto's erratic behavior at that location).

[9] In his appeal, Taranto implies that law enforcement did not look for him at this location, arguing that agents would have found him at Freedom Corner had they searched there.  In addition to being inaccurate, the argument fails to mitigate Taranto's danger to the community or disprove the difficulty of locating him.

Taranto further commented, "I didn't tell anyone where he lives 'cause I want him all to myself," and "That was Piney Branch Elementary School in Maryland…right next to where Rep. Raskin and his wife live."

Taranto argues that he was in the school lawfully at the time he made the statements regarding Representative Raskin.  This is true.  Taranto was with a group which had a county permit to access the building.  However, while inside the building, the group violated the terms of the permit and upon discovering the violations, the county revoked the group's permission to access or reserve county buildings.  Furthermore, the issue is not Taranto's access to the building. It is Taranto's motivation for being in the school at all.  As he states, he chose this elementary school due to its proximity to a sitting Congressman in order to send "shockwaves" through his intended target.

### June 22, 2023 – Payne Elementary

Shortly after the incident at Piney Branch Elementary, Taranto was in his van parked outside of a second elementary school, Payne Elementary, located in Washington D.C. while an evacuation drill was conducted within the school.  As elementary students were brought outside, Taranto filmed the children and stated that they were "being removed from school because there is a violent white supremacist out somewhere."  Taranto's presence at the school, and his filming of other people's children, is concerning, especially when he filmed from a van  known to have stored dangerous weapons and ammunition, and in the larger context of his threats to detonate the van, send "shockwaves" from a different school to a Congressman, and to see other political figures "in hell," as described below.

### June 27, 2023 – Call to House Speaker McCarthy's Office

On June 27, 2023, Taranto's YouTube channel posted a video of Taranto playing an audio

recording on his phone.  In the recording, Taranto, purportedly on the phone with Speaker McCarthy's office, repeatedly asked to be granted access to video footage from January 6, 2021.

**June 28, 2023 – YouTube Threats Against NIST, Speaker McCarthy**

On June 28, 2023, Taranto began livestreaming on his YouTube channel. The stream began by showing Taranto's face, but quickly panned to show that he was sitting in his parked van. Taranto stated that his van was parked in Gaithersburg, Maryland, and indicated that people were working on the vehicle.  During the video, Taranto made various statements that the van was "self-driving."  Notably, Taranto stated that he was "just going one way for this mission, to hell," and though he had a "detonator" he did not "really need one for this."  Taranto stated that the van would only have to go straight and described that he would be able to keep it straight on the road using a steering wheel lock.  He stated that he will not be near it when the van "goes off."[10]

During the video, Taranto also made ominous comments referencing Speaker McCarthy, saying, "Coming at you McCarthy.  Can't stop what's coming.  Nothing can stop what's coming."

Prior to June 28, 2023, law enforcement was searching for Taranto, but his lack of a fixed address frustrated efforts to find him.  Upon seeing his threatening comments, law enforcement escalated efforts to locate Taranto and increased resources to assist in the search.  However, efforts to locate Taranto that day were unsuccessful.

**June 29, 2023 – YouTube and Telegram Threats Against Former President Obama and John Podesta**

On June 29, 2023, Former President Donald Trump posted what he claimed was the address of Former President Barack Obama on the social media platform Truth Social.  Taranto used his own Truth Social account to re-post the address.  On Telegram, Taranto then stated, "We got these

---

[10] Investigators recovered a steering wheel lock during the search of Taranto's van.

losers surrounded! See you in hell, Podesta's and Obama's."

Shortly thereafter, Taranto again began livestreaming from his van on his YouTube channel. This time, Taranto was driving through the Kalorama neighborhood of Washington D.C. The neighborhood contains restricted areas which are protected heavily by the United States Secret Service. Taranto parked his van on the street and began walking around the neighborhood, continuing to film. Taranto made several references to "the Podestas" and stated several times that he was trying to get an interview. Taranto's continued narration made it clear that he intended to access or enter the private residences of his subjects. For example, Taranto panned the camera to show several sewer grates on the street – calling them "entrance points," and stating that the grates were an "entrance" to reach "them." Throughout the video he also stated,

> "So if you go down there, there's obviously tunnels down there. I don't know how close they'll get you in terms of access;"

> "We're gonna find a way to the tunnels, underneath their houses;" and,

> "We're looking for tunnel access so we can get the interview, in case they try to weasel their way out. No in or out now! See, First Amendment, just say First Amendment, free speech. Free, it's free."

Throughout the video, Taranto repeatedly attempted to couch his actions in terms of "First Amendment" or free speech, as if he believed that simply saying the words, "First Amendment" absolved him from any trespass. When initially approached by Secret Service, Taranto stated, "Hello, just trying to get an angle, for First Amendment, free speech. Thanks. That's Secret Service, she's alright." He also said, "See how it works? Just say, 'First Amendment.'"

Taranto made additional concerning statements during the video including the following statements about getting a "shot":

> "Gotta get the shot, stop at nothing to get the shot. This is where other people come to get the shot;"

> "We're gonna see what we can get, as a shot.  If I were them, I'd be
> watching this, watching my every move;" and,

> "This is where everyone goes to get the shot.  It's just me today
> though.  This is an easy way around.  Yeah, they can't stop me from
> walking through here. Just don't step foot on the street."

Regarding getting an "angle," Taranto states several times, "Let's see what angles we can get,"

and, "Just trying to get an angle, for First Amendment, free speech."  Additional concerning

statements included:

> "I don't have any ID, so in case I get detained or something, they're
> just going to have to use their cellphone to figure out who I am."

> "So yeah, more than likely, these guys also all hang for treason.  See
> how I said that? You gotta be very safe and careful.  Someone
> warned me."

> "I control the block, we've got 'em surrounded."

> "Oh, is this intimidating? I don't think so."

Due to the restricted nature of the residential area where Taranto was walking, United

States Secret Service uniformed officers began monitoring Taranto almost immediately as he

began walking around and filming.  After observing Secret Service personnel, Taranto veered off

the street, into a wooded area, and walked toward Rock Creek.  Secret Service personnel followed

Taranto into the wooded area and observed him a short distance away.  Taranto observed the

officers approaching, turned, and fled down a hill toward Rock Creek Parkway.  Additional

officers were able to apprehend him as he exited the woods.  Two firearms, a machete, and

hundreds of rounds of ammunition were located inside his van which was parked nearby.

## ADDITIONAL POTENTIAL CHARGES

During the search of the defendant's van, multiple electronic devices were seized.  The

devices are in the process of being searched and forensically analyzed.  In his motion, the defendant

argues several times that the government has conceded that his words and actions carry no criminal liability. *See, e.g.* ECF No. 19, at 8 ("The Government has since clarified . . . his alleged words and actions do not constitute threats carrying criminal liability.") This is not true. The government has *not yet* brought any additional charges related to threats or statements made by Taranto. As the government has stated multiple times, the investigation is ongoing. It is still continuing. If additional charges are warranted after a thorough review and investigation of the evidence, a superseding indictment will be sought. It is possible that Taranto's threats, words, and actions may yield additional charges, but even if they do not, the Court may nevertheless consider all of Taranto's behavior, whether or not it is captured in the criminal indictment.

## LEGAL AUTHORITY AND ANALYSIS

Upon entry of an order for detention by a magistrate judge, the defendant may request review of the order. "If a person is ordered detained by a magistrate judge . . . the person may file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order. The motion shall be determined promptly." 18 U.S.C. § 3145(b). The District Court should review the magistrate judge's order *de novo*. *United States v. Chrestman*, 525 F.Supp. 3d 14, 24 (D.D.C. 2021). Based on the proffered evidence, and the applicable legal analysis, there is simply no basis to release the defendant under these circumstances.

### I.      The Bail Reform Act

Under the Bail Reform Act, the government may seek detention and the Court must hold a detention hearing only when the charge is for certain enumerated crimes, 18 U.S.C. § 3142(f)(1), or when there is a serious risk that the defendant will flee or obstruct justice. Id. § 3142(f)(2).

When the government makes a motion for detention, the analysis proceeds in two steps. First, the judicial officer must undertake the threshold question of whether a detention hearing is

appropriate.  *See United States v. Singleton*, 182 F.3d 7, 9 (D.C. Cir. 1999); *United States v. Watkins*, 940 F.3d 152, 158 (2d Cir. 2019).  For cases where the government requests detention based on flight, the Court must determine whether the "confluence of circumstances" is sufficient "to establish that [the] case presents a serious risk of flight justifying a detention hearing." *United States v. Sagastume-Galici*a, No. 19-287 (BAH), 2020 WL 2486423, at \*2 (D.D.C. Apr. 22, 2020). "The decision whether to hold a hearing occurs based on even less information than a decision to detain or release: a detention order is based on a hearing, while an order to hold a hearing is based on a proffer of what the hearing might establish." *Singleton*, 182 F.3d at 12.

Once the Court has affirmatively answered the Step One inquiry into whether a detention hearing is warranted, the Court must then hold a hearing and determine whether it can fashion conditions to assure the safety of the community or the defendant's appearance as required.  18 U.S.C. § 3142(f).  Whatever the basis for detention, the Bail Reform Act's plain language does not limit the Court's consideration of the appropriate factors under section 3142(g).  Instead: section 3142(g) directs that judges "shall" consider the "available information concerning:" 1) the nature and circumstances of the offense; (2) the weight of the evidence against the defendant; (3) the defendant's history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g).

Several district court judges, including this Court, have agreed with the two-step analysis. Specifically, in *United States v. Curzio*, 21-cr-041, this Court analyzed this issue in the context of a January 6 case, stating that the plain text of § 3142 does not limit the Court's consideration of dangerousness when the motion for detention is based on 3142(f)(2).

> The plain language of Section 3142(f) pertains only to what triggers the requirement that a detention hearing be held.  It does not dictate what a court must consider during that detention hearing.  Instead those restrictions are provided by Section 3142(g), which tasks the

> Court with determining "whether there are conditions of release that will reasonably assure the appearance of the person as required in the safety of any other person in the community." Section 3142(g) contains no language limiting the consideration of those factors to hearings held only under subsection (f)(1), subsection (f)(2) or vice versa.

ECF No. 12-1 at 26.

Likewise, Chief Judge Boasberg similarly and properly adopted the two-step approach. In

*United States v. Hamlin*, 23-CR-00195, he expressly agreed with this Court's decision in *Curzio*:

> And I will just say alternatively that I don't agree with the Third Circuit's and First Circuit's approach, that I actually find that Judge Nichols's analysis in *Curzio*, C-U-R-Z-I-O, which is No. 21-41, and the Tenth Circuit decision in *Plata*, P-L-A-T-A, *Hernandez*, the 2019 case, and Judge Hogan's decision in *Karni*, K-A-R-N-I, 298 F.Supp.2d 129, all favor using dangerousness in the analysis, and I agree with those cases. And so, therefore, I would consider dangerousness.

ECF No. 12-2 at 20. The Chief Judge's decision in *Hamlin* informed Magistrate Judge Faruqui's

analysis when he correctly ruled that the Court may assess the defendant's dangerousness as a

basis for detention. Accordingly, consistently with its analysis in *Curzio* this Court can and should

analyze all of the factors enumerated in 18 U.S.C. § 3142(g) and affirm Judge Faruqui's decision

to detain the defendant.

## II.     Factual Analysis of § 3142(g) Factors

There are four statutory factors under Section 3142(g) that the Court analyzes in

determining whether to detain the defendant pending trial: (1) the nature and circumstances of the

offense charged; (2) the weight of the evidence against the defendant; (3) his history and

characteristics; and (4) the nature and seriousness of the danger to any person or the community

that would be posed by his release. *See* 18 U.S.C. § 3142(g). A review and understanding of the

facts and circumstances in this case warrant the conclusion that there are no conditions or

combination of conditions that would reasonably assure Taranto's future appearance and assure the safety of the community. *See* 18 U.S.C. § 3142(e)(1).

The government's burden of proof with regard to any claim of risk of flight is only by a preponderance of the evidence, *United States v. Simpkins,* 826 F.2d 94, 96 (D.C. Cir. 1987), while the government must establish by clear and convincing evidence that a defendant is a danger to the community. *United States v. Peralta*, 849 F.2d 625, 626 (D.C. Cir. 1988). A defendant's detention based on dangerousness "accords with due process only insofar as the district court determines that the defendant's history, characteristics, and alleged criminal conduct make clear that he or she poses a concrete, prospective threat to public safety." *United States v. Munchel*, 991 F.3d 1273, 1280 (D.C. Cir. 2021). Here, the defendant is *both* a flight risk and a danger to the community, and under both standards, the government has met its burden for pretrial detention.

## A. Nature and Circumstances of the Offense

At this time, Taranto has been indicted on four misdemeanor offenses related to the attack on the United States Capitol building on January 6, 2021, as well as two felony D.C. Code violations for his possession of firearms and ammunition on June 29, 2023.

With respect to Taranto's behavior on January 6, his alleged conduct occurred in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a mob from breaching the Capitol Building and disrupting the certification of the Electoral College vote. Taranto entered the Capitol building on January 6 carrying a black cane with a pointed handle and he intended for his presence to be part of the attack on January 6. He said as much in the video which he twice posted on social media stating he was 'stormin' the Capitol.' The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *Munchel*, 991 F.3d at 1284. The attack "endangered hundreds of federal officials in the Capitol

complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters."  *United States v. Judd*, 579 F.Supp.3d 1, 8 (D.D.C. 2021).

Moreover, Taranto differs from other misdemeanor defendants charged for participating in the January 6, 2021 attack on the Capitol.  As the charges from June 29, 2023 demonstrate, Taranto has continued to act on the same motivations that caused him to breach the Capitol, behavior which culminated in his arrest, outside of a private residence in D.C. where he had parked a van which contained a machete, two firearms and *hundreds* of rounds of ammunition.

Additionally, nothing requires this Court to assess Taranto's Indictment in a vacuum.  The Court may also consider the defendant's increasingly erratic and unpredictable behavior in the months and weeks leading up to his arrest.  For example, Taranto entered an elementary school where he projected footage of the January 6 attack because of his impression that such conduct would convey "shockwaves" to a member of Congress who resided nearby, doing so because of his belief that the Congressman "hated" Capitol riot participants.  He publicly declared his intention to detonate his van at a federal facility.  He has broadcast threats against the Speaker of the House, declaring that he was "coming at" the Speaker who would not be able to "stop what's coming."  He attempted to breach yet another restricted area where persons protected by the Secret Service reside; Taranto stopped moving towards the restricted area only after detecting the presence of Secret Service personnel.  Unlike many other January 6 defendants, Taranto, acting on the same impulses that drove his actions on January 6, 2021, has continued to pursue the objectives of the riot while making numerous and varied threats, possessing a machete, multiple firearms and loads of ammunition, and leaving his family and a stable residence to act on those impulses.

16

Accordingly, the nature and circumstances of the charged offenses clearly weigh in favor of detention.

### B. Weight of the Evidence

The weight of the evidence is overwhelming.  As to the defendant's behavior on January 6, Taranto took a video of himself inside the Capitol, twice posted it to the internet, and stated he was "stormin' the Capitol."  He appears extensively on both surveillance footage from the building, body worn camera from officers, and opensource videos recorded by rioters present that day.  Independent witnesses familiar with Taranto have likewise identified him in the video footage.  Additionally, Taranto has made numerous statements about his involvement, including an hours-long interview where he discussed his presence inside the Capitol that day, pointed himself out on video at the Speaker's Lobby, and endorsed conspiracy theories regarding the shooting of Ashli Babbitt.  Taranto's *pro se* filings in a civil suit contain further admissions of his presence during the riot at the Capitol on January 6.  The weight of the evidence factor heavily favors detention.

As to Taranto's behavior on June 29, 2023, the evidence is also strong.  Law enforcement was alerted to Taranto's presence in the Kalorama neighborhood as he was driving around in his van live streaming.  Secret Service personnel then observed him walking around and approaching a restricted area in the neighborhood and ultimately attempted to stop him.  After a brief foot pursuit, Taranto was taken into custody, and his van was found nearby.  No other people were found in the van, and officers located indicia that the defendant was living out of the vehicle as well as two firearms, a machete, and hundreds of rounds of ammunition inside.

The weight of the evidence heavily favors detention.

### C.  The Defendant's History and Characteristics

While Taranto does not have a criminal history, his history and characteristics, most particularly his recent behavior, are highly concerning and weigh in favor of detention since they indicate that Taranto is both a high risk of flight and is a danger to the community.

In approximately May 2023, Taranto left his home in the State of Washington, drove his van cross-country to Washington D.C. and since that time appears to have lived out of the vehicle in and around the D.C. metro area.  Taranto is a former member of the military and claims to have a degree in engineering; however, he has stated on his videos that he does not have a job because he does not use Zoom.  Despite strenuous efforts by law enforcement, Taranto was not located until Secret Service personnel encountered him near a restricted area; when they attempted to detain him, Taranto fled.

Taranto has openly stated that he does not acknowledge the legitimacy of the United States Constitution or the Constitution of the State of Washington, despite repeatedly invoking the "First Amendment" and "free speech" to justify his conduct.  Nothing in Taranto's actions or his statements since January 6 have demonstrated in any way that he would recognize this Court's authority or appreciate the circumstances that led to the indictment in the first place.  He appears to have little regard for the law and appears to operate under his own understanding of what the law should be.  There is no indication that, if given rules or directives by a United States District Court, he would comply.

Taranto expresses delusional beliefs which are inconsistent with reality.  Even if he claims he will follow the most stringent rules of pretrial release, there is still a large amount of responsibility that rests on Taranto's shoulders to actually comply when released into the community.  Given the depth of his entrenched beliefs, and his broadcasted threats against political

figures and government property, it is difficult to imagine any circumstance that would result in compliance with release conditions.

Moreover, Taranto has familiarity with and access to weapons, including dozens of additional firearms of unknown whereabouts.  His vehicle contained two firearms and hundreds of rounds of compatible ammunition.  Based on his history of firearm purchases, Taranto has access to multiple additional guns.  This favor also weighs in favor of detention.

### D.  Nature and Seriousness of Danger to the Community

Finally, if released, Taranto poses a serious risk of danger to the community.  He has clearly demonstrated his dangerousness though his increasingly erratic and disturbing words and actions.  Taranto's own words and actions demonstrate that he is a direct threat to multiple political figures as well as the public at large.  The risk that Taranto poses if released is high, and the severity of the consequences that could result are catastrophic.

Moreover, the danger that Taranto presents is not unrelated to the risk that he will flee if released from custody.  After all, he was evasive from law enforcement, and during his repeated broadcasts, law enforcement had initial difficulty in ascertaining his location.  Additionally, the government continues to assess the materials recovered from its searches of Taranto's electronic devices and it is possible that the government will seek additional charges depending on the information located therein.  Whether charged or not, the Taranto's recent conduct provides convincing and obvious grounds for the United States to seek a more severe sentence in the event of his conviction.  Such potential exposure provides additional reason why he may choose to flee and conceal his whereabouts.  The community should not have to confront the risk that he will again make such a choice or confront the consequences of his conduct if he does.

## CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court affirm Magistrate Judge Faruqui's decision and order that the defendant remain detained pending resolution of the case.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:     /s/ *Allison K. Ethen*
Allison K. Ethen
MN Bar No. 0395353
Colin Cloherty
D.C. Bar No. 1048977
Assistant United States Attorneys
601 D Street NW, Fifth Floor
Washington, D.C. 20530
E-mail: Allison.ethen@usdoj.gov
Telephone: (612) 664-5575

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that I caused a copy of this pleading to be served upon defense counsel this 1st day of August 2023.

<u>  /s/Allison K. Ethen</u>
Allison K. Ethen
Assistant United States Attorney