UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CASE NO. 1:23-cr-229-CJN |
| | : | |
| TAYLOR FRANKLIN TARANTO, | : | |
| | : | |
| Defendant. | : | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, submits this response to the defendant's motion to suppress evidence located during a search of the defendant's vehicle. ECF No. 30. The search of the defendant's vehicle was permissible under multiple exceptions to warrant requirement as law enforcement had (1) ample probable cause to search for evidence of contraband and (2) concerns for officer and public safety which created exigent circumstances. Additionally, the use of a trained police dog to conduct a sniff of the vehicle did not violate the defendant's Fourth Amendment rights but rather provided further probable cause for the search. For the reasons discussed herein, the government respectfully requests the Court deny the defendant's motion.

**FACTS**

On June 28, 2023, the defendant, Taylor Franklin Taranto, began live streaming on a publicly available YouTube channel. During the stream, he was in his van, a 2000 black Chevrolet Express G1500, and stated he was in Gaithersburg, Maryland, headed to the National Institute of Standards and Technology ("NIST"). During the video, the defendant stated the vehicle was going on a "one way mission" and they are "just going one way for this mission…to hell." The defendant made additional concerning statements, including that the vehicle, "drives by itself so we don't need to be anywhere near it when it goes off," and that the defendant had "been working on the

1

detonator, but [he didn't] really need one for this."  Based on these statements, law enforcement was concerned that the defendant intended to use his vehicle to blow up NIST.  During this time, multiple agencies were actively searching for the defendant.

On June 29, 2023, the United States District Court for the District of Columbia issued an arrest warrant based on a complaint charging the defendant with multiple crimes related to his participation in the January 6 attack on the United States Capitol.

Later that same day, former President Donald Trump posted what he claimed was the address of former President Barack Obama on the social media platform Truth Social.  The defendant used his own Truth Social account to re-post the address.  On Telegram, the defendant then stated, "We got these losers surrounded! See you in hell, Podesta's and Obama's." Shortly thereafter, the defendant again began livestreaming from his van on his YouTube channel.  This time, the defendant was driving through the Kalorama neighborhood of Washington D.C.  The neighborhood contains restricted areas which are protected heavily by the United States Secret Service.  The defendant parked his van on the street and began walking around the neighborhood, continuing to film.  The defendant made several references to "the Podestas" and stated several times that he was trying to get an interview.  The defendant's continued narration made it clear that he intended to access or enter the private residences of his subjects.  For example, the defendant panned the camera to show several sewer grates on the street – calling them "entrance points," and stating that the grates were an "entrance" to reach "them."  Throughout the video he also stated,

> "So if you go down there, there's obviously tunnels down there.  I don't know how close they'll get you in terms of access;"

> "We're gonna find a way to the tunnels, underneath their houses;" and,

"We're looking for tunnel access so we can get the interview, in case they try to weasel their way out.  No in or out now! See, First Amendment, just say First Amendment, free speech.  Free, it's free."

The defendant made additional concerning statements during the video including the following statements about getting a "shot":

"Gotta get the shot, stop at nothing to get the shot.  This is where other people come to get the shot;"

"We're gonna see what we can get, as a shot.  If I were them, I'd be watching this, watching my every move;" and,

"This is where everyone goes to get the shot.  It's just me today though.  This is an easy way around.  Yeah, they can't stop me from walking through here. Just don't step foot on the street."

Regarding getting an "angle," the defendant stated several times, "Let's see what angles we can get," and, "Just trying to get an angle, for First Amendment, free speech." Additional concerning statements included:

"I don't have any ID, so in case I get detained or something, they're just going to have to use their cellphone to figure out who I am."

"So yeah, more than likely, these guys also all hang for treason.  See how I said that? You gotta be very safe and careful.  Someone warned me."

"I control the block, we've got 'em surrounded"

"Oh, is this intimidating? I don't think so."

Due to the restricted nature of the residential area where the defendant was walking, United States Secret Service uniformed officers began monitoring the defendant almost immediately as soon as he began walking around and filming.  After observing Secret Service personnel, the defendant veered off the street, into a wooded area, and walked toward Rock Creek.  As Secret Service agents approached the defendant, he began fleeing from them; however, the defendant was apprehended and placed under arrest.

3

Following the defendant's arrest, officers quickly located the defendant's van where he had parked it on a public street in Kalorama. Multiple law enforcement agencies were on the scene, including the Federal Bureau of Investigation and the Metropolitan Police Department ("MPD"). Specifically, two MPD K9 handlers responded to the area to assist and to render the vehicle safe.[1] The first handler, Officer William Washington, Jr., working with his K9 partner Harley, was assigned to the Explosive Ordnance Disposal ("EOD") unit. Within that unit, K9 Harley is trained to detect explosives. K9 Harley did not alert on the defendant's vehicle. This sniff was not captured by Officer Washington's Body Worn Camera ("BWC") because in the event there is an explosive device, the use of the BWC could potentially detonate the device.

Shortly thereafter, a second MPD K9 handler, Officer David Boarman, and his K9 partner Trek, arrived. K9 Trek is a firearm detection dog, specifically trained to detect the scent of smokeless powder, also known as gun powder, which is commonly found in firearms ammunition. Smokeless powder can also be used to create improvised explosive devices.[2] Officer Boarman had BWC activated during the sniff. The recording of the sniff itself lasts approximately one minute. In the video, Officer Boarman, holding K9 Trek on a leash, walks K9 Trek counterclockwise around the van, which is parked up alongside a curb. Officer Boarman and K9 Trek circle the van one time, with K9 Trek sniffing along the bottom of the vehicle. On the second circle around, K9 Trek sniffed at the driver's side door, yelped, scratched his paw at the running board, and sat down. K9 Trek then got back up, and continued his circle around the vehicle. When

---

[1] Both dogs are certified and participate in ongoing training to ensure their certifications are up to date. Training logs for both K9s have been provided in discovery.

[2] A notable example of this is the pipe bomb used in the Olympic Park bombing in Atlanta, Georgia, in 1996. *See e.g.* Department of Homeland Security, "IED Attacks Improvised Explosive Devices," https://www.dhs.gov/xlibrary/assets/prep_ied_fact_sheet.pdf (last accessed October 5, 2023).

he reached the rear passenger side door of the van, he again yelped, scratched his paw at the running board, and sat.  He was then rewarded with what appears to be a toy.  K9 Trek did not enter or jump on the vehicle, nor did Officer Boarman instruct him to do so.

After receiving K9 Trek's positive alert, officers with MPD and the FBI's Special Agent Bomb Technicians conducted a safety sweep of the defendant's van for hazardous or dangerous materials.  Inside the vehicle, law enforcement located a locked backpack.  Inside of the backpack were two firearms, firearm accessories, multiple magazines, and a large quantity of ammunition.  In addition, law enforcement observed boxes of what appeared to be household chemicals and nutritional supplements.  A chemist with the FBI explosives unit conducted a hazard check of those items to ensure they were safe to handle.

Once all hazards were cleared from the vehicle and it was deemed safe, it was impounded.  On June 30, 2023, the FBI obtained a warrant to search the vehicle which was signed by Magistrate Judge Harvey.  23-SW-211-GMH.  A search pursuant to the warrant was executed on the vehicle later that day.

## ARGUMENT

### I.     PROBABLE CAUSE TO SEARCH THE VEHICLE EXISTED BEFORE THE DOG SNIFF.

It is well established that "officers may search an automobile without having obtained a warrant so long as they have probable cause to do so."  *United States v. Jenkins*, 984 F.3d 1038, 1041 (D.C. Cir. 2021) (citing *Collins v. Virginia*, 138 S.Ct. 1663, 1670 (2018)).  Probable cause exists when, based on the totality of the circumstances, "there is a fair probability that contraband or evidence of a crime will be found in a particular place."  *Illinois v. Gates*, 462 U.S. 213, 238 (1982).  This test "deals with probabilities.  These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal

technicians, act." *Id*. at 241 (citing *Brinegar v. United States*, 338 U.S. 160, 175 (1949)).

Law enforcement had probable cause to search the defendant's vehicle based on his statements both on June 28 and June 29, before either dog sniff ever took place. On June 28, 2023, the defendant live streamed, while sitting in the subject vehicle, that he had modified said vehicle to blow up a facility in Maryland containing a nuclear reactor. At that time, law enforcement also knew that the defendant had been living in the vehicle, that the defendant had made threatening statements about members of Congress, and that the defendant had a technical background in engineering and was a military veteran. On June 29, the defendant, while clearly driving the same vehicle that the day before he claimed was capable of "going off," filmed himself driving to a residential neighborhood to look for people whom he was targeting and against whom he made threatening statements. He parked the vehicle on the street and was arrested shortly thereafter while trying to evade the Secret Service.

The defendant now attempts to frame his statements during the June 28 livestream as "jokes" and "obviously not serious." ECF No. 30 at 7. This is a wild mischaracterization of the video. The defendant spoke on a livestream for approximately two hours. His car was parked at a gas station in close proximity to the National Institute of Standards and Technology, which the defendant specifically named as his intended target. He stated the car was getting upgraded firmware, that it would be self-driving, that it just had to "go straight" and that he would not be around when it went off. He made explicit mention of a detonator. Reasonably prudent law enforcement officers did not interpret these statements as jokes. The probable cause standard does not require that law enforcement assume a person is just "joking" when they make such statements. When a person makes a statement that he or she intends to detonate something and alludes to having a bomb in a vehicle, that is a statement that law enforcement must take seriously. Based

on the totality of the circumstances, and the fact that the defendant stated his vehicle was capable of detonating and that he in fact planned to detonate it, gave law enforcement probable cause to search the vehicle.

## II.   IF NECESSARY, THE SECOND DOG SNIFF PROVIDED CONCLUSIVE PROBABLE CAUSE TO SEARCH THE VEHICLE.

Even assuming, *arguendo*, that the officers did not have probable cause to search the vehicle prior to dog sniffs (as the defendant contends), K9 Trek's positive alert on the defendant's vehicle provided further probable cause to search. The D.C. Circuit has specifically held that the actions of a trained dog may provide probable cause for a search. *United States v. Maddox*, 398 Fed.Appx. 613 (D.C. Cir. 2010); *United States v. Tartaglia*, 864 F.2d 837, 840, 842 (D.C. Cir. 1989) (probable cause to search train roomette when dog "scratched" at door and whined); *United States v. Fulero*, 498 F.2d 748, 749 (D.C. Cir. 1974) (dog's indication of narcotics established probable cause to search a foot locker). In the present case, officers located the defendant's vehicle parked on a public street. The vehicle, which the defendant the previous day had alleged was capable of self-driving and detonating, was unoccupied. Because of this, members of the Metropolitan Police Department's Bomb Squad responded to clear the scene and make sure it was safe for all involved.[3] Part of the Bomb Squad's assessment of the vehicle involved the use of two K9s Harley and Trek. K9 Harley, a bomb detecting dog, was taken around the vehicle first. K9

---

[3] The defendant argues that K9 Trek's alert for the presence of gunpowder cannot provide probable cause to search because there is no indication that K9 Trek can tell the difference between a firearm that is possessed lawfully versus unlawfully. ECF No. 30 at 9. However, the legality of the firearms that were located are not relevant to the alert. Law enforcement was not looking for illegal guns. They were attempting to determine if there were dangerous items in the vehicle which could explode. Based on the defendant's statements and the positive K9 alert for the presence of gunpowder, law enforcement had ample probable cause to search the vehicle for contraband – i.e. hazardous substances or items that could harm law enforcement or the public.

Harley did not alert for the presence of explosive devices.  K9 Trek, who was trained to detect smokeless powder (which, again, can also be used to create improvised explosive devices, *see supra*), was taken around the vehicle next.  K9 Trek alerted for the presence gun powder.  To clear the car, law enforcement conducted a limited search to determine the source of the positive alert.  They located two firearms, multiple magazines, and hundreds of rounds of ammunition in the vehicle.  Once the vehicle was deemed safe, it was cleared by the Bomb Squad and preserved.  A search warrant was later obtained.

### A.  The Dog Sniff Did Not Constitute A Fourth Amendment Search.

The defendant nonetheless contends (ECF No. 30 at 7-8) that, if the officers lacked probable cause at the time of the dog sniffs, then Trek's dog sniff could not give rise to probable cause because the sniff was itself an unconstitutional search.[4]  To the extent the Court considers those arguments (*but see supra* Part I), it should reject them.  At the threshold, the defendant's argument fails because Trek's sniff was not a search under the Fourth Amendment.  In *Illinois v. Caballes*, the Supreme Court held that a narcotics-detection dog sniff performed on the exterior of a person's car is not a search under the Fourth Amendment.  543 U.S. 405, 409 (2005). The Court reasoned that "[a]ny intrusion" on the defendant's privacy expectations caused by the sniff "[did] not rise to the level of a constitutionally cognizable infringement" because it "'[did] not expose noncontraband items that otherwise would remain hidden from public view.'"  *Id.*; *see also id.* at 410 (reasoning that a narcotics-trained dog's sniff alerting to the exterior of a car "reveals no information other than the location of a substance that no individual has any right to possess").

---

[4] The defendant also takes issue (ECF No. 30 at 5-7) with the constitutionality of Harley's initial sniff.  That contention lacks merit for essentially the same reasons discussed in the text with respect to Trek's sniff.  In any event, because Harley did *not* alert to the vehicle, his sniff does *not* add to the officers' probable cause.  Whether Harley's sniff was somehow unconstitutional (which it was not) is therefore beside the point.

8

The defendant attempts to distinguish *Caballes* on the ground that firearms, unlike narcotics, are not invariably unlawful.  (ECF No. 30 at 5-6).  Whatever its merit in the abstract,[5] that distinction makes no difference in this case, where, in light of the extensive (and troubling) information already available to the officer about the defendant's violent plans, the presence of smokeless powder (let alone firearms) *was* probative of criminal activity.

The defendant also contends (ECF No. 30 at 7-8) that Trek's sniff constituted a Fourth Amendment search because he "repeatedly brush[ed] his nose up against the vehicle" and "put[] his paws on the vehicle."  In the defendant's view, this amounted to a physical trespass and, he claims, a search under *United States v. Jones*, 565 U.S. 400 (2012).  The defendant cites no binding case law which extends the *Jones* decision to reach this conclusion.  In *Jones*, the Supreme Court held that by attaching a GPS tracking device to a defendant's vehicle, law enforcement had conducted a search because (1) the GPS tracking device trespassed upon the defendant's vehicle, and two the trespass was conducted for the purpose of gaining information.  *Id*. at 401.  Neither the Supreme Court nor any D.C. Courts have extended the holding in *Jones* to find that a K9 sniff is a search under the Fourth Amendment.  Rather, the defendant cites to a case, *State v. Dorff*, issued by the Idaho Supreme Court.  526 P.3d 988 (Idaho 2023).  In *Dorff*, the Court expanded a line of Idaho caselaw which found that a K9 sniff violates the Fourth Amendment when the dog makes physical contact with the vehicle.  *Id.* 526 P.3d at 999.

The Court should not adopt the holding in *Dorff* for several reasons.  First, the *Dorff* case law is premised entirely on the fact that the K9 sniff was conducted when there was no probable cause to search the vehicle.  *See State v. Howard*, 496 P.3d 865, 869 (Idaho 2021).  As discussed

---

[5] Notably, the defendant does not cite a single decision by any court adopting, in any context, the special rule he urges for firearm-trained dogs.

above, there was ample probable cause to conduct a full search of the vehicle in this circumstance, and therefore whether either K9 ever touched the vehicle is irrelevant to the Fourth Amendment analysis.  Second, even if the Court believes it does need to consider this issue, the appellate law in this area does not support the defendant's argument.  The Third, Sixth, Seventh, Eighth, and Tenth Circuit Courts of Appeal have considered issues similar to the issue here.  *See United States v. Pierce*, 622 F.3d 209 (3d Cir. 2010), *United States v. Sharp*, 689 F.3d 616 (6th Cir. 2012), *United States v. Guidry*, 817 F.3d 997 (7th Cir. 2016), *United States v. Lyons*, 486 F.3d 367 (8th Cir. 2007), and *United States v. Stone*, 866 F.2d 359 (10th Cir. 1989).  These Courts have found that, absent probable cause to search the vehicle, a law enforcement officer may not direct a K9 inside the vehicle to conduct a sniff.  *See, e.g.*, *United States v. Winningham*, 140 F.3d 1328, 1329 (10th Cir. 1998) (holding an illegal search occurred where the officers opened the door of vehicle and allowed the K9 off his leash to jump into the vehicle and sniff the interior).  However, "absent police misconduct, the instinctive actions of a trained canine do not violate the Fourth Amendment."  *Lyons*, 486 F.3d at 373.  In this circumstance, the K9 sniff did not rise to the level of a Fourth Amendment search.  K9 Trek never entered the van, he was not instructed to jump upon the car, to stick his head into any open windows, or to go inside of the trunk.  At all times, K9 Trek and his handler Officer Boarman remained outside of the vehicle, and properly conducted the sniff which resulted in a positive alert.

**B. In Any Event, the Officers Had Probable Cause to Conduct the Dog Sniffs, and Exigent Circumstances Obviated Any Purported Need To Get A Warrant.**

Even assuming that Trek's sniff constituted a search under the Fourth Amendment, that search was supported by probable cause, and exigent circumstances existed to obviate any need to obtain a warrant.

As to probable cause, as explained above, the information available to the officers at the

time of the dog sniffs alone justified the limited search of the vehicle that the officers ultimately conducted at the scene. *A fortiori*, if one assumes that Trek's sniff of the exterior of the defendant's car was somehow a Fourth Amendment "search," then those same facts available to the officers necessarily established probable cause to conduct that even more limited "search."

Assuming a warrant could somehow be required to conduct a sniff of the exterior of a car,[6] moreover, exigent circumstances obviated any such need in this case. The test for exigent circumstances is whether the police had "an urgent need or an immediate major crisis in the performance of duty affording neither time nor opportunity to apply to a magistrate." *United States v. Johnson*, 802 F.2d 1459, 1461 (D.C. Cir. 1986) (citations omitted). "Exigent circumstances are frequently found when dangerous explosives are involved." *United States v. Duran*, 884 F.Supp. 552, 556 (D.C.C. 1995) (quoting *United States v. Lindsey*, 877 F.2d 777, 781 (9th Cir. 1989)). In *United States v. Duran*, the district court, confronted with analogous facts, found that an exigency to search the defendant's vehicle for explosives was permissible. The defendant in *Duran* fired a gun near the White House. He was tackled by a tourist and quickly subdued by the Secret Service. A short time later, law enforcement located Duran's truck nearby, parked on a public street. The Secret Service Bomb Squad responded and the truck was sniffed by a bomb-sniffing dog. The dog did not alert on the vehicle. The vehicle was to be impounded and searched pursuant to a warrant. Prior to moving the vehicle to the impound lot, a bomb technician did a protective sweep of the truck to render it safe. During the inspection, the bomb technician located a firearm.

The district court in *Duran* found that the search of the vehicle was valid because (1) the

---

[6] To be clear, it would defy to common sense to maintain, as the defendant presumes, that a warrant is required for a dog sniff of the exterior of a car, even as it is well settled that, under the automobile exception, officers may conduct a warrantless search *of the vehicle itself* so long as they have probable cause to believe that the vehicle or the container conceals evidence of criminal activity. *See, e.g.*, *California v. Acevedo*, 500 U.S. 565, 580 (1991).

officers had probable cause to search the vehicle, (2) the vehicle was possibly dangerous and its presence created an exigency, and (3) the follow-up warrant contained ample probable cause to support the subsequent search.  The same is true in the present case.  As discussed above, the officers in this case had probable cause to search the defendant's vehicle under the automobile exception.  Upon apprehending him, officers located the defendant's vehicle parked on a street in an area near the private residences of multiple people that he was targeting (the Podestas and the Obamas).  Based on the defendant's prior statements indicating the vehicle was an explosive device, officers had to render the vehicle safe.  At a minimum, those exigent circumstances obviated the need for a warrant before employing the two K9 officers.  And, after Trek alerted, those same exigent circumstances independently justified—even aside from the automobile exception—the officers' decision to enter the vehicle without warrant to conduct a limited search to discover the source of the positive alert and to ensure the vehicle could be safely transported for impound.[7]

### C. Trek's Qualifications Amply Supported the Existence of Probable Cause Based on the Sniff.

Finally, the defendant suggests that based on the *Florida v. Harris*, 568 U.S. 237 (2013), the Court may only find probable cause on the sniff existed if the government proves the dog is "well-trained, reliable, and was not improperly cued by its handler."  ECF No. 30 at 8.  While the defendant is certainly entitled to challenge a dog sniff based on the dog's training or improper

---

[7] The defendant argues that the officers who conducted the sniff did not have sufficient knowledge of the facts to justify the sniff and therefore could not have relied on exigent circumstances to conduct the sniff.  ECF No. 30 at 6.  However, the officer's assessment of the situation may be based on the "collective knowledge of the police."  *United States v. Hawkins*, 595 F.2d 751, 752 (D.C. Cir. 1978).  A judge of this Court has interpreted this to mean that a police officer is not required to have direct personal knowledge of every fact underlying probable cause, but instead may act on "a directive or request from another officer or agency."  *United States v. Gorham*, 317 F.Supp.3d 459, 470 (D.D.C. 2018).

handler cues, *Harris* explicitly rejects the notion that the government must put forward a rigid set of qualifications to establish probable cause based on a dog's alert.  Rather, "the question, similar to every inquiry into probable cause, is whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime."  *Harris*, 568 U.S. at 248.  Moreover, "evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert."  *Id* at 246.  The government has produced training logs of both K9s Harley and Trek dating back to their certifications.  While K9 Trek's alert is the only one that is relevant to this motion, the government has produced evidence that both dogs were reliable and that a reasonably prudent officer could rely upon K9 Trek's alert.

Additionally, the fact that the defendant could not access the vehicle at the time of the dog sniff is not relevant.  "Even in cases where an automobile is not immediately mobile, the lesser expectation of privacy resulting from its use as a readily mobile vehicle justifie[s] application of the vehicular exception."  *California v. Carney*, 471 U.S. 386, 391 (1985).  *See also*, *Olaniyi v. District of Columbia*, 763 F.Supp.2d 70, 103–04 (D.D.C. 2011) (applying automobile exception when occupants were already in police custody).

### III.   THE WARRANT FOR THE VEHICLE SEARCH IS VALID.

When a search has been conducted pursuant to a valid warrant, the defendant bears the burden of showing the search was unlawful.  *Franks v. Delaware*, 438 U.S.  154, 156 (1978).  In the present case, law enforcement obtained a valid warrant to search the defendant's vehicle.  *See* 23-SW-211- GMH.  The defendant argues that the warrant must be invalidated because it mentions the firearms that were located in the vehicle during the probable cause search the day prior.  ECF No. 30 at 9.  The warrant affidavit, which is 59 pages long, contains a single sentence describing

the fact that firearms were found within the vehicle and includes three photographs of the firearms and ammunition.  The warrant to search the defendant's vehicle was not based solely upon the presence of firearms in the vehicle, but rather a much larger contextual picture including the defendant's behavior beginning in January 6, 2021 and continuing until his arrest on June 29, 2023. The defendant has not met his burden of showing the warrant was unlawful, and as such, the search of the vehicle was further validated by the search warrant in this matter.

**IV.    LAW ENFORCEMENT ACTED IN GOOD FAITH IN EXECUTING THE SEARCH WARRANT.**

Even if this Court were to find the warrant lacked probable cause, suppression by the trial court would not be the appropriate remedy as the officers conducting the search acted in "objectively reasonable reliance" on the warrant's validity. *United States v. Leon*, 468 U.S. 897, 922 (1984). Ordinarily, the existence of a warrant is sufficient to establish that the officers acted in good faith in conducting the search.  *Id*. Suppression in such a case is appropriate only if "the magistrate abandoned his detached and neutral role" in assessing the affidavit, or if "the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause." *Id*. at 926.

There is no evidence here that the affidavit on its face was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.  Magistrate Judge Harvey concluded that the affidavit presented a substantial basis for probable cause.  Law enforcement reasonably relied upon that assessment.  Absent some showing by the defendant to the contrary, there is simply no basis to invalidate the warrant or to suppress evidence obtained by the warrant.

## **CONCLUSION**

For the foregoing reasons, the government respectfully requests that the Court deny the defendant's motion.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:      /s/ Allison K. Ethen
Colin Cloherty
D.C. Bar No. 1048977
Allison K. Ethen
MN Bar No. 0395353
Assistant United States Attorneys
601 D Street NW, Fifth Floor
Washington, D.C. 20530
E-mail: Colin.Cloherty@usdoj.gov
Telephone: (202) 815-8979

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that I caused a copy of this pleading to be served upon defense counsel this 11th day of October 2023.

 /s/ Colin Cloherty
Colin Cloherty
Assistant United States Attorney