UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| | : | |
| v. | : | Cr. No. 23-CR-229 (CJN) |
| | : | |
| **TAYLOR TARANTO,** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

## REPLY IN SUPPORT OF MOTION TO SUPPRESS

The government violated Mr. Taranto's constitutional rights repeatedly when it searched his vehicle. First, the government violated Mr. Taranto's constitutional rights when MPD officers sniff searched Mr. Taranto's vehicle without probable cause. Contrary to the government's assertion, a sniff search by an explosives or firearm-detecting dog is a search under the Fourth Amendment. The officers lacked probable cause to conduct those sniff searches because the government has failed to prove collective knowledge applies. Even if the court determines the collective knowledge doctrine applies, the livestreams they rely upon do not provide probable cause to believe that there was a bomb in the vehicle. And, even if there was probable cause at one point, it was dissipated when the bomb sniffing dog failed to alert to Mr. Taranto's vehicle.

Second, the government violated Mr. Taranto's constitutional rights when two FBI bomb techs searched Mr. Taranto's vehicle based on the alert by the firearm-sniffing dog. That alert did not provide probable cause to search Mr. Taranto's vehicle based on exigent circumstances, because Trek is not certified to detect explosives. At most, Trek's alert provided reason to believe a firearm was in the vehicle, but that does not create exigent circumstances because Mr. Taranto

1

was in custody at the time and was in no position to use a firearm against anyone.

Third, the government violated Mr. Taranto's constitutional rights when it searched his vehicle for a third time, which was issued based in part on the evidence obtained in violation of Mr. Taranto's rights and reckless factual errors.

## FACTS

The government's factual background focuses heavily on two livestreams Mr. Taranto allegedly made the day before and on the day of his arrest. The government repeatedly mischaracterizes them. It also gets a number of the facts surrounding the search of Mr. Taranto's vehicle wrong.

*The first livestream*: The government discusses a livestream Mr. Taranto allegedly made from Gaithersburg, Maryland on June 28, 2023, the day before his arrest. During the video, according to the government Mr. Taranto claimed his vehicle was going on a "one way mission . . . to hell", and that his vehicle "drives by itself so we don't need to be anywhere near it when it goes off." Gov. Opp. at 1. Based on this, the government says it thought Mr. Taranto might use his vehicle to blow up NIST. *Id.* at 2.

The government mischaracterizes the video and gets its facts wrong. Two vehicles are visible in the livestream: Mr. Taranto's black vehicle and then a white vehicle belonging to an acquaintance that has just been towed. Mr. Taranto's statements are not—as the government asserts—about his vehicle. Instead, they are about his acquaintance's vehicle. For example, when Mr. Taranto talks about a vehicle going "on a one-way mission" his camera is pointed at his acquaintance's vehicle. Then, later on, when his acquaintance talks about the white vehicle needing a new transmission, Mr. Taranto says: "it doesn't matter, we don't need it. . . Even if it's

2

just going 20 miles per hour it will make it." And, when talking about "self-driving capabilities," Mr. Taranto says: "I'm going to make [acquaintance's] car drive away without him. That'd be even funnier… He'd be like where the Hell's my truck." The white vehicle is clearly the one that is supposed to be going on the supposed "mission" and is supposedly self-driving.

Mr. Taranto also is clearly not being serious. The white vehicle is ancient and barely runs. It obviously does not have self-driving capabilities. Mr. Taranto talks about using USB cables to upgrade the firmware in the white vehicle. But he is quite visibly using jumper cables to get the car started. Mr. Taranto also makes a number of jokes about sleeping with his acquaintance and extracting sexual favors from him. While they are not funny, they are also plainly not intended to be taken seriously.

Further underscoring that this so-called mission was not real is the fact it never happened. Even though Mr. Taranto's statements put him in Gaithersburg, Maryland on the day of his livestream, based on the government's own investigation, neither he nor his acquaintance went to NIST, much less blew something up.

*The second livestream*: The government also recounts a livestream Mr. Taranto allegedly made on the day of his arrest of him walking around the Kalorama Neighborhood in Washington, DC. In that livestream, Mr. Taranto mentions the Podestas and trying to get an interview. He also talks about "getting the shot" and "getting an angle." The government's recounting of the facts heavily implied that Mr. Taranto is talking about getting a "shot" with a firearm or some other sort of weapon. But getting a "shot" can also be a reference to a photographic or film shot. And context makes clear that Mr. Taranto is referring to the latter.

As the government itself notes, Mr. Taranto is constantly referring to the First Amendment

3

and speech during his walk around Kalorama and then, during the heart of this video, in the woods in Rock Creek Park. Indeed, at one point Mr. Taranto explicitly says he is "[j]ust trying to get an angle for First Amendment free speech." All the while he is filming—i.e., getting "the shot" with his camera.

Mr. Taranto also mentions how the Secret Service had a right to watch him but he has a right to "get the shot." This only makes sense if he's referring to a film or photographic shot, not a gunshot.

Finally, Mr. Taranto also talks about having "got" the shot when he films the back side of a house. There is no sound of gunfire, nor shaking of the camera one might expect if someone had fired a gun. That is, of course, because Mr. Taranto is talking about getting a video shot, nothing else. (Indeed, when Mr. Taranto was arrested no firearms or weapons of any kind were found on his person).

*The sniff searches*: The government admits that, during the sniff search of the exterior of his vehicle by Officer Boarman and the K9 Trek, Trek repeatedly made contact with Mr. Taranto's black vehicle by scratching his paws on the vehicle.[1] The government, however, omits that Trek appears to also make physical contact with the vehicle when sniffing and that Officer Boarman at one point uses Trek's leash to physically make contact with the vehicle when signaling Trek to sniff.

The government also asserts that Trek is trained to detect gunpowder and notes that gunpowder can be used to make bombs. However, the training records provided by the

---

[1] The government gets a few of the details wrong. Based on Counsel's review of the BWC, Trek does not yelp at the drivers side door and he also places his paws on the rear bumper of the vehicle during the course of his sniff search.

government all indicate that Trek is certified to detect two things: firearms and ammunition. Nowhere in the records provided by the government is there any indication that Trek is certified to detect bombs made out of gunpowder or even gunpowder on its own. That is in sharp contrast to the bomb-sniffing dog Harley, who is certified to detect bombs made out of lots of different chemicals including, very notably, gunpowder.

## ARGUMENT

**I.   THE SNIFF SEARCHES VIOLATED MR. TARANTO'S FOURTH AMENDMENT RIGHTS.**

The sniff conducted by Officer Washington and K9 Harley and Officer Boarman and K9 Trek were both searches under the Fourth Amendment. And, because they were not supported by probable cause, they violated Mr. Taranto's Fourth Amendment rights. However, because the sniff search by Harley did not turn up any evidence against Mr. Taranto, they focus on the search by Trek.

**a.   The sniff search conducted by Trek was a Fourth Amendment search.**

Trek's sniff search of Mr. Taranto's vehicle for firearms was a Fourth Amendment search for two reasons. First, Trek is trained to detect firearms, which are legal. So, his sniff is a search. *See, e.g., People v. McKnight*, 446 P.3d 397, 414 (Colo. 2019) (holding that sniff search by canine trained to detect both marijuana which had been legalized and other drugs required probable cause). Second, Trek trespassed onto the exterior of Mr. Taranto's vehicle repeatedly. This separately makes his sniff a search. *See, e.g., State v. Dorff*, 526 P.3d 988, 998 (Idaho 2023).

The government complains that Mr. Taranto does not point to case law holding that sniffs by firearm-sniffing dogs are necessarily searches. But the government points to no case law to the contrary either. In reality, this issue has been litigated only sparingly—which is perhaps

5

unsurprising the Supreme Court only declared that there was a constitutional right to publicly carry firearms last year in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022).

In the few cases where the parties have disputed whether a sniff by a firearm-detecting dog is a search, courts have recognized that this is an open question and not controlled by the drug sniffing case law relied on by the government. *See Commonwealth v. Devoe*, 124 N.E.3d 706 (Mass. App. 2019) (unpublished) (holding that cases about drug sniffing dogs were not controlling but ultimately avoiding the question of whether a sniff by a dog trained in detecting firearms and explosives was a search); *United States v. Centeno-Gonzalez*, 989 F.3d 36, 47 (1st Cir. 2021) (similar). They have ultimately managed to avoid resolving the question. However, as noted in Mr. Taranto's opening brief, state courts have recognized that, following state marijuana legalization, a sniff by a dog trained to detect marijuana and other drugs is a search requiring probable cause because that search can now detect legal items in additional to illegal ones. *McKnight*, 446 P.3d at 400. The DC government has recognized that too.[2] The logic of that case law applies equally here. Just like in certain states where members of the public have a right to possess marijuana, members of the public in every state in the Union have a right to possess firearms. Indeed, if anything the logic applies more forcefully to firearms—which, subject to a few narrow exceptions, are lawful—than drugs—most of which remain illegal even after marijuana legalization. Trek's sniff for firearms was a search under the Fourth Amendment.

The government also argues that, even if a sniff by a firearm sniffing dog is generally a search, it is not here because of "information already available to the officer about the defendant's

---

[2] D.C. Police Complaints Board, Policy Report #21-3: Marijuana Trained Drug Detection Canines. https://policecomplaints.dc.gov/sites/default/files/dc/sites/office%20of%20police%20complaints/publication/attachments/Marijuana%20Detection%20K9%20Policy%20Recommendation.FINAL__0.pdf

violent plans." Gov. Br. 9. But this conflates their argument that the search was supported by probable cause (which, as explained below, it was not) with whether it was a search to begin with.[3] Law enforcement searches all the time for things that are probative of criminal activity. That does not mean that they are not searching.

While the government concedes that Trek made contact with Mr. Taranto's vehicle during his search, it argues that contact did not make his sniff a search. The government recognizes that the Idaho Supreme Court has taken a different position in *State v. Dorff*, 526 P.3d 988 (2023), but counsels against doing so here because it believes the sniff here was supported by probable cause and because, according to the government, some federal circuits have taken a conflicting view. Gov. Br. at 9-10. Again, the question of whether Officer Boarman and Trek had probable cause to conduct a sniff search is different from whether it was a search to begin with.

Furthermore, the circuit case law relied on by the government is not persuasive. As the Idaho Supreme Court explained in a precursor case to *Dorff*, most of these cases were decided before the Supreme Court's "clarification and re-affirmance of the Fourth Amendment's property rights baseline" in *United States v. Jones*, 565 U.S. 400 (2012). *State v. Randall*, 496 P.3d 844, 853 (Idaho 2021). They were also almost all decided before the Supreme Court's confirmation in *Florida. v. Jardines*, 569 U.S. 1 (2013), that *Jones*'s trespassory test applies to sniff searches. *Id.* at 10-11.[4] Furthermore, the assertion in some of these cases that the "instinctive actions of a

---

[3] *Cf. Centeno-Gonzalez*, 989 F.3d at 47-48 (avoiding the question of whether the firearm sniff was a search and instead holding based on the troubling information they had about the defendant (there had been a shooting at UEC and the defendant was known to be involved in criminal activity there) provided probable cause to search); *McKnight*, 446 P.3d at 400 (declaring sniff by dog trained to detect narcotics a search based on marijuana legalization even though dog was trained to detect methamphetamine was well and passenger in the vehicle was someone the officer knew to be a previous user of meth).

[4] In *United States v. Guidry*, 817 F.3d. 997 (7th Cir. 2016)—the one case cited by the government that postdates

trained canine" cannot violate the Fourth Amendment, Gov Br. at 10 (quoting *United States v. Winningham*, 140 F.3d 1328 (10th Cir.1998)), are unpersuasive. There is nothing "instinctive" or "innate about a dog seeking out narcotics [or firearms]." *Randall*, 496 P.3d at 854. Police K9s are supposedly highly trained animals who should obey commands. If they cannot avoid trespassing, they should not be used. The "trespassory test of *Jones* affords dogs sniffs no special treatment." *Id.* (citing *Jardines*). Trek's trespass onto Mr. Taranto's vehicle, thus, separately supports the conclusion that his sniff was a search under the Fourth Amendment.

    **b. Trek's sniff search was not supported by probable cause.**

The government argues that there was probable cause to search Mr. Taranto's vehicle based on a belief that it contained explosives because of his statements on the livestreams, particularly the first one. But those statements are relevant to the probable cause analysis only if Officer Boarman was aware of the statements, or the knowledge of those statements could be imputed to him through the collective knowledge doctrine. The government asserts that the latter is the case, but it does not point to sufficient facts to support that assertion. Furthermore, even assuming collective knowledge applies, those videos do not provide probable cause to believe that Mr. Taranto's vehicle contained explosives.

    **a. Collective knowledge does not apply.**

The collective knowledge doctrine allows the Court to impute the knowledge of one officer to another where that knowledge was communicated between them, or one officer was acting at

---

both *Jones* and *Jardines*—there is no indication that the dog trespassed onto the vehicle before it indicated to the presence of drugs. And, though the court considered the question of whether the dog's trespass *into* the vehicle was a search, it ultimately avoided the question because once the dog alerted there was probable cause to search the vehicle. *Id.* at 1006.

the direction of the other. *United States v. Gorham*, 317 F. Supp. 3d 459, 473 (D.D.C. 2018). The government's own case, *United States v. Gorham*, explains the contours of this doctrine well.

There are two strains of the collective knowledge doctrine. Vertical collective knowledge, which *Gorham* endorsed as consistent with Supreme Court and D.C. Circuit case law, and horizontal collective knowledge, which *Gorham* rejected. Vertical collective knowledge allows a police officer to act on a directive from another officer or agency without full knowledge of the facts that support reasonable suspicion. *See Gorham*, 317 F. Supp. 3d at 470. More specifically, under this doctrine, the court substitutes the knowledge of the officer conducting the search or seizure for the knowledge of the officer who directed him to do so. *See, e.g.*, *Wheeler v. Am. Univ.*, 619 F. Supp. 3d 1, 29 (D.D.C. 2022); *United States v. Massenburg*, 654 F.3d 480, 493 (4th Cir. 2011); *United States v. Rodriguez-Rodriguez*, 550 F.3d 1223, 1227 (10th Cir. 2008).

The government suggests Officer Boarman conducted the canine sniffs at the direction of someone else and so vertical collective knowledge applies. But the government does not pinpoint who the directive came from, nor does it make clear that the person giving the directive had the requisite knowledge of those livestreams. If Officer Boarman received a directive to search from someone who did not know the content of those livestreams, vertical collective knowledge can do no work because there is no knowledge to impute.[5] Thus, absent evidence the government has thus far failed to provide, it has not met its burden to show vertical collective knowledge applies.

Mr. Taranto, instead, believes that the government's argument is premised on horizontal collective knowledge, which *Gorham* expressly rejected. Under horizontal collective knowledge,

---

[5] Vertical collective knowledge might still apply if the person giving the directive was themselves acting on a directive or communication from someone with personal knowledge. But the government has not pointed to that evidence either.

9

there does not need to be communication of the facts underlying probable cause or an express directive to pool the knowledge of the officers. *Gorham*, 317 F. Supp. 3d at 471. As long as the law enforcement officers are working as a "team" and there is some minimal level of communication between them, their knowledge can be aggregated. *Id.* As noted, the government makes no attempt to connect the knowledge of the various officers involved in Mr. Taranto's surveillance/arrest/search through either communication or direction. Therefore, Mr. Taranto is left to believe that the government's argument is premised on the idea that these agencies and individuals were working as a team. However, *Gorham* rightly rejected this theory of collective knowledge.

Therefore, absent proof that the government has thus far has not indicated it plans to provide, the content of these livestreams is irrelevant to the question of whether Officer Boarman had probable cause to believe the vehicle contained an explosive device.

> **b. The livestreams do not provide probable cause to sniff search Mr. Taranto's vehicle.**

Furthermore, even if collective knowledge applies and knowledge of the livestreams can be imputed to Officer Boarman, they do not provide probable cause to conduct a sniff search. The government's argument to the contrary is based on a fundamental misunderstanding of the facts.

*The First Livestream*: The government claims that it had probable cause to search Mr. Taranto's vehicle for explosives because Mr. Taranto claimed his vehicle was going on a "one way mission… to hell", and that his vehicle "drives by itself so we don't need to be anywhere near it when it goes off." *See* Gov. Opp. at 1. This is just wrong.

Mr. Taranto is referring to his acquaintance's vehicle, not his vehicle. As explained above, this is very clear from context. Mr. Taranto talks about the mission repeatedly when his

10

camera is pointed at the other vehicle. He also makes references to how other the vehicle does not need to run well because is on this one-way mission. And he also clearly talks about using the supposed self-driving technology to make that vehicle move, not his own. Furthermore, Mr. Taranto's statements were not serious. He is joking throughout the video, though his jokes are not funny.

In fact, BWC captures the originating case agent from Capitol Police explaining to several members of law enforcement on the scene (though not members of the MPD canine unit) that he had seen the livestream. He does not describe Mr. Taranto's statements as the obvious criminal threats the government makes them out to be. Instead, he describes them only as "vague veiled threats" and "nothing really prosecutable."

Finally, it also bears highlighting that Mr. Taranto's statements were all about a "mission" to the NIST facility in Gaithersburg, Maryland on June 28—not Kalorama, Washington DC on June 29. Mr. Taranto never sent his acquaintance's self-driving car to the NIST facility to blow it up even though, according to his own statements, he was in Gaithersburg, Maryland at the time he made the livestream. This further underscores that there was no bomb or mission, and Mr. Taranto's statements were not serious.

*The Second Livestream:* The second livestream is even less helpful to the government. The livestream has nothing to do with explosives. And, as described above, Mr. Taranto is talking about getting a shot for video, not a shot for a firearm. Indeed, the same originating case agent from Capitol Police who said the initial livestream was not prosecutable said this livestream contained no threats at all.

In sum, these two videos do not provide probable cause to run a sniff search. The

11

statements he made in the first livestream were about a different vehicle and were not serious. And the statements made in the second livestream were not about explosives or other threats. Indeed, they were not threats at all but instead were statements about getting film shots.

### c. Even if there was probable cause to search the vehicle initially, it dissipated when the bomb-sniffing dog Harley did not alert to the vehicle.

When a trained dog does not alert during its sniff search of a vehicle, that can dissipate a suspicion that contraband is present. *See, e.g., Hernandez v. Boles*, 949 F.3d 251, 260 (6th Cir. 2020); *United States v. Davis*, 430 F.3d 345, 356 (6th Cir. 2005). The bomb-sniffing dog Harley was trained to detect explosives, but Harley did not alert to Mr. Taranto's car. Harley's decision not to give a trained alert to the vehicle thus dissipated whatever probable cause there was to believe that Mr. Taranto's car had a bomb in it.

The government relies heavily on the district court decision in *United States v. Duran*, 884 F. Supp. 552 (D.D.C. 1995) to argue the contrary. But that case is unpersuasive.[6] Notably, *Duran* does not provide any reasoning to support its assertion that exigent circumstances are not allayed when a canine sweep for a bomb turns up nothing. *Id.* at 554. It merely says that the MPD had a policy of manually searching a vehicle after running the dog. *Id.*

Police K9s are typically subject to a rigorous training and certification process. That is precisely why their true alerts have been found to support probable cause. But for the same reasons that a dog's alert supports probable cause, their failure to alert must be able to dissipate it.

Thus, whatever probable cause once existed, Harley's failure to alert to Mr. Taranto's vehicle dissipated it. And, accordingly, Officer Boarman lacked probable cause to conduct a sniff

---

[6] *Duran* is also distinguishable. In that case, the defendant had fired guns near the White House on the day of the search. *Id.* at 554. Mr. Taranto did nothing of the sort. *Id.*

search using Trek.  As a result, the firearms found in his vehicle based on the interior warrantless search that followed Trek's positive indication must be suppressed as fruit of the poisonous tree.

## II. THE WARRANTLESS SEARCH OF THE INSIDE OF MR. TARANTO'S VEHICLE ALSO VIOLATED THE FOURTH AMENDMENT.

The government argues that the warrantless search of the inside of Mr. Taranto's vehicle by MPD and FBI SABT agents was constitutional under the automobile exception to the warrant requirement because it was supported by probable cause.  The Court need not answer this question because this interior search was tainted by Trek's earlier illegal sniff search, which multiple MPD records describe as based on probable cause established by a K-9 alert.

But, even assuming it was not tainted, the interior search would still be unconstitutional. For the reasons discussed above, there was not probable cause to search Mr. Taranto's vehicle prior to Trek's indication.  And Trek's indication also did not supply the missing probable cause.

First and foremost, the government has still has not provided sufficient discovery demonstrating that Trek had adequate training to be reliable, alerted in a manner consistent with his training, and was not cued.  Similarly, the Government has not provided evidence that Officer Boarman had sufficient training and experience to make the search reliable.

In any event, as noted, at the time of the interior search, Harley had already sniff searched Mr. Taranto's vehicle and did not alert to any explosives.  The government's motion implies that Trek's sniff search somehow filled a gap in what Harley is trained to detect because Trek is trained to sniff out gunpowder and gunpowder can be used in bombs.  Thus, the argument goes, Trek's alert supports probable cause for the interior search for explosives notwithstanding Harley's failure to alert.  But Harley is, in fact, trained to detect gunpowder-made bombs.  Indeed, his certification records are filled with successful tests for detecting gunpowder.  Trek's training

13

records, by contrast, indicate that he is certified to detect two things: guns and ammunition. There is no suggestion from the records provided by the government that Trek is certified to detect bombs made from gunpowder or even gunpowder on its own.[7] Thus, any suggestion that Trek's indication offers probable cause to search based on a lingering fear that Mr. Taranto's vehicle contained a bomb is unfounded.

Even if Trek's indication did provide reason to believe Mr. Taranto's vehicle contained a gun, guns are legal, and there was no risk at the time of the search that Mr. Taranto might use them against anyone. By that time, he had been arrested and taken from the scene.

The government hints that Mr. Taranto's firearm could be evidence of a crime. But, as explained in Mr. Taranto's opening brief, the government has never suggested Mr. Taranto used a firearm during January 6. Mr. Taranto's statements in the livestreams were not criminal (nor is it clear how a firearm would be evidence of them). And the government has not suggested that Trek is specifically trained to detect illegal firearms or can smell the difference between firearms owned pursuant to a public carry license and arms owned without one.

In sum, there was not probable cause to search the interior of Mr. Taranto's vehicle based on the belief that it contained a bomb or other evidence of a crime.

### III. THE SEARCH OF THE INSIDE OF MR. TARANTO'S VEHICLE PURSUANT TO A WARRANT VIOLATED THE FOURTH AMENDMENT TOO.

Mr. Taranto seeks to suppress not just the firearms, but the other items that were seized from his vehicle following a second search the following day pursuant to a warrant. This warrant

---

[7] The government has suggested it is still looking for additional discovery relied to Harley and Trek, but believes Mr. Taranto's discovery requests are overbroad. The parties are exploring whether these differences can be resolved amicably or require court intervention.

14

was fatally flawed because it was based, in part, on a discussion of the evidence that had been illegally searched and seized the day prior.

Upon further review, Mr. Taranto has also noticed that the warrant contains numerous factual misstatements that, in his view, are at a minimum reckless. For example, the warrant application repeats the same false claim made here that Mr. Taranto's statements about a one-way mission to NIST were about his vehicle. No mention is made of his acquaintance's vehicle, much less that it is the one Mr. Taranto is referring to. Mr. Taranto, thus, urges the Court to hold a *Franks* hearing to determine the viability of the warrant. *See Franks v. Delaware*, 438 U.S. 154 (1978). "[W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request." *United States v. Maynard*, 615 F.3d 544 (D.C. Cir. 2010) (citations omitted). Mr. Taranto asserts that the totality of the errors rise to a level of recklessness that undermines the integrity of the affidavit and thus the warrant.

## CONCLUSION

For the foregoing reasons, the firearms seized during the warrantless search of Mr. Taranto's vehicle should be suppressed, as well as the evidence obtained pursuant to the search warrant that subsequently issued.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____

15

Courtney L. Millian
Assistant Federal Public Defender
Appellate Division
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.   20004
(202) 208-7500


Kathryn D'Adamo Guevara
Assistant Federal Public Defender
Trial Division
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.   20004
(202) 208-7500