UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| | : | |
| v. | : | Cr. No. 23-229 (TJK) |
| | : | |
| **TAYLOR TARANTO,** | : | |
| | : | |
| **Defendant.** | : | |
| | : | |

### SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION TO SUPPRESS

On June 29, 2023, Mr. Taranto was arrested for his alleged illegal entry into the U.S. Capitol on January 6, 2021. He was arrested in the Kalorama neighborhood of Washington DC in a wooded area by Rock Creek Park. After Mr. Taranto was arrested and removed from the area, his vehicle was repeatedly searched.

First, a member of the DC Metropolitan Police Department's canine unit trained to detect explosives conducted a sniff-search of Mr. Taranto's vehicle. That canine did not alert to the presence of explosives.

Second, a member of the canine unit trained to detect firearms and ammunition—K-9 Officer Trek—conducted a sniff-search of the vehicle with his handler Officer Boarman. Notably, Mr. Taranto is never alleged to have had firearms on January 6. In the course of his search, Trek

1

repeatedly touched the vehicle with his nose and paws. Trek twice gave his trained indication for the presence of firearms.

Third, based on Trek's indication, FBI SABT Joshua Rothman and his partner searched Mr. Trek's vehicle and located two firearms. Mr. Taranto was subsequently charged with carrying a pistol without a license pursuant to D.C. Code § 22-4504(a)(1) and possession of a large capacity magazine pursuant to D.C. Code § 7-2506.01(b).

The government argues that these searches were justified based on two livestreams that Mr. Taranto allegedly made on the day before his arrest and the day of his arrest. Mr. Taranto disagrees.

## FACTUAL BACKGROUND

*The first livestream*: On June 28, 2023, Mr. Taranto livestreamed for approximately an hour and half. He riffs repeatedly about all manner of things, most of which do not make sense. During the livestream, Mr. Taranto is clearly bored, riffing on one topic and flowing into the next as he helps to jump his acquaintance Danny Wayne's vehicle after it was towed. He jokes that there is a "data transfer" happening through the jumper cables, despite that it is clear that they are jumping Danny's truck.

As he is assisting his friend to jump his vehicle and waiting for him to pay for the tow, Taranto asks tow truck workers what state he is in. When they state he is in Maryland, he then says they are headed to Gaithersburg and the "NIST," "nanolab, neutron tech," "NIST neutron lab" facility. GX 2 (2:29-2:40). In reality, NIST stands for National Institute of Standards and Technology, not "Nanolab" or "Neutron tech" "NIST neutron tech," or any of the other names Mr. Taranto mutters. Moreover, at the time of the livestream, Mr. Taranto was on the opposite side of the beltway, near the National Harbor, almost 40 miles away from NIST.

2

This stream of consciousness riffing continues throughout the video. For example, Mr. Taranto talks about using USB cables to "upgrade the firmware" in his acquaintance's white jalopy vehicle. GX 2 (0:00-0:17). But he is clearly using jumper cables to get the very old, ramshackle car started. *Id.* He also references having a chip he invented that is useful "for banking in excess of 90 trillion dollars. So that's probably gonna be useful soon, with all the money I've got." *Id.* at 52:32-53:00. Again, this is obviously not real or serious.

Throughout the livestream, Mr. Taranto interacts with and responds to viewers' questions and talks stream-of-consciousness about a number of non-sequitur topics. He tongue-in-cheek states he interviewed at the police academy while vaping weed; talks about going to get burgers; he and Danny having to spend the night in Taylor's vehicle after Danny's car was towed; getting Elon and Mark Zuckerburg on his livestreamed "news" show; and having a "hobo" match at Freedom Corner in which Danny Wayne is his "bookie," among other random topics. Lastly, he gets out of the vehicle after parking it in a middle crossing lane, runs toward a cemetery, and then runs back to the car, stating once he gets back in the car "Mission success! We did it!" Danny Wayne's truck is nowhere to be seen, there is no smoke, no explosions, no nothing.

The government ignores most of this video to focus on a handful of statements Mr. Taranto makes about his acquaintance's vehicle being on a "one-way mission" and having "self-driving capabilities." But, like the other statements in the video, these are obviously jokes (albeit not terribly funny) and not intended to be taken seriously. For example, Mr. Taranto says: "This plan is failproof. . . It's gonna be really hard to stop if its going 20 mph. Or the opposite, I forgot my economic theories." GX 2 (44:10-44:36). That clearly was not a statement that Mr. Taranto expected anyone to take seriously because economic theories have nothing to do with stopping a car if it's going 20mph.

Plus, his acquaintance's car is old and run down, the front grill seems to be held up in part by ropes, and it was just towed by a tow truck. He jokes that the white truck has "Nvidia self driving processing" in apparent reference to a prototype self-driving vehicle that never went to market because of multiple crashes. Clearly neither of them were planning on going on a mission to NIST. And, indeed, they never did.

The government also fixates on Mr. Taranto's mention of "working on a detonator." But, again, context matters. Agent Rothman testified that a detonator is itself an explosive device and a phone cannot be a detonator. Tr. 53:15-23. But, it is clear from context, Mr. Taranto's reference to a detonator is intended to be a reference to some button or function on his phone, which he states he cannot show the livestream audience because it is on his phone and would stop the livestream. GX 2 (42:20-24, 45:01-03). He never suggests he has any explosive devices in his vehicle nor are any ever shown on camera – because there were none.

Notably, law enforcement did not apparently seek out Danny Wayne (in whose vehicle Taylor implies an explosive is in by saying it is self-driving, etc) in an attempt to interview, question, or seek to search his vehicle, not that day and not ever.

*The second livestream*: On June 29, 2023, Mr. Taranto allegedly made another livestream on the day of his arrest walking around the Kalorama Neighborhood in Washington, DC and into the woods near Rock Creek Park. Mr. Taranto mentions the Podestas and trying to get an interview. GX 3 (4:23-4:26, 8:02-8:11). He also makes references to "getting the shot," "where everyone gets the shot" and "getting an angle for First Amendment free speech." *Id.* (5:24-30, 8:50-58, 9:56-10:00, 12:14-24, 12:38-12:40). Mr. Taranto then says he "got" the shot when he films the backside of a house. *Id.* (12:50-54). He can also be seen finding an abandoned backpack. *Id.* (13:57-14:30).

4

*The arrest:*  Shortly after Mr. Taranto's second livestream ends, he is arrested for involvement in January 6 pursuant to a warrant. His phone and car keys are taken from him upon arrest, as is a small electronic device he picked up from an old backpack he found in the woods.

*The sniff searches*: Officers thereafter located Mr. Taranto's vehicle—a large van—parked lawfully at 2404 Kalorama Rd NW about a 10 minute walk from where he was arrested. An MPD officer conducts a sniff-search of the vehicle with a canine trained to detect explosives but he did not alert.  Tr 39:13-17; GX 6 (5:50-5:550).

After that, another MPD officer—Officer Davis Boarman—ran a different canine—Canine Officer Trek—around the vehicle.  Trek is trained to detect firearms, ammunition, and magazines based on the scent of gunpowder. Tr.106:4-11.  Trek walked around the vehicle once without alerting.  Tr.138:10-12.  Officer Boarman then spins around, hitting the vehicle with his leash, and gestures at the van again, asking Trek to search a second time. Tr.139:22-141:1. During this second sniff search, Trek repeatedly made contacts with the vehicle with his snout and paws.  GX6 (12:19-22, 12:28, 12:31-33); DX B-5 (6:05-08).  In particular, he placed a paw outside the driver's side door, then placed both paws on the rear of the van, and then again placed a paw on the rear passenger door.  GX6 (12:19-22, 12:31-33); DX B-5 (6:05-08).  During this second sniff-search, Trek also alerted twice to the presence of firearms by sitting:  once at the front driver's side door of the vehicle and once at the rear passenger door.  Tr. 146:16-23. After Trek's second alert, Officer Boarman gestures at another officer to throw Trek a toy as a reward even though he did not know whether the vehicle contained contraband.

At some point thereafter, based on purported probable cause provided by Trek's indication, SABTs Joshua Rothman and Epley searched Mr. Taranto's vehicle and discovered a

5

locked backpack on the floor behind the driver's seat, surrounded by other items. The FBI cut into that bag and discovered a pistol, rifle, magazines, and ammunition.

## ARGUMENT

1. **Mr. Taranto's rights were violated when Trek searched his vehicle without probable cause and the firearms recovered during the subsequent search of his vehicle must be suppressed as fruit of the poisonous tree.**

    a. **Trek's sniff-search was a search under the Second Amendment.**

"A dog sniff . . . that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment," *Illinois v. Caballes*, 543 U.S. 405, 410 (2005), provided the dog is not trespassing onto a constitutionally protected area. *Florida. v. Jardines*, 569 U.S. 1, 10-11 (2013),

Trek's search, however, was different. First, Trek is trained to detect firearms, magazines, and ammunition. Tr. 122:15-17. Citizens have the constitutional right to possess these items. *See generally New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). Sniff-searches conducted by dogs trained to detect lawful items in addition to lawful ones are Fourth Amendment searches requiring probable cause. *See, e.g., People v. McKnight*, 446 P.3d 397, 414 (Colo. 2019) (holding that sniff search by canine trained to detect both marijuana which had been legalized and other drugs required probable cause). Because Trek is trained to detect lawful items, his sniff-search triggered the Fourth Amendment and required probable cause.[1]

Trek also repeatedly intruded into a constitutionally protected area. Trespasses onto vehicles in order to obtain information are Fourth Amendment searches. *See, e.g., United States v. Jones*, 565 U.S. 400, 408 (2012); *United States v. Duncan*, No. CR 22-76, 2023 WL 2403444,

---

[1] It is important to note the limits inherent in Mr. Taranto's position. Gun sniffing dogs are regularly used in airports, sports arenas, and government buildings where guns are not allowed. Sniff-searches in those contexts likely would not trigger the Fourth Amendment.

at *5 (E.D. La. Mar. 8, 2023).  As a result, when a dog trespasses onto a vehicle during its sniff-search, that is also a search requiring a showing of probable cause. *See, e.g., State v. Dorff*, 526 P.3d 988, 998 (Idaho 2023); *State v. Howard*, 496 P.3d 865, 868 (Idaho 2022).  Trek repeatedly touched Mr. Taranto's vehicle during his search, both with his paws and his nose.  Tr. 144:3-22; 145:2-146:6.  And Officer Boarman admitted that this physical contact was committed by Trek as part of his searching behavior, and it was not part of his trained indication.  Tr. 138:16-25 (explaining that detailing a vehicle requires a dog to put his nose on the sales of a vehicle and potentially touching it); Tr. 119:22-3 (explaining that sitting, not pawing a vehicle or firearm, is Trek's trained indication).  Thus, for this separate reason, Trek's sniff search is only lawful if it was supported by probable cause.

### b.  Officer Boarman lacked probable cause to search Mr. Taranto's vehicle.

Officer Boarman admitted that normally he conducts sniff-searches with Trek before there is probable cause to search a vehicle.  129:24-130:6.  This case is no different.

When Officer Boarman arrived on the scene, he received a short briefing from MPD Sergeant Jackson.  He was told that Mr. Taranto had been hanging around the jail with individuals involved in January 6, had been kicked out of their group and became a counter protestor, livestreamed and bragged about his involvement in January 6, and was "popped" by the FBI for being inside the Capitol.  *See* GX6 (5:15-6:09).  He was also told that Mr. Taranto was "believed to be armed and dangerous," but that another officer had run his dog on the vehicle and it did not alert for the presence of explosives.  *Id.*

This information did not amount to probable cause to search Mr. Taranto's vehicle.  First, the fact Mr. Taranto was involved in January 6 is irrelevant because Mr. Taranto was not armed

on that day. And so, Trek's sniff-search for a firearm could not possibly turn up evidence of criminality related to January 6, 2021.

Mr. Taranto's protests outside the DC jail and disagreements with a group of people supportive of those involved in January 6, too, have nothing to do with firearms. They also are not criminal in any way.

Sergeant Jackson's references to Mr. Taranto's livestreams, too, are innocuous. He mentions no detail about the contents of them, but from context he seems to be referencing livestreams related to Mr. Taranto's protests outside the DC jail and his purported bragging about his conduct on January 6. He certainly does not mention anything about the two videos relied on by the government here, such as NIST, self-driving cars, or Mr. Taranto getting the "angle."

The assertion that Mr. Taranto was armed and dangerous is at least related to the thing Trek is trained to detect: guns and ammunition. But this assertion does not make sense. By the time Officer Boarman arrived on scene, Mr. Taranto had been arrested by the FBI, and had been found not to be in possession of any weapons, detonators, or explosives. Indeed, Officer Boarman knew Mr. Taranto was already arrested before Trek's sniff search. Tr. 136:19-137:6; GX 6 (5:42-46, 9:44-9:49). Furthermore, being armed is not illegal in and of itself, and the government has put forth no evidence to suggest Officer Boarman knew whether Mr. Taranto had a license to carry a firearm.[2]

In sum, the government has failed to meet its burden to show that Officer Boarman had probable cause to conduct a sniff search for firearms and ammunition based on his own knowledge.

---

[2] Furthermore, believing someone to be armed and dangerous is the standard for a Terry frisk, not a car search. A car can be searched without a warrant when there is probable cause to believe it contains evidence of a crime. *United States v. Lawson*, 410 F.3d 735, 740 (D.C. Cir. 2005).

The government claims that collective knowledge applies and so Trek's search can be justified based on the knowledge of other officers. However, the government has failed to meet its burden to show collective knowledge applies—at least as to the information it is trying to use to establish probable cause. Officer Boarman testified that he was advised that Mr. Taranto's vehicle needed to be sniff-searched by a Sergeant Jackson. Tr. 113:19-20. This probably suffices to impute Sergeant Jackson's knowledge to Officer Boarman. *See United States v. Gorham*, 317 F. Supp. 3d 459, 473 (D.D.C. 2018). But there is no evidence in the record about Sergeant Jackson's knowledge—beyond the briefing he gave Officer Boarman. There is no testimony, for example, that Sergeant Jackson saw either of the livestreams relied on by the government or the BOLO mentioning the first livestream. Nor is there testimony that Sergeant Jackson spoke to people who did. Officer Boarman testified that Sergeant Jackson was acting at the direction of "a commander" but he said nothing about who that commander was, what agency he worked for, or what he knew. Thus, to the extent collective knowledge applies, the government has failed to put forth evidence that it applies to the facts they want to rely on. More specifically, they have failed to show that knowledge of the NIST and Kalorama livestreams can be imputed to Officer Boarman.

Thus, the government has failed to prove the sniff-search conducted by Officer Boarman and Trek was supported by probable cause.

### c. The guns subsequently seized from Mr. Taranto's vehicle are excludable as fruit of the poisonous tree.

After Trek alerted, FBI SABT agents and MPD searched the inside of Mr. Taranto's vehicle. They did so based on the probable cause supposedly applied by Trek's alert. Because the subsequent search was a product of Trek's illegal search, the guns that were later found must be suppressed as fruit of the poisonous tree. *See, e.g.*, *United States v. Gamble*, 77 F.4th 1041, 1046 (D.C. Cir. 2023).

2. **Mr. Taranto's rights were violated when the FBI explosives device agents searched his vehicle without probable cause.**

The government argues that the warrantless search of the inside of Mr. Taranto's vehicle by MPD and FBI SABT agents to look for explosives was constitutional under the automobile exception to the warrant requirement because it was supported by probable cause. The Court need not reach this question if it concludes that Trek's search was unlawful and the recovery of Mr. Taranto's firearms were the fruit of it. However, for the sake of completeness, Mr. Taranto explains why, even assuming that Trek's prior search was lawful, there still was not probable cause to search inside his vehicle.

The government points to several things that, together, it believes add up to probable cause: the two livestream videos and Trek's alert to the vehicle. It blatantly misconstrues the videos and Trek's alert was insufficiently reliable to support a finding of probable cause.

*The first livestream*: In its briefing, the government claims that it had probable cause to search Mr. Taranto's vehicle because Mr. Taranto claimed in the first livestream that his vehicle was going on a "one way mission… to hell", and that his vehicle "drives by itself so we don't need to be anywhere near it when it goes off." *See* Gov. Opp. at 1. However, at the hearing, the FBI SABT agent—Joshua Rothman—focused on Mr. Taranto's mention of a detonator and did not address the other statements in the video. For the sake of completeness, Mr. Taranto addresses both.

As noted in Mr. Taranto's briefing, the government misconstrues this video by ignoring the fact that there are two vehicles visible in the livestream: Mr. Taranto's black vehicle and then a white vehicle belonging to acquaintance Danny Wayne that had been recently towed. Mr. Taranto's statements about a "one way mission" and self-driving are not—as the government

10

asserts—about his vehicle. Instead, they are about his acquaintance's vehicle, as the following examples illustrate.

- At minute 11:40 of the livestream, Mr. Taranto identifies the white vehicle as belonging to his acquaintance.

- At minute 12:08, the acquaintance approaches Mr. Taranto stating he wants a new transmission for his truck, to which Mr. Taranto says "it doesn't matter, we don't need it. . . Even if it's just going 20 miles per hour it will make it."

- At minute 20:25, Mr. Taranto again makes it clear that the vehicle he is referring to that will supposedly travel to Gaithersburg is his acquaintance's.  He chastises the acquaintance for having his vehicle in gear while getting jumped by Mr. Taranto. Mr. Taranto says, "[t]ake it out of gear, you idiot. It runs. It's its final mission. Just needed it working, not like well."

- At minute 55:00 of the stream, Mr. Taranto again identifies the white vehicle as the vehicle with "self-driving capabilities," and he jokingly says he's going to "make [his acquaintance's] car drive away without him."

As noted above, these statements clearly are not serious.  His acquaintance's car barely works, its front is dented and seems to be held on by rope, and is never seen anywhere driving on its own.  Also, Mr. Taranto never goes on a mission to NIST, nor does he even know the proper name of the place. Nor does the Government ever seek to find, interview, or search his acquaintance or his vehicle.

As for Mr. Taranto's references to a detonator, they are an obvious reference to his phone and not some sort of explosive device.  According to Agent Rothman, a detonator is a "very specific term in . . [the] bomb tech community" and means "a form of explosives . . . that actually

causes a secondary explosive to detonate." Tr. 53:16-23. He says a phone cannot be a detonator. Tr. 53:15. But Mr. Taranto is clearly not using the term "detonator" in the technical manner that the "bomb tech community" does. Mr. Taranto's first mention of a detonator is at 42:15 of the video. He says "I can't pull it up. I'd stop the feed. The feed would stop immediately if I push that button." GX 2 (42:20-24). That's a clear reference to the supposed "detonator" being a "button" on Mr. Taranto's phone and that he would have to exit the livestream in order to pull up. A few minutes later he confirms this by saying "I have the button on my phone." *Id.* (45:01-03). Notably, by the time the officers arrested Mr. Taranto, they had his phone in their custody, so it could not have been in Mr. Taranto's van.

*The second livestream:* Mr. Taranto's second livestream from the woods in Kalorama does not provide probable cause to believe there are explosive devices in his car either.[3] Mr. Taranto mentions nothing about explosives in this video. And while the government tries to shade his references to getting the shot and getting an angle, those are clear references to getting shots and angles for his livestream video, not something related to firearms or weapons. He repeatedly references free speech in a nod to his livestream and characterizations of it as a news program.

*The dog searches*: When well-trained dog alerts to the presence of illegal contraband, that can provide probable cause to search. The reverse is also true. When a dog does not alert during its sniff search of a vehicle, that can help to dissipate a suspicion that contraband is

---

[3] Mr. Taranto also contests whether knowledge of this video can be imputed to Agent Rothman under the collective knowledge doctrine. Agent Rothman clearly communicated with officers at some point who had seen the video about its contents. But the government has failed to meet its burden to show he did so *before* he conducted the search.

present. *See, e.g., Hernandez v. Boles*, 949 F.3d 251, 260 (6th Cir. 2020); *United States v. Davis*, 430 F.3d 345, 356 (6th Cir. 2005).

Here, the bomb-sniffing dog that was run on Mr. Taranto's vehicle did not alert to the vehicle. This undermines any inference that it contained explosives.

Trek's alert cannot supply any missing suspicion. First and foremost, Trek's alert is not reliable. Officer Boarman testifies that he rewards Trek when he alerts in the field and does not reward him when he does not alert. Tr. 148:1-14. Indeed, he even testified that he gives Trek rewards when *before* he knows if the place Trek has searched contains firearms, ammunition or magazines. Tr. 148:14-23. By doing this, Officer Boarman is risking training Trek to alert even in the absence of firearms.

In addition, Officer Boarman effectively admitted that he might have cued Trek to alert here. Cueing can be done by "circling back by previously searched locations, changing pace, staring at a place where an item may be hidden, tapping services repeatedly, making various hand movements" and so on. *See* Ensminger, John J., & L.E. Papet, Cueing and Probable Cause (2011), http://www.animallaw.info/articles/arusensminger_papet2011.htm. Officer Boarman himself agreed that you can cue a dog by things like hand gestures from a handler, voice commands, and telling a dog to search something again. Tr. 141:19-142:4, 143:5-8. Here, Officer Boarman had Trek search Mr. Taranto's vehicle twice. On the first pass, Trek did not alert to anything. Tr. 138:10-12. Only after Trek searched the second time, and particularly after Officer Boarman spun around, hit the vehicle with Trek's leash, and specifically pointed at him to search the vehicle did Trek alert. Tr. 139:22-141:3. It's also worth noting that Trek alerted to the front driver's side door and the rear passenger door, Tr. 146:16-23, but the firearms found in Mr. Taranto's vehicle

13

were actually found by neither location: instead, they were found by the rear driver's side door. Tr. 74:14-17.

Furthermore, even if Trek's alert was reliable, it cannot support a finding of probable cause here. Trek is trained to detect firearms, magazines, and ammunition, not explosives. The government focuses extensively on the fact that Trek is trained to detect those things based on the smell of gunpowder and that explosives can, occasionally, be made out of gun powder. But there is no evidence that Trek was ever certified to detect explosives made out of gunpowder or even gunpowder on its own. By contrast, bombs sniffing dogs are trained to detect bombs made out of all kinds of substances, including gunpowder.

Plus, even if Trek was trained to alert to explosives made out of gunpowder, it is important to remember that he is undisputedly trained to alert to firearms, magazines, and ammunition too. So, his alert contributes very little, if anything, to the suspicion that his vehicle contained explosives, as opposed to guns.[4]

In sum, there was not probable cause to believe that Mr. Taranto's vehicle contained evidence of explosives or detonators. The livestream videos—when viewed in context—do not establish that Agent Rothman had probable cause to believe his vehicle contained any sort of explosive device. The first livestream's reference to a supposed detonator was not serious. And, in any event, it was clearly a reference to the phone Mr. Taranto was livestreaming with—which had already been seized by that point and so could not have been in Mr. Taranto's van. The second livestream does not reference explosive devices at all. Trek's alert was unreliable and, even if it was reliable, at best, it contributed very little to the suspicion that any explosive device was in the

---

[4] Agent Rothman testified that, as a bomb technician, he is concerned with bobby traps when searching a vehicle too. However, the government has never suggested they had probable cause to believe Mr. Taranto's vehicle contained bobby traps.

vehicle. Instead, Trek's alert (assuming it was reliable, which it was not) contributes suspicion that a firearm or ammunition was in Mr. Taranto's vehicle. But firearms are legal to possess, and so do not give probable cause to search Mr. Taranto's vehicle. The firearms, magazines, and ammunition seized by Agent Rothman must be suppressed.

## CONCLUSION

For the foregoing reasons, and for any other reasons set forth at the hearing on this motion and in Mr. Taranto's prior pleadings, and that this Court may deem just and proper, Mr. Taranto respectfully requests that the Court grant this motion and suppress the use of all physical evidence seized by law enforcement agents from his vehicle.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER


_____/s/_____
Courtney L. Millian
Assistant Federal Public Defender
Appellate Division
625 Indiana Avenue, N.W., Suite 550
Washington, D.C. 20004
(202) 208-7500


Kathryn D'Adamo Guevara
Assistant Federal Public Defender
Trial Division
625 Indiana Avenue, N.W., Suite 550
Washington, D.C. 20004
(202) 208-7500