**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **United States of America,** | |
| **v.** | **Case No. 23-cr-229 (CJN)** |
| **Taylor Taranto,** | |
| **Defendant.** | |

**Motion to Dismiss Count Four of Superseding Indictment**

# TABLE OF CONTENTS

I.  **Introduction**................................................................................................................... 3

II. **Discussion**..................................................................................................................... 7

   A. *Bruen* changed the standard for evaluating firearm regulations under the Second Amendment.............................................................................................................. 7

   B. The Second Amendment protects Mr. Taranto's alleged conduct.......................... 8

   C. The District's ten-round-limit law violates the Second Amendment because there is no analogous historical tradition of firearm regulation in the founding era........................................................................................................... 10

      1. *Bruen* created a new analytical framework for evaluating history................. 11

      2. The Supreme Court has already identified the relevant historical analogue: arms that are in "common use"—like magazines holding more than 10 rounds—cannot be prohibited....................................... 15

      3. Magazines with over ten rounds enjoy a historical pedigree......................... 19

   D. The *Hanson* decision suffers from several fundamental defects............................... 24

III. **Conclusion**................................................................................................................... 30

## I.    Introduction

Mr. Taranto is an honorably discharged veteran of the U.S. Navy with no criminal history.  He is charged in Count Four of the Superseding Indictment with possessing a magazine capable of holding more than ten rounds of ammunition, in violation of D.C. Code § 7-2505.01(b) (hereinafter, "ten-round-limit law").  *See* Superseding Indictment, ECF No. 45.  This law prohibits everyone within the District of Columbia from possessing "any large capacity ammunition feeding device," which includes any magazine that has the capacity to store "more than 10 rounds of ammunition."  *See* D.C. Code § 7-2505.01(b).  Violations of this law are a felony offense, subject to potentially three-years' imprisonment and a $12,500 fine.  *See* D.C. Code § 7-2507.06(a)(4); 22-3571.01(b)(6).

This charge against Mr. Taranto must be dismissed because D.C.'s ten-round-limit law has been rendered unconstitutional by *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022).[1]  In *Bruen*, the Supreme Court upended the framework for evaluating the constitutionality of firearm regulations.  Now, if "the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct."  *Id*. at 2129-30.  To rebut the presumption, the government must show that a challenged law "is consistent with the Nation's historical traditions of firearm regulation."  *Id*.  The government's prosecution of

---

[1] This issue is presently before the D.C. Circuit in *Hanson v. District of Columbia*, No. 23-7061.

Mr. Taranto under D.C.'s ten-round-limit law is unconstitutional for the following reasons:

*First*, the Second Amendment's plain text—"the right of the people to keep and bear Arms, shall not be infringed"—covers Mr. Taranto's alleged conduct of possessing a firearm magazine. *See* U.S. Const. amend. II. Possession of firearms obviously falls within the scope of "keeping and bearing arms." And given that "magazines feed ammunition into certain guns, and ammunition is necessary for such a gun to function as intended, magazines are 'arms' within the meaning of the Second Amendment." *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. A.G. New Jersey*, 910 F.3d 106, 116 (3d Cir. 2018); *see also United States v. Miller*, 307 U.S. 174, 180 (1939) (citing 17th century commentary on gun use America that "[t]he possession of arms also implied the possession of ammunition"); *Duncan v. Becerra*, 970 F.3d 1133, 1146 (9th Cir. 2020) ("Magazines enjoy Second Amendment protection for a simple reason: Without a magazine, many weapons would be useless, including 'quintessential' self-defense weapons like the handgun"); *Kolbe v. Hogan*, 813 F.3d 160, 175 (4th Cir. 2016) (similar); *State v. Gator's Custom Guns, Inc.*, 2024 Wash. Super. LEXIS 912, *11 (Wash. Super. Ct. Apr. 8, 2024) ("No one is going to butter a sandwich or dice carrots with a magazine of any size. Magazines are only useful as weapons.").

*Second*, the government cannot carry its burden to show that D.C.'s ten-round-limit law "is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. The Supreme Court has already looked to the

Nation's history and traditions and discerned the governing principle: legislatures may only prohibit "dangerous *and* unusual weapons," defined as "highly unusual in society." *Bruen*, 597 U.S. at 47 (citation omitted); *see also Heller*, 554 U.S. at 624-625. In other words, arms that are "in common use" may not be banned; arms that are "dangerous and unusual" may be banned.  *See Heller*, 554 U.S. at 625 (excluding from protection only "those weapons not typically possessed by law-abiding citizens for lawful purposes.").  This "is a conjunctive test: A weapon may not be banned unless it is *both* dangerous *and* unusual." *Caetano*, 577 U.S. at 417 (Alito and Thomas, concurring); *see also Gator's Custom Guns, Inc.*, 2024 Wash. Super. LEXIS 912 at *26 (same).

This governing historical principle makes this an easy case.  "Virtually every federal court to have addressed this question"—including the D.C. Circuit—"has concluded that 'magazines having a capacity to accept more than ten rounds are in common use.'"  *Kolbe v. Hogan*, 813 F.3d 160, 174 (4th Cir. 2016) (quoting *Fyok v. City of Sunnyvale*, 25 F. Supp. 3d 1267, 1275 (N.D. Cal. 2014)); *Heller v. D.C.*, 670 F.3d 1244 (D.C. Cir. 2011) ("magazines holding more than ten rounds are indeed in 'common use.'").

Some courts have found millions of Americans own roughly 542 million of these magazines, *Duncan v. Bonta*, --F. Supp. 3d--, 2023 WL 6180472, at *4 (S.D. Cal. Sept. 22, 2023), accounting for "approximately half of all privately owned magazines in the United States," *Duncan v. Bonta*, 19 F.4th 1087, 1097 (9th Cir. 2021) (en banc). Even accepting the most conservative estimates, those numbers dwarf the 200,000

stun guns that the Supreme Court found sufficient to meet the "common use test." *Caetano*, 577 U.S. at 420 (Alito and Thomas, concurring); *see also N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015) ("Even accepting the most conservative estimates cited by the parties and by amici, the . . . large-capacity magazines at issue are 'in common use' as that term was used in *Heller*").

The descriptor "large-capacity magazines" is a misnomer. "Most pistols are manufactured with magazines holding ten to seventeen rounds, and many popular rifles are manufactured with magazines holding twenty or thirty rounds"—*i.e.*, magazines holding more than 10 rounds are standard. *See Duncan*, 2023 WL 6180472, at *2 (S.D. Cal. Sept. 22, 2023). Of the top-selling semi-automatic pistols in 2022— *i.e.*, the Sig Sauer P320, Sig Sauer P365, Smith & Wesson, M&P 9, and Glock 19—*all but one* are sold with magazines that hold between 12 and 18 rounds.[2] As the D.C. Circuit has already found, "[t]here may well be some capacity above which magazines are not in common use but . . . that capacity surely is not ten." *Heller II*, 670 F.3d at 1261.

Under Supreme Court precedent, demonstrating that the weapons are in "common use" is "all that is needed for citizens to have a right under the Second Amendment to keep [such magazines]." *Friedman v. City of Highlight Park*, 136 S. Ct. 447, 449 (2015) (Thomas and Alito, dissenting from denial of certiorari). Given that magazines holding more than 10 rounds are unquestionably in "common use,"

---

[2] *See* David Maccar, *Best Selling Guns of 2022 on Gunbroker: Numbers are In!* (Feb. 22, 2023), https://freerangeamerican.us/best-selling-guns.

the government's prosecution of Mr. Taranto in Count Four cannot survive *Bruen*— *i.e.*, it is unconstitutional.  *See, e.g., Duncan*, 2023 WL 6180472, at *2 (S.D. Cal. Sept. 22, 2023) (finding California's analogous ten-round-limit law unconstitutional).

**Third**, pre-*Bruen* D.C. Circuit precedent rejecting challenges to D.C.'s ten-round-limit law are no longer controlling or persuasive.  *See Heller v. D.C.*, 670 F.3d 1244 (D.C. Cir. 2011) ("*Heller II*").  In *Heller II*, the D.C. Circuit found that the District's ten-round-limit law survived a constitutional challenge, but its reasoning was premised entirely on an intermediate scrutiny, means-end analysis.  *See id.* at 1261 ("[E]ven assuming [D.C.'s ten-round-limit-law] impinge[s] upon the right protected by the Second Amendment, we think intermediate scrutiny is the appropriate standard of review and the prohibitions survive that standard.").  *Bruen* leaves no room for doubt: text and history, *not* an intermediate-scrutiny analysis, define the Second Amendment's protections.  *See Bruen*, 142 S. Ct. at 2127.  As such, *Bruen* abrogated *Heller II*.

In short, D.C.'s ten-round-limit law, D.C. Code § 7-2505.01(b), cannot survive in a post-*Bruen* world.  Mr. Taranto cannot be charged with violating an unconstitutional law and therefore Count Four of the Superseding Indictment must be dismissed.

## II.    Discussion

### A. *Bruen* changed the standard for evaluating firearm regulations under the Second Amendment.

The operative clause of the Second Amendment provides that "the right of the people to keep and bear arms, shall not be infringed." U.S. Const. amend. II.  That

right is not bestowed on the people by the federal government; rather, the Second Amendment codified a pre-existing "individual right to possess and carry weapons in case of confrontation." *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008).  This pre-existing right is not "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010).

Before *Bruen*, the D.C. Circuit joined other circuits in using a two-step test for Second Amendment challenges.  That test required courts to determine (1) "whether the challenged law burdens conduct protected by the Second Amendment," and if so, (2) whether the government could satisfy a type of intermediate scrutiny by showing that the regulation is "substantially related to an important governmental objective." *Schrader v. Holder*, 704 F.3d 980, 989 (D.C. Cir. 2013); *see also Heller II*, 670 F.3d 1244 (D.C. Cir. 2011).

In *Bruen*, the Supreme Court emphatically rejected that two-step approach, finding "it is one step too many."  142 S. Ct. at 2127.  The Supreme Court instead adopted a "text-and-history standard" for evaluating Second Amendment challenges—*i.e.*, the textual component is now step one, and the historical component is now step two.  *Id.* at 2138.  This standard's textual component requires courts to answer a simple preliminary question—whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 2126.  If it does, then "the Constitution presumptively protects that conduct." *Id.*

The burden then shifts to the government to rebut the presumption under the historical component. *Id.* To do so, the government cannot follow the old playbook of showing that the challenged law promotes an important interest. *See id.* Instead, "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* Only a law that is consistent with the Nation's historical tradition is constitutional under the Second Amendment. *Id.*

**B. The Second Amendment protects Mr. Taranto's alleged conduct.**

The Second Amendment "presumptively protects" Mr. Taranto's alleged conduct because "the Second Amendment's plain text covers [his alleged] conduct" in this case. *Bruen*, 142 S. Ct. at 2130. The Second Amendment's operative clause protects "the right of the people to keep and bear Arms." U.S. Const. amend. II. The term "arms" includes any "[w]eapons of offense" or "thing that a man wears for his defence, or takes into his hands," that is "carr[ied] . . . for the purpose of offensive or defensive action." *Heller*, 554 U.S. at 581, 584. This definition covers "all modern instruments that facilitate armed self-defense," even those that were not in existence at the time of the founding,'" regardless of whether they are strictly "necessary" for self-defense. *Bruen*, 142 S. Ct. at 2132 (quoting *Heller*, 554 U.S. at 582). Magazines must be included within this definition because, without protection of the component parts that are necessary to render a firearm operable (such as bullets and magazines), "the right to bear arms would be meaningless." *Jackson v. City and Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014); *United States v. Miller*, 307

U.S. 174, 180 (1939) (citing seventeenth-century commentary recognizing that "[t]he possession of arms also implied the possession of ammunition").   After all, constitutional rights "implicitly protect those closely related acts necessary to their exercise."  *Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring) (noting "the right to keep and bear arms, for example, 'implies a corresponding right to obtain the bullets necessary to use them'" (citation omitted)).

The vast majority of courts of appeals to have addressed this issue have concluded that magazines capable of holding more than ten rounds qualify as "arms" under the Second Amendment.  *See, e.g.*, *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. A.G. New Jersey*, 910 F.3d 106, 116 (3d Cir. 2018) ("Because magazines feed ammunition into certain guns, and ammunition is necessary for such a gun to function as intended, magazines are 'arms' within the meaning of the Second Amendment"); *Duncan v. Becerra*, 970 F.3d 1133, 1146 (9th Cir. 2020) ("Magazines enjoy Second Amendment protection for a simple reason: Without a magazine, many weapons would be useless, including 'quintessential' self-defense weapons like the handgun"); *Kolbe v. Hogan*, 813 F.3d 160, 175 (4th Cir. 2016) ("In our view, 'the right to possess firearms for protection implies a corresponding right' to possess component parts necessary to make the firearms operable" (citation omitted)).  *But see Bevis v. City of Naperville, Illinois*, 85 F.4th 1175 (7th Cir. 2023) (finding at the preliminary

injunction stage, and over a strong dissent, that magazines capable of holding more than 10 rounds for a rifle and 15 rounds for a handgun are not arms).[3]

After *Bruen*, the vast majority of lower courts have found the same. *See, e.g.*, *Duncan*, 2023 WL 6180472, at *8-*9 (S.D. Cal. Sept. 22, 2023) (larger capacity magazines are arms); *Nat'l Ass'n for Gun Rts. v. Lamont*, 2023 WL 4975979, at *19 (D. Conn. Aug. 3, 2023) (same); *Delaware State Sportsmen's Ass'n, Inc. v. Delaware Dep't of Safety & Homeland Sec.*, 664 F. Supp. 3d 584, 595-96 (D. Del. Mar. 27, 2023) (same); *Hanson v. D.C.*, 671 F. Supp. 3d 1, 6 (D.D.C. 2023) (same); *State v. Gator's Custom Guns, Inc.*, 2024 Wash. Super. LEXIS 912, *30 (Wash. Super. Ct. Apr. 8, 2024) (same).

Because the "Second Amendment's plain text covers [Mr. Taranto's alleged] conduct, the Constitution presumptively protects that conduct," meaning the government must now prove that its regulation "is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S Ct. at 2130.  It cannot do so.

## C. The District's ten-round-limit law violates the Second Amendment because there is no analogous historical tradition of firearm regulation in the founding era.

Because the Second Amendment applies, "the Constitution presumptively protects [Mr. Taranto's alleged] conduct." *Bruen*, 142 S. Ct. at 2126.  To rebut this presumption, the government must establish that D.C.'s ten-round-limit law "is

---

[3] Several courts of appeals have identified this issue but declined to answer it.  *See, e.g.*, *Heller II*, 670 F.3d at 1261 (D.C. Cir. 2011); *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 264 n.127 (2d Cir. 2015); *Duncan v. Bonta*, 19 F.4th 1087, 1103 (9th Cir. 2021); *Ocean State Tactical v. Rhode Island*, 95 F.4th 38, 43 (1st Cir. 2024).

consistent with this Nation's historical tradition of firearm regulation." *Id.* The government cannot carry that burden because there is no robust tradition of "distinctly similar" laws from the founding era. Below will discuss (1) *Bruen*'s new analytical framework for evaluating history; (2) how these magazines are not "dangerous and unusual"; and (3) how these magazines have never been subject to longstanding regulatory measures, meaning the government's prosecution is unconstitutional.

### 1. *Bruen* created a new analytical framework for evaluating history.

In *Bruen*, the Supreme Court set forth a two-track analysis under its historical component. The Court explained the standard for reviewing historical evidence depends on what kind of problem a statute is intended to address—specifically, whether that problem is old or new. *Bruen*, 142 S. Ct. at 2131-32. Old problems are "general societal problems that ha[ve] persisted since the 18th century." *Id.* at 2131. New problems, by contrast, are those involving "unprecedented societal concerns or dramatic technological changes" that were "unimaginable at the founding." *Id.* at 2132. Therefore, courts faced with a Second Amendment challenge must identify the problem at which the law was aimed, and then determine whether that problem existed in 1791 or instead grows out of "unprecedented," "unimaginable" societal changes." *Id.* at 2132. Only then will the court know which approach to employ.

*i. Track one: "distinctly similar."* When the challenged law addresses an old problem, the test is "fairly straightforward": the government must identify a tradition of "distinctly similar" laws from the founding era. *Bruen*, 142 S. Ct. at 2132;

*see also Range v. Att'y Gen. of U.S.*, 69 F.4th 96, 103 (3d Cir. 2023); *United States v. Duarte*, 101 F.4th 657, 680, 688 (9th Cir. 2024). Although *Bruen* did not expressly define "distinctly similar," it indicated the standard is a stringent one. The only historical regulation *Bruen* identified as distinctly similar to New York's proper-cause requirement was an 1871 Texas law forbidding "anyone from 'carrying on or about his person . . . any pistol . . . unless he has reasonable grounds for fearing an unlawful attack on his person.'" *Bruen*, 142 S. Ct. at 2153 (citing 1871 Tex. Gen. Laws § 1). This "reasonable grounds" requirement was essentially identical to New York courts' interpretation of that state's proper-cause standard. *See id.* at 2123-24.

Bruen also noted that "*Heller* . . . exemplifies th[e] kind of straightforward historical inquiry" demanded by the "distinctly similar" test. *Id.* at 2131. *Heller* confirms that the standard is a strict one. When assessing the "total[] ban[]" on handgun possession at issue in *Heller*, the Supreme Court identified only two historical laws for comparison: a Georgia law and a Tennessee law, both of which prohibited the open carry of pistols. 554 U.S. at 628-29. *Bruen* and *Heller* both show that the focus of the "distinctly similar" test is on historical laws that are virtually identical to the modern law.

***ii. Track two: "relevantly similar."*** When the challenged law addresses a new problem, the test is "more nuanced." *Bruen*, 142. S. Ct. at 2132. Courts must determine if the challenged modern law fits into a "relevantly similar" tradition of historical laws. *Id.* The Supreme Court identified two "central considerations" for courts to determine if laws are relevantly similar: "whether modern and historical

regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 2133.  In other words, the government need not identify a "historical twin," but it still must show that the regulations are aligned as to "*how* and *why* [they] burden a law-abiding citizen's right to armed self-defense." *Id.*

The "relevantly similar" test is less difficult for the government to satisfy because it allows for "analogical reasoning." *Id.* at 2132.  But courts may use this test only when the challenged law is aimed at a societal problem that was "unimaginable at the founding." *Id.*  It is not available when the challenged law addresses an old problem—that is, one which "has persisted since the 18th century." *Id.* at 2131. When a law addresses an old problem, it must satisfy the stringent "distinctly similar" test; there must be a historical tradition of laws that are virtually identical to the modern law.  *Id.* at 2153; *Heller*, 554 U.S. at 628-29.

*iii. Relevant timeframe.*   Regardless of whether the case calls for the stringent "distinctly similar" or the looser "relevantly similar" test, the relevant "historical tradition" is that which existed when the Second Amendment was ratified in 1791.  *Bruen*, 142 S. Ct. at 2136.  That is because "[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." *Id.* (emphasis in original).  Courts may look to the tradition of firearms regulation "before . . . and even after the founding" period but should do so with care.  *Id.* at 2131-32.  *Bruen* cautioned that "[h]istorical evidence that long predates [1791] may not illuminate the scope of the [Second Amendment] right if linguistic or legal

conventions changed in the intervening years." *Id.* at 2136.  Courts should not rely on practices "that had become obsolete in England at the time of the adoption of the Constitution and never [were] acted upon or accepted in the colonies." *Id.*

Likewise, courts must not "giv[e] postenactment history more weight than it can rightly bear." *Id.*  While evidence "of how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century represent[s] a critical tool of constitutional interpretation," historical evidence becomes less probative the farther forward in time one goes from 1791.  *Id.* at 2136-37.  The Court recognized that "discussions of the right to keep and bear arms" that took place after the Civil War (1865) provided less insight into the Second Amendment's original meaning than earlier sources because they took place roughly 75 years after its ratification (in 1791).  *Id.* at 2137.  Courts therefore should credit such later history to the extent it is consistent with prior practice but should otherwise afford it little weight.  *See id.*  After all, "post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text." *Id.* (emphasis in original); *see also id.* at 2154 n.28 (ignoring "20th-century historical evidence" because it is too far removed from 1791); *see also Range*, 69 F.4th at 104 ("[W]e are confident that a law passed in 1961—some 170 years after the Second Amendment's ratification and nearly a century after the Fourteenth Amendment's ratifications— falls well short of 'longstanding' for purposes of demarcating the scope of a constitutional right.").

*iv. "Outlier" regulations are insufficient.* *Bruen* also makes clear that the comparable tradition of regulation must be "well-established and representative." 142 S. Ct. at 2133; *see also id.* at 2137 (explaining that "a governmental practice" can guide [courts'] interpretation of an ambiguous constitutional provision" only if that practice "has been open, widespread, and unchallenged since the early days of the Republic."). A handful of "outlier[]" statutes or cases from a small number of "outlier jurisdictions" are not enough to establish a historical tradition. *Id.* at 2153, 2156. For instance, the Supreme Court doubted laws from three of the thirteen original colonies were enough to show a relevant tradition. *See id.* at 2142. It rejected the government's reliance on laws from Texas and West Virginia that directly supported its view. *See id.* at 2153 ("We acknowledge that the Texas [and West Virginia] cases support New York's proper-cause requirement, which one can analogize to Texas' 'reasonable grounds' standard," but the Texas and West Virginia statutes "are outliers"). And it rejected the government's reliance upon the laws from the Western Territories because they were "transitory" and "short lived." *Id.* at 2154. The analysis thus requires that Courts not justify modern regulations with reference to "outliers," such as laws from a few states or colonies "that contradicts the overwhelming weight of other evidence" on the meaning of the Second Amendment." *See id.* at 2153.

*v. Government's burden.* Finally, *Bruen* emphasized that "the burden falls on [the government] to show that [a law] is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2135. Consistent with "the principle of party

presentation," courts are "entitled to decide a case based on the historical record compiled by the parties." *Id.* at 2130 n.6. Accordingly, courts "are not obliged to sift the historical materials for evidence to sustain [a] statute.  That is [the government's] burden." *Id.* at 2150. And insofar as there are "multiple plausible interpretations" of an ambiguous historical record, courts must "favor the one that is more consistent with the Second Amendment's command." *Id.* at 2141 n.11; *see also id.* at 2139 (concluding that where "history [is] ambiguous at best," it "is not sufficiently probative to defend" a law).

### 2. The Supreme Court has already identified the relevant historical analogue: arms that are in "common use"—like magazines holding more than 10 rounds—cannot be prohibited.

The Supreme Court has already held that the Nation's historical tradition (and thus the Second Amendment) protects arms "in common use" for lawful purposes. *See Heller*, 554 U.S. at 624, 627; *Bruen*, 142 S. Ct. at 2128, 2143, 2156.  Or put differently, under Supreme Court precedent, "[a] weapon may not be banned unless it is *both* dangerous *and* unusual." *Caetano v. Massachusetts,* 577 U.S. 411, 411-12 (2016) (Alito and Thomas, concurring).  "Dangerousness" relates to whether "the weapon belongs to a class of arms commonly used for lawful purposes."  *Id.* at 418. And "unusualness" relates to whether the weapon is in common use *today*.  *See id.* at 412, 419-20.  "[T]his is a conjunctive test," meaning if the Court concludes that ten-round magazines are usual (*i.e.*, in "common use"), it does not need to consider whether they are also "dangerous."  *See id.*; *see also Heller*, 554 U.S. at 720-21 (Breyer, J., dissenting) (criticizing the majority's test because "if tomorrow someone

invents a particularly useful, highly dangerous self-defense weapon, Congress and the States had better ban it immediately, for once it becomes popular Congress will no longer possess the constitutional authority to do so.").

In *Heller*, the Supreme Court grappled with what types of weapons receive Second Amendment protection.  After surveying numerous historical sources—from Blackstone through 19th-century cases—the Court found that weapons in "common use at the time" were protected under the Second Amendment and only those not typically possessed by ordinary citizens, such as sawed-off shotguns, were not protected.  *See* 554 U.S. at 627 (citing 4 W. Blackstone, Commentaries on the Laws of England 148–149 (1769) among other sources; then quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)).  Later, in *Bruen*, the Supreme Court re-affirmed this holding: "The Second Amendment protects the possession and use of weapons that are in 'common use at the time,' as opposed to those that are 'highly unusual in society at large.'" 597 US. at 21 (quoting *Heller*, 554 U.S. at 627). The Court found the common use test "fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'"  *Id.* (quoting *Heller*, 544 U.S. at 627); *see also Teter v. Lopez*, 76 F.4th 938, 950 (9th Cir. 2023) ("*Heller* itself stated that the relevance of a weapon's dangerous and unusual character lies in the '*historical tradition* of prohibiting the carrying of dangerous and unusual weapons.'").  Thus, the Supreme Court has already surveyed the Nation's history and traditions and discerned the governing principle: legislatures may only prohibit "dangerous *and* unusual weapons."  *See Gator's Custom Guns, Inc.*, 2024 Wash. Super. LEXIS 912 at

\*26 ("There is no need to re-do the historical analysis in an arm ban case" because the "Supreme Court has already done the historical analysis" and provided that the "Court needs only apply the in common use" test).

Given these principles, the government cannot meet its burden. The D.C. Circuit, along with "[v]irtually every federal court to have addressed this question," has concluded that "magazines having a capacity to accept more than ten rounds are in common use." *Kolbe v. Hogan*, 813 F.3d 160, 174 (4th Cir. 2016) (quoting *Fyok v. City of Sunnyvale*, 25 F. Supp. 3d 1267, 1275 (N.D. Cal. 2014)); *Heller v. D.C.*, 670 F.3d 1244 (D.C. Cir. 2011) ("magazines holding more than ten rounds are indeed in 'common use.'").

Such magazines are commonly owned by millions of Americans for all manner of lawful purposes, including self-defense, sporting, and hunting. *Duncan*, 2023 WL 6180472, at \*4 (S.D. Cal. Sept. 22, 2023). Roughly 30 years ago, in 1994, "18 percent of all firearms . . . were equipped with magazines holding more than ten rounds, and approximately 4.7 million more such magazines were imported into the United States between 1995 and 2000." *Heller II*, 670 F.3d at 1261. Now, some experts estimate that 81 million Americans own roughly 542 million of these magazines, *Duncan*, 2023 WL 6180472, at \*4 (S.D. Cal. Sept. 22, 2023) (citing to William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned*, Georgetown University, McDonough School of Business, at 20, 24-25 (May

18, 2022)[4]), accounting for "***approximately half of all privately owned magazines in the United States***," *Duncan v. Bonta*, 19 F.4th 1087, 1097 (9th Cir. 2021) (en banc) (emphasis added); *see also Barnett v. Raoul*, 671 F. Supp. 3d 928, 945 (S.D. Ill. 2023), *vacated by Bevis v. Naperville, Ill.*, 85 F.4th 1175 (7th Cir. 2023) (similarly opining that millions of Americans "have owned magazines over 10 rounds (up to 542 million such magazines in total)").

The reason for such large numbers is simple: the most popular handguns often come standard with magazines that hold more than 10 rounds. That is, the phrase "large-capacity magazines" is a misnomer; "these magazines are so common that they are standard." *Kolbe v. Hogan*, 813 F.3d 160, 174 (4th Cir. 2016). The most popular handgun in America is the Glock 17, which comes standard with a 17-round magazine. *Duncan*, 970 F.3d at 1142, 1148 (9th Cir. 2020). Many other popular pistols likewise come standard with magazines that hold more than 10 rounds—for example, "the Beretta Model 92 ... comes standard with a sixteen-round magazine," "Smith & Wesson (S&W), M&P 9 M2.0 nine-millimeter magazines contain seventeen rounds," and "[t]he Ruger SR9 has a 17-round standard magazine." *Id.* at 1142 and n.4. Hence, D.C.'s ten-round-limit law "makes it criminal for [individuals] to own magazines that come standard in Glocks, Berettas, and other handguns that are staples of self-defense," a law so sweeping in scope that "half of all magazines in

---

[4] The study is available at
https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4109494.

America are now unlawful to own in [the District of Columbia]." *Duncan*, 970 F.3d
113, 1141 (9th Cir. 2020).

As the D.C. Circuit has already found, "[t]here may well be some capacity
above which magazines are not in common use but . . . that capacity surely is not
ten." *Heller II*, 670 F.3d at 1261.  Given the ubiquity of magazines capable of holding
more than 10 rounds, there should be no serious dispute that they satisfy the
common-use test—*i.e.*, the government cannot satisfy the "unusualness" prong. *Cf.*
*Caetano*, 577 U.S. at 420 (Alito and Thomas, concurring) (finding the circulation
200,000 stun guns was enough to meet the "common use" test); *Heller II*, 670 F.3d at
1261 ("magazines holding more than ten rounds are indeed in 'common use.'").

Although the Court's analysis can and should end with the conclusion that the
government has failed to demonstrate such magazines are not in "common use," the
government cannot satisfy the "dangerousness" prong either.  *See Caetano*, 577 U.S.
at 417 (2016) ("As the *per curiam* opinion recognizes, this is a conjunctive test: A
weapon may not be banned unless it is *both* dangerous *and* unusual." (Alito and
Thomas, concurring)).  Millions of Americans own tens of millions—if not hundreds
of millions—of magazines holding more than 10 rounds.  As a matter of simple
statistics, the very large number of such magazines owned by *millions* of citizens who
are not committing crimes with them establishes common use for lawful purposes.
And the fact that such magazines are commonly possessed for lawful purposes only
further bolsters the conclusion that D.C.'s ten-round-limit law is unconstitutional.

*See, e.g.*, *Duncan*, 2023 WL 6180472, at *2 (S.D. Cal. Sept. 22, 2023) (finding California's ten-round-limit law unconstitutional).

### 3. Magazines with over ten rounds enjoy a long historical pedigree.

Although the common-use test is dispositive to the analysis, if the Court detoured into its own independent review of the Nation's history and traditions under the *Bruen* framework, it would arrive at the same result: D.C.'s ten-round-limit law is unconstitutional. "Firearms or magazines holding more than ten rounds have been in existence—and owned by American citizens—for centuries. Firearms with greater than ten round capacities existed even before our nation's founding, and the common use of [large-capacity magazines] for self-defense is apparent in our shared national history." *Duncan*, 970 F.3d at 1147 (9th Cir. 2020).

Several judges from the Ninth Circuit surveyed the Nation's history of firearms with large-capacity capabilities and revealed that they were widely possessed by Americans around the time of the Second Amendment's ratification:

- The first known firearm capable of firing more than ten rounds without reloading was a 16-shooter invented in 1580.

- The earliest record of a repeating firearm in America noted that it fired more than ten rounds: In 1722, Samuel Niles wrote of Indians being entertained by a firearm that "though loaded but once, ... was discharged eleven times following, with bullets, in the space of two minutes." Harold L. Peterson, *Arms and Armor in Colonial America* 1526–1783, 215 (2000).

- At the Founding, the state-of-the-art firearm was the Girandoni air rifle with a 22-shot magazine capacity.

- In 1777, Joseph Belton demonstrated a 16-shot repeating rifle before the Continental Congress, seeking approval for its manufacture. Robert

Held, *The Belton Systems, 1758 & 1784–86: America's First Repeating Firearms* 37 (1986).

- By the 1830s, "Pepperbox" pistols had been introduced to the American public and became commercially successful. Depending on the model, the Pepperbox could fire 5, 6, 12, 18, or 24 rounds without reloading.

- It took several years for Samuel Colt's revolvers (also invented in the 1830s) to surpass the Pepperbox pistol in the marketplace.

- From the 1830s to the 1850s, several more rifles were invented with large ammunition capacities, ranging from 12- to 38-shot magazines.

- By 1855, Daniel Wesson (of Smith and Wesson fame) and Oliver Winchester collaborated to introduce the lever action rifle, which contained a 30-round magazine that could be emptied in less than one minute. A later iteration of this rifle, the 16-round Henry lever action rifle, became commercially successful, selling about 14,000 from 1860 to 1866.

- By 1866, the first Winchester rifle, the Model 1866, could hold 17 rounds in the magazine and one in the chamber, all of which could be fired in nine seconds. All told, Winchester made over 170,000 copies of the from 1866 to 1898. See Norm Flayderman, *Flayderman's Guide to Antique Firearms and Their Values* 268 (6th ed. 1994).

- A few years later, Winchester produced the M1873, capable of holding 10 to 11 rounds, of which over 720,000 copies were made from 1873 to 1919.

*Duncan v. Bonta*, 19 F.4th at 1154-55 (9th Cir. 2021) (en banc) (Bumatay, Ikuta, and R. Nelson, dissenting). "From this history, the clear picture emerges that firearms with large-capacity capabilities were widely possessed by law-abiding citizens by the time of the Second Amendment's incorporation." *Id.* at 1155; *see also* David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions,* 78 Alb. L. Rev. 849, 851 (2015) ("In terms of large-scale commercial success, rifle magazines of more than

ten rounds had become popular by the time the Fourteenth Amendment was being ratified.").

While arms that could fire more than 10 rounds without reloading would by no means have been "unimaginable at the founding," *Bruen*, 142 S. Ct. at 2132, laws prohibiting their possession certainly would.   Despite the long tradition of law-abiding citizens possessing these firearms for lawful purposes, there is no similar tradition of government regulation.  *See Duncan*, 970 F.3d at 1150 (9th Cir. 2020). Most tellingly, there were no—*i.e.*, *zero*—restrictions on ammunition or firing capacity when the Second and Fourteen Amendments were ratified, "despite multi-shot firearms having been in existence for some 200 years."  *Id.*

The first such laws did not come until the 20th century, and, even then, they were rare.  *See id.*  In the 1920s and 1930s, many states and the federal government began regulating *automatic* weapons (*i.e.*, machine guns), which, from the date they hit the civilian market, were the "the weapon of choice among gangsters," not "law-abiding citizens."  *Friedman v. City of Highland Park, Ill.*, 784 F.3d 406, 416 (7th Cir. 2015) (Manion, J., dissenting); *see also Hollis v. Lynch*, 827 F.3d 436, 449 (5th Cir. 2016) (finding machine guns were not in common use for lawful purposes).

During this time, only three states and the District of Columbia restricted the firing capacity of *semi*-automatic weapons.  *Duncan*, 970 F.3d at 1150 & n.10 (9th Cir. 2020).[5]  None of these restrictions on imposed a limit on firing capacity as low as

---

[5] *See* 1927 Mich. Pub. Acts 887, §3 (prohibiting "any ... firearm which can be fired sixteen times without reloading"), repealed via 1959 Mich. Pub. Acts 249, 250; 1927 R.I. Pub. Laws 256 §§1, 3 (prohibiting firearms "which shoot[] more than twelve shots

ten rounds.  And, with the exception of the District of Columbia, all of these laws were repealed within a few decades.  *See id.*[6]  In other words, these anomalous laws are substantively distinguishable from D.C.'s ten-round-law, "short lived," and emerged several decades *after* the isolated "late-19th century" laws that the Supreme Court found to be too few and too late to have any meaningful historical relevance in *Bruen*, 142 S. Ct. at 2154-55, n.28 ("We will not address any of the 20th-century historical evidence brought to bear by respondents or their *amici*.").

The first state to restrict *magazine* capacity (New Jersey) did not do so *until 1990*—more than two centuries after the founding.  *Duncan*, 2023 WL 6180472, at *18 (S.D. Cal. Sept. 22, 2023).  Obviously, that is far too late to demonstrate anything about the original meaning of the Second Amendment.  *See United States v. Range*, 69 F.4th 96, 104 (3d Cir. 2023) ("[W]e are confident that a law passed in 1961—some 170 years after the Second Amendment's ratification and nearly a century after the

---

semi-automatically without reloading"), repealed via 1959 R.I. Acts & Resolves 260, 260, 263 (amended 1975); 1933 Ohio Laws 189, §§12819-3, -4 (prohibiting "any firearm which shoots more than eighteen shots semi-automatically without reloading"), repealed via 1972 Ohio Laws 1866, 1963 (setting 32-round limit); see also 2013-2014 Leg., H.R. 234 (Ohio) (fully repealing magazine ban) (codified at Ohio Rev. Code Ann. §2923.11); 47 Stat. 650, §§1, 14 (1932) (prohibiting "any firearm which shoots ... semiautomatically more than twelve shots without reloading" in the District of Columbia), repealed via 48 Stat. 1236 (1934), currently codified as amended at 26 U.S.C. §§5801- 72.

[6] "These states included Michigan (1927, repealed in 1959), Rhode Island (1927, repealed in 1975), and Ohio (1933, repealed in 2014). It is important to note that the Rhode Island and Michigan statutes applied only to weapons rather than magazines, and the Ohio statute was interpreted to only forbid the simultaneous purchase of a firearm and compatible 18-round magazine." *Duncan*, 970 F.3d at 1150 n.10.  "In fact, the *only* statute regulating LCMs that has been in continuous existence, and only since 1932, is the District of Columbia"—and even there, the limit was not as low as ten rounds.  *See id.* at 1150 (emphasis in original).

Fourteenth Amendment's ratifications—falls well short of 'longstanding' for purposes of demarcating the scope of a constitutional right."); *United States v. Duarte*, 101 F.4th 657, 660 n.3 (9th Cir. 2024) ("We are confident . . . that anything postdating the 19th century is not what the Court has in mind."). The federal government did not restrict magazine capacity until 1994, and Congress allowed that law to expire in 2004 after the Justice Department concluded that it produced "no discernible reduction" in gun violence.[7] Christopher S. Koper et al., *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets & Gun Violence, 1994-2003*, Dep't of Justice, at 96 (2004).[8]

In the last 30 years, several states (14) have enacted some form of magazine capacity restrictions (with many tolerating more than 10 rounds), but the majority (8) did not do so until 2013, and 5 of them did not do so until 2022.[9] In other words,

---

[7] See Pub. L. No. 103-322, 108 Stat. 1796 (codified at 18 U.S.C. §§ 921(a)(31)(A), 922(w)(1) (expired 2004)).

[8] Available at https://bit.ly/3wUdGRE (last visited Dec. 13, 2023).

[9] Below shows the 14 states that impose capacity restrictions (at least 4 of which tolerate magazine capacity greater than 10 rounds) in chronological order:

1990 N.J. Laws 217, 221, 235 (codified at N.J. Stat. Ann. §2C:39-1(y), - 3(j));
1992 Haw. Sess. Laws 740, 742 (codified at Haw. Rev. Stat. §134-8);
1994 Md. Laws 2165; (codified as amended at Md. Code Ann., Crim. Law §4-305);
1998 Mass. Gen. Laws ch. 140 §121;
1999 Cal. Stat. 1781, 1785, 1793 (codified as amended at Cal. Penal Code §§ 16750, 32310);
2000 N.Y. Laws 2788, 2793 (codified as amended at N.Y. Penal Law §265.36);
2013 Colo. Sess. Laws 144, 144-45 (codified at Colo. Rev. Stat. §18-12-302(1)) (15 rounds);
2013 Conn. Gen. Stat. §53-202w;
2018 Vt. Stat. Ann. tit. 13, §4021 (15 rounds);
2022 Wash. Rev. Code Ann. §§9.41.010, .370, .375;
2022 Del. Code Ann. tit. 11, § 1469(a) (17 rounds);

the government would face an uphill battle identifying a "well-established and representative" tradition of restricting magazine capacity to 10 rounds *today*, let alone identify any "representative historical analogue" around the founding. *See Bruen*, 142 S. Ct. at 2133. Firearms capable of firing over 10 rounds without reloading have been in existence before the Second Amendment was ratified and achieved "large-scale commercial success . . . by the time the Fourteenth Amendment was being ratified." Kopel, 78 Alb. L. Rev. at 851 (2015). In essence, today's magazines capable of holding more than 10 rounds "are modern-day equivalents' of these historical arms." *Duncan*, 83 F.4th at 814 (9th Cir. 2023) (Bumatay, J., dissenting). Hence, although the Court does not need to wade through this history, the dearth of distinctly similar firearm regulations at the time of founding only further bolsters the conclusion that D.C.'s ten-round-limit law is unconstitutional.

**D. The *Hanson* decision suffers from several fundamental defects.**

No doubt the government will rely heavily upon *Hanson v. D.C.*, 671 F. Supp. 3d 1 (D.D.C. 2023), where Judge Contreras found D.C.'s ten-round-limit law withstood a Second Amendment challenge at the preliminary injunction stage.[10] While Judge Contreras's analysis got some things right (*i.e.*, that magazines capable

---

2022 R.I. Gen. Laws § 11-47.1-3(b);
2022 Oregon Ballot Measure 114, § 11;
2023 Ill. ch. 720 § 5/24-1 (15 rounds).

[10] The government will likely also upon *Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38 (1st Cir. 2024), which upheld Rhode Island's ten-round-limit law at the preliminary injunction stage. This decision suffers from many of the same defects as *Hanson* (discussed below).

of holding more than ten rounds are "arms"), it suffers from numerous defects at step two of the analysis that render it unpersuasive.

***First***, the *Hanson* decision misapprehended the "common use test."  Instead of looking to the millions of Americans possessing such magazines without incident, and the hundreds of millions of such magazines in lawful circulation today, the court instead asked whether magazines that hold more than ten rounds are "most useful in military service," which would mean (in its erroneous view) that such magazines "fall outside of the Second Amendment."  *See id.* at 12.  But Supreme Court precedent has squarely rejected this line of reasoning, stating "*Heller* rejected the proposition 'that only those weapons useful in warfare are protected.'"  *Caetano*, 577 U.S. at 412; *see also Duncan*, 2023 WL 6180472, at *16 (S.D. Cal. 2023) (rejecting the military-based argument on grounds that "[t]he Supreme Court said no such thing"); *Bevis v. City of Naperville, Ill.*, 657 F.Supp.3d 1052, 1066 (N.D. Ill. 2023) ("The Supreme Court has unequivocally dismissed the argument that 'only those weapons useful in warfare are protected'").

More so, the proposition that those weapons "most useful in military service" are unprotected is self-defeating.  By that logic, the government could ban *all* weapons because the nature of military engagement necessarily means that every weapon would be far more useful in that context than as part of civilian life.  And it bears noting that virtually all modern firearms have a military heritage—*e.g.*, the Glock handgun was originally developed for the Austrian Military; the Beretta 92F was adopted as the standard handgun of the U.S. military.  Under *Hanson's*

rationale, all these firearms could be banned, even though they are among the most popular firearms in the country. Such a proposition cannot be so under *Heller*.

**Second**, compounding the above error, the *Hanson* court relied heavily upon a study that stated the average number of shots a civilian fired in self-defense was 2.2 bullets per incident; given this, the court reasoned that magazines containing more than 10 rounds are not covered by the Second Amendment "because they are not in fact commonly *used* for self-defense." *Hanson*, 671 F. Supp. 3d at. at *10 (emphasis added). But this completely misconstrued Supreme Court precedent and the lawful purposes test.

For starters, "lawful purposes" is not limited to just self-defense; it can also include sporting, hunting, and (quite literally) virtually anything not unlawful. Therefore, relying upon a study that analyzes only one narrow subset of the Second Amendments protections (self-defense) is problematic, and that's putting aside more fundamental problems with the study's underlying research. *See Duncan*, 2023 WL 6180472, at *13-*15 (S.D. Cal. 2023) (criticizing the study's underlying data that "is based on hearsay (anecdotes) upon hearsay new reporting, rather than police investigatory reports").

More fundamentally, the *Hanson* decision adopts an overly restrictive interpretation of the word "use" by treating the Supreme Court's "common *use*" language in a judicial opinion "like the language of a statute." *Duncan*, 2023 WL 618047, at *10. That is a mistake. Canons of statutory construction do not apply to judicial opinions. *See, e.g.*, *Upper Skagit Indian Tribe v. Sauk-Suiattle Indian Tribe*,

66 F.4th 766, 770 (9th Cir. 2023) ("Because 'opinions, unlike statutes, are not usually written with the knowledge or expectation that each and every word may be the subject of searching analysis,' we do not follow statutory canons of construction with their focus on 'textual precision' when interpreting judicial opinions." (cleaned up)).

When discussing "use" in the context of the "common use test," the Supreme Court has indicated that "an arms needs only to be regarded as *typically* possessed or carried, or *commonly* kept by citizens for use, if needed." *Duncan*, 2023 WL 6180472, at *10 (S.D. Cal. 2023); *Gator's Custom Guns, Inc.*, 2024 Wash. Super. LEXIS at 14 ("The plain language of both the State and Federal Supreme Court decisions discussing keep and carry focus on <u>possession</u>" and the "firing test has no rational basis in law or logic").[11]  It has never "said that the actual firing of a gun is any part of the test." *Duncan*, 2023 WL 6180472, at *10 (S.D. Cal. 2023).  Nor has it ever "looked at the average number of times that a handgun had been fired in self-defense to determine whether it is commonly used for that purpose." *Duncan*, 83 F.4th 803, 820 (9th Cir. 2023) (en banc) (Bumatay, Ikuta, R. Nelson, and Vandyke, dissenting).[12]

---

[11] *See also Heller*, 554 U.S. at 625, 629 (finding the second Amendment protects handguns, which are described as "the most popular weapon chosen by Americans for self-defense in the home" and "does not protect those weapons not *typically possessed* by law-abiding citizens for lawful purposes"); *see id.* at 720-21 (Breyer, J., dissenting) (criticizing majority decision because if "Congress and the States lift restrictions on the *possession* of machineguns, and people buy machineguns to protect their homes", the Court will have to reverse course and find that the Second Amendment . . . protect[s] the individual self-defense-related right *to possess* a machinegun." (emphasis added)).

[12] Although it is a dissenting opinion, it is more persuasive than the majority opinion because the majority offers virtually no substantive analysis.  *See id.* at 809 ("Despite

In *Heller*, for example, "the Court didn't dissect statistics on self-defense situations or look at anecdotes of handgun's use in self-defense." *Id.* Rather than going down this unwieldy statistical rabbit hole, the Court simply "looked to Americans' overall *choice* to use a firearm." *Id.* To the Court, "it was sufficient that the handgun was 'overwhelmingly chosen by American society for th[e] lawful purpose' of self-defense." *Id.* (quoting *Heller*, 554 U.S. at 628). Thus, "'banning from the home the most preferred firearm in the nation to keep and use for protection of one's home and family would fail constitutional muster' under any standards of review." *Id.* (quoting *Heller*, 554 U.S. at 628-29). "***Whatever the reason***," said the Supreme Court, "handguns are the most popular weapon chosen by Americans for self-defense in the home," so they could not be banned. *See Heller*, 554 U.S. at 629 (emphasis added); *see also Caetano*, 557 U.S. at 420 (finding the circulation 200,000 stun guns was enough to meet the "common use" test without engaging in any statistical inquiry on how often they were actually fired in self-defense).

In short, the *Hanson* decision erred by adopting an overly restrictive interpretation of the so-called "common-use test," which requires actual firing of the weapon for self-defense purposes—akin to "saying we don't 'use' our seatbelts whenever our cars don't crash." *Duncan*, 83 F.4th at 815 (9th Cir. 2023) (Bumatay, J., dissenting). While "use" certainly encompasses discharging a firearm, it also encompasses ownership and possession of firearms for all lawful purposes (*e.g.*, self-

---

this clear direction, our court once again swats down another Second Amendment challenge. On what grounds? Well, the majority largely doesn't think it worthy of explanation ").

defense, sport, hunting), even if not actually fired. *See Fyock v. City of Sunnyvale*, 25 F. Supp. 3d 1267, 1276 (N.D. Cal. 2014). In the same vein, magazines are "used" every time they are carried in a firearm or possessed for lawful purposes, even if not actually fired. *See Duncan*, 83 F.4th at 815 (9th Cir. 2023) (Bumatay, J., dissenting).

**Third,** the *Hanson* decision's historical analysis was flawed in numerous respects. It first ventured beyond the dispositive "dangerous and unusual" test, instead divining its own relevant historical analogue. *See Bruen*, 597 U.S. at 29 (courts should not 'uphold every modern law that remotely resembles a historical analogue,' because doing so 'risks endorsing outliers that our ancestors would never have accepted."). This was an error because, under Supreme Court precedent, demonstrating that the weapons are in "common use" is "all that is needed for citizens to have a right under the Second Amendment to keep [such magazines]." *Friedman v. City of Highlight Park*, 136 S. Ct. 447, 449 (2015) (Thomas and Alito, dissenting from denial of certiorari); *see also Caetano*, 577 U.S. at 417 (2016) ("As the *per curiam* opinion recognizes, this is a conjunctive test: A weapon may not be banned unless it is *both* dangerous *and* unusual." (Alito and Thomas, concurring)); *Bruen*, 597 US. at 21 ("The Second Amendment protects the possession and use of weapons that are in 'common use at the time,' as opposed to those that are 'highly unusual in society at large.'" (quoting *Heller*, 554 U.S. at 627)).

The court further erred by analogizing primarily to 20th-century restrictions on *machine* guns to uphold D.C.'s ten-round-limit law. *Hanson*, 671 F. Supp. 3d at 21. Under *Bruen's* framework, these laws were enacted far too late to shed any

meaningful light on what the founders understood when they ratified the Second Amendment.  *See* 597 U.S. at 66 n.28 ("We will not address any of the 20th-century historical evidence brought to bear by respondents or their *amici*.  As with their late-19th century evidence, the 20th century evidence . . . does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence); *see also cf. Espinoza v. Montana Dept. of Rev.*, 140 S. Ct. 2246 (2020) (recognizing that a practice that "arose in the second half of the 19th century ... cannot by itself establish an early American tradition" informing our understanding of the First Amendment).

Moreover, such laws are not "comparably justified."  Machine guns "function differently, have a different historical lineage and record of use, and offer a different type of hazard than large-capacity magazines."  *Duncan*, 83 F.4th at 820 (9th Cir. 2023) (Bumatay, J., dissenting).  From the date they entered the civilian market, machine guns were the weapon of choice amongst gangsters, and were certainly never as commonly owned as magazines capable of holding more than ten rounds are today.  *See Heller II*, 670 F.3d at 1287 (Kavanaugh, J., dissenting) (discussing how full automatics "were never in widespread civilian use in the United States"—*e.g.*, the "Tommy gun" "entered commercial sale in the United States in the mid-1920s but saw very limited civilian use outside of organized crime and law enforcement"); *cf. Heller*, 554 U.S. at 720-21 (Breyer, J., dissenting) (criticizing the majority's reasoning because "if Congress and the States lift restrictions on the possession and use of machineguns, and people buy machine guns to protect their homes, the Court will have to reverse course and find that the Second Amendment *does*, in fact, protect

the individual self-defense-related right to possess a machine gun"). Such laws regulating machine guns "would warrant a separate consideration of history and tradition under the Second Amendment." *Duncan*, 83 F.4th at 820 (9th Cir. 2023) (Bumatay, J., dissenting).

*Finally*, the *Hanson* decision further erred because it effectively backdoored in the means-end analysis that the *Bruen* Court unequivocally rejected. The court found machine gun laws were "comparably justified" because they showed that "states [historically] confronted the public safety issues of their time with vigor" and "[j]ust as states and the District enacted sweeping laws restricting possession of high capacity-weapons in an attempt to reduce violence during the Prohibition era, so can the District now." *Hansen*, 671 F. Supp. 3d at 22. But by using the guise of history to resurrect a means-end analysis, *Hanson* rendered *Bruen*'s historical test (and explicit rejection of the means-end analysis) virtually meaningless.

### III.   Conclusion

The District's ten-round-limit law violates the Second Amendment. *See* D.C. Code § 7-2505.01(b). Because Mr. Taranto cannot be charged with violating an unconstitutional law, Count Four of the Superseding Indictment must be dismissed.


Respectfully submitted,

A. J. KRAMER
Federal Public Defender


_____/s/_____
BENJAMIN FLICK
Research & Writing Attorney

34

SHELLI PETERSON
ELIZABETH MULLIN
COURTNEY MILLIAN
Assistant Federal Public Defenders
Federal Public Defender's Office
625 Indiana Ave NW, Suite 550
Washington, D.C. 20004