**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| | : | |
| **v.** | : | **Cr. No. 23-229 (CJN)** |
| | : | |
| **TAYLOR TARANTO,** | : | |
| | : | |
| **Defendant.** | : | |
| _____ | : | |

## MOTION TO DISMISS COUNT ONE

Pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B)(v), Mr. Taylor Taranto, by and through counsel, respectfully moves this Court to dismiss Count One of the Superseding Indictment, which charges a violation of 26 U.S.C. §§ 5861(d), 5845(a)(3).

### INTRODUCTION

In Count One, the government has charged Mr. Taranto with possessing an unregistered short-barreled rifle (SBR) in violation of the National Firearms Act (NFA). In reality, however, the firearm the government characterizes as an SBR is a pistol with an attached stabilizing brace.

Beginning in 2012, the Bureau of Alcohol, Tobacco and Firearms (ATF) took the position that the attachment of a stabilizing brace to a pistol did not convert it into an SBR. A decade later, ATF changed its mind and last year issued a rule classifying braced pistols as SBRs. ATF was sued immediately. Before the enforcement period for the rule even began, the Fifth Circuit enjoined its enforcement

1

as to the parties in one litigation, and, as of today, no fewer than six courts have enjoined the government from enforcing this rule.  In fact, one court has enjoined the enforcement of the rule nationwide and, just yesterday, another court vacated the rule in its entirety.

Against this background, the government has made the truly stunning choice to criminally prosecute Mr. Taranto for failure to register a braced pistol as an SBR under the NFA—an offense that carries a penalty of up to ten years imprisonment. Unsurprisingly, this charge is replete with legal problems and there are many independently sufficient grounds for the Court to dismiss it.

*First*, the government's decision to prosecute Mr. Taranto violates both a nationwide injunction and a recent decision vacating the rule.

*Second*, the Government's prosecution violates the Administrative Procedure Act (APA).  The government relies on an ATF rulemaking that failed to follow the APA's requirements.  The rule, as numerous courts have held, was not a logical outgrowth of the initial notice of proposed rulemaking (NPRM) and is arbitrary and capricious.

*Third*, the braced pistol Mr. Taranto is alleged to have possessed is not an SBR under the text of the NFA.

*Fourth*, the government's prosecution of Mr. Taranto violates the Second Amendment.  The Second Amendment presumptively protects Mr. Taranto's alleged conduct because a braced pistol is an "arm" within the plain text of the Second Amendment.  The government cannot meet its burden to establish a historical

tradition of comparable regulation because millions of pistol braces are in use today and arms that are in common use today cannot be banned.

*Fifth*, the government's prosecution of Mr. Taranto offends due process principles grounded in fair notice. ATF's recent rulemaking has been vacated. Regulated parties acting in good faith cannot identify with ascertainable certainty what standards ATF will apply to determine whether their braced pistols are NFA firearms.

*Sixth*, the NFA violates the Supreme Court's fee jurisprudence because the $200 fee the statute imposes was not designed to meet administrative costs but to suppress firearm possession in general.[1]

## BACKGROUND

### I.   Legislative and Regulatory History

**The National Firearm Act.** Congress passed the National Firearm Act in 1934. 26 U.S.C. §§ 5801–5872. The NFA was designed to target "gangster-type weapons." *Mock v. Garland*, 75 F.4th 563, 567 (5th Cir. 2023) (*Mock II*). It concentrated on "particularly dangerous weapons and devices such as machine guns, sawed-off shotguns and silencers." *Lomont v. O'Neill*, 285 F.3d 9, 11 (D.C. Cir. 2002) (citing *Sonzinsky v. United States*, 300 U.S. 506, 511–12 (1937) and *United States v. Kenney*, 91 F.3d 884, 890 (7th Cir. 1996)). To do this, the NFA identified eight categories of "firearms" it regulated. *See* 26 U.S.C. § 5845(a).

---

[1] Mr. Taranto has also filed separate motions to dismiss Count One for vindictive and to compel discovery to support his claim of selective prosecution.

Under the original NFA draft, essentially all concealable guns (i.e., not rifles) were regulated. The initial draft "defined 'firearm' as any 'pistol, revolver, shotgun having a barrel less than sixteen inches in length, or any other firearm capable of being concealed on the person, a muffler or silencer therefor, or a machine gun.'" Oliver Krawczyk, *Dangerous and Unusual: How an Expanding National Firearms Act Will Spell Its Own Demise*, 127 Dick. L. Rev. 273, 278 (2022).

Pistols, however, were removed from the NFA before it was enacted, while SBRs were added. *Id.* at 279. The practical consequence is odd: a person can lawfully possess, without NFA registration, a handgun version of the same platform firearm (such as an AR-15 or AK-47), but cannot possess a "short-barreled rifle" version of the same platform—even if the two weapons are mechanically identical and have barrels of the same length. This is true because the only distinction between an illegal AR-15 "short-barreled rifle" and an otherwise-identical AR-15 pistol is whether the gun in question is "intended to be fired from the shoulder[.]" 26 U.S.C. § 5845(c). The legislative history does not reveal Congress's rationale for including SBRs.[2]

---

[2] Early in hearings on the legislation, Representative Harold Knutson, of Minnesota, asked if they might add "rifles" of 18 inches or more to the bill, ostensibly to protect deer-hunters in his home state. *See* National Firearms Act: Hearings on H.R. 9066 Before the H. Comm. On Ways & Means, 73d Cong. 4, at 13, 87 (1934). But this rationale appears to have been the product of Representative Knutson's own confusion, given that the congressman was actually asking to add restrictions which would make it *harder* to acquire rifles. The Attorney General, for his part, seems to have understood this, observing that "as long as [rifles are] not mentioned at all, [the NFA] would not interfere at all" with hunters' rights. *Id.* at 13. There was no further discussion of SBRs.

**The NFA today.**  The NFA provides two definitions of a "firearm" that are relevant to SBRs.  It defines a "firearm" as (1) "a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length," 26 U.S.C. § 5845(a)(4); and (2) "a rifle having a barrel or barrels of less than 16 inches in length," 26 U.S.C. § 5845(a)(3).  The NFA defines a "rifle" as a "a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder." *Id.* § 5845(c).  And, as noted, the NFA expressly exempts pistols from regulation.  26 U.S.C. § 5845(e); *see also Mock II*, 75 F.4th at 570 ("the NFA specifically exempts 'a pistol or a revolver having a rifled bore' from its coverage").

NFA "firearms," including SBRs, must be registered in the National Firearms Registration and Transfer Record, *see* 26 U.S.C. § 5841(a), and are subject to a host of stringent regulatory requirements.  NFA "firearms" cannot be made, transferred, or possessed without the authorization of the Attorney General.  *Id.* §§ 5812, 5822. Importers, manufacturers, and dealers of rifles must register with the ATF, must pay annually a special occupation tax, and must register any SBR they manufacture. *See* 26 U.S.C. §§ 5801–02; 5841(c). Individual firearm owners are also required to file applications to receive an NFA "firearm."  These applications "shall" be denied if possession of the firearm would place the owner "in violation of law," 26 U.S.C. § 5812.

When purchased by individuals, SBRs are subject to a $200 transfer tax stamp. *Id.* § 5811; 27 C.F.R. § 479.11. In addition, an NFA "firearm" owner is required to

provide ATF with his fingerprints and photograph, 26 U.S.C. § 5812(a)(3); and subject himself to registration in a federal database, *id.* § 5841(b).

Notably, while the NFA levies taxes on certain firearms, Congress did not enact the NFA to raise revenue. As ATF itself acknowledges, the NFA's "underlying purpose was to curtail, if not prohibit, transactions in NFA firearms." *See National Firearms Act*, BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, available at https://www.atf.gov/content/firearms/firearms-industry/national-firearms-act.

Consistent with this intent, the penalties for failing to comply with the NFA's burdensome regulatory requirements are severe.  Violating the NFA carries the potential for ten years' imprisonment, 26 U.S.C. § 5871, seizure and forfeiture of the firearm, *id.* § 5872, and a fine up to $250,000 for an individual and $500,000 for an organization. 18 U.S.C. § 3571(b)-(c).  Because failure to comply is a felony offense, a conviction for violating the NFA results in a lifetime ban on ownership of firearms. *See* 18 U.S.C. § 922(g)(1).

**Initial ATF Regulation of Short-Barreled Rifles.**  SB Tactical developed the original Pistol Stabilizing Brace to assist disabled military veterans in firing pistols in 2012. *See* Factoring Criteria for Firearms With Attached "Stabilizing Braces", 88 Fed Reg. 6478-01, at 6,479, 6,482-83, 2023 WL 1102552 (Jan. 31, 2023) ("Final Rule").  Stabilizing braces are orthotic devices that attach to users' arms and "permit disabled and weaker persons to fire pistols more easily." *Mock II*, 75 F.4th at 566. They generally consist of a cuff and strap, and the support they provide allows

individuals to use handguns more accurately, safely, and comfortably.  *See id.* at 571. A picture of the original stabilizing brace is included below.





2012 submission of original "stabilizing brace" attached to an AR-type pistol

In 2012, SBT obtained a determination from ATF that attaching a stabilizing brace to a pistol "would not alter the classification of a pistol or other firearm" and that "such a firearm would not be subject to NFA controls." 88 Fed. Reg. at 6,479 (quoting Letter from ATF #2013-0172 (Nov. 26, 2012)).  ATF recognized that a stabilizing brace, "when attached to a firearm, d[oes] 'not convert that weapon to be fired from the shoulder.'" *Id.*  The approval of the stabilizing brace was not restricted to disabled individuals.

In the years that followed, ATF issued at least 20 classifications finding that the attachment of various stabilizing braces did not transform a pistol into an SBR. *See* Final Rule at 6,502 n.84.  A brace attached with Velcro straps, for example, did not suffice to transform a pistol into an SBR. ATF Letter #2013-0172, https://vpc.org/wpcontent/uploads/2019/08/ATF-Approval-Letter-2012.pdf  (Nov.  26, 2012).  Neither did "firing a weapon from a particular position, such as placing the

receiver extension of an AR-15 type pistol on the user's shoulder, change the classification of the weapon." ATF Letter #3311/301737, https://www.guntrustlawyer.com/files/2015/02/sb15.pdf (March 5, 2024). Central to these determinations, at least in some cases, was the manufacturer's "representation that the purpose and intent of the designs, is solely to allow shooters . . . to better support large handguns or pistols when firing one-handed." ATF Letter #3311/304296, https://vpc.org/wp-content/uploads/2019/08/sig-sauer-ATF-Approval-Letter-Adjustable-Pistol-Brace-2015.pdf (Dec. 22, 2015). Most of these letters were private adjudication determinations, though brace manufacturers regularly publicized approvals of their braces. ATF disapprovals of firearm braces, however, were not made public as a matter of course, and ATF did not generally require manufacturers to notify customers of their determinations.

In 2015, following the approval of numerous pistol braces, ATF issued an Open Letter explaining that "if used as designed—to assist shooters in stabilizing a handgun while shooting with a single hand—[a stabilizing brace] is not considered a shoulder stock and therefore may be attached to a handgun without making a NFA firearm." Max M. Kingery, ATF, Open Letter on the Redesign of "Stabilizing Braces" (Jan. 16, 2015), https://www.atf.gov/resource-center/docs/foia/impact-laws-footnote-13-2015-atf-open-letter/download. However, ATF claimed that "use [of a stabilizing brace] as a shoulder stock constitute[d] a 'redesign' of the device because a possessor has changed the very function of the item. . . . Any person who intends to use a handgun stabilizing brace as a shoulder stock on a pistol must first file an ATF Form

1 and pay the applicable tax because the resulting firearm will be subject to all provisions of the NFA." *Id.*

Two years later, ATF clarified that opinion. It explained that incidental use of a braced pistol "from a firing position at or near the shoulder" was not sufficient to "redesign" it and did not transform the braced pistol into an NFA firearm. Letter from ATF #9000, https://atf.gov/file/166416/download (Mar. 27, 2017). Instead, it is only when the shooter makes more permanent changes, such as "removing the arm-strap or otherwise undermining [the brace's] ability to be used as a brace" that the pistol becomes an NFA weapon. *Id.*

Following the issuance of the 2017 letter, ATF continued to issue letters concluding that braced pistols were not NFA firearms. *See* Final Rule at 6,502 n.84. And, ATF asserted in criminal prosecutions that "ATF letters do correctly state that they consider a firearm with a pistol brace to *not* be a rifle under the NFA." Sentencing Hr'g Tr. at 38, *United States v. Kamali*, No. 3:18-cr-00288 (D. Conn. Sept. 30, 2019), ECF No. 110 (emphasis added). These statements, unsurprisingly, set off a rapid expansion of the pistol-brace market. Rule, 88 Fed. Reg. at 6,560 (acknowledging "demand . . . t[ook] off" in "2017"). Today, Americans own millions of braced pistols. *See* Final Rule at 6,560 (approximately 3-7 million braced pistols sold); William J. Krouse, CONG. RSCH. SERV., *Handguns, Stabilizing Braces, and Related Components* 2 (Apr. 19, 2021), https://bit.ly/3yKPSlt ("[U]nofficial estimates suggest that there are between 10 and 40 million stabilizing braces and similar components already in civilian hands.").

Below are some images of pistol braces that ATF approved during this period.

| Product | Product Images | Source |
|---------|----------------|--------|
| Original pistol stabilizing brace Nov. 8, 2012 |  | Final Rule at 6482-83 |
| SigTac SB15 Oct. 28. 2014 |  | https://vpc.org/wp-content/uploads/2019/08/black-aces-ATF-Black-Aces-Tactical-Letter.pdf |
| Sig Sauer Adjustable Pistol Stabilizing Brace[3] Dec. 22, 2015 |  | https://vpc.org/wp-content/uploads/2019/08/sig-sauer-ATF-Approval-Letter-Adjustable-Pistol-Brace-2015.pdf |

---

[3] ATF did request that the rear ridges on the brace be removed.

| Tailhook Mod2 (Oct. 6, 2016) |  | https://gearheadworks.com/wp-content/uploads/2018/12/Mod-2-Approval-Letter.pdf |
| SBL Mini (March 3, 2020) | 2020 submission of firearm with SBL Mini attached | Final Rule at 6492 |

**2021 Notice of Proposed Rulemaking.**  In 2021, however, ATF pivoted.  It announced its intent to revamp its classification of pistol braces in a Notice of Proposed Rulemaking (NPRM).  *See* Factoring Criteria for Firearms with Attached "Stabilizing Braces," 86 Fed. Reg. 30826 (June 10, 2021) ("Proposed Rule").  "Similar to . . . Form 4590, used to determine if a firearm is 'sporting' for purposes of importation," ATF proposed to use a new "Worksheet 4999 to determine if a firearm is designed and intended to be fired from the shoulder." *Id.* at 30830 (internal quotations added).  ATF Worksheet 4999 proposed a point system in which ATF would assign a weighted value "to various characteristics of the fully assembled firearm as configured when submitted for classification." *Id*. at 30829.  According to the NPRM, if the Worksheet yielded a "total point value . . . equal to or greater than 4—in either [Accessory Characteristics or Weapons Configuration sections of the Worksheet]—then the firearm, with the attached 'stabilizing brace,'" would be

11

considered a "rifle" and thus, presuming the attached pistol did not have a long barrel, would be considered an SBR.  *Id.*   The NPRM sought comments on "additional criteria that should be considered" and comments on whether ATF "selected the most appropriate criteria." Proposed Rule at 30850.

"[T]he Proposed Rule was controversial." *Mock II*, 75 F.4th at 573.  It received 237,000 comments, which were "overwhelmingly negative."  *Id.*   In fact, approximately 92% of the comments received by ATF opposed the rule.  *Id.*

**The Final Rule.**  On January 31, 2023, ATF published its Final Rule.  *See* Factoring Criteria for Firearms With Attached "Stabilizing Braces", 88 Fed Reg. 6478-01, 2023 WL 1102552 (Jan. 31, 2023).  That Rule acknowledged the general public's perception that "that a firearm equipped with a 'stabilizing brace' never falls within the purview of the NFA" and that some purchasers may not have realized that their affixing a stabilizing brace onto their firearm might convert it into an SBR.  *Id.* at 6502, 6555.  However, it elected to treat pistols equipped with stabilizing braces as NFA "firearms" anyway, including those equipped with braces that it had long approved.

Instead of proceeding via the detailed Worksheet it had initially proposed, ATF "amend[ed] the [regulatory] definition of 'rifle'. . . to expressly state that the term 'designed or redesigned, made or remade, and intended to be fired from the shoulder' includes a weapon that is equipped with an accessory, component, or other rearward attachment (e.g., a 'stabilizing brace') that provides surface area that allows the weapon to be fired from the shoulder, provided other factors, as listed in the amended

regulations and described in this preamble, indicate that the weapon is designed, made, and intended to be fired from the shoulder.'" *Id.* at 6480. Its other factors, far more vague and subjective than the ones set out in the Worksheet, were:

(1) Whether the weapon has a weight or length consistent with the weight or length of similarly designed rifles;

(2) Whether the weapon has a length of pull, measured from the center of the trigger to the center of the shoulder stock or other rearward accessory, component or attachment (including an adjustable or telescoping attachment with the ability to lock into various positions along a buffer tube, receiver extension, or other attachment method), that is consistent with similarly designed rifles;

(3) Whether the weapon is equipped with sights or a scope with eye relief that require the weapon to be fired from the shoulder in order to be used as designed;

(4) Whether the surface area that allows the weapon to be fired from the shoulder is created by a buffer tube, receiver extension, or any other accessory, component, or other rearward attachment that is necessary for the cycle of operations;

(5) The manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon; and

(6) Information demonstrating the likely use of the weapon in the general community.

*Id.*

ATF explained that the Final Rule's definition of "rifle" was "the best interpretation of the statute, and it [was] immediately effective." *Id.* ATF also explained that "because prior ATF classifications of firearms equipped with a 'brace' device did not all employ this correct understanding of the statutory terms, all such prior classifications are no longer valid as of January 31, 2023." *Id.* In doing so, overnight, ATF made possessors of pistol braces into felons, though it announced that

it would exercise prosecutorial discretion for several months, until May 31, 2023, for individuals to come into compliance with the new rule.  Final Rule at 6478, 6498.

**Litigation over the Final Rule.**  Litigation ensued immediately.   Within days of the Rule's publication, brace manufacturers, customers, gun rights organizations, and several states sued ATF.  *See, e.g.*, Complaint, *Mock v. Garland*, No. 4:23-cv-00095-O (N.D. Tex. January 31, 2023), ECF No. 1; Complaint, *Britto v. ATF*, No. 2:23-cv-00019-Z (N.D. Tex. January 31, 2023), ECF No. 1; Complaint, *Colon v. ATF*, No. 8:23-cv-00223 (M.D. Fla. February 2, 2023), ECF No. 1;  Complaint, *Firearms Regulatory Accountability Coalition v. Garland*, No. 1:23-cv-00024 (D.N.D. Feb. 9, 2023), ECF No. 1.  They argued, among other things, that the rule violates the APA, the text of the NFA, and the Second Amendment.

By May 23, 2023, before ATF's grace period ended, the Fifth Circuit had enjoined the government from enforcing the rule against plaintiffs in one such litigation.  Order, *Mock v. Garland*, No. 23-10319 (5th Cir. May 23, 2023).  As of today, the government is enjoined from enforcing the rule by six different courts.[4]  One of those injunctions is nationwide. *See Britto*, 2023 WL 7418291, at *5; *see* Government

---

[4] *See Mock v. Garland*, No. 4:23-CV-00095-O, 2023 WL 6457920, at *18 (N.D. Tex. Oct. 2, 2023) (*Mock III*); *Colon v. Bureau of Alcohol*, No. 8:23-CV-223-MSS-UAM, 2024 WL 309975, at *22 (M.D. Fla. Jan. 26, 2024); *Texas v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, No. 6:23-CV-00013, 2023 WL 7116844, at *12-13 (S.D. Tex. Oct. 27, 2023); *Britto v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, No. 2:23-CV-019-Z, 2023 WL 7418291, at *5 (N.D. Tex. Nov. 8, 2023); *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, No. 3:23-CV-1471-L, 2024 WL 1349307, at *11 (N.D. Tex. Mar. 29, 2024); *Texas Gun Rts., Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, No. 4:23-CV-00578-O, 2023 WL 8352316, at *4 (N.D. Tex. Oct. 4, 2023).

Response to Motion to Stay, *Miller v. Garland*, No. 23-1604 (4th Cir. Dec. 20, 2023) (acknowledging that the rule is stayed nationwide).  And, just yesterday, the Final Rule was vacated in its entirety at summary judgment.  *See Mock v. Garland* (*Mock IV*), No. 4:23-cv-00095-O (N.D. Tex. June 13, 2024), ECF. 110.  These courts have enjoined enforcement of the rule for a variety of reasons, including because it is not a logical outgrowth of the proposed rule, it is arbitrary and capricious, it risks infringing the Second Amendment, and it raises fair notice concerns.  *See Mock II*, 75 F.4th at 586; *Mock III*, 2023 WL 6457920, at *6; *Colon*, 2024 WL 309975, at *18; *Texas*, 2023 WL 7116844, at *9; *Britto*, 2023 WL 7418291, at *3; *NRA*, 2024 WL 1349307, at *7-*8; *Texas Gun Rts.*, 2023 WL 8352316, at *3-*4.

Since the nationwide injunction, the government has told courts that it is no longer enforcing the Final Rule.  *See* Government's Supplemental Brief, *Watterson v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, No. 4:23-CV-00080, ECF No. 58 (E.D. Tex. Feb. 23, 2024).  Indeed, the government has successfully prevented the entry of at least one injunction on the theory that a plaintiff in possession of a braced pistol cannot demonstrate irreparable harm. *Watterson v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, No. 4:23-CV-00080, 2024 WL 897595, at *19 (E.D. Tex. Mar. 1, 2024).  In that case, the plaintiff tried to argue that he still faced a risk of prosecution, but the district court rejected that argument because ATF no longer had authority to enforce the Final Rule following the *Britto* injunction, and affirmatively said they were not enforcing it.  *Id.* at *19.

In light of these injunctions and the government's public statements, stabilizing brace manufacturers and retailers are continuing to sell their braces much as they did before the Final Rule went into effect.  Mr. Taranto, however, has not been so lucky.

## II.    Procedural History

On June 29, 2023, Mr. Taranto was arrested in Washington DC.  In a locked backpack in Mr. Taranto's van, law enforcement found a pistol and pistol brace—more specifically, a Česká Zbrojovka a.s. Uherský Brod (CZ), model Scorpion EVO 3 S1 pistol with an attached SBTEVO stabilizing brace accessory.

Initially the government did not charge Mr. Taranto with possession of an unregistered SBR.  On July 12, 2023, Mr. Taranto was indicted on two D.C. Code violations—carrying a pistol without a license and possession of a large capacity magazine—and four misdemeanor federal offenses related to January 6.  Dkt. 15.

However, following Mr. Taranto's refusal to plead, the government sought and obtained a superseding indictment on February 14, 2024.  Notwithstanding the government's numerous losses in the pistol brace litigation, and the resulting injunctions against the Final Rule, the indictment included an SBR charge.  Count One of the superseding indictment charges Mr. Taranto with possession of an unregistered short-barreled rifle—the aforementioned Scorpion CZ—in violation of 26 U.S.C. §§ 5861(d), 5845(a)(3) of the NFA.  Dkt. 45.  In communications with the government, it has confirmed that Count One's NFA registration charge is based on the Scorpion CZ pistol and attached SBTEVO brace.  Attached to this motion is an

ATF report provided by the government which concludes that this braced pistol combination is an SBR. *See* Ex. 1.

Mr. Taranto now moves to dismiss that charge because (1) it has been brought in violation of the Court order enjoining ATF's Final Rule; (2) the Final Rule that purports to classify braced pistols as SBRs violates the APA; (3) classifying Mr. Taranto's firearm as an SBR violates the NFA; (4) prosecuting Mr. Taranto for possessing his braced-pistol violates the Second Amendment; (5) prosecuting Mr. Taranto runs afoul of due process and proper notice; and (6) the NFA violates the Supreme Court's fee jurisprudence.

## ARGUMENT

At this point, half a dozen courts have enjoined ATF, DOJ, and related agencies from enforcing the Final Rule. Yesterday, one court vacated the rule nationwide. These injunctions and the logic behind them, as well as some issues not yet reached by the courts, support the dismissal of Count One.

### I.   Legal Standards

A defendant in a criminal case may move to dismiss an indictment or information before trial for "failure to state an offense," Fed. R. Crim. P. 12(b)(3)(B)(v), including because the statute under which he is charged does not apply to his alleged conduct or violates the constitution. *United States v. Eshetu*, 863 F.3d 946, 952 (D.C. Cir. 2017), *vacated on other grounds* 898 F.3d 36 (D.C. Cir. 2018).

In determining whether a charging document fails to state an offense, courts must ask "whether the allegations, if proven, would be sufficient to permit a jury to find that the crimes charged were committed." *United States v. Bowdoin*, 770 F. Supp.

2d 142, 146 (D.D.C. 2011) (citing *United States v. Sampson*, 371 U.S. 75, 76 (1962)). In ruling on a pretrial motion to dismiss the trial court must presume the truth of the facts alleged in the charging instrument, *United States v. Park*, 938 F.3d 354, 358 (D.C. Cir. 2019), and may also accept any "undisputed facts" as true. *United States v. Yakou*, 428 F.3d 241, 247 (D.C. Cir. 2005) (explaining that "undisputed facts obviate[ ] the need for [a] district court to make factual determinations properly reserved for a jury").

## II.    The government is enjoined from relying on the interpretation embedded in the ATF regulation.

On November 8, 2023, a judge in the Northern District of Texas stayed the Final Rule classifying braced pistols as firearms subject to the NFA nationwide. *See Britto*, 2023 WL 7418291, at *5; *see* Government Response to Motion to Stay, *Miller v. Garland*, No. 23-1604 (4th Cir. Dec. 20, 2023) (acknowledging that the rule is stayed nationwide). That stay remains in effect today. Order Granting Motion to Stay, No. 2:23-CV-019-Z, ECF 73 (Jan. 1, 2024) (noting that the "previously issued injunction against Defendant's 'Final Rule' is 'left wholly intact'"). Yesterday, a judge vacated the Final Rule. *See Mock IV*, at 12.

Mr. Taranto's prosecution violates this stay and vacatur. According to the ATF report supplied by the government, Mr. Taranto's pistol and brace constitute an SBR under the NFA. In particular, the ATF report describes Mr. Taranto's weapon as "being equipped with a . . . 'stabilizing brace' accessory" that creates a "surface area to be fired from the shoulder." *See* Ex. 1 at 3-4. It explains that, according to the report, Mr. Taranto's gun has a similar "weight," "barrel length," "overall length," and

"length of pull" to an exemplar rifle.  *Id.* at 4.  It notes that the rifle, like the exemplar rifle, is equipped with sights, and that the stabilizing brace accessory creates a surface area that is not "needed for the proper cycle of operations."  *Id.*  These criteria are lifted straight from the Final Rule, and thus violate the *Britto* injunction and the *Mock* vacatur.  *See* Final Rule at 6480 (explaining that, under this new rule, a rifle now includes weapons equipped with a "stabilizing brace" that provides "surface area" allowing the weapon to be fired from the shoulder provided the weapon has "other factors that indicate it is made to be fired from the shoulder" including: "whether the weapon has a weight or length consistent with the weight and length of similarly designed rifles," "whether the weapon has a length of pull . . . that is consistent with similarly designed rifles,"  "whether the weapon is equipped with sights or a scope," "whether the surface area that allows the weapon to be fired from the shoulder is created by . . . any [] accessory, component, or reward attachment that is necessary for the cycle of operations" etc.).   Because the government is relying on a Rule that no longer exists to prosecute Mr. Taranto, Count One must be dismissed.

### III.    The regulation violates the APA.

Count One must also be dismissed because the Rule the government relies on to prosecute Mr. Taranto violates the APA.  "[A] criminal prosecution founded on an agency rule should be held to the strict letter of the APA." *United States v. Picciotto*, 875 F.2d 345, 346 (D.C. Cir. 1989).  In a criminal case, "[t]he liberty interest at stake is greater than the ordinary civil interests litigated in administrative cases." *United States v. Reynolds*, 710 F.3d 498, 511 (3d Cir. 2013).  "Before a person is threatened

with jail for such a violation, the government must ensure that the rule itself is not in violation of the law." *Picciotto*, 875 F.2d at 349. Where, as here, the government cannot meet that burden, our Circuit has held that the case against the defendant must be thrown out. *Id.*

The government cannot meet its burden to show that the Final Rule complied with the APA. The Final Rule is not a "logical-outgrowth" of the proposed rule, and it is arbitrary and capricious.

Under the APA, "an agency's proposed rule and its final rule may differ only insofar as the latter is a 'logical outgrowth' of the former." *Env't Integrity Project v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005). The logical outgrowth requirement serves to ensure the public has adequate notice and "an opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. § 553(c). A final rule is a logical outgrowth if interested parties "'should have anticipated' that the change was possible" from the notice. *Ne. Md. Waste Disposal Auth. v. EPA*, 358 F.3d 936, 951-52 (D.C. Cir. 2004). When the notice "expressly asked for comments on a particular issue or otherwise made clear that the agency was contemplating a particular change" that test is typically satisfied. *CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1081 (D.C. Cir. 2009). However, a rule fails this test where parties "would have had to 'divine [the agency's] unspoken thoughts,' because the final rule was surprisingly distant from the Agency's proposal." *Id.* at 1081.

The Final Rule upon which Mr. Taranto's prosecution is based bears "little resemblance" to ATF's proposed rule. *Mock II*, 75 F.4th at 583. "The Proposed Rule

centered entirely on Worksheet 4999, which determined, by an extensive point system, whether a firearm was a 'rifle' under the NFA." *Id.* (citing Proposed Rule at 30830–31). "[N]owhere in the Proposed Rule did the ATF give notice that it was considering getting rid of the Worksheet for a vaguer test." *Id.* at 584. "Nor was the public, which criticized the subjective nature of the purportedly objective criteria of Worksheet 4999 and its overbreadth, put on notice that not only would the ATF change the criteria, but it also would make the criteria so expansive as to subject an estimated 99% of stabilizing braces on the market to enhanced regulation and increase the economic effect of the Rule by over $100 million." *Id.* at 583. "Instead, the 'Comments Sought' section of the Proposed Rule requested only 'additional criteria that should be considered' and comments on whether the ATF 'selected the most appropriate criteria.'" *Id.* at 584 (quoting Proposed Rule at 30850). "Unsurprisingly, the comments on the Proposed Rule concentrated on implementing Worksheet 4999." *Id.* at 583 (citing Final Rule at 6510–48.).

"Whereas the Worksheet allowed an individual to analyze his own weapon and gave each individual an objective basis to disagree with the ATF's determinations, the Final Rule vests the ATF with complete discretion to use a subjective balancing test to weigh six opaque factors on an invisible scale." *Id.* This decision to remove "all objective criteria operates [as] a rug-pull on the public," *id.* at 583, and a "total shift in the 'rifle' analysis that interested parties would never have been able to predict." *Colon*, 2024 WL 309975, at *13. Therefore, as numerous courts have held, the parties' challenging the Final Rule are likely to succeed on their claim that the

Final Rule is not a logical outgrowth of the Proposed Rule.  *See Mock II*, 75 F.4th at 586; *Colon*, 2024 WL 309975, at *13 (same); *Texas*, 2023 WL 7116844, at *9 (same); *Britto*, 2023 WL 7418291, at *3 (same); *NRA*, 2024 WL 1349307, at *8 (same).  *But see Miller v. Garland*, 674 F. Supp. 3d 296, 308 (E.D. Va. 2023) (finding that the logical growth test did not apply based on the since-vacated district court decision in *Mock v. Garland*, 666 F. Supp. 3d 633, 641-42 (N.D. Tex.)) (*Mock I*), *rev'd and remanded*, 75 F.4th 563 (5th Cir. 2023)).

The Final Rule is also arbitrary and capricious. To satisfy arbitrary and capricious review, an agency must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between facts found and the choice made." *Motor Vehicle Mfrs. v. State Farm*, 463 U.S. 29, 43 (1983). An agency must provide a more "detailed justification" for a "new policy [that] rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (citing *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 742 (1996)).

Here, ATF did not provide sufficient justification for its change in position. "For close to a decade, the ATF concluded that attaching the brace to a firearm does not alter the classification of the firearm or subject the firearm to NFA control." *Texas Gun Rts*, 2023 WL 8352316, at *3.  "Under the Final Rule, the ATF estimated about 99% of pistols with stabilizing braces would be reclassified as NFA rifles." *Id.* Contemporaneously, ATF also issued around 60 adjudications that reclassified

different configurations of firearms with stabilizing braces as NFA rifles, including the firearm Mr. Taranto is charged with possessing.  *See* ATF, *Commercially available firearms equipped with a "stabilizing brace" that are short-barreled rifles* at 26, https://www.atf.gov/rules-and-regulations/docs/undefined/bracefinalruleguid-ance-commerciallypdf/download.  ATF "provided no explanations for how the agency came to these classifications." *Texas Gun Rts*, 2023 WL 8352316, at *3.  It is unclear if there is even one pistol and stabilizing brace combination that would be exempt from the NFA.  *See Mock II*, 75 F.4th at 585 (finding none).  These "'unexplained and inconsistent' positions are arbitrary and capricious."  *Texas Gun Rts*, 2023 WL 8352316, at *3.

Moreover, "the standards set forth in the Final Rule are impermissibly vague." *Mock IV*, at 9 (quoting *Mock II*, 75 F.4th at 584).  The Worksheet in the Proposed Rule allowed members of the public to evaluate their own weapons and an objective basis to dispute an ATF determination to the contrary.  *Id.*  However, "the Final Rule vests the ATF with complete discretion to use a subjective balancing test to weigh six opaque factors on an invisible scale."  *Id.* (quoting *Mock II*, 75 F.4th at 584).  The Final Rule is "impermissibly vague" because "provides no meaningful clarity about what constitutes an impermissible stabilizing brace, and . . . it is nigh impossible for a regular citizen to determine what constitutes a braced pistol that requires NFA registration."  *Id.* (quoting *Mock II*, 75 F.4th at 584-85 in part).

For this separate reason, Count One should be dismissed.

#### IV.    A braced pistol is not a short barrel rifle under the NFA.

Congress enacted the NFA to regulate specific firearms favored by prohibition-era "gangster[s]"—"i.e., sawed-off shotguns, sawed-off rifles, and machine guns." United States Br. 5, *United States v. Miller*, 307 U.S. 174 (1939), 1939 WL 48353, at *5; *see also Lomont v. O'Neill*, 285 F.3d 9, 11-12 (D.C. Cir. 2002). But, as noted above, it left pistols untouched.

Two NFA subsections address SBRs in particular.   Subsection 5845(a)(4) concerns the specific evil of sawed-off rifles, designating as an NFA "firearm" "a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length." 26 U.S.C. § 5845(a)(4). Because the NFA defines "ma[d]e" to exclude production by a "qualified" manufacturer, *id.* § 5845(i), subsection (a)(4) covers only rifles shortened after initial production.  This does not apply to Mr. Taranto's braced pistol, which has never been shortened.

Subsection (a)(3) reaches initial production. It regulates "a rifle having a barrel or barrels of less than 16 inches in length." *Id.* § 5845(a)(3). Subsection (a)(3) thus ensures the NFA treats commercially produced short-barreled rifles the same as subsection (a)(4) treats sawed-off rifles.  However, because subsection (a)(3) omits "made" or "modified"—terms present only in subsection (a)(4)—this provision applies to short-barreled rifles produced by a qualified manufacturer and not by post-production additions of an accessory to a handgun or pistol by an end consumer.

Furthermore, neither subsection purports to regulate pistols, accessories, or stabilizing braces. Subsection (e) confirms the omission is intentional, expressly excluding "pistols" from the catch-all definition for an NFA "firearm." 26 U.S.C. § 5845(e); *see also Mock*, 75 F.4th at 570 ("The NFA specifically exempts 'a pistol or a revolver having a rifled bore' from its coverage").

The government may try to get around this obvious conclusion by relying not on the provisions regulating short-barreled rifles, but on the definition of rifle itself. Under the NFA, a firearm is a rifle only if it is "designed or redesigned, made or remade, and intended to be fired from the shoulder." 26 U.S.C. § 5845(c) (emphasis added). Presumably, the government will argue, as it has in recent cases, that a braced pistol has been "made" or "remade" into a rifle. But this is not correct.

For one, this interpretation would lead to superfluity in the statute. If the definition of "rifle" meant that subsection (a)(3) regulates a weapon "made" or "remade" from another firearm, subsection (a)(4) would be left with no work to perform—its role subsumed by subsection (a)(3). This interpretation would "violat[e] the cardinal rule" that "effect shall be given to every clause and part of a statute," *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012), and it should be rejected. *See Ysleta Del Sur Pueblo v. Texas*, 142 S. Ct. 1929, 1939 (2022) (rejecting interpretation that collapsed two statutory provisions).

In *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489 (1982), the Supreme Court interpreted a statute prohibiting sale of items "designed . . . for use with illegal cannabis or drugs." *Id.* at 491. The Court found it "plain" and

25

"clear" that "designed" includes "an item that is principally used with illegal drugs" but not "items which are principally used for nondrug purposes." *Id.* at 501. Thus, the statute would cover a pipe "typically used to smoke marihuana" but not "ordinary pipes"; a "roach clip" but not "paper clips sold next to Rolling Stone magazine." *Id.* at 494, 501-02.

The Supreme Court has applied similar reasoning under the NFA. In *United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505 (1992), the plurality explained that someone did not "make" a "firearm" by packaging components that could "be converted not only into a short-barreled rifle, which is a regulated firearm, but also into a long-barreled rifle, which is not." *Id.* at 513 (plurality). Because the "aggregation of parts" served a "useful purpose" other than "the assembly of a[n NFA] firearm," lenity required the conclusion that the parts had "not been 'made' into a short-barreled rifle for purposes of the NFA." *Id.* at 512-13, 517-18.

*Hoffman Estates* and *Thompson/Center Arms*, applied together, require the dismissal of Count One. Stabilizing braces—as their name suggests—are, by their very nature, "designed," "made" and "intended" to brace the user's firing arm. That is why they have openings in the back of the brace that a user's arm can be inserted into, and flaps and straps that anchor the user's shooting hand. Indeed, the presence of an opening in a brace and such straps to stabilize the user's firearm was one of the only truly consistent through-lines in the ATF's letter determinations evaluating pistol braces.

An image of the firearm Mr. Taranto is accused of possessing is included below.



Ex. 1.

As can be seen in the above image, the brace has flaps and a strap to anchor the shooter's hand without firing from the shoulder.  It also has an opening that the shooter's arm can be placed through, which plainly aids with braced firing, but this opening does nothing to promote firing from the shoulder.  These features demonstrate that the attachment serves a primary and useful purpose other than the assembly of an NFA firearm (*i.e.*, braced firing).[5]

In sum, the firearm Mr. Taranto is charged with possessing is a braced pistol, not an SBR.  Count One must be dismissed.  Furthermore, to the extent the court is torn about the appropriate interpretation here, both rule of lenity and the principle

---

[5] The ATF classification report provided by the government contains zero discussion of the relevance of these two features or the suitability of the braced CZ Scorpion for non-shoulder fire.  *See* Ex. 1.  It does not appear that the classifying officer even attempted non-shouldered fire with the weapon.

of constitutional avoidance, *see infra* section V (discussing the Second Amendment),

counsel in favor of a narrower interpretation.  *United States v. Davis*, 588 U.S. 445,

464 (2019).

### V.   Treating a braced pistol as a short barrel rifle violates the Second Amendment.

Count One must be dismissed because the government's prosecution of Mr.

Taranto violates the Second Amendment.  In *New York State Rifle & Pistol Ass'n, Inc.*

*v. Bruen*, 597 U.S. 1 (2022), the Supreme Court established a two-step test for Second

Amendment challenges.  At the first step, the defendant must show that the plain

text of the Second Amendment covers the restricted conduct.  *Id.* at 18.  If it does, the

burden shifts to the government to demonstrate that the challenged firearm

restriction is "consistent with the Nation's historic tradition of firearm regulation."

*Id.* at 24.   If the government fails to meet that burden, the restriction is

unconstitutional.  *Id.*

### a.  The Second Amendment protects Mr. Taranto's alleged conduct of possessing a braced pistol.

The Second Amendment "presumptively protects" Mr. Taranto's alleged

conduct because it is covered by "the Second Amendment's plain text." *Bruen*, 142 S.

Ct. at 2130.  The Second Amendment's operative clause protects "the right of the

people to keep and bear Arms." U.S. Const. amend. II.  The term "arms" is broadly

defined to include any "[w]eapons of offense" or "thing that a man wears for his

defence, or takes into his hands," that is "carr[ied] . . . for the purpose of offensive or

defensive action."  *Heller*, 554 U.S. at 581, 584.  This definition covers all "modern

instruments that facilitate armed self-defense," *Bruen* 142 S. Ct. at 2132, "even those

that were not in existence at the time of the founding," regardless of whether they are strictly necessary for self-defense. *Id.* (quoting *Heller*, 554 U.S. at 582).

Mr. Taranto's braced pistol is undoubtedly such a weapon. When a brace is attached (or affixed) to a pistol, it becomes a single instrument, allowing it to be fired one-handed. The braces are designed solely to facilitate the use of the pistol. "No one is going to butter a sandwich or dice carrots" with them. *See State v. Gator's Custom Guns, Inc.*, 2024 Wash. Super. LEXIS 912, *11 (Wash. Super. Ct. Apr. 8, 2024). Moreover, the NFA does not "ban or regulate 'stabilizing brace' devices that are not attached to a firearm," *see* Final Rule at 6497 and 6500-01; rather, it regulates "firearms." Hence, the first step of the analysis is easy: braced pistols are "arms." *See Mock III*, 2023 WL 6457920, at *10 (finding "possession and use of brace pistols" is an "arm" and "therefore within the ambit of Second Amendment protection").

### b. The government cannot satisfy its burden because the Supreme Court has held that arms that are in "common use"—like braced pistols—cannot be banned.

Because Mr. Taranto's possession of a braced pistol is covered by the plain text of the Second Amendment, the burden shifts to the government to establish a historical tradition of similar firearm regulation. When the challenged law addresses an old problem, the test is "fairly straightforward": the government must identify a tradition of "distinctly similar" laws from the founding era. *Bruen*, 142 S. Ct. at 2132; *see also Range v. Att'y Gen. of U.S.*, 69 F.4th 96, 103 (3d Cir. 2023); *United States v. Duarte*, 101 F.4th 657, 680, 688 (9th Cir. 2024). Although *Bruen* did not expressly define "distinctly similar," it indicated the standard is a stringent one. The only

historical regulation *Bruen* identified as distinctly similar to New York's proper-cause requirement was an 1871 Texas law forbidding "anyone from 'carrying on or about his person . . . any pistol . . . unless he has reasonable grounds for fearing an unlawful attack on his person.'" *Bruen*, 142 S. Ct. at 2153 (citing 1871 Tex. Gen. Laws § 1). This "reasonable grounds" requirement was essentially identical to New York courts' interpretation of that state's proper-cause standard. *See id.* at 2123-24.

When the challenged law addresses a new problem, the test is "more nuanced." *Bruen*, 142. S. Ct. at 2132. Courts must determine if the challenged modern law fits into a "relevantly similar" tradition of historical laws. *Id.* The Supreme Court identified two "central considerations" for courts to determine if laws are relevantly similar: "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 2133. In other words, the government need not identify a "historical twin," but it still must show that the regulations are aligned as to "*how* and *why* [they] burden a law-abiding citizen's right to armed self-defense." *Id.* To carry its burden, "the government [must] identify a well-established and representative" tradition of analogous regulation, and "courts should not 'uphold every modern law that remotely resembles a historical analogue,' because doing so 'risk[s] endorsing outliers that our ancestors would never have accepted.'" *Id.* at 2133 (citation omitted).

As explained in Mr. Taranto's motion to dismiss Count Four, the Supreme Court has already identified the relevant historical tradition as it relates to the arms ban question: arms that are in "common use" for lawful purposes cannot be banned.

*See Heller*, 554 U.S. at 624, 627; *Bruen*, 142 S. Ct. at 2128, 2143, 2156.  Or put differently, under Supreme Court precedent, "[a] weapon may not be banned unless it is *both* dangerous *and* unusual."  *Caetano v. Massachusetts,* 577 U.S. 411, 411-12 (2016) (Alito and Thomas, concurring) (emphasis in original).  "Dangerousness" relates to whether "the weapon belongs to a class of arms commonly used for lawful purposes."  *Id.* at 418.  And "unusualness" relates to whether the weapon is in common use *today*.  *See id.* at 412, 419-20.  "[T]his is a conjunctive test," meaning if the Court concludes that braced pistols are usual (*i.e.*, in "common use"), it does not need to consider whether they are also "dangerous."  *See id.*; *see also Heller*, 554 U.S. at 720-21 (Breyer, J., dissenting) (criticizing the majority's test because "if tomorrow someone invents a particularly useful, highly dangerous self-defense weapon, Congress and the States had better ban it immediately, for once it becomes popular Congress will no longer possess the constitutional authority to do so.").

In *Heller*, the Supreme Court grappled with what types of weapons receive Second Amendment protection.  After surveying numerous historical sources—from Blackstone through 19th-century cases—the Court found that weapons in "common use at the time" were protected under the Second Amendment and only those not typically possessed by ordinary citizens were not protected.  *See* 554 U.S. at 627 (citing 4 W. Blackstone, Commentaries on the Laws of England 148–149 (1769) among other sources; then quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)).  Later, in *Bruen*, the Supreme Court re-affirmed this holding: "The Second Amendment protects the possession and use of weapons that are in 'common use at

the time,' as opposed to those that are 'highly unusual in society at large.'" 142 S. Ct. at 2128 (quoting *Heller*, 554 U.S. at 627). The Court found the common use test "fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id.* (quoting *Heller*, 544 U.S. at 627); *see also Teter v. Lopez*, 76 F.4th 938, 950 (9th Cir. 2023), *rehearing en banc granted* 2024 U.S. App. LEXIS 4079 (9th Cir. Haw., Feb. 22, 2024) ("*Heller* itself stated that the relevance of a weapon's dangerous and unusual character lies in the '*historical tradition* of prohibiting the carrying of dangerous and unusual weapons.'"). Thus, the Supreme Court has already surveyed the Nation's history and traditions and discerned the governing principle: legislatures may only prohibit "dangerous *and* unusual weapons." *See Gator's Custom Guns, Inc.*, 2024 Wash. Super. LEXIS 912 at *26 ("There is no need to re-do the historical analysis in an arm ban case" because the "Supreme Court has already done the historical analysis" and provided that the "Court needs only apply the in common use" test).

"The relevant inquiry under [the common use] standard is the total number of a particular weapon that is in lawful possession, ownership, and circulation throughout the United States." *Mock III*, 2023 WL 6457920, at *9 (citing *Caetano*, 577 U.S. at 420, (Alito, J., concurring in the judgment); *Friedman v. City of Highland Park, Ill.*, 577 U.S. 1039 (2015) (Thomas, J., dissenting from the denial of certiorari); *Hollis v. Lynch*, 827 F.3d 436, 449-450 (5th Cir. 2016) (collecting cases)); *see also Heller v. D.C.*, 670 F.3d 1244, 1261 (D.C. Cir. 2011) (explaining that it is "clear enough in the record that semi-automatic rifles and magazines holding more than ten rounds

are indeed in 'common use'" because approximately 1.6 million AR-15s have been manufactured and 4.7 million such magazines have been imported to the United States).

Given these principles, the government cannot meet its burden to show a historical tradition of regulation. Pistols like the one possessed by Mr. Taranto are indisputably in common use (and therefore protected by the Second Amendment) without the attached brace. *See, e.g.*, *Mock III*, 2023 WL 6457920, at *9. "A stabilizing brace does not somehow alter that status and effectively strip [a pistol] of [its] Second Amendment protection." *Id.* "The ATF's regulatory analysis conclude[d] that there are between 3 and 7 million, with a fifty percentile estimate of 5 million, braced pistols under the ownership of law-abiding individuals for lawful purposes throughout the United States." *Id.*; *see also* Final Rule at 6,560 (listing these numbers); Krouse, *supra* ("[U]nofficial estimates suggest that there are between 10 and 40 million stabilizing braces and similar components already in civilian hands.") (emphasis added). "In the Final Rule publication as well, ATF did not dispute noteworthy public comments pointing out that 'millions of 'braces' are in use' and that braced pistols are 'commonly used by millions of law-abiding Americans for various reasons.'" *Id.*[6] Accordingly, braced pistols are in "common use" in the United States.

---

[6] In *Mock III*, the court concluded that the possession of braced pistols was presumptively protected under the Second Amendment, but stopped short of deciding if the government had met its burden to demonstrate a tradition of analogous regulation because the court had already concluded that the Final Rule likely violated the APA. 2023 WL 6457920, at *8-*12 & n.16.

The government may argue, in response, that the NFA does not ban SBRs but only subject them to registration requirements.  However, the NFA does more than establish a perfunctory registration requirement.  Among other things, it requires Mr. Taranto and individuals like him to submit an application to register their firearms, and prohibits granting such an application where doing so would place the person "in violation of law." 26 U.S.C. § 5812.  The NFA's registration requirement, therefore, amounts to a ban on possessing firearms where doing so would otherwise violate the law.

Washington, D.C. prohibits the possession of short-barreled rifles.  It does this by prohibiting the registration of short-barreled rifles, D.C. Code § 7-2502.02, which it defines in materially similar terms to the NFA,[7] and then prohibiting the possession of unregistered firearms, D.C. Code § 7-2502.01.  Therefore, if a braced pistol is indeed a type of SBR, the NFA amounts to a ban on its possession at the time and place where Mr. Taranto is alleged to have possessed it because possessing it would have placed him "in violation of the law." 26 U.S.C. § 5812.

Furthermore, even assuming *arguendo* that the NFA sets out mere registration requirements, the government still cannot meet its burden to establish a historical tradition of analogous regulation.  From the time of the founding there

---

[7] *See* D.C. Code § 7–2501.01(17) ("'Short barreled rifle' means a rifle having any barrel less than 16 inches in length, or a firearm made from a rifle if such firearm as modified has an overall length of less than 26 inches or any barrel of less than 16 inches"); *id.* § 7–2501.01(14)("'Rifle' means a grooved bore firearm using a fixed metallic cartridge with a single projectile and designed or redesigned, made or remade, and intended to be fired from the shoulder.").

have been arms capable of being shouldered and with barrels shorter than 16 inches. *See, e.g.*, David Condon, Inc., *American Revolutionary War Era Exceptional French Elliptical-Bore Bronze-Barrel Flintlock Blunderbuss With Spring Bayonet* (circa 1770).[8]  In other words, the problem of shouldered firearms with short barrels is "general societal problem that has persisted since the 18th century." *Bruen*, 142 S. Ct. at 2131.  Thus, the government is obligated to point to a "distinctly similar" tradition of requiring registration of such firearms.

In prior pistol-brace litigation, the government has cited a "litany of state regulations dating to 1631 to show that many 'states' required registration, inspection, or surveying of citizens' firearms." *Colon*, 2024 WL 309975, at *19.  But those laws "have nothing to do with the inspection or registration of firearms for crime control or to prevent shoulder fire." *Colon v. Bureau of Alcohol*, No. 8:23-CV-223-MSS-NHA, 2024 WL 1050581, at *2 (M.D. Fla. Mar. 11, 2024) (*Colon II*) (rejecting the government's motion to dismiss the defendant's Second Amendment claim). Instead, they "concerned civilian readiness for combat, adequacy of stock, and taxation of firearms and ammunition to raise revenue for the general welfare." *Colon*, 2024 WL 309975, at *19.  They "were undertaken to ensure that the citizenry was well-armed." *Id.*; *see also Heller v. District of Columbia*, 670 F.3d 1244, 1270 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) ("Registration of all lawfully possessed guns—as distinct from licensing of gun owners or mandatory record-keeping by gun sellers—

---

[8]    Available    at    https://www.davidcondon.com/inventory/Antique%20Handguns-/american-revolutionary-warera-exceptional-french-elliptical-bore-bronze-barrel-flintlock-blunderbuss-with-spring-bayonet-29805.

has not traditionally been required in the United States and even today remains highly unusual. Under *Heller*'s history- and tradition-based test, D.C.'s registration requirement is therefore unconstitutional."). The NFA's purpose is the opposite. Congress designed to "curtail, if not prohibit, transactions in NFA firearms." *See National Firearms Act*, BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, available at https://www.atf.gov/content/firearms/firearms-industry/national-firearms-act.[9] In sum, the historical regulations that have been relied upon by the government in the past are not "comparably justified," and so do not provide the necessary historical tradition of regulation to justify the NFA's registration requirement. *Bruen*, 142 S. Ct. at 2133.

Furthermore, as Judge Willett explained in his concurring opinion in *Mock*, pistol braces "improve a pistol's stability, and thus a user's accuracy." *Mock*, 75 F.4th at 588 (Willett, J., concurring). "Accuracy, in turn, promotes safety." *Id*. The government cannot establish a "historical tradition of requiring ordinary citizens to

---

[9] The government may point to the DC Circuit's decision in *Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) (*Heller II*), to argue that registration requirements pass constitutional muster. In *Heller II*, the D.C. Circuit held, over a dissent from then-Judge Kavanaugh, that D.C.'s firearm registration requirement was consistent with the Second Amendment because states enacted such laws in the early 20th century and, thus, they were purportedly "longstanding." *Id*. at 1270. *Heller II*, however, predates *Bruen* and is not good law. In *Bruen*, the Supreme Court struck down New York's proper cause requirement that had itself been a matter of New York law since 1913. *Bruen*, 597 U.S. at 11. In doing so, the Supreme Court did not even bother to discuss the early 20th century regulations identified by those arguing in favor of New York's law, explaining that they did not provide insight into the Second Amendment. *Id*. at 66. Thus, *Heller II*'s conclusion that registration requirements were longstanding, and thus constitutionally permissible, because they had their origins in the early 20th century, cannot survive *Bruen*.

endure a lengthy, costly, and discretionary approval process just to use accessories that make an otherwise lawful weapon *safer*." *Id.* (emphasis in original).

For these reasons, the Count One must be dismissed for violating the Second Amendment.

### VI. The government's interpretation offends fundamental principles of fair notice and runs afoul of due process.

A penal statute must "define the criminal offense [1] with sufficient definiteness that ordinary people can understand what conduct is prohibited and [2] in a manner that does not encourage arbitrary and discriminatory enforcement." *United States v. Skilling*, 561 U.S. 358, 402-03 (2010) (quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)). "The constitutional requirement of definiteness is violated by a criminal statute that fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute." *United States v. Harriss*, 347 U.S. 612, 617 (1954). "The failure of 'persistent efforts . . . to establish a [governing] standard,'" including by administrative officials, "can provide evidence of vagueness." *Johnson v. United States*, 576 U.S. 591, 598 (2015) (quoting *United States v. L. Cohen Grocery Co.*, 255 U.S. 81, 91 (1921), which discusses persistent efforts by administrators to establish a standard to enforce the law).

"The degree of vagueness tolerable in a given statutory provision," moreover, "varies based on 'the nature of the enactment." *U.S. Telecom Ass'n v. FCC*, 825 F.3d 674, 736 (D.C. Cir. 2016) (quoting *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498-99 (1982)). Rules that "threaten[ ] to inhibit the

exercise of constitutionally protected rights" or that include criminal penalties are subject to "a more stringent vagueness test." *Hoffman Estates*, 455 U.S. at 499.

Fair notice principles also apply to agency regulations. "[W]hen sanctions are drastic . . . 'elementary fairness compels clarity' in the statements and regulations setting forth the actions with which the agency expects the public to comply." *Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1328–29 (D.C. Cir. 1995). Courts "ask whether 'by reviewing the regulations and other public statements issued by the agency, a regulated party acting in good faith would be able to identify, with ascertainable certainty, the standards with which the agency expects parties to conform.'" *Trinity Broad. of Fla., Inc. v. FCC*, 211 F.3d 618, 628 (D.C. Cir. 2000).

The D.C. Circuit's decision in *United States v. Chrysler Corp.*, 158 F.3d 1350 (D.C. Cir. 1998), provides a helpful illustration. In that case, the agency promulgated a seatbelt safety standard, which required carmakers to install seatbelt anchorages that could withstand certain pressure forces and required carmakers to conduct their pressure tests using a "pelvic body block." *Id.* at 1351. The seatbelt standard did not tell car makers where to install that block during the tests. Chrysler put the pelvic block against the seat back during testing and certified that its cars complied with the relevant rules. *Id.* at 1352. However, during its own, independent testing, the agency moved the pelvic block away from the seat back and the seatbelt failed. *Id.* Based on these results, the agency ordered Chrysler to recall its cars. *Id.*

The D.C. Circuit found that the agency's decision ran afoul of fair notice principles. The agency argued that nothing in the relevant standards guaranteed

Chrysler that, if the seatbelt anchorages were compliant when the pelvic block was pressed against the seat back, it would pass testing. *Id.* at 1355-56. It also pointed to a notice it had issued reflecting the agency's general policy that, "when a standard does not specify a particular test condition, there is a presumption that the requirements of the standard must be met at all such test conditions." *Id.* at 1356. But the D.C. Circuit held that this notice was "far too general" to provide Chrysler fair notice of its obligations to test the pelvic block at other locations. *Id.* It also did not matter that the agency previously told regulated entities not to rely on the testing schematic attached to Standard 210 (which had showed the pelvic block placed at the back of the seat), because "an agency is hard pressed to show fair notice when the agency itself has taken action in the past that conflicts with its current interpretation of a regulation." *Id.* (citing *Gen. Elec. Co.*, 53 F.2d at 1332).

Under these principles, it is obvious that the government's interpretation of the NFA as applying to braced pistols offends traditional fair notice principles and runs afoul of due process. To begin, strict vagueness principles apply here. As is evident by the criminal charge in this case, violating the NFA carries serious criminal penalties. It likewise threatens the constitutionally protected right to bear arms. *See supra* section V. Yet, as of today, ATF has no operable criteria governing whether and how braced pistols are classified as SBRs under the NFA. The Final Rule has been vacated. *Mock IV*, at 12. The relevant regulations have reverted to what they were before the Final Rule. That is, the ATF definition of rifle and SBR mirror the

39

statute in all material respects.[10]  Thus, ATF is "hard pressed" to show fair notice given that it has "taken actions in the past that conflict[]" with its current interpretation of those terms.  *Chrysler Corp.*, 158 F.3d at 1356.  ATF's long history of approving braced pistols and its acknowledgement of the public perception that pistol braces did not subject a firearm to NFA regulation make clear that ordinary citizens do not have fair notice about what the NFA prohibits—at least as applied to this particular category of firearms.

This situation is a problem of ATF's own making.  As detailed above, beginning in 2012, ATF began approving braced pistols and concluding that they were not SBRs.  And, in the years that followed, ATF issued numerous classification letters finding that braced pistols were not NFA firearms.  For the most part, it made these determinations in private adjudication letters, but it permitted them to be made public.  And, when it finally attempted to bring clarity to the regulatory landscape through rulemaking, it failed to follow the requirements of the APA.  Regulated parties in Mr. Taranto's position, acting in good faith, cannot identify with ascertainable certainty what standards ATF will apply to determine whether their braced pistols are NFA firearms.  As a matter of fact, it is counsel's understanding that ATF and DOJ have declined to prosecute other individuals found in possession

---

[10] *See* 27 C.F.R. § 478.11 (2022) ("Rifle. A weapon designed or redesigned, made or remade, and intended to be fired from the shoulder, and designed or redesigned and made or remade to use the energy of an explosive to fire only a single projectile through a rifled bore for each single pull of the trigger."); *id.* ("Short-barreled rifle. A rifle having one or more barrels less than 16 inches in length, and any weapon made from a rifle, whether by alteration, modification, or otherwise, if such weapon, as modified, has an overall length of less than 26 inches.").

of braced pistols because of these notice concerns and the injunctions entered in other courts.  Because Mr. Taranto's prosecution offends fair notice principles grounded in due process, Count One must be dismissed.

## VII.   The NFA runs afoul of the Supreme Court's fee jurisprudence.

Fee jurisprudence doctrine first arose in the First Amendment context.  *Bauer v. Becerra*, 858 F.3d 1216, 1225 (9th Cir. 2017) (describing doctrine).  The basic rule is straightforward: taxes on constitutionally-protected activities are only permissible if they are tailored "to meet the expense incident to the administration of the act and to the maintenance of public order in the matter licensed."  *Id.* (quoting *Cox v. New Hampshire*, 312 U.S. 569, 577 (1941)).  "Put another way, imposing fees on the exercise of constitutional rights is permissible when the fees are designed to defray (and do not exceed) the administrative costs of regulating the protected activity."  *Kwong v. Bloomberg*, 723 F.3d 160, 165 (2d Cir. 2013).  In other words, taxes on constitutional rights must be tailored as narrowly as possible.  They cannot be a vehicle for suppressing protected-but-unpopular conduct.

The registration fee here violates this principle.  As ATF itself admits, the NFA's "underlying purpose was to curtail, if not prohibit, transactions in NFA firearms." *See National Firearms Act*, BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES,     available     at     https://www.atf.gov/content/firearms/firearms-industry/national-firearms-act. The congressional testimony was clear on this point:

> A sawed-off shotgun is one of the most dangerous and
> deadly weapons. A machine gun, of course, ought never to
> be in the hands of any private individual. There is not the
> slightest excuse for it, not the least in the world, and we

must, if we are going to be successful in this effort to suppress crime in America, take these machine guns out of the hands of the criminal class.

*National Firearms Act: Hearings on H.R. 9066 Before the H. Comm. On Ways & Means*, 73rd Cong. 1 (1934) [Testimony of Attorney General Homer Stille Cummings].

The NFA set out to take weapons out of the hands of the public not by outlawing them *per se*, but setting a tax that was prohibitively expensive. From the beginning, Congress set the tax at $200—the equivalent of approximately $4,758.62 per firearm in today's dollars. *See Inflation Calculator,* BUREAU OF LABOR STATISTICS, https://www.bls.gov/data/inflation_calculator.htm. Depending on the specific firearm, this amount equaled or dwarfed the actual cost of the gun, rendering them practically unavailable to everyone but the rich. Alexandria Kincaid, *Origins of the NFA,* Recoil Magazine, available at https://www.recoilweb.com/origins-of-the-nfa-128767.html (July 18, 2017).

This specific scheme is distinct from other fee jurisprudence challenges to gun regulations. In *Bauer*, for instance, the Ninth Circuit considered a California law that exacted "$5 of a $19 fee on firearms transfers to fund enforcement efforts against illegal firearm purchasers[.]" 858 F.3d at 1218. That small fee was permissible because it was a "minimal burden" aimed at "fund[ing] 'costs associated with funding Department of Justice firearms-related regulatory and enforcement activities related to the sale, purchase, possession, loan, or transfer of firearms.'" *Id.* at 1224. California's legislative history likewise supported this conclusion—the relevant senate committee clarified that the challenged fee went toward the costs of administering the firearm registration program. *Id.*

The opposite is true here.  The NFA's own drafters made their intent clear: they wanted the tax to suppress firearm possession generally, not to fund NFA program costs.  And the $200 fee (in 1934 dollars) outstrips the *Bauer* fee by several orders of magnitude.  Congress cannot use the Taxing Power as an end-run around the Second Amendment. Because the 1934 Congress attempted to enact a gun ban in all but name, fee jurisprudence doctrine compels the conclusion that the NFA is unconstitutional.  For this final reason, Count One must be dismissed.

## CONCLUSION

The government has lost again and again and again in cases challenging the propriety of its classification of braced pistols as NFA firearms.  Courts have enjoined and vacated the Final Rule.  They have said it violates the APA.  They have raised Second Amendment and notice concerns about it.   And these concerns, as discussed above, do not even cover all the legal problems with the government's treatment of braced pistols as SBRs.  The government's decision to prosecute Mr. Taranto with a ten-year federal felony notwithstanding all of this is—to put it mildly—troubling. More importantly, it is legally impermissible.  For the foregoing reasons, Mr. Taranto respectfully requests that the Court dismiss Count One.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER


_____/s/_____
Courtney L. Millian
Elizabeth Mullin
Shelli Peterson
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500