UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | CASE NO. 23-CR-229 (CJN) |
| v. : | |
| : | |
| TAYLOR TARANTO, : | |
| : | |
| Defendant. : | |

GOVERNMENT'S OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS COUNT FOUR OF THE SUPERSEDING INDICTMENT

The defendant, Taylor Taranto, seeks dismissal of Count Four of the Superseding Indictment for possession of a large-capacity ammunition feeding device (PLCFD) (D.C. Code § 7-2506.01(b)), claiming that these statutes are facially unconstitutional. To achieve this sweeping result, he relies principally on *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022), which held that New York's licensing regime violates the Second Amendment because the State "issues public-carry licenses only when an applicant demonstrates a special need for self-defense[.]" *Id*. at 2122. This ruling has no direct bearing on the District of Columbia's firearm laws.[1] Defendant asserts that, under *Bruen*'s text-and-history mode of analysis, the District's firearm laws violate the Second Amendment, but his claim fails.

---

[1] As *Bruen* noted, the District of Columbia's "analogue[]" to the New York "proper cause" standard at issue in *Bruen* "has been permanently enjoined since 2017." 142 S. Ct. at 2124 (citing *Wrenn v. District of Columbia*, 864 F.3d 650, 668 (D.C. Cir. 2017)). The District thus no longer enforces the "good cause" provision. *See* https://mpdc.dc.gov/firearms#LicensetoCarryaHandgun (last visited Mar. 18, 2024) ("Pursuant to the decision of the U.S. Court of Appeals for the District of Columbia Circuit [in] *Wrenn*[ ], applicants for a license to carry a concealed handgun in the District of Columbia no longer need to provide a good reason for carrying a handgun.").

## BACKGROUND

### A.     *The January 6 Attack on the United States Capitol*

At 1:00 p.m., on January 6, 2021, a Joint Session of the United States Congress, consisting of the House of Representatives and the Senate, convened in the Capitol Building. The Joint Session assembled to debate and certify the vote of the Electoral College of the 2020 Presidential Election. With the Joint Session underway and with Vice President Michael Richard Pence presiding, a large crowd gathered outside the U.S. Capitol. "The mob [ . . . ] scaled walls, smashed through barricades, and shattered windows to gain access to the interior of the Capitol," with the first rioters entering shortly after 2:00 p.m. *Trump v. Thompson*, 20 F.4th 10, 10 (D.C. Cir. 2021).

Shortly thereafter, at approximately 2:20 p.m., members of the House and Senate, including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate the chambers. The siege of the Capitol lasted for several hours and represented a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.7 million dollars in damage and losses.

### B.     *The Defendant's Conduct on and Subsequent to January 6. 2021*

On January 6, 2021, the Defendant traveled to the United States Capitol and entered the restricted area of the United States Capitol Grounds. The Defendant subsequently entered the United States Capitol Building through a door on the Upper West Terrace at approximately 2:33 PM and remained in the building until he was forced out by uniformed law enforcement officers at approximately 2:57 PM.  After being expelled from the building, the Defendant remained within the restricted area of the Capitol Grounds for some time, mingling with other rioters.

In the wake of the events of January 6, 2021, the Defendant returned to his home in the state of Washington, where he continued to promote conspiracy theories about the events of January 6. In the spring of 2023, the Defendant drove cross-country from Washington to the District of Columbia and began to temporarily live out of his van on the streets of Washington, DC. During this time, the Defendant's behavior escalated in a series of erratic and dangerous stunts and social media posts, which culminated on June 28, 2023, when the Defendant stated on a live video stream that he planned to detonate a self-driving vehicle at the National Institute of Standards and Technology. Based on this recorded statement, law enforcement personnel immediately began searching for the Defendant in and around the District of Columbia.  He was located and arrested the next day, June 29, 2023, while searching for "tunnels" he believed would provide access to private residences in the Kalorama neighborhood of Washington, DC. Shortly following his arrest, a lawful search was conducted of the Defendant's van, which was parked near the scene of his arrest in Kalorama. During the search of the vehicle, law enforcement officers found indicia that the Defendant had been living out of the van. They also lawfully seized a backpack behind the driver's seat, which contained two firearms, including a CZ Scorpion EVO 3 S1 9mm Luger firearm (the "CZ Scorpion"), as well as 13 magazines (at least one of which could hold 32 rounds) and hundreds of rounds of ammunition.

Based on the above events, Taranto is charged by Superseding Indictment with 26 U.S.C. § 5861(d) (Possession of an Unregistered Firearm) (Count One); 22 D.C. Code § 4504(a)(1) (Carrying a Pistol without a License) (Counts Two and Three); 7 D.C. Code § 2506.01(b) (Possession of a Large Capacity Ammunition Feeding Device) (Count Four); 7 D.C. Code § 2506.01(a)(3) (Unlawful Possession of Ammunition) (Count Five); 18 U.S.C. § 1038(a)(1) (False Information and Hoaxes) (Count Six); 18 U.S.C. § 1512(c)(2) (Obstruction of an Official

Proceeding) (Count Seven); 18 U.S.C. § 1752(a)(1) (Entering or Remaining in a Restricted Building or Grounds) (Count Eight); 18 U.S.C. § 1752(a)(2) (Disorderly or Disruptive Conduct in a Restricted Building or Grounds) (Count Nine); 40 U.S.C. § 5104(e)(2)(D) (Disorderly Conduct in a Capitol Building) (Count Ten); 40 U.S.C. § 5104(e)(2)(G) (Parading, Demonstrating, or Picketing in a Capitol Building) (Count Eleven).

Taranto now seeks to dismiss Count 4, Possession of a Large Capacity Ammunition Feeding Device. The code offense at issue states, "No person in the District shall knowingly possess, sell, or transfer any ammunition feeding device that is, in fact, a large capacity ammunition feeding device regardless of whether the device is attached to a firearm." 7 D.C. Code § 2506.01(b). The code goes on to define a "large capacity ammunition feeding device as, "a magazine, belt, drum, feed strip, or similar device that has a capacity of, or that can be readily restored or converted to accept, more than 10 rounds of ammunition." 7 D.C. Code § 2506.01(c).

## ARGUMENT

### I. The PLCFD Statute is Constitutional Under *Bruen*.

Taranto asserts that under *Bruen*, 7 D.C. Code § 2506.01(b) violates the Second Amendment. He is incorrect.

#### A. *Bruen*, *Rahimi*, and the Relevant Legal Framework

In *Bruen*, the Supreme Court considered a challenge made by two "law-abiding, adult citizens" to New York's requirement that, to obtain a license to carry a concealed firearm outside the home or place of business for self-defense, one must prove to the licensing officer that "proper cause exists" to issue it. 142 S. Ct. at 2123, 2125. "Proper cause" was not defined by statute, but had been interpreted by New York courts to require proof of a "special need for self-protection distinguishable from that of the general community." *Id.* at 2123 (quotation marks and citation omitted). This was a "demanding" standard. Living or working in a high-crime area was not

enough; instead, applicants typically needed "evidence of particular threats, attacks, or other extraordinary danger to personal safety." *Id.* (quotation marks and citations omitted).

The Supreme Court held that New York's "proper cause" requirement violates the Second Amendment. In doing so, the Court noted the then-prevailing two-step test fashioned by the lower courts after *District of Columbia v. Heller*, 554 U.S. 570 (2008), *i.e.*, (1) determining whether the regulated conduct fell within "the original scope of the [Second Amendment] right based on its historical meaning," and if so, (2) engaging in a means-end balancing inquiry whether the challenged regulation could satisfy either strict or intermediate scrutiny, depending on whether the regulation burdened the "core" Second Amendment right. *Bruen*, 142 S. Ct. at 2125–26 (cleaned up). *Bruen* held that,

> this two-step approach[ ] is one step too many. Step one of the predominant framework is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history. But *Heller* and *McDonald* [*v. City of Chicago*, 561 U.S. 742 (2010),] do not support applying means-end scrutiny [*i.e.*, step two,] in the Second Amendment context.

*Id.* at 2127. *Bruen* explained that it was *applying*, rather than expanding or otherwise altering, the same test set forth in *Heller* to assess Second Amendment claims: "The test that we set forth in *Heller* and apply today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Bruen*, 142 S. Ct. at 2131. *See also id.* (indicating that the Court was "[f]ollowing the course charted by *Heller*"). The Court simply made the *Heller* test "more explicit," by clarifying that courts should evaluate firearm laws based only upon a "text and history" inquiry, without conducting an additional interest-balancing, means-end inquiry. *Id.* at 2128–30, 2134.

In applying the text-and-history test, the Supreme Court first concluded that the Second Amendment's text protected conduct governed by New York's "proper cause" requirement. The

Court reiterated *Heller's* holding that the text of the Second Amendment protected "'the right of law-abiding, responsible citizens to use arms' for self-defense," *Bruen*, 142 S. Ct. at 2131 (quoting *Heller*, 554 U.S. at 635). Moreover, the Court held that this right applies outside the home or place of business, such that the "proper cause" licensing requirement infringed upon it. *Id.* at 2134–35.

Second, because the Second Amendment's "text" protected conduct governed by the "proper cause" requirement, the Supreme Court considered whether New York could show that this requirement was "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2135. The Court agreed that "[t]hroughout modern Anglo-American history, the right to keep and bear arms in public has traditionally been subject to well-defined restrictions governing the intent for which one could carry arms, the manner of carry, or the exceptional circumstances under which one could not carry arms." *Id.* at 2138. Nonetheless, there was not "a tradition of broadly prohibiting the public carry of commonly used firearms for self-defense," or of "limiting public carry only to those law-abiding citizens who demonstrate a special need for self-defense." *Id.* Accordingly, the Court held, "[u]nder *Heller*'s text-and-history standard, the proper-cause requirement is therefore unconstitutional." *Id.*

In *United States v. Rahimi*, 144 S. Ct. 1889 (2024), the Court further clarified the proper inquiry. *Rahimi* involved a Second Amendment challenge to the federal law disarming individuals subject to certain domestic violence protective orders. In upholding that law, the Supreme Court observed that "some courts have misunderstood the methodology of our recent Second Amendment cases." *Rahimi*, 144 S. Ct. at 1897. Those cases, the Court explained, "were not meant to suggest a law trapped in amber." *Id.* Instead, "the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Id.* at 1898 (emphasis added). For instance, "if laws at the founding regulated firearm

use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations." *Id.* But even "when a challenged regulation does not precisely match its historical precursors, it still may be analogous enough to pass constitutional muster," so long as the law "comport[s] with the principles underlying the Second Amendment[.]" *Id.* In applying this standard, the Court reiterated that "many . . . prohibitions, like those on the possession of firearms by 'felons and the mentally ill,' are 'presumptively lawful.'" *Id.* at 1902 (quoting *Heller*, 554 U.S. at 626, 627 & n.26 (2008)).

### B.  The PLCFD Statute is Constitutional Under *Bruen* and *Rahimi*.

Defendant seeks dismissal of Count Four, Possession of a Large Capacity Ammunition Feeding Device, claiming that this statute is unconstitutional. However, he fails to demonstrate a Second Amendment violation. "State statutes, like federal ones, are entitled to the presumption of constitutionality until their invalidity is judicially declared." *Davies Warehouse Co. v. Bowles*, 321 U.S. 144, 153 (1944). Facial attacks on the constitutionality of a statute rarely succeed, because the challenger must establish that "no set of circumstances exists under which the [a]ct would be valid, i.e., that the law is unconstitutional in all of its applications." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008) (internal quotation marks and citation omitted). Here, defendant bears the burden to show that § 922(g)(1) infringes upon the Second Amendment right of law-abiding citizens to bear arms in self-defense. Only then does "the burden fall[] on [the government] to show that [the challenged regulation] is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2135.

Defendant's claim fails at the outset because, unlike the petitioners in *Bruen*, he has never proffered that he possessed the gun for the purpose of lawful self-defense. *See Bruen*, 142 S. Ct. at 2134–35 (course of conduct protected by the Second Amendment is that of "armed self-

defense"; "self-defense is 'the *central component* of the [Second Amendment] right itself'") (quoting *Heller*, 554 U.S. at 599) (emphasis ii *Heller*). Nor is he entitled to a presumption to that effect, given that under *Bruen* he must first show that the Second Amendment regulates his proposed conduct. *See* 142 S. Ct. at 2129-30. *See also, e.g.*, *Lowery*, 3 A.3d at 1177 (refusing, on plain error review, to "erect a presumption that a defendant is an 'ordinary citizen,' entitled to exercise Second Amendment rights unless disqualifying information affirmatively appears on the record"). Accordingly, because the statute is constitutional as applied to him, his facial challenge fails.

In any event, his substantive arguments are meritless. He argues that large capacity magazines constitute "arms"; that they are commonly used for self-defense; and that they are presumptively protected by the Second Amendment, because prohibiting them would make it "impossible" for law-abiding citizens to use handguns for self-defense. These assertions are wrong in every respect. And even if all these assertions were correct, the possession of a large capacity ammunition feeding device statute is consistent with the Nation's historical tradition of firearm regulation.

### C. Case Law Upholding Large Capacity Magazine Statutes Remains Persuasive.

Although the D.C. Circuit has not ruled on the constitutionality of the District's possession of a large capacity ammunition feeding device statute, the statute has been upheld in this district after *Bruen*. In *Hanson v. District of Columbia*, the District Court denied the plaintiff's motion for a preliminary injunction that would enjoin the District of Columbia from enforcing its ban on large capacity ammunition feeding devices pursuant to D.C. Code § 7-2506.01(b).  671 F. Supp. 3d 1, 3 (D.D.C. 2023).  Applying *Bruen*, the court examined (1) "whether the Second Amendment's plain text covers [the] individual's conduct," and if yes, whether (2) "the regulation is consistent with

the Nation's historical tradition of firearm regulation." *Hanson*, 671 F. Supp.3d at 8 (citing *Bruen*, 597 U.S. at 17) (quotations omitted).

As to the first inquiry, the District Court held that while large capacity magazines fit the definition of "arms within the meaning of the Second Amendment," 671 F. Supp.3d at 10, they are not "commonly used for self-defense," and are therefore fall outside of the scope of the Second Amendment. *Id.* at 16. The District Court did not end the inquiry there. Instead, it undertook an extensive analysis of the historical traditions consistent with the ban on large capacity magazines, focusing on the invention of the large capacity magazine, *id.* at 18-20, and analogous Prohibition-era bans. *Id.* at 21-25. Ultimately, the District Court found that the Second Amendment does not apply to an individual's right to possess a large capacity magazine, and further found that a ban on large capacity magazines is consistent with historical firearm regulations.[2]

In addition, each of the seven federal Circuit courts to have considered the constitutionality of similar restrictions have upheld them. *See, e.g., Duncan v. Bonta,* 19 F.4th 1087, 1099 (9th Cir. 2021) (citing *Worman v. Healey*, 922 F.3d 26 (1st Cir. 2019); *Ass'n of New Jersey Rifle and Pistol Clubs, Inc., v. Attorney General of New Jersey* ("*ANJRPC*"), 910 F.3d 106 (3d Cir. 2018); *Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017); *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo* ("*NYSRPA*"), 804 F.3d 242 (2d Cir. 2015); *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015); *Heller v. District of Columbia (Heller II)*, 670 F.3d 1244 (D.C. Cir. 2011)), *judgment vacated,* 142 S. Ct. 2895 (2022), *and vacated and remanded,* 49 F.4th 1228 (9th Cir. 2022).[3]

---

[2] This ruling is currently on appeal to the D.C. Circuit in Case No. 23-7061.
[3] On remand, the district court in *Duncan* found that California's PLCFD statute violated the Second Amendment. *Duncan v. Bonta*, 2023 WL 6180472 (S.D. Cal. Sept. 22, 2023). However, the Ninth Circuit subsequently granted a stay of that ruling pending appeal, after finding that "the Attorney General is likely to succeed on the merits," based on "strong arguments that California's large capacity magazine statute] comports with the Second Amendment under *Bruen*." *Duncan v. Bonta*, 83 F.4th 803, 805-806 (9th Cir. 2023) (noting that "ten other federal district courts have

To the extent these Circuit cases relied on the now-rejected interest-balancing "second step," their holdings have been abrogated by *Bruen*. Most of the federal cases upholding large capacity magazine regulations found it unnecessary to resolve the text-and-history question.[4] However, those cases discussed text and history in a way that remains persuasive post-*Bruen*.

### D. Defendant's Second Amendment Arguments Are Meritless.

#### 1. The Plain Text of the Second Amendment Does Not Apply to Large Capacity Magazines.

As an initial matter, defendant's challenge to the large capacity magazine statute fails because he fails to show that the plain text of the Second Amendment applies to large capacity magazines.

##### a. Defendant Fails to Show That Large Capacity Magazines are "Arms."

Defendant fails to show that large capacity magazines are "arms" under the Second Amendment. At the outset, we note that *Herrington v. United States*, 6 A.3d 1237 (D.C. 2010), held that *ammunition* generally are "arms" under the Second Amendment, since it would be "impossible" to use a gun without ammunition. And federal cases have held that an ammunition feeding device generally is a Second Amendment "arm" for the same reason. To be sure, restrictions on the possession of parts that are *necessary* to the use of firearms for self-defense may

---

considered a Second Amendment challenge to large-capacity magazine restrictions since *Bruen* was decided. Yet only one of those courts—the Southern District of Illinois—granted a preliminary injunction, finding that the challenge was likely to succeed on the merits. . . . In that case, the Seventh Circuit subsequently stayed the district court's order pending appeal—the very relief the Attorney General seeks here.") (citing cases).

[4] In *Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111, the Fourth Circuit rejected a Second Amendment challenge to Maryland's large capacity magazine statute independently on the surviving first-step text-and-history analysis, *see Kolbe*, 849 F.3d at 130 ("[Large capacity magazines] are *not* constitutionally protected arms" under the Second Amendment) (emphasis in original), and in the alternative under the interest-balancing second step that *Bruen* rejected.

implicate the Second Amendment. *See Jackson v. City and County of San Francisco*, 746 F.3d 953, 967–68 (9th Cir. 2014) ("without bullets, the right to bear arms would be meaningless," and thus "[a] regulation *eliminating* a person's ability to obtain or use ammunition" would infringe upon the Second Amendment by "mak[ing] it *impossible* to use firearms for their core purpose" of self-defense) (emphasis added). Although a magazine may be required for some firearms to operate, a *large capacity* magazine is not. Indeed, defendant does not assert that any firearm will be rendered inoperable by using a magazine of less than 11 rounds.

Accordingly, large capacity magazines are in the category of accessories that are not necessary for a firearm to function and thus outside the Second Amendment's protection. *See, e.g., United States v. Cox*, 906 F.3d 1170 (10th Cir. 2018) (upholding law banning sale of unregistered silencers; "[a] silencer is a firearm accessory; it's not a weapon in itself," and so it is not "a type of instrument protected by the Second Amendment"). Like silencers, scopes, bumpstocks, or "giggle switches,"[5] large capacity magazines may provide an additional feature to an already fully-functional firearm—the ability to fire more bullets in rapid succession—but they are not *necessary* for the firearm to function for its core purpose of self-defense. *See, e.g., Duncan*, 19 F.4th at 1107 n.5 (rejecting analogies that "start from the false premise that a ban on [large capacity magazines] somehow amounts to a ban on the basic functionality of all firearms"; "[a] ban on [large capacity magazines] cannot reasonably be considered a ban on firearms any more than a ban on leaded gasoline, . . . or speed limits[,] could be considered a ban on cars"), *judgment vacated*, 142 S. Ct. 2895, *and vacated and remanded*, 49 F.4th 1228. Accordingly, the possession of a large capacity

---

[5] A giggle switch is an accessory attachment that enables a semiautomatic pistol to fire continuously while the trigger is held down. See, e.g., *Illegal Device Makes Semiautomatic Pistols Fully Automatic*, https://www.nbcwashington.com/news/local/illegal-device-makes-semiautomatic-pistols-fully-automatic/2712262/ (last visited Mar. 18, 2024).

ammunition feeding device statute's "prohibition on [large capacity magazines] is entirely different from the handgun ban at issue in *Heller*. The law at issue here does not ban any firearm at all. It bans merely a subset (large-capacity) of a part (a magazine) that some (but not all) firearms use." *Duncan*, 19 F.4th at 1107, *judgment vacated*, 142 S. Ct. 2895, *and vacated and remanded*, 49 F.4th 1228.

That some firearms may be sold in tandem with large capacity magazines is immaterial. If retailers began selling firearms in tandem with silencers, that product-bundling choice would not transform a silencer from an accessory to an "arm" for Second Amendment purposes. For the same reasons, the overall number of large capacity magazines in circulation is immaterial to the question of whether they are "arms" under the Second Amendment.[6]

### b. Defendant Fails to Show that Large Capacity Magazines are Commonly Used for Self-Defense.

Defendant also fails to show that large capacity magazines are commonly used for self-defense.[7] For example, *Duncan*, 19 F. 4th at 1097, *judgment vacated*, 142 S. Ct. 2895, *and vacated*

---

[6] Instead, their prevalence is more properly considered as to the independent question of whether they are commonly used for self-defense, as discussed *infra*. But the answer to that question is immaterial as well, because large capacity magazines are not "arms" under the Second Amendment.

[7] The "in common use for self-defense" inquiry is not dispositive of the "history" portion of *Bruen*'s text-and-history test. To the contrary, as *Bruen* explained, the question of whether a regulated item is "in common use for self-defense" is antecedent not only to the question of whether there is a historical analogue to its regulation, but also to the question of whether the Second Amendment applies to the regulated conduct at all. *See Bruen*, 142 S. Ct. at 2134 (starting its analysis by noting that it is undisputed that (1) petitioners there are part of "the people" under the Second Amendment, and that "handguns are [(2)] weapons [(3)] 'in common use' today for self defense. *We therefore turn to whether the plain text of the Second Amendment protects [petitioners'] proposed course of conduct*," and if it does, whether the government can show that the regulation is consistent with the historical tradition of firearm regulation) (emphasis added). As discussed *infra*, the PLCFD statute is consistent with the historical tradition of firearm regulation.
Although rudimentary large capacity magazines had been invented by the time of the founding, see David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L.

*and remanded*, 49 F.4th 1228, noted that "most" current pistols are sold with magazines that can hold more than ten rounds, and that according to "some experts," approximately half of all privately-owned magazines can hold more than ten rounds. But *Duncan* attached little significance to this data, and instead "question[ed] whether circulation percentages of a part that comes standard with many firearm purchases meaningfully reflect an affirmative choice by consumers." 19 F.4th at 1107, *judgment vacated*, 142 S. Ct. 2895, *and vacated and remanded*, 49 F.4th 1228.

"More to the point," *Duncan* explained, *Heller*'s characterization of handguns as "the quintessential self-defense weapon" was premised on the fact that "consumers overwhelmingly chose to purchase handguns *for the purpose of self-defense*[.]" *Duncan*, 19 F.4th at 1107 (cleaned up; emphasis in original) (citing *Kolbe*, 849 F.3d at 138 (same)), *judgment vacated*, 142 S. Ct. 2895, *and vacated and remanded*, 49 F.4th 1228. By contrast, *Duncan* noted, there was "little evidence that [large capacity magazines] are commonly used, or even suitable, for that purpose." *Id.* Indeed, *Duncan* found,

---

Rev. 849 (2015), there is nothing to suggest that large capacity magazines were in common use for self-defense at that time. To the contrary, Kopel's article merely indicates that rudimentary large capacity magazines had been invented by the time of the founding, and by that time were in limited military use, including "by elite units" in European armies. 78 Alb. L. Rev. at 852–53. But even by Kopel's definition of "in common use," which does not consider *Bruen*'s subsequent requirement of common use *for self-defense*, large capacity magazines were *uncommon* until "the mid-nineteenth century" for rifles; "1935" for handguns; and "the mid-1960s" for handgun large capacity magazines exceeding 15 rounds. *Id.* at 883.

That timing corresponds closely to the enactment of regulations on the ability of firearms to rapidly shoot many bullets without reloading. As these features became more widespread and posed risks to public safety, many states started to regulate firing capacity in various ways, including by regulating weapons defined "by the number of rounds that could be fired without reloading or by the ability to receive bullet feeding devices." *See* Robert J. Spitzer, *Gun Accessories and the Second Amendment*, 83 Law & Contemp. Probs. 231, 238 (2020) ("Spitzer, *Gun Accessories*"); Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 Law & Contemp. Probs. 55, 69–72 (2017) ("Spitzer, Gun Law History") (collecting regulations of semiautomatic weapons, including magazine limits). In total, between 1927 and 1934, at least 18 states regulated "magazines or similar feeding devices, and/or round capacity." Spitzer, *Gun Accessories*, at 237–38.

> Experts in this case and other cases report that "most homeowners only use two to three rounds of ammunition in self-defense." *ANJRPC*, 910 F.3d at 121 n.25. The use of more than ten bullets in defense of the home is "rare," *Kolbe*, 849 F.3d at 127, or non-existent, *see Worman*, 922 F.3d at 37 (noting that neither the plaintiffs nor their experts "could . . . identify even a single example of a self-defense episode in which ten or more shots were fired"). An expert in this case found that, using varying methodologies and data sets, more than ten bullets were used in either 0% or fewer than 0.5% of reported incidents of self-defense of the home. Even in those situations, the record does not disclose whether the shooter fired all shots from the same weapon, whether the shooter fired in short succession such that reloading or replacing a spent cartridge was impractical, or whether the additional bullets had any practical effect after the first ten shots. In other words, the record here, as in other cases, does not disclose whether the added benefit of a large-capacity magazine—being able to fire more than ten bullets in rapid succession—has ever been realized in self-defense in the home. *See ANJRPC*, 910 F.3d at 118 ("The record here demonstrates that [large-capacity magazines] are not well-suited for self-defense."); *Kolbe*, 849 F.3d at 138 (noting the "scant evidence ... [that] large-capacity magazines are possessed, or even suitable, for self-protection"); *Heller II*, 670 F.3d at 1262 (pointing to the lack of evidence that "magazines holding more than ten rounds are well-suited to or preferred for the purpose of self-defense or sport"). Indeed, Plaintiffs have not pointed to a single instance in this record (or elsewhere) of a homeowner who was unable to defend himself or herself because of a lack of a large-capacity magazine.

19 F.4th at 1104–05, *judgment vacated*, 142 S. Ct. 2895, *and vacated and remanded*, 49 F.4th 1228. *Duncan* thus "decline[d] to read *Heller*'s rejection of an outright ban on the most popular self-defense weapon as meaning that governments may not impose a much narrower ban on an accessory that is a feature of some weapons and that has little to no usefulness in self-defense." *Id.* at 1108.

The same is true here. Defendant offers no evidence that large capacity magazines are useful for self-defense, much less that they are "commonly" used for that purpose. Instead, as *Duncan* found, the "[e]vidence supports the common-sense conclusion" that large capacity magazines, which "were originally designed and produced for military assault rifles," and "provide significant benefit to soldiers and criminals who wish to kill many people rapidly. But the magazines provide at most a minimal benefit for civilian, lawful purposes." 19 F.4th at 1105–1106

(cleaned up), *judgment vacated*, 142 S. Ct. 2895, *and vacated and remanded*, 49 F.4th 1228.[8] Accordingly, large capacity magazines are not commonly used for lawful self-defense, and thus are outside the scope of the Second Amendment.

### c. Any Burden on the Second Amendment is Minimal.

Even if large capacity magazines are considered "arms" that are commonly used for self-defense, the possession of a large capacity ammunition feeding device statute is constitutional, because it "do[es] not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right[s]." *Bruen*, 142 S. Ct at 2138 n.9.

*Bruen* explained that a "central consideration" in assessing the validity of a firearms regulation is the "burden on the right of armed self-defense" that the regulation imposes. 142 S.

---

[8] For the same reasons, as the Fourth Circuit held in *Kolbe*, large capacity magazines are "like M-16 rifles, i.e., weapons that are most useful in military service, and thus outside the ambit of the Second Amendment[.]" 849 F.3d at 136 (quoting *Heller*, 554 U.S. at 627) (cleaned up). Thus, defendant's reliance on practices among law-enforcement agencies supports the government's position rather than his own. *See, e.g., Friedman*, 784 F.3d at 410 (noting that, unlike in the civilian context, "[s]ome of the weapons prohibited by the [upheld] ordinance are commonly used for military *and police* functions;" but in keeping with *Heller*, states are "allowed to decide when *civilians* can possess *military-grade* firearms") (emphasis added).

As in *Kolbe*, *id.* at 136 n.10, it is unnecessary to determine whether large capacity magazines are also "dangerous and unusual," which would furnish yet another basis to find that large capacity magazines are outside the scope of the Second Amendment under *Heller*. But for the reasons herein, if this Court were to reach that question here, large capacity magazines are properly considered "dangerous and unusual," and thus outside the scope of the Second Amendment. In contrast with the minimal (at most) use of large capacity magazines for self-defense described *supra*,

> [i]n the past half-century, large capacity magazines have been used in about three-quarters of gun massacres with 10 or more deaths and in 100 percent of gun massacres with 20 or more deaths, and more than twice as many people have been killed or injured in mass shootings that involved a large capacity magazine as compared with mass shootings that involved a smaller-capacity magazine.

*Duncan*, 19 F.4th at 1096, *judgment vacated*, 142 S. Ct. 2895, *and vacated and remanded*, 49 F.4th 1228.

Ct. at 2133. *Heller* approved safety-related firearm regulations because such laws "do not remotely burden the right of self-defense as much as an absolute ban on handguns." 554 U.S. at 632. Similarly, *Bruen* noted that none of antecedent historical regulations cited by the respondents "imposed a substantial burden on public carry analogous to the burden created by New York's restrictive licensing regime," 142 S. Ct. at 2145, and upheld "may issue" licensing regimes on the same basis.

Applying the same reasoning, the D.C. Court of Appeals upheld the carrying a pistol without a license statute in *Brown*, 979 A.2d at 639, finding that "the licensure requirement that the [carrying a pistol without a license] statute imposes does not appear as a substantial obstacle to exercise of Second Amendment rights." *Id.*, quoted in *Plummer*, 983 A.2d at 339. And in keeping with this rationale, *Heller II* held that the District's registration statute "does not impinge upon the right protected by the Second Amendment" because "basic registration requirements are self-evidently de minimis, for they are similar to other common registration or licensing schemes, such as those for voting or for driving a car, that cannot reasonably be considered onerous." 670 F.3d at 1254-55.

For the same reasons, the possession of a large capacity ammunition feeding device statute does not "impose[ ] a substantial burden on [the right to armed self-defense] analogous to the burden created by New York's restrictive licensing regime." *Bruen*, 142 S. Ct. at 2145. The statute does not make it impossible to use a handgun for self-defense. Indeed, it does not affect that ability whatsoever, other than in the extreme (and as discussed *supra*, almost purely theoretical) situation where a person wishes to fire more than ten shots in self-defense without reloading.

### 2. The Statute is Consistent With the Nation's History and Tradition of Firearm Regulation.

Even assuming, arguendo, that large capacity magazines qualify as "arms" that are commonly used for self-defense within the Second Amendment's scope, the possession of a large capacity ammunition feeding device statute is consistent with "this Nation's historical tradition of firearm regulation[.]" *Bruen*, 142 S. Ct. at 2126. "The historical record shows that gun safety regulation was commonplace in the colonies, and around the time of the founding, a variety of gun safety regulations were on the books." *Nat'l Rifle Ass'n of Am., Inc. v. Bur. of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 200 (5th Cir. 2012), *abrogated on other grounds* by *Bruen*, 142 S. Ct. 2111. Those regulations "included safety laws . . . disarming certain groups and restricting sales to certain groups." *Id.* This included "persons who refused to swear an oath of allegiance to the state or to the nation," *id.*; felons, *see generally* Don B. Kates & Clayton E. Cramer, *Second Amendment Limitations and Criminological Considerations*, 60 Hastings L.J. 1339, 1360 (2009) ("there is every reason to believe that the Founding Fathers would have deemed persons convicted of any of the common law felonies not to be among 'the [virtuous] people' to whom they were guaranteeing the right to arms") (internal citations and footnotes omitted); illegal aliens, *United States v. Portillo-Munoz*, 643 F.3d 437, 439–40 (5th Cir. 2011); persons under domestic-violence protective orders, *Bena*, 664 F.3d at 1184; and unlawful drug users, *United States v. Patterson*, 431 F.3d 832, 836 (5th Cir. 2005).

The possession of a large capacity ammunition feeding device statute is consistent with other safety-related analogues. During the founding era, for example, governments enacted regulations "aimed in part at pistols and offensive knives." Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 Law & Contemp. Probs. 55, 67 (2017) ("Spitzer, Gun Law History"). In the early 19th century, many states specifically outlawed public

carry of "Bowie Knives" and other particularly dangerous and unusual knives. *See* David B. Kopel et. al., *Knives and the Second Amendment*, 47 U. Mich. J.L. Reform 167, 184 n.95, 184–87 (2013). States also regulated "the practice of rigging firearms to be fired with a string or similar method . . . without an actual finger on the firearm trigger," also known as "trap guns" or "infernal machines." Spitzer, *Gun Law History* at 67. Like large capacity magazines, such weapons posed special dangers to human life and were accordingly regulated. *See id.*

Likewise, the Nation has historically placed limits on gunpowder storage, given the obvious risks to public safety. *Brown v. Maryland*, 25 U.S. 419, 443 (1827), *abrogated on other grounds as recognized by Okla. Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 180 (1995). *See* Saul Cornell & Nathan DeNino, *A Well-Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 510–11 (2004) ("by the close of the eighteenth century, there was already a tradition of statutes regulating the storage and transport of gunpowder"; "[l]imits on the amount of gunpowder a person could possess were common") (collecting statutes). There appears to have been no concern at the time that such laws somehow interfered with the right of armed self-defense, e.g., by limiting the number of times a gun could be fired before running out of gunpowder.[9]

In sum, large capacity magazines are not Second Amendment "arms." They instead are military-inspired accessories associated in the civilian context with mass shootings and public terror, and are not commonly used for self-defense. The possession of a large capacity feeding

---

[9] Indeed, the large capacity magazine restriction (which does not impair a gun's operability at all, in that consumers may use as many standard-capacity magazines as they like) is far less of a limitation on firing ability than traditional eighteenth-century gunpowder restrictions, where exhausting the permissible supply of powder would render the gun inoperable. Nonetheless, as *Bruen* said in approving "sensitive places" statutes, "we are aware of no disputes regarding the lawfulness of such prohibitions. We therefore can assume it settled" that the founding-era gunpowder regulations were "consistent with the Second Amendment." 142 S. Ct. at 2134.

device restriction imposes no burden whatsoever on the possession of handguns for self-defense, or on the number of bullets or standard-capacity magazines. The statute places "at most a minimal burden, if any burden at all, on the right of [armed] self-defense[.]" *Duncan*, 19 F.4th at 1107, *judgment vacated*, 142 S. Ct. 2895, *and vacated and remanded*, 49 F.4th 1228. In any event, any such burden is consistent with the Nation's history and tradition of firearm regulation.

## CONCLUSION

For the foregoing reasons, the defendant's motion to dismiss should be denied.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:   /s/Allison K. Ethen
      Samuel White
      NC Bar No. 44908
      Allison K. Ethen
      MN Bar No. 0395353
      Carlos A. Valdivia
      D.C. Bar No. 1019242
      Assistant United States Attorneys
      601 D Street NW, Fifth Floor
      Washington, D.C. 20530
      Allison.ethen@usdoj.gov
      612-664-5575