**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|                                   |   |                          |
|-----------------------------------|---|--------------------------|
| **UNITED STATES OF AMERICA**      | : |                          |
|                                   | : |                          |
| **v.**                            | : | **No. 23-CR-229 (CJN)**  |
|                                   | : |                          |
| **TAYLOR TARANTO,**               | : |                          |
|                                   | : |                          |
| **Defendant.**                    | : |                          |

**UNITED STATES' OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS COUNT ONE OF THE SUPERCEDING
<u>INDICTMENT FOR VINDICTIVE PROSECUTION</u>**

The United States of America respectfully submits this opposition to Defendant Taylor
Taranto ("Defendant")'s motion to dismiss Count One of the superseding indictment filed on
February 14, 2024. The Defendant argues that Count One, alleging a violation of 26 U.S.C. §
5861(d), was filed vindictively in order to punish the Defendant for exercising his constitutional
rights. ECF No. 59 at 5. The Defendant's claim lacks merit, and this Court should deny the
Defendant's motion.

## I.      BACKGROUND

### A.      *The January 6 Attack on the United States Capitol*

At 1:00 p.m., on January 6, 2021, a Joint Session of the United States Congress, consisting
of the House of Representatives and the Senate, convened in the Capitol Building. The Joint
Session assembled to debate and certify the vote of the Electoral College of the 2020 Presidential
Election. With the Joint Session underway and with Vice President Michael Richard Pence
presiding, a large crowd gathered outside the U.S. Capitol. "The mob [ . . . ] scaled walls, smashed
through barricades, and shattered windows to gain access to the interior of the Capitol," with the
first rioters entering shortly after 2:00 p.m. *Trump v. Thompson*, 20 F.4th 10, 10 (D.C. Cir. 2021).

Shortly thereafter, at approximately 2:20 p.m., members of the House and Senate, including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate the chambers. The siege of the Capitol lasted for several hours and represented a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.7 million dollars in damage and losses.

**B.      The Defendant's Conduct on and Subsequent to January 6. 2021**

On January 6, 2021, the Defendant traveled to the United States Capitol and entered the restricted area of the United States Capitol Grounds. The Defendant subsequently entered the United States Capitol Building through a door on the Upper West Terrace at approximately 2:33 PM and remained in the building until he was forced out by uniformed law enforcement officers at approximately 2:57 PM.  After being expelled from the building, the Defendant remained within the restricted area of the Capitol Grounds for some time, mingling with other rioters.

In the wake of the events of January 6, 2021, the Defendant returned to his home in the state of Washington, where he continued to promote conspiracy theories about the events of January 6. In the spring of 2023, the Defendant drove cross-country from Washington to the District of Columbia and began to temporarily live out of his van on the streets of Washington, DC. During this time, the Defendant's behavior escalated in a series of erratic and dangerous stunts and social media posts, which culminated on June 28, 2023, when the Defendant stated on a live video stream that he planned to detonate a self-driving vehicle at the National Institute of Standards and Technology. Based on this recorded statement, law enforcement personnel immediately began searching for the Defendant in and around the District of Columbia.  He was located and arrested the next day, June 29, 2023, while searching for "tunnels" he believed would provide access to

private residences in the Kalorama neighborhood of Washington, DC. Shortly following his arrest, a lawful search was conducted of the Defendant's van, which was parked near the scene of his arrest in Kalorama. During the search of the vehicle, law enforcement officers found indicia that the Defendant had been living out of the van. They also lawfully seized a backpack behind the driver's seat, which contained two firearms, including a CZ Scorpion EVO 3 S1 9mm Luger firearm (the "CZ Scorpion"), as well as 13 magazines (at least one of which could hold 32 rounds) and hundreds of rounds of ammunition.

### C.    *The Government's Developing Investigation*

Following the Defendant's arrest on June 29, 2023, in July 2023 the grand jury charged the Defendant with the following offenses: (1) Carrying a Pistol Without a License (Outside Home or Place of Business), in violation of 22 D.C. Code § 4504(a)(1); (2) Possession of a Large Capacity Ammunition Feeding Device, in violation of 7 D.C. Code § 2506.01(b); (3) Entering or Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1); (4) Disorderly or Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2); (5) Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); and (6) Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).

On July 14, 2023, defense counsel for the Defendant emailed trial counsel to request a conversation about a potential plea offer for the Defendant. During a subsequent phone conversation, the government proposed a plea offer to defense counsel in which the Defendant would plead guilty to five counts: (1) Carrying a Pistol Without a License (Outside Home or Place of Business), in violation of 22 D.C. Code § 4504(a)(1); (2) Entering or Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1); (3) Disorderly or Disruptive Conduct

3

in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2); (4) Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); and (5) Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). Following that phone conversation, the government received no further inquiries from defense counsel regarding the plea offer discussed by telephone, and the parties subsequently litigated multiple motions, including the Defendant's Motion for Release from Custody, filed on July 27, 2023 (ECF No. 19) and the Defendant's Motion to Suppress evidence seized from his van, filed on September 27, 2023 (ECF No. 30), both of which suggested to the government that the Defendant was uninterested in a pre-trial resolution of his case.

In October 2023, as part of its ongoing investigation in the case, the government shipped the CZ Scorpion seized from the Defendant's van to the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF). After receiving the CZ Scorpion on October 30, 2023, ATF conducted an evaluation of the weapon to determine if it was a short-barreled rifle, as defined by the National Firearms Act of 1934 (NFA) and the Gun Control Act of 1968 (GCA). As subsequently documented in a Report of Technical Examination dated November 6, 2023, an ATF firearms enforcement officer determined that the CZ Scorpion seized from the Defendant's van on June 29, 2023 was both a firearm and a rifle with a barrel length of less than 16 inches in length, making it subject to registration requirements under the NFA. In making these determinations, the firearms enforcement officer relied upon the statutory language and definitions of the NFA and GCA and the objective design features of the firearm, without reference to the rule issued by the ATF in January 2023 on factoring criteria for firearms with stabilizing braces (discussed in greater detail below).

Following receipt of the ATF's Report of Technical Examination on November 6, 2023, the government contacted defense counsel via email on December 1, 2023, documenting the government's understanding that the Defendant was not interested in resolving his case via the plea outlined during the previous summer and setting a deadline of December 8, 2023 for the Defendant to notify the government if he wanted to accept that plea offer. The government's email also informed defense counsel that the government expected, based in part on new evidence gathered in the case, to pursue a superseding indictment in the near future. In an email reply on December 3, 2023, defense counsel inquired about what charges the government intended to bring in its superseding indictment and requested an extension of the plea deadline beyond December 8, 2023. On December 8, 2023, the government informed defense counsel that the anticipated superseding indictment would include, among other counts, a charge under 26 U.S.C. § 5861(d) and agreed to keep the plea offer open through December 18, 2023. On December 15, 2023, the government followed up with draft plea paperwork, formally extending the same plea offer previously discussed with defense counsel to the Defendant via written letter and reiterating the December 18, 2023 deadline on the plea offer. The government received no further response prior to the December 18, 2023 deadline.

On December 19, 2023, at a status hearing in the Defendant's case, the government relayed to the Court that the Defendant had rejected the previously discussed plea offer, and that the government intended to seek a superseding indictment in the case. Based on the representations of the parties, the Court suggested that the government might delay its pursuit of a superseding indictment, in order to allow the Defendant additional time to consider the previously discussed plea offer. The government agreed to both delay seeking a superseding indictment and extend the deadline on its plea offer. On December 21, 2023, the government confirmed in writing to the

Defendant, through counsel, that the plea offer would remain available through January 12, 2024, and that the government would not present its superseding indictment to a grand jury until after the plea offer had expired. On January 5, 2024, defense counsel acknowledged in writing that the plea offer would expire on January 12, 2024. The government received no further response from the Defendant regarding the plea offer prior to its expiration on January 12, 2024, and subsequently emailed defense counsel on February 9, 2024 to confirm in writing that the plea offer had expired and was revoked.

On February 14, 2024, the Defendant was charged by superseding indictment with the following offenses: (1) Possession of an Unregistered Firearm, in violation of 26 U.S.C. §§ 5861(d) and 5845(a)(3) (Count One); (2) Carrying a Pistol Without a License (Outside Home or Place of Business), in violation of 22 D.C. Code § 4504(a)(1) (Count Two); (3) Carrying a Pistol Without a License (Outside Home or Place of Business), in violation of 22 D.C. Code § 4504(a)(1) (Count Three); (4) Possession of a Large Capacity Ammunition Feeding Device, in violation of 7 D.C. Code § 2506.01(b) (Count Four); (5) Unlawful Possession of Ammunition, in violation of 7 D.C. Code § 2506.01(a)(3) (Count Five); (6) False Information and Hoaxes, in violation of 18 U.S.C. §1038(a) (Count Six); (7) Obstruction of an Official Proceeding, in violation of 18 U.S.C. § 1512(c)(2) and 2 (Count Seven); (8) Entering or Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1) (Count Eight); (9) Disorderly or Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2) (Count Nine); (10) Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Ten); and (11) Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G) (Count Eleven).

### D.    *Litigation over the ATF's Rule on Stabilizing Braces*

The NFA, 26 U.S.C. §§ 5801-5872, regulates "dangerous weapons," H.R. Rep. No. 73-1780, at 1 (1934), in part by imposing registration requirements on certain classes or types of weapons. 26 U.S.C. § 5861(d) criminalizes the receipt or possession of "a firearm which is not registered to [the receiver or possessor] in the National Firearms Registration and Transfer Record." 26 U.S.C. § 5845(a)(3) defines a "firearm" for the purposes of the NFA as including "a rifle having a barrel or barrels of less than 16 inches in length," and 26 U.S.C. 5845(c) defines a "rifle" for the purposes of the NFA as "a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger . . . ." Similarly, the GCA defines a "rifle" as "a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of an explosive to fire only a single projectile through a rifled bore for each single pull of the trigger," and defines a "short-barreled rifle" as "a rifle having one or more barrels less than sixteen inches in length and any weapon made from a rifle (whether by alteration, modification, or otherwise) if such weapon, as modified, has an overall length of less than twenty-six inches." 18 U.S.C. § 921(a)(7-8). Prior to January 2023, ATF firearms enforcement officers used the statutory language of the NFA and GCA to guide their examination of the overall configuration, physical characteristics, objective design features, and any other information that directly affected classification of a particular firearm in making case-by-case determinations regarding whether braced weapons were "rifles" falling under the purview of the NFA. *See* 88 Fed. Reg. 6478, II.A.

On January 31, 2023, ATF issued an interpretive rule entitled "Factoring Criteria for Firearms with Attached 'Stabilizing Braces.'" 88 Fed. Reg. 6478.  ATF intended for the rule to

clarify the framework that the agency will use to determine whether any particular firearm equipped with a stabilizing brace is a "rifle" within the meaning of the GCA and NFA—that is, when the firearm is designed, made, and intended to be fired from the shoulder. The Rule states that such a firearm will constitute a "rifle" if the brace "provides surface area that allows the weapon to be fired from the shoulder" and if "other factors, as listed in the rule, indicate that the weapon is designed, made, and intended to be fired from the shoulder." *Id.* In issuing the rule, ATF noted that the agency had previously issued individual determinations evaluating whether braced firearms constituted short-barreled rifles—with many, though not all, classified as short-barreled rifles—but that those classifications were not consistent and sometimes gave undue weight to certain factors in the factual analysis. *Id.* at II.B. In addition, the rule announced that, in an exercise of ATF's enforcement discretion, gun owners in possession of a short-barreled rifle equipped with a stabilizing brace would be given until May 31, 2023 to come into compliance with the requirements imposed by the NFA. *Id.*

Following the issuance of the ATF's rule in January 2023, various plaintiffs brought civil suits challenging the rule, with multiple cases arising within the Fifth Circuit. On May 23, 2023, a Fifth Circuit Motions Panel issued a temporary injunction that barred enforcement of ATF's rule against plaintiffs in that case and some related parties pending appeal, and on August 1, 2023, the Fifth Circuit held that the plaintiffs were likely to succeed in their claim that ATF's rule violated the Administrative Procedure Act's notice-and-comment requirements. *Mock v. Garland*, 75 F.4th 563, 578 (5th Cir. 2023). On remand back to the trial court in the Northern District of Texas, the plaintiffs in *Mock* were subsequently granted a preliminary injunction against enforcement of the rule by ATF on October 2, 2023, but notably the injunction was limited in scope to the plaintiffs and various related parties, with the court denying plaintiffs'

request for a nationwide injunction. *See Mock v. Garland,* Civil Action No. 4:23-cv-00095-O, 2023 U.S. Dist. LEXIS 178809, at *55 (N.D. Tex. Oct. 2, 2023). On October 27, 2023, a separate court in the Southern District of Texas granted another set of plaintiffs a preliminary injunction against the enforcement of the rule, but again declined to extend the injunction nationwide. *Texas v. BATFE*, Civil Action No. 6:23-CV-00013, 2023 U.S. Dist. LEXIS 193593, at *35 (S.D. Tex. Oct. 27, 2023). On November 8, 2023, a third court, again within the Northern District of Texas, entered a universal stay of the rule's effective date under 5 U.S.C. § 705. *Britto v. BATFE*, No. 2:23-CV-019-Z, 2023 U.S. Dist. LEXIS 200933, at *13 (N.D. Tex. Nov. 8, 2023).  The preliminary rulings in *Texas*, *Britto*, and other cases in which preliminary injunctions have been granted against enforcement of the rule are presently being appealed by the government. Subsequent to the nationwide stay granted in *Britto*, courts in both the Eastern and Northern Districts of Texas have denied requests for injunctive relief from the rule. *See Second Amendment Found., Inc. v. BATFE,* No. 3:21-CV-0116-B, 2023 U.S. Dist. LEXIS 202589, at *2 (N.D. Tex. Nov. 13, 2023) (denying injunctive relief both for plaintiffs and nationwide); *see also Watterson v. BATFE*, Civil Action No. 4:23-cv-00080, 2024 U.S. Dist. LEXIS 35973, at *56 (E.D. Tex. Mar. 1, 2024) (denying motion to reconsider and modify the court's prior denial of injunctive relief both for plaintiffs and nationwide). Similarly, courts in other circuits have also found no basis for injunctive relief from the rule. *See, e.g., Miller v. Garland*, 2023 U.S. Dist. LEXIS 93105, 2023 WL 3692841 (E.D. Va., May 26, 2023) (denying preliminary injunction motion), appeal filed, (4th Cir. 2023); *Firearms Regul. Accountability Coal., Inc. v. Garland*, No. 1:23-CV-024, 2023 U.S. Dist. LEXIS 161546, 2023 WL 5942365, at *5 (D.N.D. Sept. 12, 2023) (denying preliminary injunction motion), appeal filed, (8th Cir. 2023). However, the nationwide stay imposed in *Britto* remains presently in effect, and on June 13, 2024, the trial

court in *Mock* granted a motion for summary judgment based on a finding that the rule violated the APA's procedural requirements and was not a logical outgrowth of the Proposed Rule, and vacated the rule. *Mock*, Civil Action No. 4:23-cv-00095-O, ECF No. 111, at 1 (N.D. Tex. Jun. 13, 2024).

## II.    LEGAL STANDARD

"'Prosecutorial vindictiveness' is a term of art with a precise and limited meaning." *United States v. Meyer*, 810 F.2d 1242, 1245 (D.C. Cir. 1987). It refers to situations where the government acts in a way that is designed to penalize a defendant for his or her prior exercise of a constitutional or statutory right. *Id.*, citing *United States v. Goodwin*, 457 U.S. 368, 372 (1982); *see also United States v. Safavian*, 649 F.3d 688, 692 (D.C. Cir. 2011). The "concerns over alleged vindictiveness do not relate to whether the prosecutor has acted maliciously or in bad faith, but whether a prosecutor's actions are designed to punish a defendant for asserting her legal rights." *United States v. Gary*, 291 F.3d 30, 35 (D.C. Cir. 2002); *see also Maddox v. Elzie*, 238 F.3d 437, 446 (D.C. Cir. 2001). There are two ways that a defendant may establish prosecutorial vindictiveness: (1) the defendant shows "actual vindictiveness," or (2) the defendant presents facts that give rise to a "presumption of vindictiveness." *Meyer*, 810 F.2d at 1245, citing *Goodwin*, 457 U.S. at 380–81; *see also Safavian*, 649 F.3d at 692. When considering whether the defendant has demonstrated vindictiveness under either approach, the court must consider the actions of the government as a whole – not necessarily just the actions of the individual prosecutor. *Meyer*, 810 F.2d at 1248 ("The Supreme Court's decisions concerning vindictive prosecution have focused on the conduct of the government as a whole, rather than on the conduct or retributive sentiments of a single prosecutor . . . . Thus, the government cannot defeat the defendants' argument that a presumption should arise in this case merely by pointing out that two different individuals made the charging decisions.").

A defendant may establish actual vindictiveness "through objective evidence that a

prosecutor acted in order to punish him for standing on his legal rights." *Id.* at 1245; *see also*
*Maddox*, 238 F.3d at 446 ("To prove actual vindictiveness requires 'objective evidence' that the
prosecutor's actions were designed to punish a defendant for asserting his legal rights."). "This
showing is, of course, exceedingly difficult to make." *Meyer*, 810 F.2d at 1245.

In the absence of such evidence, a defendant may attempt to establish a presumption of
vindictiveness. To establish the presumption, a defendant must produce evidence sufficient to
establish a "realistic likelihood of vindictiveness." *Safavian*, 649 F.3d at 692, quoting *Meyer*,
810 F.2d at 1245. Identifying evidence establishing a "realistic likelihood of vindictiveness"
requires "something more" than an increase in charges that followed the exercise of his
constitutional or statutory rights. *United States v. Meadows*, 867 F.3d 1305, 1313 (D.C. Cir.
2017); *see also Safavian,* 649 F.3d at 692 ("[A] prosecutorial decision to increase charges after
a defendant has exercised a legal right does not alone give rise to a presumption in the pretrial
context"). This principle applies even where the evidence supporting the new charge was in the
government's possession at the time of the initial indictment. "An initial indictment—from
which the prosecutor embarks on a course of plea negotiation—does not necessarily define the
extent of the legitimate interest in prosecution." *Goodwin*, 457 U.S. at 380. "[E]ven where the
government has full knowledge of the facts, it can initially exercise its discretion to bring lesser
charges." *United States v. Slatten*, 865 F.3d 767, 800 (D.C. Cir. 2017). And, as the Supreme
Court has observed, "a prosecutor may"—as part of a plea agreement—"forgo legitimate
charges already brought in an effort to save the time and expense of trial." *Goodwin,* 457 U.S.
at 380. The converse is likewise true: "a prosecutor may file additional charges if an initial
expectation that a defendant would plead guilty to lesser charges proves unfounded." *Id*.

In the pretrial context, prosecutorial vindictiveness claims based on the addition of charges

rarely succeed. "A defendant must show that the prosecutor's action was 'more likely than not' attributable to vindictiveness." *Safavian*, 649 F.3d at 692 (quoting *Gary*, 291 F.3d at 34) (quoting *Alabama v. Smith*, 490 U.S. 794, 801 (1989))). This is a difficult showing to make in a pretrial posture, where "'the prosecutor's assessment of the proper extent of prosecution may not have crystallized,' so an increase in charges may be the result of additional information or further consideration of known information, rather than a vindictive motive." *Slatten*, 865 F.3d at 799 (quoting *Goodwin*, 457 U.S. at 381). Moreover, the "routine exercise of many pre-trial rights also weakens any inference of vindictiveness, *i.e.*, that a prosecutor would retaliate simply because a defendant sought a jury trial or pleaded an affirmative defense." *Id.* In addition, "'so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion.'" *Meadows*, 867 F.3d at 1313 (quoting *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978)).

In *Goodwin,* the Supreme Court addressed a situation where the government initially charged a defendant with misdemeanors and then added a felony charge after the defendant requested a jury trial. *Goodwin*, 457 U.S. at 370. The Court declined to apply a presumption of vindictiveness. It explained, "[t]here is good reason to be cautious before adopting an inflexible presumption of prosecutorial vindictiveness in a pretrial setting. In the course of preparing a case for trial, the prosecutor may uncover additional information that suggests a basis for further prosecution *or he simply may come to realize that information possessed by the State has a broader significance.*" *Id.* at 381 (emphasis added).  The Court found that:

> the timing of the prosecutor's action in this case suggests that a presumption of vindictiveness is not warranted. A prosecutor should remain free before trial to exercise the broad discretion entrusted to him to determine the extent of the societal

> interest in prosecution. An initial decision should not freeze future conduct. As we made clear in *Bordenkircher*, the initial charges filed by a prosecutor may not reflect the extent to which an individual is legitimately subject to prosecution.

*Id.* at 381-82. "[T]he mere fact that a defendant refuses to plead guilty and forces the government to prove its case is insufficient to warrant a presumption that subsequent changes in the charging decision are unjustified." *Id.* at 382-83. The Court thus declined to presume vindictiveness simply because the government brought additional or greater charges after the defendant made a pretrial demand for a jury trial. *Id.* at 384.

## III.   ARGUMENT

The Defendant's claim that he has been the victim of a vindictive prosecution seeking to penalize him for the exercise of his rights is unsupported by the facts presented above and in the Defendant's motion, which fail to establish either actual vindictiveness or the presumption of vindictiveness. As acknowledged in the Defendant's own motion, the Defendant cannot present any evidence of actual vindictiveness by the government in this case. ECF No. 59 at 6. Instead, the Defendant argues that the timeline of the government's investigation and "the reactiveness of the government" establish a realistic likelihood of vindictiveness. *Id.* The Defendant further argues that, by charging him under 26 U.S.C § 5861(d), the government "made an exception" for the Defendant when "the government is declining to prosecute [other defendants] in similar cases." *Id.* at 5. The Defendant's assertions are contradicted by the facts laid out above and are without merit.

### A. The Timing of the Superseding Indictment

First, the timing of the government's pursuit of a superseding indictment, to include Count One's allegation of a violation of 26 U.S.C. § 5861(d), does not support the rebuttable presumption of vindictiveness. The Defendant claims that because the superseding indictment in this case was

filed on February 14, 2024, "eight months after law enforcement recovered firearms from [the Defendant's] van," the government's decision to file the superseding indictment suggests vindictiveness because "the government was aware of the characteristics of the firearms" at the time the first indictment was filed on July 12, 2023, and presumably could have charged the Defendant under 26 U.S.C. § 5861(d) at the outset of the case. ECF No. 59 at 2-6.

This argument fails as a matter of both law and fact. The Defendant's singular reliance on the charges' timing contravenes the Supreme Court's guidance in *Goodwin* that "[a] prosecutor should remain free before trial to exercise the broad discretion entrusted to him to determine the extent of the societal interest in prosecution" and that "[a]n initial decision should not freeze future conduct"; rather, "the initial charges filed by a prosecutor may not reflect the extent to which an individual is legitimately subject to prosecution." 457 U.S. at 381-82.

In any event, even if timing alone could give rise to a presumption of vindictiveness in *some* cases, the argument would still lack factual support in *this* case. Indeed, the Defendant's entire argument is premised on a misapprehension of the timeline of the government's investigation. In the present case, when the government sought the superseding indictment, the government did not just reassess the evidence and information that was already on hand at the time of the first indictment. Rather, it based its superseding charging decision on information that had not been available in the summer of 2023. Most significantly, the government received new information regarding the Defendant's CZ Scorpion, such as ATF's analysis of the firearm—information that made an additional charge under 26 U.S.C. § 5861(d) viable only months after the grand jury returned the initial indictment. As described above, the government's plea negotiations with the Defendant were protracted (and intermittent), spanning the six-month period between July 2023 and January 2024. After the Defendant had expressed no further interest in the

plea informally discussed between counsel in the summer of 2023, the government's investigation included the ATF analysis in October 2023 of the CZ Scorpion seized from the Defendant's van. Contrary to the Defendant's claim that "the characteristics of the firearms were known" to the government at the time of the first indictment in this case, the shipping of the weapon to ATF (and subsequent analysis by ATF) represented an investigatory step taken by the government to confirm the CZ Scorpion's characteristics and status, information the government needed in order to determine what charges might be applicable and appropriate to the Defendant's alleged possession of the weapon in June 2023.

Only after November 6, 2023, when the ATF returned its Report of Technical Examination with its determinations regarding the status of the weapon under the NFA and GCA, was the government able to conclusively determine that the Defendant's possession of the CZ Scorpion made him potentially liable under 26 U.S.C. § 5861(d). Even after collecting that information, the government still needed to make further decisions regarding its approach to charging the Defendant in this case. While finalizing its plans to bring additional charges against the Defendant, the government engaged in further good-faith communications with defense counsel regarding a plea and was clear in those communications about the government's plan and expectation that it would pursue a superseding indictment. Discussions with the Defendant's counsel over a potential plea culminated in the eventual expiration of a twice extended plea deadline on January 12, 2024, approximately a month prior to the filing of the superseding indictment on February 14, 2024,

In summary, even if it were appropriate to inquire into the timing of the government's pretrial charging decisions (which, under *Goodwin*, is rarely the case), the Defendant is simply incorrect in his speculation that the government could have charged Count One at the outset of the case, and is even more incorrect in claiming that the timing should somehow give rise to a

*presumption* of vindictiveness. Instead, as clearly established by the timeline of the investigation and superseding indictment, the government could not have proceeded with a charge under 26 U.S.C. § 5861(d) until at least November 6, 2023. Even after receiving the new information about the CZ Scorpion's classification from the ATF's report, the government continued to engage in good-faith plea discussions with the Defendant in December 2023—at which time the government expressly informed the defense of its plan to seek additional charges. When those negotiations failed, and after an additional month of consideration by the government, the government filed the superseding indictment. Given the Defendant offers no other evidence regarding the timeline of this case to support his claim, he has failed to make the requisite showing to establish a realistic likelihood of vindictiveness and his motion should be denied.

### B. The 26 U.S.C. § 5861(d) Count and the Stay of ATF's Rule

The Defendant separately asserts that a presumption of vindictiveness is warranted because, in his view, his charge under 26 U.S.C. § 5861(d) is "an exception" to a presumed Department choice of "declining to prosecute individuals who possess a stabilizing brace under the NFA" in the wake of the *Britto* stay and other litigation involving the ATF's rule on stabilizing braces. ECF No. 59 at 5. He is incorrect.

To begin with, the Defendant's prosecution for violating Section 5861(d) based on his possession of an unregistered short-barrel rifle is entirely consistent with both the stay of ATF's rule on stabilizing braces and the Department of Justice's previous representations in *Watterson v. BATFE*. As discussed above, following the granting of a stay in *Britto v. ATF* on November 8, 2023 (and the more recent vacatur in *Mock* on June 13, 2024), the interpretive rule "Factoring Criteria for Firearms with Attached 'Stabilizing Braces'" is not in effect. As a result of that stay, the Defendant claims that the government is "enjoined from enforcing its recent rule classifying

16

braced pistols as [short-barreled rifles]" and "is declining to prosecute in similar cases." ECF No. 59 at 4-5. However, the Defendant's motion mischaracterizes the effect of the stay and fails to demonstrate how the Defendant is being treated differently from "similar" defendants in any meaningful way.

The fundamental error in Defendant's argument is that he fails to understand the interaction between the rule and the statute. As the rule itself makes clear, the rule does not have the independent force and effect of law but only articulates ATF's best interpretation of the statute; in other words, whether or not the rule is in effect, the statute itself is the source of all legal obligations relating to the registration of short-barreled "rifles." *See, e.g.*, 88 Fed. Reg. at 6478 ("[T]his rule does not impose any new legal obligations on owners of 'stabilizing braces' at all, as any obligations for these owners result only from the NFA and the [Gun Control Act]. Instead, this rule merely conveys more clearly to the public the objective design features and other factors that indicate a weapon is in fact a firearm or short-barreled rifle under the relevant statutes."); *id.* at 6480 ("The revised definition in this final rule clarifies, consistent with the best interpretation of the statutory provision, that firearms with an attached 'stabilizing brace' can possess objective design features that make them 'rifles,' as that term is defined under the NFA[.]"); *id.* at 6501 ("[T]he rule does not create any new law; instead it simply implements the relevant statutes based on the Department's best interpretation of those statutes."); *see also id.* at 6500-02, 6507-11, 6531, 6548, 6551-57, 6559-61, 6569 (all similar). The *Britto* court stayed ATF's rule, which sought to articulate ATF's interpretation of the underlying statute. But the *Britto* stay makes no mention of, and has no effect on, the enforcement of 26 U.S.C. § 5861(d), the criminal statute under which the Defendant is charged in Count One.

Perhaps for that reason, the Defendant offers no evidence at all to support his contention that the government is declining to prosecute offenses under 26 U.S.C. § 5861(d) in "similar cases." On the contrary, and as the Court is well aware, charges alleging possessory weapon offenses make up a sizeable number of current federal criminal cases,[1] and a cursory search of open federal cases shows numerous defendants across the nation (including defendants in the Fifth Circuit, where *Britto* is being litigated) have been charged under 26 U.S.C. § 5861(d) since both the *Britto* stay was issued on November 8, 2023 and the Defendant's superseding indictment was filed on February 14, 2024. *See, e.g., United States v. Westra*, No. 4:24-cr-40082, ECF No. 1 (D.S.D. Jul. 11, 2024); *United States v. Moser*, No. 1:23-mj-04039, ECF No. 19 (D.N.J. Jul. 8, 2024); *United States v. Starkey*, No. 4:24-mj-00445, ECF No. 1 (N.D. Okla. Jul. 2, 2024); *United States v. Kiley,* No. 1:24-cr-00199, ECF No. 1 (D. Colo. Jun. 27, 2024); *United States v. Payton*, No. 2:24-cr-00015, ECF No. 1 (E.D. Tex. Jun. 26, 2024); *United States v. Menjivar*, No. 3:24-mj-00567, ECF No. 1 (N.D. Tex. Jun. 21, 2024). As a result, it is unclear how the Defendant's arrived at his claim that his prosecution represents an "exception" to a (non-existent) wider prohibition on prosecuting non-registration offenses under the NFA, as the *Britto* court made no mention of the underlying statute for Count One and other defendants continue to face prosecution for failing to register firearms and other devices covered by the NFA.

The Defendant's related claim that the government is bound by a what he characterizes as a previously expressed "stated policy" of not prosecuting individuals "similarly situated" to the Defendant is equally meritless. ECF No. 59 at 4. The Defendant cites to *Watterson v. BAFTE*,

---

[1] For the most recently available annual period (March 31, 2022 through March 31, 2023), the Federal Judicial Caseload Statistics show 10,490 criminal cases alleging possessory firearm offenses were charged in district courts nationwide. *See* Criminal Federal Judicial Caseload Statistics, Table D-2, https://www.uscourts.gov/statistics/table/d-2/federal-judicial-caseload-statistics/2023/03/31.

where a supplemental filing by the government in February 2024 noted that ATF is not currently enforcing its rule, based on the *Britto* stay. *Watterson v. BAFTE*, No. 4:23-CV-00080, ECF No. 58, at 2 (E.D. Tex. Feb 23, 2024) ("Because the Rule is stayed nationwide, ATF is not enforcing it . . . ."). That statement is true: the government is not currently enforcing the rule. But it is also true that the government was never enforcing the rule in the relevant sense, because (as explained) the government has all along understood the rule to simply clarify the statutory terms and thus have no independent legal effect. And indeed, in *Watterson* itself (as in other cases challenging the rule), the government has made clear that any relief against the rule alone would not prevent enforcement of the underlying statutory obligations. *See, e.g.*, *Watterson*, ECF No. 29-1, at 16-17 (questioning whether plaintiff "even has standing to challenge the Rule, as divorced from the statute," because "it is the statute—not the Rule in a vacuum—that imposes the relevant obligations on Plaintiff").

Thus, nothing about the government's statement in *Watterson* could give rise to the inference that the government was expressing a policy, stated or otherwise, of declining prosecution for all weapons equipped with stabilizing braces. In addition to such a blanket declination policy being far beyond the scope of what the *Britto* stay requires, it would also run contrary to ATF's own history, laid out in detail at the time of the rule's issuance, of conducting assessments of the applicability of the NFA's statutory requirements to various weapons equipped with brace devices on a case-by-case basis based on the physical design characteristics of the weapon in the years prior to the promulgation of the rule. *See* 88 Fed. Reg. 6478, II. Background (Jan. 31, 2023). Although the rule is stayed (and, now, vacated), ATF is not barred from continuing to enforce the underlying statute as it always has: by making case-by-case determinations about whether particular braced firearms constitute "rifles" under the NFA and GCA. And of course,

because the rule reflects ATF's best understanding of the statute, those determinations will naturally tend to look substantially like the determinations that would follow from applying the clear framework outlined in the rule. Perhaps more importantly in this case, nothing in *Britto* or the government's representations in *Watterson* requires ATF to disown previous determinations about braced weapons made prior to the imposition of the *Britto* stay.

The timing of the ATF's classification of the Defendant's CZ Scorpion as a short-barreled rifle further undercuts any claim that the Defendant is being treated differently than other similarly situated defendants. The Defendant's motion places a heavy emphasis on the alleged (but unsubstantiated) impact of the *Britto* stay on prosecutions of unregistered weapons equipped with stabilizing braces. But tellingly, he fails to discuss the timing of the ATF's determination in this case. As previously discussed, ATF evaluated the CZ Scorpion seized from the Defendant's van after receiving it on October 30, 2023, and reported its determinations regarding the weapon in a report dated November 6, 2023. At the time ATF completed its assessment of the Defendant's weapon, no nationwide stay against ATF's rule existed, and ATF was free to apply the rule itself to guide its classification of the Defendant's weapon – though in this case ATF did not, in fact, use or rely upon the rule, and instead relied upon the statutory language of the NFA and GCA and the objective design features of the CZ Scorpion in making its classification. Thus, even assuming (counter-factually) that the Defendant's interpretation of the government's statement in *Watterson* were accurate (i.e., following the *Britto* stay being issued on November 8, 2023, the Department of Justice is unilaterally declining to prosecute all unregistered braced firearms under 26 U.S.C. § 5861(d)), the government would still have been free to utilize ATF's earlier-in-time classification of the Defendant's CZ Scorpion in bringing a charge under 26 U.S.C. § 5861(d). As a result, the Defendant's claim of being treated differently than other defendants in similar cases is unsupported

by the evidence in this case, and the Defendant has failed to establish a realistic likelihood of vindictiveness. The Defendant's motion should therefore be denied.

## IV.    CONCLUSION

For the foregoing reasons, the Government respectfully requests that the Defendant's Motion to Dismiss Count One of the Superseding Indictment for Vindictive Prosecution be denied.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

/S/_____
Samuel White
Assistant United States Attorney
601 D Street NW
Washington, DC 20001
202-431-4453
Samuel.white@usdoj.gov

## CERTIFICATE OF SERVICE

On this 25th day of July 2024, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

/s/_____
Samuel White
Assistant United States Attorney