UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **No. 23-CR-229 (CJN)** |
| | : | |
| **TAYLOR TARANTO,** | : | |
| | : | |
| **Defendant.** | : | |

### UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION TO COMPEL DISCOVERY IN SUPPORT OF DEFENDANT'S CLAIM OF SELECTIVE PROSECUTION

The United States of America respectfully submits this opposition to Defendant Taylor Taranto ("Defendant")'s Motion to Compel Discovery in Support of Defendant's Claim of Selective Prosecution. ECF No. 60. The Defendant argues that his prosecution for an unregistered firearm in violation of 26 U.S.C. § 5861(d) represents a "singling out" of the Defendant because it alleges an offense that the government is otherwise "declining to prosecute nationwide." ECF No. 60 at 1. Based on this alleged selective prosecution for his political beliefs, the Defendant asks the Court to compel disclosure of communications between various governmental entities regarding the Defendant's prosecution and prosecutions of other individuals alleged to have possessed firearms with attached stabilizing braces. *Id.* at 1-2, 7. The Defendant fails to make the requisite showing of discriminatory effect, let alone intent, to warrant his requested relief, and this Court should deny the Defendant's motion.

### I.      BACKGROUND

#### A.      *The January 6 Attack on the United States Capitol*

At 1:00 p.m., on January 6, 2021, a Joint Session of the United States Congress, consisting of the House of Representatives and the Senate, convened in the Capitol Building. The Joint

Session assembled to debate and certify the vote of the Electoral College of the 2020 Presidential Election. With the Joint Session underway and with Vice President Michael Pence presiding, a large crowd gathered outside the U.S. Capitol. "The mob [ . . . ] scaled walls, smashed through barricades, and shattered windows to gain access to the interior of the Capitol," with the first rioters entering shortly after 2:00 p.m. *Trump v. Thompson*, 20 F.4th 10, 10 (D.C. Cir. 2021).

Shortly thereafter, at approximately 2:20 p.m., members of the House and Senate, including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate the chambers. The siege of the Capitol lasted for several hours and represented a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.7 million dollars in damage and losses.

### B.      The Defendant's Conduct on and Subsequent to January 6. 2021

On January 6, 2021, the Defendant traveled to the United States Capitol and entered the restricted area of the United States Capitol Grounds. The Defendant subsequently entered the United States Capitol Building through a door on the Upper West Terrace at approximately 2:33 PM and remained in the building until he was forced out by uniformed law enforcement officers at approximately 2:57 PM.  After being expelled from the building, the Defendant remained within the restricted area of the Capitol Grounds for some time, mingling with other rioters.

In the wake of the events of January 6, 2021, the Defendant returned to his home in the state of Washington, where he continued to promote conspiracy theories about the events of January 6. In the spring of 2023, the Defendant drove cross-country from Washington to the District of Columbia and began to temporarily live out of his van on the streets of Washington, DC. During this time, the Defendant's behavior escalated in a series of erratic and dangerous stunts

2

and social media posts, which culminated on June 28, 2023, when the Defendant stated on a live video stream that he planned to detonate a self-driving vehicle at the National Institute of Standards and Technology. Based on this recorded statement, law enforcement personnel immediately began searching for the Defendant in and around the District of Columbia. He was located and arrested the next day, June 29, 2023, while searching for "tunnels" he believed would provide access to private residences in the Kalorama neighborhood of Washington, DC. Shortly following his arrest, a lawful search was conducted of the Defendant's van, which was parked near the scene of his arrest in Kalorama. During the search of the vehicle, law enforcement officers found indicia that the Defendant had been living out of the van. They also lawfully seized a backpack behind the driver's seat, which contained two firearms, including a CZ Scorpion EVO 3 S1 9mm Luger firearm (the "CZ Scorpion"), as well as 13 magazines (at least one of which could hold 32 rounds) and hundreds of rounds of ammunition.

### C.      The Government's Developing Investigation

Following his arrest on June 29, 2023, in July 2023, the grand jury initially charged the Defendant with the following offenses: (1) Carrying a Pistol Without a License (Outside Home or Place of Business), in violation of 22 D.C. Code § 4504(a)(1); (2) Possession of a Large Capacity Ammunition Feeding Device, in violation of 7 D.C. Code § 2506.01(b); (3) Entering or Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1); (4) Disorderly or Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2); (5) Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); and (6) Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).

On July 14, 2023, defense counsel for the Defendant emailed trial counsel to request a conversation about a potential plea offer for the Defendant. During a subsequent phone conversation, the government proposed a plea offer to defense counsel in which the Defendant would plead guilty to five separate counts: (1) Carrying a Pistol Without a License (Outside Home or Place of Business), in violation of 22 D.C. Code § 4504(a)(1); (2) Entering or Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1); (3) Disorderly or Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2); (4) Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); and (5) Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). Following that phone conversation, the government received no further inquiries from defense counsel regarding the plea offer discussed by telephone, and the parties subsequently litigated multiple motions, including the Defendant's Motion for Release from Custody, filed on July 27, 2023 (ECF No. 19) and the Defendant's Motion to Suppress evidence seized from his van, filed on September 27, 2023 (ECF No. 30), both of which suggested to the government that the Defendant was uninterested in a pre-trial resolution of his case.

In October 2023, as part of its ongoing investigation in the case, the government shipped the CZ Scorpion seized from the Defendant's van to the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF). After receiving the CZ Scorpion on October 30, 2023, the ATF conducted an evaluation of the weapon to determine if it was a short-barreled rifle, as defined by the National Firearms Act of 1934 (NFA) and the Gun Control Act of 1968 (GCA). As subsequently documented in a Report of Technical Examination dated November 6, 2023, an ATF firearms enforcement officer determined that the CZ Scorpion seized from the Defendant's van on June 29, 2023 was both a firearm and a rifle with a barrel length of less than 16 inches in length, making it

subject to registration requirements under the NFA. In making these determinations, the firearms enforcement officer relied upon the statutory language and definitions of the NFA and GCA and the objective design features of the firearm, without reference to the rule issued by the ATF in January 2023 on factoring criteria for firearms with stabilizing braces (discussed in greater detail below).

Following receipt of the ATF's Report of Technical Examination on November 6, 2023, the government contacted defense counsel via email on December 1, 2023, documenting the government's understanding that the Defendant was not interested in resolving his case via the plea outlined the previous summer and setting a deadline of December 8, 2023 for the Defendant to notify the government if he wanted to accept the plea offer. The government's email also informed defense counsel that the government expected, based in part on new evidence gathered in the case, to pursue a superseding indictment in the near future. In an email reply on December 3, 2023, defense counsel inquired about what charges the government intended to bring in its superseding indictment and requested an extension of the plea deadline beyond December 8, 2023. On December 8, 2023, the government informed defense counsel that the anticipated superseding indictment would include, amongst other counts, a charge under 26 U.S.C. § 5861(d) and agreed to keep the plea offer open through December 18, 2023. On December 15, 2023, the government followed up with draft plea paperwork, formally extending the same plea offer previously discussed with defense counsel to the Defendant via written letter and reiterating the December 18, 2023 deadline on the plea offer. The government received no further response prior to the December 18, 2023 deadline.

On December 19, 2023, at a status hearing in the Defendant's case, the government relayed to the Court that the Defendant had rejected the previously discussed plea offer, and that the

government intended to seek a superseding indictment in the case. Based on the representations of the parties, the Court suggested that the government might delay its pursuit of a superseding indictment, in order to allow the Defendant additional time to consider the previously discussed plea offer, and the government agreed to both delay seeking a superseding indictment and extend the deadline on its plea offer. On December 21, 2023, the government confirmed in writing to the Defendant, through counsel, that the plea offer would remain available through January 12, 2024, and that the government would not present its superseding indictment to a grand jury until after the plea offer had expired. On January 5, 2024, defense counsel acknowledged in writing that the plea offer would expire on January 12, 2024.  The government received no further response from the Defendant regarding the plea offer prior to its expiration on January 12, 2024, and subsequently emailed defense counsel on February 9, 2024 to confirm in writing that the plea offer had expired and was revoked.

On February 14, 2024, the Defendant was charged by superseding indictment with the following offenses: (1) Possession of an Unregistered Firearm, in violation of 26 U.S.C. §§ 5861(d) and 5845(a)(3) (Count One); (2) Carrying a Pistol Without a License (Outside Home or Place of Business), in violation of 22 D.C. Code § 4504(a)(1) (Count Two); (3) Carrying a Pistol Without a License (Outside Home or Place of Business), in violation of 22 D.C. Code § 4504(a)(1) (Count Three); (4) Possession of a Large Capacity Ammunition Feeding Device, in violation of 7 D.C. Code § 2506.01(b) (Count Four); (5) Unlawful Possession of Ammunition, in violation of 7 D.C. Code § 2506.01(a)(3) (Count Five); (6) False Information and Hoaxes, in violation of 18 U.S.C. §1038(a) (Count Six); (7) Obstruction of an Official Proceeding, in  violation of 18 U.S.C. § 1512(c)(2) and 2 (Count Seven); (8) Entering or Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1) (Count Eight); (9) Disorderly or Disruptive Conduct in a

Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2) (Count Nine); (10) Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Ten); and (11) Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). ECF No. 45 (Count Eleven).

### D.      *Litigation over ATF's Rule on Stabilizing Braces*

The NFA, 26 U.S.C. §§ 5801-5872, regulates "dangerous weapons," H.R. Rep. No. 73-1780, at 1 (1934), in part by imposing registration requirements on certain classes or types of weapons. 26 U.S.C. § 5861(d) criminalizes the receipt or possession of "a firearm which is not registered to [the receiver or possessor] in the National Firearms Registration and Transfer Record." 26 U.S.C. § 5845(a)(3) defines a "firearm" for the purposes of the NFA as including "a rifle having a barrel or barrels of less than 16 inches in length," and 26 U.S.C. 5845(c) defines a "rifle" for the purposes of the NFA as "a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger . . . ." Similarly, the GCA defines a "rifle" as "a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of an explosive to fire only a single projectile through a rifled bore for each single pull of the trigger," and defines a "short-barreled rifle" as "a rifle having one or more barrels less than sixteen inches in length and any weapon made from a rifle (whether by alteration, modification, or otherwise) if such weapon, as modified, has an overall length of less than twenty-six inches." 18 U.S.C. § 921(a)(7-8). Prior to January 2023, ATF firearms enforcement officers used the statutory language of the NFA and GCA to guide their examination of the overall configuration, physical characteristics, objective

design features, and any other information that directly affected classification of a particular firearm in making case-by-case determinations regarding whether braced weapons were "rifles" falling under the purview of the NFA. *See* 88 Fed. Reg. 6478, II.A.

On January 31, 2023, ATF issued an interpretive rule entitled "Factoring Criteria for Firearms with Attached 'Stabilizing Braces.'" 88 Fed. Reg. 6478. ATF intended for the rule to clarify the framework that the agency will use to determine whether any particular firearm equipped with a stabilizing brace is a "rifle" within the meaning of the GCA and NFA—that is, when the firearm is designed, made, and intended to be fired from the shoulder. The rule states that such a firearm will constitute a "rifle" if the brace "provides surface area that allows the weapon to be fired from the shoulder" and if "other factors, as listed in the rule, indicate that the weapon is designed, made, and intended to be fired from the shoulder." *Id.* In issuing the rule, ATF noted that the agency had previously issued individual determinations evaluating whether braced firearms constituted short-barreled rifles—with many, though not all, classified as short-barreled rifles—but that those classifications were not consistent and sometimes gave undue weight to certain factors in the factual analysis. *Id.* at II.B. In addition, the rule announced that, in an exercise of ATF's enforcement discretion, gun owners in possession of a short-barreled rifle equipped with a stabilizing brace would be given until May 31, 2023 to come into compliance with the requirements imposed by the NFA. *Id.*

Following the issuance of the ATF's rule in January 2023, various plaintiffs brought civil suits challenging the rule, with multiple cases arising within the Fifth Circuit. On May 23, 2023, a Fifth Circuit Motions Panel issued a temporary injunction that barred enforcement of ATF's rule against plaintiffs in that case and some related parties pending appeal, and on August 1, 2023, the

Fifth Circuit held that the plaintiffs were likely to succeed in their claim that ATF's rule violated the Administrative Procedure Act's notice-and-comment requirements. *Mock v. Garland*, 75 F.4th 563, 578 (5th Cir. 2023). On remand back to the trial court in the Northern District of Texas, the plaintiffs in *Mock* were subsequently granted a preliminary injunction against enforcement of the rule by ATF on October 2, 2023, but the injunction was limited in scope to the plaintiffs and various related parties, with the court denying plaintiffs' request for a nationwide injunction. *See Mock v. Garland,* Civil Action No. 4:23-cv-00095-O, 2023 U.S. Dist. LEXIS 178809, at *55 (N.D. Tex. Oct. 2, 2023). On October 27, 2023, a court in the Southern District of Texas granted another set of plaintiffs a preliminary injunction against the enforcement of the rule, but again declined to extend the injunction nationwide. *Texas v. BATFE*, Civil Action No. 6:23-CV-00013, 2023 U.S. Dist. LEXIS 193593, at *35 (S.D. Tex. Oct. 27, 2023). On November 8, 2023, a third court, again in the Northern District of Texas, entered a universal stay of the rule's effective date under 5 U.S.C. § 705. *Britto v. BATFE*, No. 2:23-CV-019-Z, 2023 U.S. Dist. LEXIS 200933, at *13 (N.D. Tex. Nov. 8, 2023).  The preliminary rulings in *Texas*, *Britto*, and other cases in which preliminary injunctions have been granted against enforcement of the rule are presently being appealed by the government. Subsequent to the nationwide stay granted in *Britto*, courts in both the Eastern and Northern Districts of Texas have denied requests for injunctive relief from the rule. *See Second Amendment Found., Inc. v. BATFE,* No. 3:21-CV-0116-B, 2023 U.S. Dist. LEXIS 202589, at *2 (N.D. Tex. Nov. 13, 2023) (denying injunctive relief both for plaintiffs and nationwide); *see also Watterson v. BATFE*, Civil Action No. 4:23-cv-00080, 2024 U.S. Dist. LEXIS 35973, at *56 (E.D. Tex. Mar. 1, 2024) (denying motion to reconsider and modify the court's prior denial of injunctive relief both for plaintiffs and nationwide). Similarly, courts in other circuits have also found no basis for injunctive relief from the rule. *See, e.g., Miller v. Garland*, 2023 U.S. Dist. LEXIS 93105,

2023 WL 3692841 (E.D. Va., May 26, 2023) (denying preliminary injunction motion), appeal filed, (4th Cir. 2023); *Firearms Regul. Accountability Coal., Inc. v. Garland*, No. 1:23-CV-024, 2023 U.S. Dist. LEXIS 161546, 2023 WL 5942365, at *5 (D.N.D. Sept. 12, 2023) (denying preliminary injunction motion), appeal filed, (8th Cir. 2023). However, the nationwide stay imposed in *Britto* remains presently in effect, and on June 13, 2024, the trial court in *Mock* granted a motion for summary judgment based on a finding that the rule violated the APA's procedural requirements and was not a logical outgrowth of the Proposed Rule, and vacated the rule. *Mock*, Civil Action No. 4:23-cv-00095-O, ECF No. 111, at 1 (N.D. Tex. Jun. 13, 2024).

## II.    LEGAL STANDARD

"[T]he prosecution (and non-prosecution) power is a vital aspect of the executive power. . . . Prosecutorial discretion lies within the 'special province of the Executive Branch, inasmuch as it is the Executive who is charged by the Constitution to 'take Care that the Laws be faithfully executed.'" *Frederick Douglass Found. v. District of Columbia*, 82 F.4th 1122, 1136 (D.C. Cir. 2023) (quoting *Heckler v. Chaney*, 470 U.S. 821, 832 (1985)). As a result, it is generally beyond the purview of the judiciary to review charging decisions made by the executive. *See id.* at 1136–37 ("As we have explained, the 'Executive's charging authority embraces decisions about whether to initiate charges, whom to prosecute, which charges to bring,' and '[i]t has long been settled that the Judiciary generally lacks authority to second-guess those Executive determinations.'" (quoting *United States v. Fokker Servs. B.V.*, 818 F.3d 733, 737 (D.C. Cir. 2016)). However, "a prosecutor's discretion is 'subject to constitutional constraints,'" including that "the decision whether to prosecute may not be based on 'an unjustifiable standard such as race, religion, or other arbitrary classification.'" *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (first quoting *United States v. Batchelder*, 442 U.S. 114, 125 (1979), and then quoting *Oyler v. Boles*, 368 U.S. 446, 456

(1962)). A "presumption of regularity supports … prosecutorial decisions" such that "in the absence of clear and convincing evidence to the contrary, courts presume that [the Attorney General and United States Attorneys] have properly discharged their official duties." *Armstrong*, 517 U.S. at 464 (internal quotation marks and citations omitted). This presumption exists because "the decision to prosecute is particularly ill-suited to judicial review." *Wayte v. United States*, 470 U.S. 598, 607 (1985). "Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis courts are competent to undertake." *Id.*; *see also Fokker Servs. B.V.*, 818 F.3d at 741 ("[J]udicial authority is … at its most limited when reviewing the Executive's . . . charging determinations" because "the Judiciary … generally is not competent to undertake that sort of inquiry.") (internal quotation marks and citations omitted). The presumption of regularity "also stems from a concern not to unnecessarily impair the performance of a core executive constitutional function." *Armstrong,* 517 U.S. at 465.

A claim of selective prosecution seeks to rebut the presumption of regularity by "assert[ing] that the prosecutor has brought the charge for reasons forbidden by the Constitution," *Armstrong,* 517 U.S. at 463, "such as race, religion, or other arbitrary classification," *id.* at 464 (citation omitted). That standard requires proof that the prosecution "had a discriminatory effect and that it was motivated by a discriminatory purpose." *Wayte*, 470 U.S. at 608; *see also Armstrong,* 517 U.S. at 465. "[T]he standard is a demanding one." *Armstrong,* 517 U.S. at 463. "[T]he D.C. Circuit has called for a two-pronged showing that: (1) the defendant was 'singled out for prosecution from among others similarly situated' and (2) 'the prosecution was improperly motivated, i.e., based on race, religion or another arbitrary classification.'" *United States v. Stone*, 394 F. Supp. 3d 1, 30 (D.D.C. 2019) (quoting *Branch Ministries v. Rossotti*, 211 F.3d 137, 144 (D.C. Cir. 2000)); *see*

11

*also Attorney Gen. of United States v. Irish People, Inc.*, 684 F.2d 928, 946 (D.C. Cir. 1982). "This is a rigorous test; 'the conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation.'" *United States v. Mangieri*, 694 F.2d 1270, 1273 (D.C. Cir. 1982) (quoting *Oyler v. Boles*, 368 U.S. 448, 456 (1962)). More recently, in the First Amendment context, the D.C. Circuit has held that, at least in civil cases, "to make out a First Amendment selective enforcement claim, the [individual] is not required to allege discriminatory intent.'" *Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122 1144-45 (D.C. Cir. 2023) (quoting *Reed v. Town of Gilbert,* 576 U.S. 155, 165 (2015)) (citations omitted). Discriminatory effect – a showing that the defendant has been treated differently from similarly situated individuals – is still required. *Id.* at 1145.

As explained by Judge Berman Jackson in *Stone*, an individual may be similarly situated to the defendant if:

> "[He] committed the same basic crime in substantially the same manner as the defendant—so that any prosecution of that individual would have the same deterrence value and would be related in the same way to the Government's enforcement priorities and enforcement plan—and against whom the evidence was as strong or stronger than that against the defendant."

*Stone*, 394 F. Supp. 3d at 31 (Berman Jackson, J.) (quoting *United States v. Smith*, 231 F.3d 800, 810 (11th Cir. 2000)); s*ee also United States v. Lewis*, 517 F.3d 20, 27-28 (1st Cir. 2008) (defining a similarly situated offender as "one outside the protected class who has committed roughly the same crime under roughly the same circumstances but against whom the law has not been enforced."). "Defendants are similarly situated when their circumstances present **no** distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them." *Branch Ministries*, 211 F.3d at 145 (citing *United States v.*

*Hastings*, 126 F.3d 310, 315 (4th Cir. 1997)) (emphasis added). The phrase "similarly situated" is "narrowly" interpreted. *United States v. Judd*, 579 F. Supp. 3d 1, 4 (D.D.C. 2021) (quoting *Stone*, 394 F. Supp. 3d at 31). Among the factors that must be considered when determining if defendants are "similarly situated" are "the comparability of the crimes, the similarities in the manner in which the crimes were committed, the relative efficacy of each prosecution as a deterrent, and the equivalency of the evidence against each prospective defendant." *Lewis*, 517 F.3d at 27-28 (internal citations omitted).

### III.    ARGUMENT

The Defendant claims that he has been selectively targeted for prosecution because of his status as a "vocal conservative," and that his treatment represents a discriminatory effect when his prosecution is compared to "thousands of Americans who possess pistols with attached braces" who are not being prosecuted as part of what the Defendant alleges is a "nationwide" governmental declination policy. ECF No. 60 at 6. The Defendant's claims are without merit, and he fails to make the requisite showing of a colorable claim of discriminatory effect.

### A.    *The Defendant Misidentifies The Pool of Alleged Similarly Situated Individuals*

The Defendant's claim of discriminatory effect is undercut from the start by his faulty identification of an alleged pool of "similarly situated" individuals for comparison. The Defendant identifies no specific individuals and offers no statistical analyses or evidence of different treatment of other defendants. Instead, the Defendant attempts to create the largest possible comparative pool by arguing that his selective treatment by the government differs from the government's handling of an unknown number of unnamed individuals "who possess pistols with attached braces" and have not been prosecuted under 26 U.S.C. § 5681(d). ECF No. 60 at 6. However, as laid out in Count One of the Superseding Indictment, the Defendant is not charged

with possession of a pistol with an attached brace, but instead with possession of an unregistered short-barreled rifle. ECF No. 45 at 1. As noted above, prior to the issuance of ATF's rule on stabilizing braces, various types of pistols equipped with a stabilizing brace were evaluated by the ATF on a case-by-case basis, and in multiple instances were found to not meet the definition of a "rifle" under the NFA. *See* 88 Fed. Reg. 6478, Part II.B ((Jan. 31, 2023). Importantly, this same case-by-case evaluation process for weapons with stabilizing braces remains available to ATF firearms enforcement officers in the present, even after the stay of the ATF rule on stabilizing braces in *Britto*. The Defendant's charge under 26 U.S.C. § 5681(d) stems from a determination, made by an ATF firearms enforcement officer on November 6, 2023, that the Defendant's CZ Scorpion was a short-barreled rifle under the NFA and the GCA.

Conversely, the hypothetical unknown, unidentified individuals in possession of "pistols with attached braces" referenced in the Defendant's motion may possess weapons that, because they were never evaluated by ATF or were evaluated and found to not meet the definition of a "rifle" under the NFA and GCA, do not require registration under the NFA. As a result, the Defendant's hypothetical pool of "similarly situated" individuals would not in fact be similarly situated to the Defendant, unless they were in fact in possession of unregistered short-barreled rifles that fall under the registration requirements of the NFA. The Defendant's motion fails to provide any evidence or examples of individuals who fit materially similar circumstances to his own and have not been charged. This is unsurprising, given, as discussed above and contrary to any claim of a "nationwide" governmental policy of declination, numerous prosecutions under 26 U.S.C. § 5681(d) have been initiated since the *Britto* stay went into effect on November 8, 2023. *See, e.g.*, *United States v. Westra*, No. 4:24-cr-40082, ECF No. 1 (D.S.D. Jul. 11, 2024); *United States v. Moser*, No. 1:23-mj-04039, ECF No. 19 (D.N.J. Jul. 8, 2024); *United States v. Starkey*,

No. 4:24-mj-00445, ECF No. 1 (N.D. Okla. Jul. 2, 2024); *United States v. Kiley*, No. 1:24-cr-00199, ECF No. 1 (D. Colo. Jun. 27, 2024); *United States v. Payton*, No. 2:24-cr-00015, ECF No. 1 (E.D. Tex. Jun. 26, 2024); *United States v. Menjivar*, No. 3:24-mj-00567, ECF No. 1 (N.D. Tex. Jun. 21, 2024).

Within this larger pool of new prosecutions initiated after the *Britto* stay was issued, a cursory search of legal research databases shows numerous cases alleging the possession by defendants of unregistered short-barreled rifles. *See*, *e.g., United States v. Reigard*, 6:24-cr-00253, ECF No. 1 (D. Or. Jun. 20, 2024) (alleging a violation of 26 U.S.C. § 5861(d) via possession of an unregistered Windham Weaponry WW-15 short-barreled rifle); *United States v. Judson*, 2:24-mj-1781, ECF No. 3 at 3 (C.D. Cal. May 30, 2024) (alleging a violation of 26 U.S.C. § 5861(d) via possession of an unregistered AR-type "ghost gun" short-barreled rifle); *United States v. Lucas*, 4:24-cr-22, ECF No. 2 at 6 (N.D. Okla. Jan. 17, 2024) (alleging a violation of 26 U.S.C. § 5861(d) via possession of an unregistered Polish PPS-43 type short-barreled rifle).

The Defendant also offers what amounts to unfounded speculation, without citation or supporting evidence, regarding instructions being allegedly relayed from ATF to the Department of Justice to refrain from charging possession of "braced pistols." ECF No. 60 at 6. The Defendant's assertion is incorrect. ATF has certainly not directed or instructed the Department of Justice on charging decisions in the Defendant's case. Nor has the Defendant provided any reason to believe—and the undersigned counsel is unaware of any such reason—that ATF has directed or instructed the Department of Justice on charging decisions in other currently pending cases or investigations involving allegations of unlawful possession of braced firearms. And, in any event, even if such directions or instructions had been made in *some* cases, it would still fall short of

supporting the Defendant's theory of selective prosecution based on political bias. Given that the government continues to prosecute defendants in various jurisdictions across the country for the possession of unregistered short-barreled rifles and the clear distinction between the Defendant's conduct (as discussed further below) and the conduct of his offered hypothetical pool of lawful possessors of pistols with attached braces that have not been classified as short-barreled rifles by ATF, the Defendant has failed to establish that he is experiencing any discriminatory effect from his prosecution.

### B.    The Defendant's Prosecution Is Not Exceptional

The Defendant's claim of having been singled out for his political beliefs via his prosecution under 26 U.S.C. § 5861(d) in the aftermath of the stay of the ATF rule on stabilizing braces is also undercut by ATF's continued efforts to evaluate weapons with stabilizing braces or other attachments and in some cases classify them as short-barreled rifles pursuant to the NFA, as was done pre-*Britto* stay with the Defendant's CZ Scorpion. As discussed in greater detail in the government's response to the Defendant's Motion to Dismiss Count One of the Superseding Indictment for Vindictive Prosecution (incorporated here by reference), ATF, in accordance with the *Britto* stay and consistent with the government's representations in *Watterson v. BAFTE*, No. 4:23-CV-00080, ECF No. 58, at 2 (E.D. Tex. Feb 23, 2024), has currently ceased applying the 2023 rule to guide its classification process. However, post-*Britto* stay, ATF has maintained the capability to evaluate weapons with braces or other attachments for potential classification as "rifles" under the NFA and GCA on a case-by-case basis based on the physical design characteristics of the weapon, as it did in the years prior to the issuance of the stayed (and now vacated) rule. *See* 88 Fed. Reg. 6478, II.B (Jan. 31, 2023). ATF's continued evaluation of weapons with attachments or braces makes clear that the Defendant's current prosecution does not represent

16

an unlawfully selective action by the government, as weapons with stabilizing braces can still be classified as "rifles," and prosecutions for short-barreled rifles continue to be regularly initiated under 26 U.S.C. § 5861(d). *See, e.g., Reigard*, 6:24-cr-00253, ECF No. 1 (D. Or. Jun. 20, 2024); *Judson*, 2:24-mj-1781, ECF No. 3 at 3 (C.D. Cal. May 30, 2024); *Lucas*, 4:24-cr-22, ECF No. 2 at 6 (N.D. Okla. Jan. 17, 2024). As a result, the Defendant's prosecution does not support a finding of exceptional treatment and is instead consistent with both ATF's past and present classification procedures and the government's continued practice of prosecuting the possession of unregistered short-barreled rifles under 26 U.S.C. § 5861(d).

### C.    The Defendant's Multiple Distinguishable Legitimate Prosecutorial Factors

Even if, for the sake of argument, the Defendant had successfully (and with sufficient detail) identified a post-*Britto* stay pool of individuals who were not being prosecuted despite possessing unregistered weapons with stabilizing braces that had been classified as short-barreled rifles, there are multiple "distinguishable legitimate prosecutorial factors" that would justify the government's decision to prosecute the Defendant. *Branch Ministries*, 211 F.3d at 145 (citing *United States v. Hastings*, 126 F.3d 310, 315 (4th Cir. 1997)). First, the Defendant's claim of selective prosecution fails to account for the temporal distinction between his case and any hypothetical post-*Britto* stay pool of individuals. The Defendant argues that the government's prosecution represents a singling out of his case because at this time the government, due to the *Britto* stay and related civil litigation over ATF's rule, is declining to prosecute other cases involving unregistered "braced pistols." ECF No. 60 at 6. Although no such policy exists, even if it did, ATF evaluated the CZ Scorpion seized from the Defendant's van after receiving it on October 30, 2023, and reported its determinations regarding the weapon in a report dated November 6, 2023. Therefore, at the time ATF completed its assessment of the Defendant's

weapon, the *Britto* nationwide stay of ATF's rule did not yet exist. For that reason alone, ATF was free at that time to use the rule itself to guide its classification of the CZ Scorpion—even though ATF did not, in fact, use or rely on the rule in this case, and instead relied upon the statutory language of the NFA and GCA and the objective design features of the CZ Scorpion in making its classification. Thus, even if the Defendant had made a sufficient showing that owners of unregistered short-barreled rifles with stabilizing braces were not <u>currently</u> being charged under 26 U.S.C. § 5861(d), the timeline of the government's investigation forecloses any claim of selective prosecution, because it was made under materially different circumstances. The fact that ATF's classification of the Defendant's weapon was completed prior to the imposition of the nationwide stay of ATF's rule would therefore differentiate the Defendant's case from any hypothetical present investigations.

More fundamentally, the Defendant's other alleged criminal conduct separates and distinguishes him from either his misidentified pool of similarly situated "braced pistol" owners or the more accurate pool of unregistered short-barreled rifle possessors identified by the government. As discussed in *Stone*, "similarly situated" individuals are those:

> "that engaged in the same type of conduct, which means that the comparator committed the same basic crime in substantially the same manner as the defendant – so that any prosecution of the that individual would have the same deterrence value and would be related in the same way to the Government's enforcement priorities and enforcement plan."

*Stone*, 394 F. Supp. 3d at 31 (quoting *United States v. Smith*, 231 F.3d 800, 810 (11th Cir. 2000)). In the present case, the Defendant, in addition to his charge under 26 U.S.C. § 5861(d), currently faces ten other charges, including four other felonies: one count of False Information and Hoaxes, in violation of 18 U.S.C. §1038(a), one count of Obstruction of an Official Proceeding, in violation of 18 U.S.C. § 1512(c)(2) and 2, and two counts of Carrying a Pistol Without a License (Outside

Home or Place of Business), in violation of 22 D.C. Code § 4504(a)(1). ECF No. 45. The Defendant's range of alleged criminal offenses, covering actions in both January 2021 and June 2023, significantly narrow the field of potential comparators, and it is plain that the breadth of criminal violations allegedly committed by the Defendant represent exactly the kind of legitimate prosecutorial factor that would lend greater deterrence value to his potential prosecution and make him a higher enforcement priority for the government.

Additionally, in weighing factors to determine if defendants are "similarly situated," courts have upheld the government's decision to prosecute more readily when "the specter of terrorism is implicated." *United States v. Lewis*, 517 F.3d 20, 28 (1st Cir. 2008); *see also United States v. Khan,* 461 F.3d 477, 498 (4th Cir. 2006) (affirming denial of discovery in selective prosecution case where the available evidence demonstrates that legitimate prosecutorial factors, including the defendants' being accused of supporting a terrorist organization, motivated prosecutorial decisions); *cf. Reno v. Am.-Arab Anti-Discrim. Comm.,* 525 U.S. 471, 491-92 (1999) (holding that consideration of terrorist links in deportation context is not sufficient to constitute selective deportation). Here, the Defendant entered the U.S. Capitol Building as part of a large crowd of rioters on January 6, 2021 and, two and one-half years later, threatened via a social media live stream to detonate a self-driving vehicle at the National Institute of Standards and Technology on June 28, 2023. The following day, he was arrested in a residential neighborhood while searching for tunnels that he believed would provide access to the homes of private citizens. These acts, which posed a risk to public safety and raised grave concerns for local law enforcement and citizens alike, easily set the Defendant apart from the vast majority of hypothetical comparators, and make clear why the Defendant's prosecution would have greater deterrence value to the

government and be a greater enforcement priority than another hypothetical unregistered possessor. *See Frederick Douglass Found.,* 82 F.4th at 1143 (quoting *Wayte*, 470 U.S. at 607).

### D.       The Defendant Fails to Establish a Discriminatory Purpose

As noted above, the D.C. Circuit held in 2023 that, in the context of a civil First Amendment selective enforcement case, a party making a claim was not required to allege "discriminatory intent." *Frederick Douglass Found.*, 82 F.4th at 1145. While the D.C. Circuit was addressing a civil claim, multiple courts in this jurisdiction have now applied the same reasoning to claims of selective prosecution in criminal cases. *See United States v. Eshetu*, No. 13-262, 2023 WL 7384996, at *12–14 (D.D.C. Nov. 8, 2023); *United States v. Trevor Brown*, No. 22-170, ECF No. 105 (D.D.C. Jun. 10, 2024). In the present case, the Defendant alleges that, in charging him under 26 U.S.C. § 5861(d), the government acted with the discriminatory purpose of targeting his "vocal" conservatism. ECF No. 60 at 6. The Defendant offers no evidence to support his allegation of discriminatory purpose, and the government denies that any such purpose exists. To the extent a showing of discriminatory purpose is required, the Defendant has failed to make it.

## IV.       CONCLUSION

For the foregoing reasons, the Defendant has failed to present a claim that meets the "particularly demanding" standard of showing that he has been prosecuted for an impermissible reason. *Frederick Douglass Found.*, 82 F.4th at 1143. The Government respectfully requests that the Defendant's Motion to Compel Discovery In Support of the Defendant's Claim of Selective Prosecution be denied.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

/S/_____
Samuel White
Assistant United States Attorney
NC Bar # 44908
601 D Street NW
Washington, DC 20001
202-431-4453
Samuel.white@usdoj.gov

## **CERTIFICATE OF SERVICE**

On this 25th day of July 2024, a copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

/s/_____
Samuel White
Assistant United States Attorney