**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 23-cr-229 (CJN)** |
| | : | |
| **TAYLOR FRANKLIN TARANTO,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S**
**MOTION TO DISMISS COUNT SIX OF THE INDICTMENT**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits its Opposition to defendant Taylor Taranto's Motion to Dismiss Count Six of the Superseding Indictment (ECF No. 58 or "Mot."). Defendant claims that the charge violates the First Amendment and he raises facial, as-applied, and overbreadth challenges. These arguments are meritless.

**BACKGROUND**

***The January 6 Attack on the United States Capitol***

At 1:00 p.m., on January 6, 2021, a Joint Session of the United States Congress, consisting of the House of Representatives and the Senate, convened in the Capitol Building. The Joint Session assembled to debate and certify the vote of the Electoral College of the 2020 Presidential Election. With the Joint Session underway and with Vice President Michael Pence presiding, a large crowd gathered outside the U.S. Capitol. "The mob [ . . . ] scaled walls, smashed through barricades, and shattered windows to gain access to the interior of the Capitol," with the first rioters entering shortly after 2:00 p.m. *Trump v. Thompson*, 20 F.4th 10, 10 (D.C. Cir. 2021).

Shortly thereafter, at approximately 2:20 p.m., members of the House and Senate, including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate the chambers. The siege of the Capitol lasted for several hours and represented a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.7 million dollars in damage and losses.

### *The Defendant's Conduct on and Subsequent to January 6, 2021*

On January 6, 2021, Taranto traveled to the United States Capitol and entered the restricted area of the United States Capitol Grounds. He subsequently entered the United States Capitol Building through a door on the Upper West Terrace at approximately 2:33 p.m. and remained in the building until he was forced out by uniformed law enforcement officers at approximately 2:57 p.m. After being expelled from the building, defendant remained within the restricted area of the Capitol Grounds for some time, mingling with other rioters.

In the wake of the events of January 6, 2021, Taranto returned to his home in the State of Washington, where he continued to promote conspiracy theories about the events of January 6. In June 2023, Taranto returned to Washington, D.C., driving through the city and the surrounding region in his van. Defendant engaged in erratic behavior that intensified on June 28, 2023, when he livestreamed himself and suggested that he had outfitted his vehicle with a detonator. He made several statements indicating that he intended to blow up his vehicle at the National Institute of Standards and Technology (NIST). He stated that he was headed to NIST and that his van was "self-driving." He stated that he was "just going one way for this mission, to hell." He remarked that the vehicle was capable of "driv[ing] by itself" and that he would "not need to be anywhere

near it when it goes off." Taranto said he had "been working on a detonator, but [he didn't] really need one for this." U.S. Capitol Police obtained a copy of this footage and issued a "be-on-the-lookout" alert to several law enforcement agencies, informing them of Taranto's van and his comments about a "detonator."

The next day, former President Donald Trump published what he claimed was the address of former President Barack Obama on a social media platform. Taranto re-posted the address on the same platform and thereafter started livestreaming from his van on his YouTube channel. Taranto broadcast footage of himself as he drove through the Kalorama neighborhood in Washington, D.C., claiming he was searching for "tunnels" he believed would provide him access to the private residences of certain high-profile individuals, including former President Obama. Taranto left his van and walked around the neighborhood and through the nearby woods. When Secret Service agents approached him, Taranto fled, but he was apprehended and placed under arrest.

Shortly following his arrest, officers located Taranto's van and multiple law enforcement agencies responded to the scene. Law enforcement officials created a perimeter around Taranto's van to minimize the potential harm to members of the public. Two MPD K9 handlers responded to the scene, including a bomb-sniffing dog. Mindful of the possible existence of an explosive device or detonator, members of the Metropolitan Police Department and FBI Special Agent Bomb Technicians conducted a safety sweep of the van for hazardous or dangerous materials. A lawful search was then conducted of Taranto's van, which was parked near the scene of his arrest in Kalorama. While entering the van and searching a backpack inside, an agent was careful to avoid potential "booby traps." Law enforcement officials recovered two firearms, some large-capacity

magazines, and hundreds of rounds of ammunition, but did not find evidence of a detonator or explosive device.

### The Charge Against Defendant

On February 14, 2024, a grand jury charged that:

<u>COUNT SIX</u>

> On or about June 28 and 29, 2023, within the District of Columbia and elsewhere, TAYLOR TARANTO did intentionally convey false and misleading information under circumstances where such information may reasonably have been believed, that indicated that an activity would take place that would constitute a violation of Chapter 40 of Title 18 United States Code (malicious damaging of any building or vehicle, in violation of 18 U.S.C. § 844(f)(1)), specifically, that he would maliciously damage or destroy, or attempt to damage or destroy, by means of an explosive, the National Institute of Standards and Technology.

> (False Information and Hoaxes, in violation of Title 18, United States Code, Section 1038(a))

ECF No. 45.

Taranto has moved to dismiss Count Six. The government is opposed.

## LEGAL STANDARD

An indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged and must be signed by an attorney for the government." Fed. R. Crim. P. 7(c)(1). An indictment is sufficient under the Constitution and Rule 7 of the Federal Rules of Criminal Procedure if it "contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend," *Hamling v. United States*, 418 U.S. 87, 117 (1974), which may be accomplished, as it is here, by "echo[ing] the operative statutory text while also specifying the time and place of the offense," *United States v. Williamson*, 903 F.3d 124, 130 (D.C. Cir. 2018). "[T]he validity of an indictment 'is not a question of whether it could

have been more definite and certain.'" *United States v. Verrusio*, 762 F.3d 1, 13 (D.C. Cir. 2014) (quoting *United States v. Debrow*, 346 U.S. 374, 378 (1953)). An indictment need not inform a defendant "as to every means by which the prosecution hopes to prove that the crime was committed." *United States v. Haldeman*, 559 F.2d 31, 124 (D.C. Cir. 1976).

Rule 12 permits a party to raise in a pretrial motion "any defense, objection, or request that the court can determine *without a trial on the merits*." Fed. R. Crim. P. 12(b)(1) (emphasis added). It follows that Rule 12 "does not explicitly authorize the pretrial dismissal of an indictment on sufficiency-of-the-evidence grounds" unless the United States "has made a *full* proffer of evidence" or the parties have agreed to a "stipulated record," *United States v. Yakou*, 428 F.3d 241, 246–47 (D.C. Cir. 2005) (emphasis added)—neither of which has occurred here.

Indeed, "[i]f contested facts surrounding the commission of the offense would be of *any* assistance in determining the validity of the motion, Rule 12 doesn't authorize its disposition before trial." *United States v. Pope*, 613 F.3d 1255, 1259 (10th Cir. 2010) (Gorsuch, J.). Criminal cases have no mechanism equivalent to the civil rule for summary judgment. *See, e.g.*, *United States v. Bailey*, 444 U.S. 394, 413 n.9 (1980) ("[M]otions for summary judgment are creatures of civil, not criminal trials."); *Yakou*, 428 F.3d at 246–47 ("There is no federal criminal procedural mechanism that resembles a motion for summary judgment in the civil context."); *United States v. Oseguera Gonzalez*, 20-cr-40, 2020 WL 6342948 at *5 (D.D.C. Oct. 29, 2020) (collecting cases explaining that there is no summary judgment procedure in criminal cases or one that permits pretrial determination of the sufficiency of the evidence). Accordingly, dismissal of a charge does not depend on forecasts from defendants of what the United States can prove. Instead, a criminal defendant may move for dismissal based on a defect in the indictment, such as a failure to state an offense. *See United States v. Knowles*, 197 F. Supp. 3d 143, 148 (D.D.C. 2016).

5

Whether an indictment fails to state an offense because an essential element is absent calls for a legal determination. Thus, when ruling on a motion to dismiss for failure to state an offense, a district court is limited to reviewing the face of the indictment and more specifically, the language used to charge the crimes. *See, e.g.*, *Bingert*, 605 F. Supp. 3d at 118 (a motion to dismiss challenges the adequacy of an indictment on its face and the relevant inquiry is whether its allegations permit a jury to find that the crimes charged were committed); *McHugh*, 583 F. Supp. 3d at 26–28 (a motion to dismiss involves the Court's determination of the legal sufficiency of the indictment, not the sufficiency of the evidence); *Puma*, 596 F. Supp. 3d at 96 ("In ruling on a motion to dismiss for failure to state an offense, a district court is limited to reviewing the *face* of the indictment and, more specifically, the *language used* to charge the crimes." (emphasis in original) (quoting *United States v. Sunia*, 643 F. Supp. 2d 51, 60 (D.D.C. 2009))).

## ARGUMENT

Defendant raises both an as-applied and a facial overbreadth challenge, claiming that § 1038(a)(1) violates the First Amendment's guarantee of freedom of speech. Both claims fail.[1] Defendant's statements about his plan to equip his van with a "detonator" and driving that van to

---

[1] Defendant purports to assert, separately, a "facial" (Mot. 3–6) and an "overbreadth" (Mot. 7–9) challenge. But "[t]o succeed in a typical facial attack," the defendant "would have to establish 'that no set of circumstances exists under which [the statute] would be valid,' or that the statute lacks any 'plainly legitimate sweep.'" *United States v. Stevens*, 559 U.S. 460, 473 (2010). That standard is even more demanding than the already demanding standard for First Amendment overbreadth challenges, which require a showing that "a substantial number of [a statute's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Id.* A standalone "facial" challenge under the First Amendment therefore adds nothing to defendant's overbreadth challenge.

NIST are not protected speech. And Taranto has not come close to making the demanding showing required to establish that the statute is facially overbroad.

## I.   The Defendant's As-Applied Challenge Fails

Generally, "the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. Am. Civil Liberties Union*, 535 U.S. 564, 573 (2002). However, content-based restrictions on expression are permissible for a few historic categories of speech, including "speech presenting some grave and imminent threat the government has the power to prevent." *United States v. Alvarez*, 567 U.S. 709, (2012). Falsely crying "fire" in a crowded theater, for example, is beyond the protection of the First Amendment. *See Schenck v. United States*, 249 U.S. 47, 52 (1919). The clear and present danger exception may be difficult to sustain, *see New York Times, Co. v. United States*, 403 U.S. 713 (1971), but § 1038(a)(1)'s application to the defendant's conduct is a prime example of a statute that permissibly outlaws "a subset of lies where specific harm is more likely to occur," *see Alvarez*, 567 U.S. at 736 (Breyer, J., concurring).

18 U.S.C. § 1038(a)(1) provides that:

> Whoever engages in any conduct with intent to convey false or misleading information under circumstances where such information may reasonably be believed and where such information indicates that an activity has taken, is taking, or will take place that would constitute a violation of chapter 2, 10, 11B, 39, 40, 44, 111, or 113B of this title, section 236 of the Atomic Energy Act of 1954 (42 U.S.C. 2284), or section 46502, the second sentence of section 46504, section 46505(b)(3) or (c), section 46506 if homicide or attempted homicide is involved, or section 60123(b) of title 49, shall—
>
> (A) be fined under this title or imprisoned not more than 5 years, or both;

(B) if serious bodily injury results, be fined under this title or imprisoned not more than 20 years, or both; and

(C) if death results, be fined under this title or imprisoned for any number of years up to life, or both.

"The statute requires conduct that conveys false information that, if true, would violate certain enumerated statutes" that "cover a broad range of topics, including: destruction of aircraft and motor vehicles, biological and chemical weapons, improper use of explosives, improper use of firearms, destruction of shipping vessels, acts of terrorism, sabotage of nuclear facilities, and aircraft piracy." *United States v. Onuoha*, 13-cr-676, 2014 WL 12633531, at *3 (C.D. Cal. Jan. 31, 2014). Hoaxes covered by this statute "will often result in actions including: deployment of first responders, evacuations, hazardous materials units, S.W.A.T. teams, bomb squads, extensive investigations concerning the threat, and more." *Id.* Section 1038(a)(1) therefore prohibits false statements presenting some "grave and imminent" threat that is within the government's power to prevent. *United States v. Keyser*, 704 F.3d 631, 640 (9th Cir. 2012). *Cf. United States v. Perez*, 43 F.4th 437, 443 (5th Cir. 2022) (concluding that § 1038 permissibly restricted "true threats"), *cert. denied*, 143 S. Ct. 796 (2023).

Defendant argues (at 3–6) that § 1038 criminalizes mere falsity, like the Stolen Valor Act at issue in *Alvarez*. But the statutes are readily distinguishable. The Stolen Valor Act criminalized false claims about receiving military decorations. In holding the Stolen Valor Act unconstitutional, the Court explained that the statute "by its plain terms applie[d] to a false statement made at any time, in any place, to any person" and sought to "suppress all false statements on this one subject in almost limitless times and settings." *Alvarez*, 567 U.S. at 722.

By contrast, § 1038(a)(1) is narrow in scope. First, it requires intent to convey the false information. Second, and more importantly, the substance of the false information must be

reasonably believable—patently outlandish claims are not criminalized. Finally, and most importantly, the activity that is falsely indicated, for example a fake bomb threat, must constitute a violation of certain enumerated statutes and crimes—crimes such as improper use of explosives, acts of terrorism, and the sabotaging of nuclear facilities. The third requirement, in particular, is critical, for it carefully narrows the statute's reach to single out only those false statements that are most likely to create a grave and imminent threat to public safety: "If someone provides false or misleading information concerning any of these crimes to the extent that he or she was reasonably believed, there would understandably be 'a tangible negative response.'" *Onuoha*, 2014 WL 12633531, at *3 (quoting *Keyser*, 704 F.3d at 640); *see also United States v. Perez*, 20-cr-283, 2021 WL 4621695, at *6 (W.D. Tex. June 9, 2021) ("Section 1038(a) prohibits speech that would cause panic in society, whereas the Stolen Valor Act does not."), *aff'd*, 43 F.4th 437 (5th Cir. 2022).

Indeed, § 1038(a)(1) serves a critical purpose: deterring hoaxers who, by falsely indicating acts of terrorism or other like threats, could deprive first responders of the ability to respond to real emergencies, could force residents to evacuate buildings, could waste the resources of the agencies that investigate the false threat, and more. *See United States v. Keyser*, 704 F.3d 631, 640 (9th Cir. 2012) (noting the tangible negative response to the mailings of fake anthrax). Defendant concedes (at 6) that Congress's stated goals for enacting § 1038(a)(1) are "legitimate," but cherry-picks the words "any conduct" to suggest that the statute has nearly universal reach and application, especially when the government may engage in "counterspeech." As discussed above, the statute is much more limited in scope. But, in any event, the idea of counterspeech in this context defies common sense. A false statement that tends to cause panic will not necessarily be mitigated by a public service announcement or by removing a video from social media without explanation. If a

person falsely claims they have a bomb in an airport, it would be beyond imprudent for law enforcement to ask travelers to stick around while they investigate the threat.

In any event, whatever their merit in some abstract scenarios, defendant's First Amendment concerns are particularly misplaced as applied to his own conduct. Taranto asserts (at 7) that his statements were "vague, demonstrably false, and patently incredible," and that § 1038(a)(1) is therefore unconstitutional as applied to his conduct. But that assertion ignores the essential facts of this case. To succeed on an as-applied challenge, Taranto would have to show that the application of § 1038(a)(1) to his statements about his vehicle and a "detonator" impermissibly infringed his right to free speech. *See Perez*, 43 F.4th at 443, *cert. denied*, 143 S. Ct. 796 (2023). As discussed above, his statements were not protected speech. In addition, Taranto's statements were not vague or patently incredible or demonstrably false. (Indeed, defendant makes no effort to demonstrate that his statements were unbelievable.) His statements about a detonator and self-driving vehicle were coupled with suggestions that the vehicle would "go off" when he was at a safe distance. And his statement in fact provoked a substantial police response involving bomb technicians, K9 units, and multiple law enforcement agencies—precisely the tangible negative response that § 1038(a)(1) seeks to deter.

Defendant cites to *Watts v. United States*, 394 U.S. 705 (1969), and *United States v. Kelner*, 534 F.2d 1020 (2d Cir. 1976), to argue that his statements are distinguishable from true threats or malicious statements. Mot. at 7. In *Watts*, the Supreme Court decided that a person who stated they would get the President in their "sights" was engaged in political hyperbole and that his statement was expressly conditional. 394 U.S. at 708 (remanded for acquittal). In *Kelner*, the speaker made statements suggesting that he and others were "planning to assassinate Mr. Arafat." 534 F.2d at 1028 (conviction affirmed). Neither case supports Taranto's arguments. *Watts* and *Kelner* both

involved statements that expressed an unequivocal threat to cause physical harm. In *Watts*, however, the speaker used a conditional statement deemed political hyperbole. *See* 394 U.S. at 706, 708 (1969) ("If they ever make me carry a rifle the first man I want to get in my sights is L.B.J."). Taranto did not make a conditional statement or engage in political hyperbole. In *Kelner*, the speaker claimed that his statement—"We are planning to assassinate Mr. Arafat"—was political hyperbole. *Kelner*, 534 F.2d at 1024. The Second Circuit disagreed.

The Second Circuit looked at the circumstances to determine whether there was an immediate threat to the life or safety of others. *Kelner*, 534 F.2d at 1028. The statement was not made in a jesting manner, a firearm was present at the time, the language was unequivocal and unconditional, it was immediate, and it was specific as to a target. *Id.* All these elements are present here. Taranto did not jokingly refer to a detonator. Firearms, hundreds of rounds of ammunition, and large-capacity magazines were recovered near in time to the false bomb threat. His language was not conditional and he unequivocally stated that he had "been working on a detonator." It was an immediate threat: he stated his van was equipped with a detonator while he was behind the wheel of the vehicle. And he had a specific target: NIST. Even if his statements had been made in the midst of protected political expression (and they were not), the false bomb threat was an affront to the need to ensure public safety and prevent panic. *See Kelner*, 534 F.2d at 1027 (threat punishable when it affronts important societal interests). Accordingly, his as-applied challenge fails.

## II.    The Statute is Not Overbroad

In the alternative, defendant argues (at 7–10) that § 1038 is unconstitutionally overbroad. That is incorrect. For defendant to succeed on that challenge, he must "show that 'a substantial

number of [§ 1038(a)(1)'s] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *United States v. Perez*, 43 F.4th 437, 444 (5th Cir. 2022) (alteration in original), *cert. denied*, 143 S. Ct. 796 (2023) (quoting *United States v. Stevens*, 559 U.S. 460, 473 (2010)). Such challenges are disfavored, and require that a statute's "overbreadth be substantial, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." *Perez*, 43 F.4th at 444, *cert. denied*, 143 S. Ct. 796 (2023) (quoting *United States v. Williams*, 553 U.S. 285, 292 (2008)). This analysis begins with a reading of the statute.

This statute "covers much unprotected speech." *Perez*, 43 F.4th at 444. "Although the 'any conduct' language is undeniably broad," as noted, "the statute's scope is limited by the requirements that the violator act 'with intent to convey false or misleading information' and do so 'under circumstances where such information may reasonably be believed.'" *Id.*

Defendant contends (at 9–10) that the statute potentially criminalizes jokes about terrorism, lies about being home sick, spreading certain gossip, parody, and other artistic expression. Taranto points to Orson Welles's broadcast of "War of the Worlds" as a well-known example of an artistic production that was believed by many listeners. This example was considered and discounted in *United States v. Brahm*, and for good reason: as the *Brahm* court explained, when weighing hypothetical situations, "probable concerns have more weight than improbable scenarios." 520 F. Supp. 2d 619, 626 (D.N.J. 2007). "[H]oaxes from attention-seekers or fellow-travelers of dangerous movements would be more frequent than dramatic presentations of realistic false news broadcasts." *Id.*

Also, the examples that defendant provides, such as lying about being sick or spreading false gossip about STDs, would not violate § 1038(a)(1) because those scenarios do not come close to fitting the potential violations expressed in the adjacent anti-terrorism laws that limit the

statute's scope. And movies like "The Blair Witch Project"—which defendant seems to think is realistic—may not reasonably be believed. *Perez*, 43 F.4th at 445 (mockumentaries would not meet requirement for liability under § 1038), *cert. denied*, 143 S. Ct. 796 (2023). At a minimum, defendant's far-fetched examples fall far short of showing that a "*substantial* number of [§ 1038(a)(1)'s] applications are unconstitutional." *Stevens*, 559 U.S. at 473 (emphasis added).

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the defendant's motion to dismiss Count Six be denied.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
DC Bar No. 481052

By: */s/ Carlos A. Valdivia*
CARLOS A. VALDIVIA
DC Bar No. 1019242
ALLISON K. ETHEN
MN Bar No. 0395353
SAMUEL WHITE
NC Bar No. 44908
Assistant United States Attorneys
601 D Street, NW
Washington, D.C. 20530
(202) 252-7508
Carlos.Valdivia@usdoj.gov