UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

United States of America,

v.

Taylor Taranto,

        Defendant.

Case No. 23-cr-229 (CJN)

**Reply in Support of Motion to Dismiss Count Four of Superseding Indictment**

Only a few years ago, the Supreme Court reaffirmed—once again—that "the Second Amendment protects the possession and use of weapons that are 'in common use.'" *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 21 (2022) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008)). The D.C. Circuit has already concluded that "magazines holding more than ten rounds are indeed in 'common use.'" *Heller v. D.C.*, 670 F.3d 1244, 1261 (D.C. Cir. 2011). That makes this an exceptionally easy case. Under a straightforward application of *Bruen*, then, D.C. Code § 7-2506.01(b)'s prohibition on any feeding device capable of storing "more than 10 rounds of ammunition" is out of step with our nation's history of firearm regulation and, therefore, violates the Second Amendment. Because Mr. Taranto cannot be charged with violating an unconstitutional law, Count Four of the Superseding Indictment must be dismissed.

In an effort to salvage its prosecution of Mr. Taranto under this unconstitutional law, the government makes four primary arguments: **First**, without any citations to relevant legal authority, the government claims that Mr. Taranto cannot even challenge his prosecution for possessing such magazines unless he first proffers "that he possessed the [magazines] for the purpose of lawful self-defense"—in other words, the government believes a defendant must first

admit his guilt to the possession charge before he can challenge it.  *See* Gov't Opp'n at 7.

**Second**, it claims that roughly half of the ammunition feeding devices in circulation today—which are part of what make semi-automatic firearms work—are not "arms" and therefore do not implicate the Second Amendment *at all*, *see* Gov't Opp'n at 11-12, even though the Supreme Court has already interpreted "arms" to broadly include all "modern instruments that *facilitate* armed self-defense." *Bruen*, 597 U.S. at 28 (emphasis added).  **Third**, even though the D.C. Circuit has already held such magazines are in "common use," *Heller*, 670 F.3d at 1261, and even though the Supreme Court has explicitly defined the Second Amendment's protections as including a right to "be[] armed and ready for offensive or defensive action," *Bruen*, 597 U.S. at 32 (quoting *Heller*, 554 U.S. at 584), the government nevertheless argues such magazines are *not* in common use because it is rare for people to actually use/fire them at would-be attackers.  *See* Gov't Opp'n at 13-15.  **And finally**, the government asks this Court to deem a smattering of unrelated historical regulations (involving Bowie knives, trap guns, and gunpowder storage facilities) that did not ban arms in common use as sufficiently analogous to the categorical ban at issue here.  *See* Gov't Opp'n at 17-19.  To accept the government's strained arguments requires ignoring *Bruen*, not applying it.  For the reasons discussed at length below, Count 4 of the Superseding Indictment must be dismissed.

A. **The government's attempt to superimpose a new "purpose" requirement has no constitutional mooring and would create constitutional problems.**

The government first argues that Mr. Taranto's "claim fails at the outset because, unlike the petitioners in *Bruen*, he has never proffered that he possessed the [large capacity magazines] for the purpose of lawful self-defense." Gov't Opp'n at 8 (citing *Bruen*, 142 S. Ct. at 2134-35). This argument can be quickly rejected.  For starters, such a requirement is not found in *Bruen*;

rather, it is one of the government's creation without any doctrinal mooring.  Worse yet, imposing such a requirement would create constitutional problems.  The crux of the charged offense is mere possession.  *See* Superseding Indictment, ECF No. 45 at 3 (charging Mr. Taranto in Count 4 with "*possess[ing]*" a magazine capable of holding more than ten rounds of ammunition, in violation of D.C. Code § 7-2505.01(b)).  The government has alleged that they found large capacity magazines inside Mr. Taranto's van, where he was temporarily living at the time.  *See* Gov't Opp'n at 3.  There is no evidence or allegations that Mr. Taranto used these magazines offensively against other individuals or property.  *See id.*  If Mr. Taranto were required to proffer that he possessed the magazines "for the purpose of lawful self-defense" as the government claims, then he would be required to admit his guilt to the offense.  *See* D.C. Code § 7-2505.01(b).  That cannot be so.  *See United States v. Quailes*, 688 F.Supp.3d 184, 196 (M.D. Pa. 2023) ("The crux of the Section 922(g)(1) charge is that the mere possession of a firearm is a criminal act due to the defendant's status as a convicted felon. Accordingly, there cannot be a requirement for the defendant to state his purpose for possessing the firearm.").

Although the government cites no case law to support imposing such a requirement, several courts have rejected it.  *See, e.g.*, *Quailes*, 688 F.Supp.3d at 196 (finding "there cannot be a requirement for the defendant to state his purpose for possessing the firearm" when granting a motion to dismiss a § 922(g)(1) charge as unconstitutional under the Second Amendment); *United States v. Harper*, 689 F. Supp. 3d 16, 28 (M.D. Pa. 2023) ("there is no reason to require a defendant accused of illegal possession of a firearm pursuant to Section 922(g) to state his purpose for possessing the firearm"); *United States v. Williams*, -- F. Supp. 3d--, 2024 WL 731932, at *12 (E.D. Mich. Feb. 22, 2024) ("[T]his Court will only consider the conduct alleged

in the indictment to determine whether the Defendant's conduct is covered by the Second

Amendment's text; the Court will not require Defendant to specify the purpose for which he had

the firearm"); *United States v. Newkirk*, No. 2:20-cr-623, 2024 WL 3518109, at *7 (D. N.J. July

23, 2024) ("Although Defendant has not clearly stated his purpose in owning the firearm . . . the

Court does not find it necessary for Defendant to show protected conduct.").

### B. The government's cases are not persuasive and all "seven federal Circuit Courts" it cites have been abrogated by *Bruen*.

The government next tries to defend D.C.'s ten-round limit law by simply pointing to

*Hanson v. District*, 671 F. Supp. 3d 1 (D.D.C. 2023) and "seven federal Circuit Courts to have

considered the constitutionality of similar restrictions [that] have upheld them."   *See* Gov't

Opp'n at 9.  None of these cases are persuasive.  Mr. Taranto already addressed the fundamental

defects of *Hanson*, *see* Def.'s Mot., ECF No. 61 at 34—which the government completely

ignores.  And it is surprising that the government relies upon any of the circuit court cases

because all of them were so clearly premised upon the means-end balancing test that *Bruen*

explicitly repudiated.  Indeed, some of the circuit court cases were specifically identified in *Bruen*

as abrogated.  *See Bruen*, 597 U.S. 1, 18 n.4 (abrogating *Kolbe v. Hogan*, 849 F.3d 114 (4th Cir.

2017) and *Ass'n of New Jersey Rifle and Pistol Clubs, Inc., v. Attorney General of New Jersey,* 910

F.3d 106 (3d Cir. 2018)).  Below are the "seven federal Circuit Courts" the government relies

upon, along with passages where they improperly relied upon a type of intermediate scrutiny:

| # | Case | Improper framework |
|---|------|--------------------|
| 1 | *Duncan v. Bonta,* 19 F.4th 1087 (9th Cir. 2021) | Majority: "Just as our sister circuits unanimously have applied strict scrutiny to other laws banning or restricting large-capacity magazines, we hold that intermediate scrutiny applies to California's ban."  *Id.* at 1104. |

| | | Dissent: "From the start, the majority misses the mark, the most fundamental error being the use of an improper framework to analyze Second Amendment challenges," which includes a "two-step, tiers-of-scrutiny approach." The "proper analytical framework" is "one that looks to the text, history, and tradition of the Second Amendment. Under that analytical framework, California's ban on large-capacity magazines cannot withstand a Second Amendment challenge" and this "is not a close question." *Id.* at 1142 (Bumatay, J., dissenting). |
|---|---|---|
| 2 | *Ass'n of New Jersey Rifle and Pistol Clubs, Inc., v. Attorney General of New Jersey,* 910 F.3d 106 (3d Cir. 2018) | "Assuming the [large capacity magazine law] implicates an arm subject to Second Amendment protection, we next address the level of means-end scrutiny that must be applied." *Id.* at 117 |
| 3 | *Kolbe v. Hogan,* 849 F.3d 114 (4th Cir. 2017) | "In the alternative, assuming that the assault weapons and large-capacity magazines prohibited by the [Act] are somehow entitled to Second Amendment protection, we conclude that the district court properly upheld the FSA as constitutional under the intermediate scrutiny standard of review." *Id.* at 138. |
| 4 | *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo,* 804 F.3d 242 (2d Cir. 2015) | "Having concluded that the statutes impinge upon Second Amendment rights, we must next determine and apply the appropriate level of scrutiny." *Id.* at 258. |
| 5 | *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015) | Applying its unique type of scrutiny: "we think it better to ask whether a regulation bans weapons that were common at the time of ratification or those that have 'some reasonable relationship to the preservation or efficiency of a well regulated militia . . . and whether law-abiding citizens retain adequate means of self-defense." *Id.* at 410. |
| 6 | *Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) ("*Heller II*") | Majority: "[E]ven assuming [D.C.'s ten-round-limit-law] impinge[s] upon the right protected by the Second Amendment, we think intermediate scrutiny is the appropriate standard of review and the prohibitions survive that standard." *Id.* at 1261 <br><br> Dissent: "In my view, *Heller* and *McDonald* leave little doubt that courts are to assess gun bans and regulations based on text, history, and tradition, not by a balancing |

| | | |
|---|---|---|
| | | test such as strict or intermediate scrutiny." *Id.* at 1271 (Kavanaugh, J., dissenting). "[*H*]eller protects weapons that have not traditionally been banned and are in common use by law-abiding citizens. Semi-automatic rifles have not been traditionally banned and are in common use today, and are thus protected under *Heller*." *Id.* at 1287. "In order to apply *Heller's* test to [D.C.'s 10-round limit law], we must know whether magazines with more than 10 rounds have traditionally been banned and are not in common use." *Id.* at 1296. n.20. |
| 7 | *Duncan v. Bonta*, 142 S. Ct. 2895 (2022) | "On petition for writ of certiorari to the United States Court of Appeals for the Ninth Circuit. Petition for writ of certiorari granted. Judgment vacated, and case remanded to the United States Court of Appeals for the Ninth Circuit for further consideration in light of *New York State Rifle & Pistol Assn., Inc. v. Bruen*, 597 U.S. ––––, 142 S.Ct. 2111, ––– L.Ed.2d –––– (2022)." |

The government's reliance upon the above abrogated cases helps demonstrate the weakness of its position. Indeed, some of the decisions included a dissent that applied the appropriate analytical framework and found similar arms restrictions unconstitutional. *See, e.g., Duncan v. Bonta,* 19 F.4th 1087, 1142 (9th Cir. 2021) (Bumatay, J., dissenting) (finding under a historical analysis that "large-capacity magazines cannot withstand a Second Amendment challenge" and this "is not a close question."); *Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) (finding D.C.'s ban on semi-automatic rifles unconstitutional because they are in common use today).

The last case the government cites—*Duncan v. Bonta*, 142 S. Ct. 2895 (2022)—makes little sense because the decision is comprised of the single paragraph quoted above vacating and remanding *Duncan v. Bonta,* 19 F.4th 1087 (9th Cir. 2021) in light of *Bruen*. And notably, on remand, the District Court found California's 10-round limit law unconstitutional under *Bruen*.

*See Duncan v. Bonta*, 695 F. Supp. 3d 1206 (S.D. Cal. Sept. 22, 2023).[1]  In doing so, the district court engaged in a comprehensive historical analysis and rejected every argument the government makes here.  With respect to the government's arguments that such magazines are not "arms," the court surveyed the Second Amendment jurisprudence and found "[t]his is not even a close call"—such magazines are arms.  *See id.* (quoting *Barnett v. Raoul*, 671 F. Supp. 3d 928, 943 (S.D. Ill. 2023)).  At step two of the analysis, it found the Supreme Court had already looked to the Nation's history and traditions and discerned the governing principle: legislatures may not prohibit "the possession and use of weapons a that are 'in common use at the time'" and such magazines indisputably are commonly used.  *See id.* at 1236.  The court then independently surveyed the Nation's history and traditions—including regulations on Bowie knives, trap guns, and gunpowder storage laws (*i.e.*, the same historical analogues the government relies upon here, *see* Gov't Opp'n at 17-19)—and determined that "a ban on magazines able to hold more than 10 rounds has no historical pedigree" and that each of the government's presented regulation failed the "why and how tests" required under *Bruen*.  *Id.* at 1235, 1248-53.  For the reasons discussed below, the district court was correct.

## C. The indicted conduct implicates the Second Amendment because magazines are "arms."

When addressing the merits, the government first argues that "defendant's challenge to the large capacity magazine statute fails because he fails to show that the plain text of the Second Amendment applies to large capacity magazines."  Gov't Opp'n at 10.  The government's

---

[1] Afterward, without any substantive analysis and over a scathing dissent, the Ninth Circuit stayed the district court's judgment pending appeal ruling at the preliminary injunction stage. *See Duncan v. Bonta*, 83 F.4th 803 (9th Cir. Oct. 10, 2023).

argument, however, is premised on a misapplication *Bruen*.  Under *Bruen*, a defendant's burden is slight: All one must show is that "the Second Amendment's plain text covers" the "conduct" the challenged law restricts.  *Bruen*, 597 U.S. at 17, 24.  If it does, then "the Constitution presumptively protects" what the law restricts and "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation."  *Id.* at 24.

Here, the government has charged Mr. Taranto in Count 4 of the Superseding Indictment with "*possess[ing]*" a magazine capable of holding more than ten rounds of ammunition, in violation of D.C. Code § 7-2505.01(b).  *See* Superseding Indictment, ECF No. 45 at 3 (emphasis added).  The Second Amendment's plain text indisputably covers possessing arms, *see* U.S. Const. amend. II ("the right of the people to keep and bear Arms shall not be infringed"), meaning the only question is whether magazines capable of holding more than ten rounds constitute "Arms."

The answer is decidedly yes.  In *Heller*, the Supreme Court "interpret[ed]" the term "Arms" to mean "any thing that a man wears for his defense, or takes into his hands, or useth in wrath to cast at or strike at another."  554 U.S. at 581.  And in *Bruen*, the Court not only reiterated that "general definition," but confirmed that "the Second Amendment's definition of 'arms' . . . covers modern instruments that facilitate armed self-defense."  597 U.S. at 28.  The government does not argue that the magazines the District has banned fail to satisfy that definition.  Nor could it.  After all, such magazines actively feed ammunition into the firing chamber of the firearm and thus "facilitate armed self-defense."

Instead of addressing the binding interpretations of "Arms," the government seeks to impose definitions of its own creation.  ***First***, it claims that magazines do not implicate the

Second Amendment at all because they are mere "accessories" that "are not *necessary* for the firearm to function." Gov't Opp'n at 11. That is both wrong and beside the point. Ammunition feeding devices are necessary for the semiautomatic weapon to function because they *actively feed* ammunition into the firing chamber of a firearm. Some semiautomatic weapons have fixed magazines (which means they are permanently affixed to the firearm, much like the trigger, grip, and barrel), whereas others have detachable magazines (which allows one to replace the magazine). Either way, when a user pulls the trigger, the round in the chamber fires, and the semiautomatic action combines with the feeding device to feed a new round to the chamber. Such magazines are not analogous to a silencer, as the government suggests, Gov't Opp'n at 11; rather, they are a component part that is necessary to render a semi-automatic firearm operable. Without a feeding device, semiautomatic firearms could fire *at most one bullet* before needing to be reloaded. Hence, taking the government's argument to its logical conclusion would mean that it could "ban *all* magazines (not just LCMs) . . . because a firearm technically does not require *any* magazine to operate; one could simply fire the single bullet in the firearm's chamber." *Hanson v. District of Columbia*, 671 F. Supp. 3d 1, 10 (D.D.C. 2023); *Duncan v. Bonta*, 695 F. Supp. 3d at 1222 ("What the State seems to be really saying is that a magazine may be a protected arm, but only the State has the right to pick the number of rounds a citizen may have in his gun. This Court disagrees."). The Supreme Court's Second Amendment precedent demonstrate such a proposition is self-evidently wrong.

The government's argument relating to necessity is also beside the point. The Supreme Court's test for what qualifies as an "arm" has nothing to do with whether something is "necessary," but simply whether something "facilitate[s] armed self-defense." *Bruen*, 142 S.Ct.

at 2132; *see also Heller*, 554 U.S. at 635 (teaching that the Second Amendment leaves to "the people," not the government, the choice of how best to defend themselves).  Just as the Second Amendment's text does not "draw[] a home/public distinction with respect to the right to keep and bear arms," *Bruen*, 597 U.S. at 4, it does not draw a necessary/unnecessary distinction with respect to what qualifies as "arms." It refers only to "arms," irrespective of whether they are necessary.  U.S. Const. amend. II.  Under *Bruen*, the "plain text" is what controls and "[n]othing in the Second Amendment's text" (or Supreme Court's case law) draws the distinction the government seeks.  *See id.*

As the government appears to recognize, the vast majority of courts of appeals—including the Third, Fourth, Ninth, and D.C. Court of Appeals—have found that magazines are "arms."  *See, e.g.*, *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. A.G. New Jersey*, 910 F.3d 106, 116 (3d Cir. 2018); *Kolbe v. Hogan*, 813 F.3d 160, 175 (4th Cir. 2016); *Duncan v. Becerra*, 970 F.3d 1133, 1146 (9th Cir. 2020); *Hanson v. D.C.*, 671 F. Supp. 3d 1, 6 (D.D.C. 2023); *Herrington v. United States*, 6 A.3d 1237 (D.C. 2010).  The reasons set out in those opinions are more persuasive than the government's a-textual analysis.

**Second,** the government argues that magazines capable of holding more than ten bullets do not implicate the Second Amendment at all because they "are [not] in common use," in the sense that firing the weapon and *actual* "use of more than ten bullets in defense of the home is 'rare.'"  *See* Gov't Opp'n at 13-14.  The problems with this argument are manifest.  For starters, the government conflates *Bruen's* first step with its second.[2]  *See Teter v. Lopez*, 76 F.4th 938, 950

---

[2] This should come as no surprise because, to make this argument, the government principally relies on cases that were decided before *Bruen* and thus did not apply the proper analytical framework.

(9th Cir. 2023), *vacated for rehearing en banc in* 93 F.4th 1140 (2024) (rejecting the "argument that the purported 'dangerous and unusual' nature of butterfly knives means that they are not arms," as the relevance of that inquiry "lies in the '*historical tradition* of prohibiting and carrying of dangerous and unusual weapons" at step two of the analysis (quoting *Heller*, 554 U.S. at 627)). The Supreme Court was emphatic on this point: it has twice instructed that whether a type of arm is "in common use"—or instead is "highly unusual in society at large"—is part of the "historical tradition," not the textual inquiry. *Bruen*, 597 U.S. at 47 (quoting *Heller*, 554 U.S. at 627); *see also Heller*, 554 U.S. at 582 (explaining that the term "Arms" "extends, prima facie, to all instruments that constitute bearable arms, *even those that were not in existence at the time of founding.*"); *Heller II*, 670 F.3d at 1272 (Kavanaugh, J., dissenting) (discussing how the "in common use test" "accords with the historical understanding of the scope of the right").

Moreover, the notion that someone must actually fire the weapon to be protected by the Second Amendment elides the text of the Constitution.  The Second Amendment protects the right "to keep and bear arms," not just to fire them.  *See* U.S. Const. amend. II.  That is precisely why the Supreme Court has held that "bear[ing] arms" includes not just firing them at would-be attackers, but "wear[ing], bear[ing], or carry[ing]" arms equipped with ammunition "for the purpose . . . of *being armed and ready* for offensive or defensive action in a case of conflict with another person."  *Bruen*, 597 U.S. 32 (quoting *Heller*, 554 U.S. at 584).

Both the plain text of the Constitution and Supreme Court case law establish that someone "uses" a firearm every time he or she *keeps* it inside the home or *carries* it outside the home—*i.e.*, every time he or she keeps or bears it.  *See id.*  In *Heller*, for example, the Court did not consider how many times someone actually fired the weapon in undertaking its "common

11

use" test; rather, it sufficed that "handguns are the most popular weapon chosen by Americans for self-defense." *Heller*, 554 U.S. at 629.  Likewise, in *Bruen*, the Court held that citizens have a fundamental right to carry handguns outside the home for self-defense, without ever asking how frequently people fire them in self-defense situations.  597 U.S. at 8.  And in *Caetano v. Massachusetts*, the Court found that stun guns were protected even though Ms. Caetano did not actually energize and fire her stun gun.  577 U.S. 411 (2016).  Absent from any these binding opinions is a discussion about the average number of times someone actually fired the weapon.  And this is for a simple reason: how frequently people fire the weapon in self-defense is legally irrelevant to whether something is "in common use" or qualifies as an "arm."

**Third,** the government attempts to create yet another definition of "arms," claiming that "weapons that are most useful in military service" fall "outside the ambit of the Second Amendment."  Gov't Opp'n at 15 n.8 (quoting *Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017), abrogated by *Bruen*).  The flaws in this argument have already been addressed in Mr. Taranto's opening brief, ECF No. 61 at 28-29.  Such a proposition would mean the government could ban *all* weapons because the nature of military engagement necessarily means that every weapon would be far more useful in that context than as part of civilian life.  And it bears noting that virtually all modern firearms have military heritage.  As other courts have recognized, the Supreme Court has never adopted such a view;[3] rather, "*Caetano* addressed this question and

---

[3] To be sure, *Heller* acknowledged that *application* of the common use test may compel the conclusion that some "weapons that are most useful in military service—M-16 rifles and the like—may be banned," since they are "highly unusual in society at large."  554 U.S. at 627.  But *Heller* nowhere embraced the proposition that weapons may be banned *because* they are useful in military service.  Judge *Benitez's* opinion in *Duncan v. Bonta*, 695 F. Supp. 3d at 1232 persuasively explains how this language has been taken out of context and misapplied by the government and some courts.

sa[id], '*Heller* rejected the proposition 'that only those weapons useful in warfare are protected.'''" *Duncan v. Bonta*, 695 F. Supp. 3d at 1232 (quoting *Caetano*, 577 U.S. at 412); *see also Duncan v. Becerra*, 970 F.3d 1133, 1149 (9th Cir. 2020), *vacated to be heard en banc by* 988 F.3d 1209 (9th Cir. 2021) (noting most circuits to have faced the issue have rejected the government's claim that "LCMs fall outside the scope of the Second Amendment because they are 'most useful in military service.'").

Such a definition would also make no sense based on the history of this Country. At founding, the Second Amendment was meant to safeguard the commonly possessed weapons of citizens for military service. *See Heller*, 554 U.S. at 627 ("At the time of the Second Amendment's ratification," it was understood that "all citizens capable of military service . . . would bring the sorts of lawful weapons that they possessed at home to militia duty"); *see also id.* at 624 ("Ordinarily when called for militia service able-bodied men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time."). It would turn the Second Amendment on its head to say that citizens must bring their musket from home to serve for militia duty; yet such a weapon is not protected by the Second Amendment after they are done serving, particularly since the Second Amendment right is a fundamental *individual* right rather than a collective right relating to military service.

***Finally***, the government argues that "[e]ven if large capacity are considered 'arms' that are commonly used for self defense," they are still unprotected by the Second Amendment at step one of *Bruen's* analysis because "any burden on the Second Amendment is minimal." *See* Gov't Opp'n at 15. If that weighing of the "burden on the Second Amendment" sounds like means-end interest balancing, it is because it is. And *Bruen* unequivocally rejected that

consideration in the analysis in step one of the analysis.  *See* 597 U.S. at 19; *see also id.* at 29 n.7

(warning that lower courts may not "engage in independent means-end scrutiny under the guise

of analogical inquiry").[4]

Putting that issue aside, the government's argument misconstrues the burden inquiry

entirely.  *Bruen* does not instruct courts to conduct an ad hoc inquiry into the whether burden a

law imposes is "minimal."  It was the dissent that advocated for a test focused on "the degree to

which the [challenged] law burdens the Second Amendment right."  *Bruen*, 597 U.S. at 131

(Breyer, J., dissenting).  Rather, the majority embraced a test that examines "how" a law

"burdens" the right relative to historical traditions, not how much of a burden (the government

thinks) a law imposes.  In other words, courts are supposed to *Bruen's* historical inquiry by

comparing the mechanics of historical and modern laws and how they relate to each other; they

are not supposed to look at where the laws fall on some overarching "burdensomeness"

spectrum.

In short, the threshold textual inquiry begins and ends with the fact that that conduct

giving rise to the indictment here—possession of magazines capable of holding more than 10

rounds—touches on the Second Amendment's right to keep and bear arms, which suffices to

---

[4] The government relies heavily on *Brown v. United States*, 979 A.2d 630 (D.C. 2009) and *Heller v. D.C.*, 670 F.3d 1244 (D.C. Cir. 2011) (*Heller II*), but both cases were decided before *Bruen* and did not apply the appropriate framework or presumptions, making their entire analysis flawed. *See, e.g.*, *Brown*, 979 A.2d at 640 ("In analyzing whether enforcement of the CPWL statute against appellant impermissibly infringed his rights under the Second Amendment, our initial task is to ask what level of scrutiny we must apply in considering appellant's claim"); *Heller II*, 670 F.3d at 1261 ("[E]ven assuming [D.C.'s ten-round-limit-law] impinge[s] upon the right protected by the Second Amendment, we think intermediate scrutiny is the appropriate standard of review and the prohibitions survive that standard.").

render them "presumptively protect[ed] by the Second Amendment." *Bruen*, 597 U.S. at 17, 24, 28.

The government attempts to complicate this straightforward analysis, but as the Supreme Court emphasized, this simple approach "accords with how we protect other constitutional rights." *Bruen*, 597 U.S. at 24. In the freedom of speech context, for example, the defendant burden is slight: he must merely show that his actions qualify as speech (rather than non-expressive conduct) to be protected by the plain text of the First Amendment. If it does, then the "the government bears the burden of proving the constitutionality of its actions," which generally requires it to "point to *historical* evidence about" whether the "expressive conduct falls outside the category of protected speech"—*e.g.*, whether the speech falls within a category of unprotected speech like true threats, obscenity, and the like. *Id.* at 24-25. Notably, if the government shows a history and tradition that a particular category of speech is unprotected, it does not mean it is not speech; it merely means the government may regulate that speech because it is unprotected. So too here. Arms that fall outside the category of protected arms are still arms. If the government wants to prohibit a class of arms—*e.g.*, magazines that hold over ten rounds—then it must meet its burden of proving that they belong to a historic and traditional category of *unprotected* arms. Either way, they are still "arms" at the first step in the analysis and are presumptively protected.

### D. The magazine are in "common use" and therefore D.C.'s ban is unconstitutional.

Because the magazines at issue satisfy "the Second Amendment's definition of 'arms,'" the government bears the burden of proving that they can be banned "consistent with this

Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17, 28, 33-34; *Rahimi*, 144 S. Ct. at 1897. The government has not and cannot meet that burden.

The Supreme Court has already decided what "arms" may be banned "consistent with this Nation's historical tradition of firearm regulation": those that are (at a minimum) "'highly unusual in society at large,'" rather than "in common use today." *Bruen*, 597 U.S. at 47 (quoting *Heller*, 554 U.S. at 627); *see also Heller*, 544 U.S. at 627 (noting the "common use test" "is fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.").[5] And the D.C. Circuit has already found that "magazines holding more than ten rounds are indeed in 'common use.'" *Heller v. D.C.*, 670 F.3d 1244 (D.C. Cir. 2011). That makes this an easy case. Under a straightforward application of *Bruen*, D.C. Code § 7-2506.01(b)'s prohibition on any feeding device capable of storing "more than 10 rounds of ammunition" is out of step with our nation's history of firearm regulation and, therefore, violates the Second Amendment. The analysis should end there.[6]

---

[5] *See also Teter v. Lopez*, 76 F.4th 938, 950 (9th Cir. 2023) ("*Heller* itself stated that the relevance of a weapon's dangerous and unusual character lies in the '*historical tradition* of prohibiting the carrying of dangerous and unusual weapons.'"); *Gator's Custom Guns, Inc.*, 2024 Wash. Super. LEXIS 912 at *26 (Wash Sup. Ct. Apr. 8, 2024) ("There is no need to re-do the historical analysis in an arm ban case" because the "Supreme Court has already done the historical analysis" and provided that the "Court needs only apply the in common use" test); Mark W. Smith, *What Part of 'In Common Use' Don't You Understand?: How Courts Have Defied* Heller *in Arms-ban Cases—Again* (June 18, 2023), bit.ly/42OrITT ("In arms-ban cases, *Heller*'s 'in common use' constitutional *test* controls, and there is nothing for the lower courts to do except apply that *test* to the facts at issue.").

[6] Again, this approach accords with how we treat other Constitutional rights. In the free speech context, for example, courts need not conduct the historical inquiry afresh once the Supreme Court has decided that a category of speech is protected or not. Rather, the historical-tradition burden arises when the government asks a court to "declare new categories of speech outside the scope of the First Amendment." *See United States v. Stevens*, 559 U.S. 460, 472 (2010).

The government resists this conclusion by trying to flip the burden and argue that "Defendant offers no evidence that large capacity magazines are useful for self-defense, much less that they are 'commonly' used for that purpose." Gov't Opp'n at 14.  But the government has the burden exactly backwards: it is *the government's* burden to establish that such magazines are *not* in common use and it has offered no evidence to do so.  Nor could it as an empirical matter.  Millions of Americans own tens of millions—if not hundreds of millions—of magazines holding more than 10 rounds.  *Duncan*, 695 F. Supp. 2d at 1217; *see also* William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned*, Georgetown University, McDonough School of Business, at 20, 24-25 (Sept. 28, 2022).[7]  The very large of such magazines owned by millions of citizens who are not committing crimes with them establishes common use for lawful purposes.

Of course, as with any arm, some individuals will misuse them for unlawful—indeed, awful—purposes.  But "criminal use of LCMs is relatively low compared to their market saturation."  *Duncan v. Becerra*, 970 F.3d at 1149 n.8 (9th Cir. 2020).  And the same could be said of the handguns at issue in *Heller*.  The *Heller* dissenters protested that handguns "are specially linked to urban gun deaths and injuries" and "are the overwhelming favorite weapon of armed criminals."  554 U.S. at 682 (Breyer, J., dissenting).  And amicus briefs highlighted that handguns were "uniquely dangerous"; used in "the large majority of mass shootings," "murders, robberies, and assaults"; and were "now fire ammunition capable of piercing *body armor*—the last line of defense responsible for saving thousands of police officers' lives." Mark W. Smith, *What Part of 'In Common Use' Don't You Understand?: How Courts Have*

---

[7] The study is available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4109494.

*Defied* Heller *in Arms-ban Cases—Again* at 14-15 (June 18, 2023) (quoting amicus briefs). The majority did not dispute these points; it just found them irrelevant to whether handguns are constitutionally protected, because that question does not turn on how often arms are misused, but rather how often they are commonly kept for lawful purposes. *See id.* at 629 ("Whatever the reason, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition on their use is invalid."). That is why it was enough in *Heller* that handguns are "*typically* possessed . . . for lawful purposes." *See id.* at 624-25. What was true in *Heller* is no less true here: given the millions of Americans who own such magazines, the flat ban on their possession is unconstitutional.

### E. The government's historical analogues are inapt.

Unable to create a genuine dispute about whether such magazines satisfy the common use test, the government relies upon a smattering of unrelated historical regulations to justify this flat ban on magazines capable of holding more than ten rounds, including Bowie knives, trap guns, and gunpowder storage facilities. None are availing as each fail the "why and how tests" that *Bruen* requires. *See Duncan*, 695 F. Supp. 3d at 1248-53.

**1. Bowie Knives.** The government first argues that the flat ban at issue here is consistent with how "[i]n the early 19th century, many states specifically outlawed public carry of 'Bowie Knives' and other particularly dangerous and unusual knives." Gov't Opp'n at 18 (citing David Kopel, *Knives and the Second Amendment*, 47 U. Mich. J. L. Reform 167 (2013)). The government is mistaken. These laws were limited to, at most, restricting concealed carry (not their possession or use). *See Teter*, 76 F.4th at 951 (finding government's reliance on Bowie knife statutes inapt to justify a categorical ban on butterfly knives because "the 'how' of the proffered

18

state statutes is different" in that they "did not ban the possession of knives; they regulated only

their *carry*."). Most of the restrictions merely escalated punishments for crimes committed with

Bowie knives, while leaving intact citizens right to possess them for self-defense. And to the

extent that a couple of laws could be read to ban possession, they were contemporaneously held

unconstitutional. *See, e.g.*, *Nunn v. State*, 1 Ga. 243, 251 (1846) (finding that a law which merely

inhibits the wearing of certain weapons in a concealed manner is valid. But so far as it cuts off the

exercise of the right of the citizen altogether to bear arms "is in conflict with the Constitution,

and void."); *cf. Bruen*, 597 U.S. at 26 ("[I]f some jurisdictions actually attempted to enact

analogous regulations during this timeframe, but those proposals were rejected on constitutional

grounds, that rejection surely would provide some probative evidence of unconstitutionality.").

The very historian the government relies upon, David Kopel, confirms that Bowie knives "were

often regulated like handguns" and were not subject to flat bans:

> ***At the end of the 19th century, no state prohibited possession of Bowie knives***. Two
> states, Tennessee and Arkansas, prohibited sales. The most extreme tax statutes,
> such as Alabama's $100 transfer tax from 1837, had been repealed.
>
> Only a very few statutes had ever attempted to regulate the peaceable possession or
> carrying of Bowie knives more stringently than handguns or other fighting knives,
> such as dirks and daggers. Of those, only the 1838 Tennessee sales ban was still on
> the books by the end of the century…. ***As with handguns, the states were nearly
> unanimous in rejecting bans on adult possession or acquisition of Bowie knives***….
> The much more common approach was to legislate against concealed carry,
> criminal misuse, or sales to minors.

David Kopel, *Bowie Knife Statutes 1837-1899*, the Volokh Conspiracy (Nov. 20, 2022) (emphasis

added), available at https://tinyurl.com/msh566r9. Given that the Bowie knife regulations did

not involve a flat ban like D.C. Code § 7-2506.01(b), it does not "impose a comparable burden on

the right of armed self-defense." *Bruen*, 597 U.S. at 29.

**2. Trap guns.**  The government's next relies upon so-called "trap guns," but they are even less apposite.  Gov't Opp'n at 18.  Trap guns are not bearable arms; they fire a projectile automatically when a trap (*i.e.*, trap wire) is triggered without human intervention.  These laws did not ban any class of arms; rather, they regulated the manner of using them.  Laws regulating the use of an arm is not analogous to a complete prohibition on the possession of the arm.

**3. Gunpowder storage restrictions.**  The government relies upon gunpowder storage restrictions, which are even further afield.  Gov't Opp'n at 18.  These laws were designed to ensure that combustible material would not combust *when not in use* are self-evidently different in "how . . . [they] burden [the] right to armed self-defense," *Bruen*, 597 U.S. at 29, from the laws at issue here.  *See District of Columbia v. Heller*, 554 U.S. 570, 632 (2008) (noting that "gunpowder-storage laws" were "fire safety laws" that did "not remotely burden the right of self-defense as much as an absolute ban on [a class of arms]"); *see also Rahimi*, 144 S. Ct. at 1898 (Barrett, J., concurring) ("[A] court must be careful not to read a principle at such a high level of generality that it waters down the right.").

**4. Minimal burden.**  The government ultimately abandons any pretense of a search for relevant similarity and insists that what matters is that (in its view) its sweeping ban on common feeding devices imposes only a "minimal burden, if any burden at all, on the right of armed self defense."  Gov't Opp'n at 19 (citation omitted).  But the Supreme Court did not expressly reject the two-step interest-balancing approach just to readopt it *sub silentio* later in the same opinion.  *See Bruen*, 597 U.S. at 19.  *Bruen*'s reference to analogical reasoning and comparable burdens, including the "how" and "why" metrics, was not an invitation to reinject interest-balancing through the backdoor.  On this point, the Supreme Court could not have been clearer:

"Analogical reasoning requires judges to apply faithfully the balance *struck by the founding generation* to modern circumstances…. It is not an invitation to revise that balance through means-end scrutiny." *Id.* at 29 n.7 (emphasis added).

In short, it is the government's burden to demonstrate that the 10-round limit law "is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17. This Court is "entitled to decide [this] case based on the historical record compiled by the parties," *id.* at 26 n.6, and is "not obligated to sift the historical materials for evidence to sustain a statute," *id.* at 60. That is the government's burden. And it has not met its burden here.

## Conclusion

The District's ten-round-limit law violates the Second Amendment. *See* D.C. Code § 7-2505.01(b). Because Mr. Taranto cannot be charged with violating an unconstitutional law, Count Four of the Superseding Indictment must be dismissed.

Respectfully submitted,

A. J. KRAMER
Federal Public Defender

_____/s/_____
BENJAMIN FLICK
Research & Writing Attorney

SHELLI PETERSON
ELIZABETH MULLIN
COURTNEY MILLIAN
Assistant Federal Public Defenders
Federal Public Defender's Office
625 Indiana Ave NW, Suite 550
Washington, D.C. 20004