## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Crim. Action No.: 1:23CR229(CJN)** |
| **TAYLOR TARANTO,** | |
| **Defendant.** | |

## MR. TARANTO'S REPLY IN SUPPORT OF
## HIS MOTION TO DISMISS COUNT ONE

The government's opposition has taken a truly astonishing position. Pistol braces—items that are lawfully sold and affixed to firearms every single day—must be registered or they are not lawfully possessed. ATF promulgated a rule that took exactly that position in 2023, but has lost again and again in federal courts across the country. Most recently, it lost in the Eighth Circuit, where a panel found the plaintiffs challenging the rule were likely to succeed on the merits of their claim that the Final Rule was arbitrary and capricious. *See FRAC v. Garland*, --- F.4th ----, No. 23-3230, 2024 WL 3737366 (8th Cir. Aug. 9, 2024)

Notwithstanding these repeated losses, the government believes it can continue with this prosecution because it is purportedly not relying on the now-vacated Rule, just relying on the legal conclusions embedded in it. Yet, in the next breath, it claims that Mr. Taranto had fair notice that he had to register the braced pistol because of that very Final Rule. The government's positions are contradictory, unfair, and most importantly not legally sound. Count One must be dismissed because: it is founded on an unlawful rule; the classification decision in this case is arbitrary and capricious in its own right; braced pistols are not NFA "firearms" subject to registration

requirements; the NFA is unconstitutional as applied to braced pistols; and the NFA runs afoul of the Supreme Court's fee jurisprudence.

## I.   The government's opposition confirms that Count One of the superseding indictment must be dismissed because it is founded on an unlawful rule.

The government's superseding indictment alleges that Mr. Taranto possessed an unregistered "short-barreled rifle" (SBR).  Dkt. 45.  But, in fact, Mr. Taranto possessed a pistol "equipped with a folding 'stabilizing brace' accessory," as the government elsewhere acknowledges. Ex. 1 at 4-5. Thus, this charge depends on whether Mr. Taranto's lightly-regulated pistol became a heavily-regulated SBR when it was equipped with a stabilizing brace.  Because the government effectively admits that it resolved this question in reliance on an administrative rule that has now been vacated, Count One of the superseding indictment must be dismissed.

### A.   The government agrees ATF's stabilizing-brace rule is unlawful.

This prosecution would not have happened until very recently.  That is because in 2012, ATF agreed that a brace "did not convert" a pistol "to be fired from the shoulder and would not alter the classification of a pistol or other firearm." *Mock v. Garland*, 75 F.4th 563, 571 (5th Cir. 2023) ("*Mock II*") (quotations omitted).  While ATF occasionally recognized "[e]xceptions" to that finding, the agency's "general position" for a decade was "that stabilizing braces were not stocks and that pistols equipped with braces were not short-barreled rifles." *Id.* at 572.  As recently as 2019, the government "asserted in criminal prosecutions that 'ATF letters do correctly state that they consider a firearm with a pistol brace to not be a rifle under the NFA for purposes of the NFA.'"  *Id.* (quoting Sentencing Hr'g Tr. at 38, *United States v. Kamali,* No. 3:18-cr-00288 (D. Conn. Sept. 30, 2019), ECF 110).

ATF changed its mind in 2023.  That year, ATF issued a final rule that uses a multifactor test to differentiate brace-equipped pistols from SBRs.  *See Factoring Criteria for Firearms With*

*Attached "Stabilizing Braces,"* Final Rule, 88 Fed. Reg. 6,478 (Jan. 31, 2023).  The factors include "surface area," "weight," "length," "length of pull," "sights," "marketing" materials, and others. *Id.* at 6,575 (codified at 27 C.F.R. § 479.11).  The rule invalidated all "prior ATF classifications of firearms equipped with a 'brace' device."  *Id.* at 6,480.  "Alongside the Final Rule, the ATF published two electronic slideshows … to inform the public about weapons it considers 'short-barreled rifles.'"  *FRAC v. Garland*, --- F.4th ----, No. 23-3230, 2024 WL 3737366, at *4 (8th Cir. Aug. 9, 2024).[1]

But the rule did not last long.  On August 31, 2023, the Fifth Circuit enjoined the rule because it was promulgated without following the Administrative Procedure Act's ("APA") notice-and-comment requirements.  *Mock II*, 75 F.4th at 588.  Additional courts—both within and outside the Fifth Circuit—issued follow-on injunctions based on the notice-and-comment violation.  *See, e.g.*, *Nat'l Rifle Ass'n of Am., Inc. v. ATF*, No. 3:23-CV-1471-L, 2024 WL 1349307, at *7–*8 (N.D. Tex. Mar. 29, 2024); *Colon v. ATF*, No. 8:23-CV-223-MSS-UAM, 2024 WL 309975, at *11–*18 (M.D. Fla. Jan. 26, 2024); *Texas v. ATF*, 700 F. Supp. 3d 556, 569 (S.D. Tex. 2023); *Mock v. Garland*, 697 F. Supp. 3d 564, 576 (N.D. Tex. 2023) ("*Mock III*").

Courts held the rule unlawful on other grounds too.  The Eighth Circuit, relying heavily on D.C. Circuit precedent, found that the rule's individual factors were arbitrary because ATF did not "articulate the standards that guided its analysis," *FRAC*, 2024 WL 3737366, at *8 (cleaned) (citing *Tripoli Rocketry Ass'n, Inc. v. ATF*, 437 F.3d 75, 81 (D.C. Cir. 2006)), used "internally inconsistent" reasoning, *id.* at *11 (citing *Constellation Mystic Power, LLC v. FERC*, 45 F.4th

---

[1]  *See* ATF, *Common Weapon Platforms with Attached "Stabilizing Brace" Designs That Are Short-Barreled Rifles*, available at https://perma.cc/GX8K-A4TW; ATF, *Commercially Available Firearms Equipped with a "Stabilizing Brace" That Are Short-Barreled Rifles* ("Firearms Slideshow"), available at https://perma.cc/BK6C-BRGQ.

1028, 1057 (D.C. Cir. 2022)), and devised a test that "allow[ed] ATF to arrive at whatever conclusion it wishes without" explanation, *id.* at *12 (cleaned) (citing *LeMoyne-Owen Coll. v. NLRB*, 357 F.3d 55, 61 (D.C. Cir. 2004) (Roberts, J.)).  The Eighth Circuit also held that ATF's so-called "Slideshows" were final agency actions and were arbitrary because they are "devoid of any explanation."  *Id.* at *12.  Other courts echoed ATF's "disregard for principles of fair notice," *Texas Gun Rts., Inc. v. ATF*, 697 F. Supp. 3d 593, 599–600 (N.D. Tex. 2023), and found the agency did not adequately consider "reliance interests," *id.*

These decisions on preliminary relief culminated on June 13, 2024, when a federal court vacated ATF's rule.  *See Mock v. Garland*, 2024 WL 2982056 (N.D. Tex. June 13, 2024) ("*Mock IV*").  The court found the rule unlawful for three reasons.  (The government (at 11) mentions only one of them).  *First*, the court agreed with the Fifth Circuit that "the Final Rule violated the APA's procedural requirements because it was not a logical outgrowth of the Proposed Rule."  *Id.* at *3. *Second*, it held that the rule was arbitrary because ATF flip-flopped on how it classified brace-equipped pistols for a decade without adequately considering "serious reliance interests."  *Id.* at *4–*5.  *Third*, it held that the rule was arbitrary because it was "impermissibly vague."  *Id.* at *5; *accord Hikvision USA, Inc. v. FCC*, 97 F.4th 938, 950 (D.C. Cir. 2024) (holding "arbitrary" agency action that "fail[ed] to provide comprehensible guidance").

The government does not dispute that the rule is unlawful or that it was vacated.  *See* Dkt. 73 at 11.  But it incorrectly asserts that "[a]ll the courts' holdings" finding the rule unlawful "turn on purported procedural defects with the rulemaking."  *Id.* at 16 n.1.  Not so.  While numerous courts have rejected ATF's test on procedural grounds, others—both before and since the government's filing—held the rule's multifactor test substantively unreasonable because it is "impermissibly vague."  *Mock IV*, 2024 WL 2982056, at *5; *FRAC*, 2024 WL 3737366, at *8, *12;

*Texas Gun Rts.*, 697 F. Supp. at 599–600; *accord Mock II*, 75 F.4th at 584 ("Under the Final Rule, it is nigh impossible for a regular citizen to determine what constitutes a braced pistol").

**B.    The government's opposition confirms Count One of the superseding indictment is founded on the unlawful rule.**

The vacatur of the rule forecloses the government's unregistered-firearm prosecution.  The government agrees Count One of the superseding indictment charges Mr. Taranto with possession of a brace-equipped pistol that it claims is really an SBR.  Dkt. 73 at 20.  And the government agrees the basis for that indictment is an ATF report that applies the same factors as the now-vacated rule: "surface area," "weight," "overall length," "length of pull," "sights," "the cycle of operations," and marketing.  Ex. 1 at 4-5; *see* Dkt. 73 at 20-21.  Those concessions require dismissal because "a criminal prosecution founded on an agency rule" is invalid if the rule fails to meet "the strict letter of the APA."  *United States v. Picciotto*, 875 F.2d 345, 346–49 (D.C. Cir. 1989); *see also United States v. Ross*, 848 F.3d 1129, 1137 (D.C. Cir. 2017) ("vacat[ing] the conviction" because of government's "APA violations").

The government's response is to ask this Court to ignore reality.  According to the government, because the indictment and ATF report do not expressly "cite" or "mention" the rule, Mr. Taranto is not being prosecuted under it.  Dkt. 73 at 16-19.  Instead, the government says, he is being prosecuted "under the statute." *Id.* at 18.  But then the government gives the game away. It says that even though the rule is unlawful, the government's "best understanding of the statute" is still the "framework outline [sic] in the rule." *Id.*  Thus, its prosecution is based on "factors like those discussed in the rule." *Id.* at 16.  Factors which, notably, are mentioned nowhere in the NFA itself.  Applying the rule without citing it is still applying the rule.

Despite the government's arguments to the contrary, this Court is "not required to exhibit a naiveté from which ordinary citizens are free." *Dep't of Com. v. New York*, 588 U.S. 752, 785

(2019); *see Sparrow v. Strong*, 70 U.S. 97, 104 (1865) ("we cannot shut our eyes to the public history").  Because the Government's prosecution is "founded on an agency rule" that violates the APA, *Picciotto*, 875 F.2d at 346–49, Count One must be dismissed for that reason alone.

Indeed, consider the absurd implications of the government's position.  At least seven judicial opinions have concluded that ATF's rule is unlawful.  Courts have rejected the rule on procedural grounds for violating notice-and-comment requirements, *see, e.g.*, *Mock II*, 75 F.4th at 588, and on substantive grounds for failing to provide comprehensible guidance, *see, e.g.*, *FRAC*, 2024 WL 3737366, at *8–*12.  These courts also found that ATF's rule carried legal consequences and thus rejected its argument that the rule was not a final agency action.  *See, e.g.*, *Mock IV*, 2024 WL 2982056, at *5; *FRAC*, 2024 WL 3737366, at *6–*7.  If the government is still permitted to enforce the rule as-is—just by omitting a citation to it—then these opinions would be effectively advisory because the unlawful rule would still be in effect and would still carry legal consequences after being set aside.  Plus, the government would appear free to prosecute not just Mr. Taranto but the millions of Americans who lawfully purchased pistol braces, including the very individuals who have sued ATF over the Final Rule and prevailed in their legal challenges. Indeed, nothing would seem to stop the government from using the representations individual plaintiffs have made in their civil suits against them in federal criminal prosecutions.

These results are absurd, and thankfully are not how administrative law works.  Where, as here, a rule is vacated under the APA, the remedy "act[s] directly against the challenged agency action" to nullify it.  *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 144 S. Ct. 2440, 2467 (2024) (Kavanaugh, J., concurring).  Thus, allowing the government to continue applying its rule—just sans a C.F.R. cite—contravenes the basic function of judicial review.

**C.     The government's opposition confirms Count One of the superseding indictment is founded on an unlawful agency adjudication.**

Even if the Court accepted the government's fiction that it has not applied the rule, the indictment must independently be dismissed because it is indisputably founded on another arbitrary agency action: ATF's classification *in this case* of the SBTEVO-equipped pistol allegedly possessed by Mr. Taranto.  *See* Ex. 1.  There can be no doubt that ATF's classification decision is a final agency action.  *See, e.g.*, *FRAC*, 2024 WL 3737366, at *11–*12 (holding that ATF's classification of braced pistols as "short-barreled rifles" were "final agency actions"); *Sig Sauer, Inc. v. Brandon*, 826 F.3d 598, 600 n.1 (1st Cir. 2016) (noting ATF's "agree[ment]" that its "classification letter is a 'final agency action'"); *Innovator Enterprises, Inc. v. Jones*, 28 F. Supp. 3d 14, 20 (D.D.C. 2014) (Bates, J.) (reviewing ATF classification decision as "final agency action under the APA").  And the government's opposition to the motion to dismiss confirms that it relied on this report to charge Mr. Taranto.  *See* Dkt. 73 at 11–13.

ATF's report, like the rule, violates the APA.  That is because the report, like the rule, "fails to provide comprehensible guidance" as to how the agency reached its conclusion.  *Hikvision*, 97 F.4th at 950.  It instead uses the same list of vague, ill-defined factors as the rule.  *See* Ex. 1 at 4. The Eighth Circuit found that this vague multifactor test makes evaluating the legality of a braced pistol "an impossible task for anyone, including [federal] court[s]," effectively allowing the agency "to reach whatever result it wants" in a given prosecution.  *FRAC*, 2024 WL 3737366, at *12.  The Fifth Circuit concluded that the multifactor test "vests the ATF with complete discretion to use a subjective balancing test to weigh six opaque factors on an invisible scale."  *Mock II*, 75 F.4th at 584.  The result is an agency action that "provides no meaningful clarity" and that makes "it nigh impossible for a regular citizen to determine what constitutes" an SBR.  *Id.* at 584–85.  Thus, like the rule, the report's multifactor test "is arbitrary and capricious" because "it fails to articulate a

comprehensible standard." *ACA Int'l v. FCC*, 885 F.3d 687, 700 (D.C. Cir. 2018) (cleaned).

The report's analysis of the individual factors fares no better. Take the government's assertion that the SBTEVO brace has rear surface area indicative of shouldering. Ex. 1 at 4. When the Eighth Circuit held the rule unlawful, it explained that "ATF 'has articulated no standard whatsoever for determining' when a stabilizing brace's rear surface area would allow the shouldering of a weapon." *FRAC*, 2024 WL 3737366, at *9 (quoting *Tripoli Rocketry*, 437 F.3d at 84). The court thus held that "this step" in ATF's analysis "is arbitrary and capricious." *Id.* The same is true here. ATF's report purports to compare the surface area of the SBTEVO brace with the surface area of a single example stock and claims "there is little meaningful difference between" the two. Ex. 1 at 4. But this kind of "unbounded comparative analysis" "has articulated no standard whatsoever for determining when a stabilizing brace's rear surface area would allow the shouldering of a weapon." *FRAC*, 2024 WL 3737366, at *8–*9; *see also Tripoli Rocketry*, 437 F.3d at 80–84. ATF's pictures prove the point. Because the SBTEVO is a brace, its middle is hollowed out—offering no surface area there—unlike the comparator stock. Thus, there is plainly a "difference" in surface area, and ATF's report offers no reason why that difference is not "meaningful." That omitted explanation renders ATF's report arbitrary.

ATF's analysis of the other factors relies on the same "unbounded comparative analysis." For example, ATF says the SBTEVO-equipped pistol has a "length of pull" and an "overall length and weight" that are "similar to" the measurements of one rifle that ATF has chosen to use as an "exemplar." Ex. 1 at 4. But all of the SBTEVO-equipped pistol's measurements are different than the exemplar rifle's measurements, *see id.*, and ATF's report does not explain why they are "similar" enough to trigger felony penalties. That failure of explanation is arbitrary. ATF also does not explain why it chose its exemplar rifle and instead says the exemplar is "similar" to the

SBTEVO-equipped pistol.  *Id.* at 3.  But choosing a "similar" exemplar as a comparator for a test that depends on how "similar" the two weapons are suggests ATF chose a comparator that would justify a preordained conclusion.  *See FRAC*, 2024 WL 3737366, at *12 n.15 ("This is much like shooting the side of a barn, drawing the target around the bullet holes, and then proclaiming, 'bullseye!'").  At the very least, ATF's failure to explain why it cherrypicked a single comparator—rather than using, say, the average weight, length, and length of pull for rifles—is arbitrary.

ATF's report also entirely fails to consider all evidence of manufacturer intent.  That omission is glaring because the report acknowledges that the SBTEVO accessory is "marketed by SB Tactical as a 'stabilizing brace.'"  Ex. 1 at 2.  One would think that the manufacturer's stated intent should at least be factored into an analysis to determine the purpose for which a weapon is "designed and intended."  26 U.S.C. § 5845(c).  Indeed, the vacated rule said ATF's analysis must consider "[t]he manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon."  88 Fed. Reg. at 6,575.  Yet, ATF nowhere acknowledges that SB Tactical's marketing of the SBTEVO cuts against its conclusion, nor does it try to explain why the other evidence is sufficient to overcome the marketing evidence.  ATF's refusal to analyze manufacturer intent shows that it "entirely failed to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). It also confirms the deficiency in reasoning that the Eighth Circuit recognized: ATF's marketing factor fails to "define and explain the criteria the agency is applying."  *FRAC*, 2024 WL 3737366, at *11 (cleaned) (quoting *Miss. Comm'n on Env't Quality v. EPA*, 790 F.3d 138, 150 (D.C. Cir. 2015)).

So even if the Court takes the government at its word that it is not applying the rule—just the rule's factors—the prosecution is still founded upon an arbitrary and capricious agency action:

the ATF classification decision.  Count one must be dismissed for this additional, independent reason.

**II.    The government's opposition confirms Count One of the superseding indictment must be dismissed because it contravenes the NFA.**

       **A.    The government's opposition confirms a pistol equipped with an SBTEVO stabilizing brace is not a short-barreled rifle.**

To constitute an SBR under the NFA, the SBTEVO-equipped pistol allegedly possessed by Mr. Taranto must be "designed" and "intended to be fired from the shoulder."  26 U.S.C. § 5845(a)(3), (c).  As Mr. Taranto explained in his motion to dismiss, the SBTEVO-equipped pistol fails to meet this standard because its principal use is braced fire, not shoulder fire.  *See* Dkt. 62 at 25–27.  After all, there is no other reason to include flaps and a strap on the SBTEVO—and to remove surface area that would be useful for shouldering—other than for it to function as a brace. And indeed, the government agrees the SBTEVO is useful as a brace, explaining "that Taranto's [gun] has a SBTEVO accessory that allows a shooter to fire the CZ scorpion … braced against his forearm."  Dkt. 73 at 20.

Despite conceding the facts, the government's response gets the law wrong.  In the government's view, the SBTEVO's function as a brace "is immaterial."  *Id.*; *see also id.* at 22.  The Supreme Court disagrees.  In *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489 (1982), the Supreme Court explained that the statutory phrase "designed for use" in a criminal drug-paraphernalia statute covered "an item that is principally used with illegal drugs" but not "items which are principally used for nondrug purposes.  *Id.* at 500–02.  And in *United States v. Thompson/Center Arms Co.*, 504 U.S. 505 (1992), the Court held that a kit that could make either an NFA-regulated "firearm" or an unregulated weapon was not a "firearm" because the kit served an unregulated "useful purpose."  *Id.* at 512–13, 517–18 (plurality).  The government simply pretends these cases on dual-use items do not exist.  But they do, and they control here.

The SBTEVO is "principally used" as a brace, *Hoffman Estates*, 455 U.S. at 500–02, and—at minimum—serves a "useful purpose" to facilitate non-shouldered fire, *Thompson/Center Arms*, 504 U.S. at 512–13, 517–18.  Thus, it is excluded from the reach of the NFA.

ATF's own regulatory framework confirms as much.  Now that ATF's rule has been vacated, it "re-establishes the status quo—that existed for decades prior to the Final Rule going into effect last year—absent the unlawful agency action."  *Mock IV*, 2024 WL 2982056, at *6 (cleaned).  Under that pre-rule status quo, ATF's "general position" is "that stabilizing braces [a]re not stocks and that pistols equipped with stabilizing braces [a]re not short-barreled rifles."  *Mock II*, 75 F.4th at 572.  Thus, a brace will "not alter the classification of a pistol" where it "provide[s] the shooter with additional support of a firearm while it is still held and operated with one hand."  88 Fed. Reg. at 6,479 (quoting pre-rule classification decision).  Or as ATF put it in 2021: "Stabilizing support is a vital characteristic because it provides evidence to evaluate the purported purpose of the attached device[.]"  *Factoring Criteria for Firearms With Attached "Stabilizing Braces,"* Notice of Proposed Rulemaking, 86 Fed. Reg. 30,826, 30,832 (2021).  Because the SBTEVO's principal purpose is to offer stabilizing support for non-shouldered fire, its addition to a pistol does not result in the creation of an SBR rifle under the pre-rule framework.

To the extent there is ambiguity about whether the statute covers the SBTEVO-equipped pistol, the rule of lenity requires answering that question in the negative.  *See, e.g.*, *United States v. Davis*, 588 U.S. 445, 464 (2019) ("ambiguities about the breadth of a criminal statute should be resolved in the defendant's favor.").  Constitutional avoidance also requires a "narrow" construction of "a criminal statute" to avoid vagueness concerns.  *Id.* at 464–65; *see Snyder v. United States*, 144 S. Ct. 1947, 1957–58 (2024) (rejecting interpretation of criminal statute that "offer[ed] no clear federal rules for" regulated parties); *accord infra* Section IV (discussing

vagueness).

These principles preclude finding that the SBTEVO-equipped pistol is an NFA-regulated SBR.  Again, the government alleges that Mr. Taranto possessed a brace that was "marketed … as a 'stabilizing brace,'" *see* Ex. 1 at 2, and that "allows a shooter to fire the CZ Scorpion … braced against his forearm," Dkt. 73, at 20.  The test employed by the government to analyze whether that brace was secretly a stock has been characterized as "impossible" to apply, *FRAC*, 2024 WL 3737366, at *12, "impermissibly vague," *Mock IV*, 2024 WL 2982056, at *5, and unable to put "an owner … on notice that his firearm is subject to criminal penalties without registration," *Mock II*, 75 F.4th at 585.  And the only time the government suggested the SBTEVO might raise scrutiny was through an unexplained picture in a slideshow, *see* Firearms Slideshow supra n.1 at 26, that the Eighth Circuit deemed "arbitrary" and without "the force of law," *FRAC*, 2024 WL 3737366, at *12.[2]  Thus, at minimum, it is ambiguous whether the SBTEVO-equipped pistol is "designed" and "intended" to be shoulder-fired.  As a result, lenity and constitutional avoidance preclude criminalizing it under the NFA.

**B.    The government's opposition confirms braced pistols are categorically outside the scope of the NFA.**

The NFA definition of "firearm" contains two subsections that reach SBRs.  *See* 26 U.S.C. § 5845.  Subsection (a)(4) covers "a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length."  Subsection (a)(3) covers "a rifle having a barrel or barrels of less than 16 inches in length."  Unlike

---

[2]  The government says Mr. Taranto was on notice because of the rule and the slideshows.  *See* Dkt. 73 at 39–40.  Yet both the rule and the slideshows have been declared unlawful—precisely because of their "disregard for principles of fair notice."  *Mock IV*, 2024 WL 2982056, at *5; *FRAC*, 2024 WL 3737366, at *11–*12.  The suggestion that Mr. Taranto had notice from agency actions held unlawful for their lack of fair notice borders on frivolous.

subsection (a)(4), subsection (a)(3) does not say anything about a weapon "made from" another weapon or anything about "modified" weapons. Because these "differences in language … convey differences in meaning," *Rudisill v. McDonough*, 601 U.S. 294, 308 (2024), only subsection (a)(4) reaches weapon modifications, while subsection (a)(3) is limited to original manufacture. Indeed, rejecting that structural implication would render subsection (a)(4) superfluous because any weapon modified to have a short barrel would necessarily satisfy subsection (a)(3). That interpretation would also undermine the statute's purpose—i.e., regulating "sawed-off" guns that are more easily "concealed" and that have "indiscriminate accuracy." *United States v. Marzzarella*, 614 F.3d 85, 95 (3d Cir. 2010). Unlike shortening a rifle, lengthening a pistol with a brace makes the "pistol less concealable" and "promotes safety" by "improv[ing] a pistol's stability" and "accuracy." *Mock II*, 75 F.4th at 588 (Willett, J., concurring). For these reasons, a braced pistol does not fall within subsection (a)(3). Thus, Count One of the superseding indictment—which alleges a violation of subsection (a)(3) for adding a brace to a pistol—must be dismissed.

The government's response is to ignore the statutory text. First, it asserts without explanation that Mr. Taranto's "interpretation is pulled from thin air." Dkt. 73 at 22. Not so. It is black-letter law that courts must "consider both the specific context in which [a clause] appears and the broader context of the statute as a whole." *Fischer v. United States*, 144 S. Ct. 2176, 2183 (2024) (cleaned). That requires, *inter alia*, "giv[ing] effect, if possible to every clause and word of the statute." *Id.* (cleaned). Heeding these interpretive principles to properly construe the reach of subsection (a)(3) is required, and the government's invitation to "read snippets of statutory text in a vacuum" is reversible error. *iTech U.S., Inc. v. Renaud*, 5 F.4th 59, 63 (D.C. Cir. 2021).

Next, the government says "the statutory definition of the word 'rifle' makes no reference to whether the [SBR] is manufactured or modified." Dkt. 73 at 22. To begin, the government gets

the analysis backwards: the definition of "firearm" cross-references the word "rifle," not vice versa. *Compare* 26 U.S.C. § 5845(a)(3), *with id.* § 5845(c). But more fundamentally, not all rifles are SBRs. In *United States v. Thompson/Center Arms Co.*, 504 U.S. 505 (1992), the Supreme Court agreed that a kit had "been 'made' into a rifle," *id.* at 513 n.6, but went on to hold that it had "*not* been 'made' into a short-barreled rifle," *id.* at 518 (emphasis added). Thus, the government cannot rely on the statutory definition of "rifle" to evade the structural limitations in the definition of "firearm."

In sum, adding a brace to a pistol does not create a weapon that falls within 26 U.S.C. § 5845(a)(3). At minimum, such additions are not unambiguously covered by subsection (a)(3) and thus trigger lenity and avoidance. *See supra*. Count One of the superseding indictment must be dismissed for this independent reason.[3]

### III. Treating a braced pistol as an SBR violates the Second Amendment.

If braced pistols were to qualify as NFA "firearms," which they do not, the NFA would be unconstitutional as applied to these weapons. This is particularly so in Washington, DC, where the NFA operates as an effective ban on SBRs. Because braced pistols easily fall within the plain text of the Second Amendment, the burden falls to the government to demonstrate that the NFA's restrictions are constitutional. The government has utterly failed to meet this burden. While it has correctly identified the relevant historical tradition—the "in common use" test from *Heller* and *Bruen*—it fundamentally misunderstands how this test operates. Mr. Taranto, not the government, prevails under it.

> **a. Step One:  Braced pistols are "arms" and "possession" of them falls within the plain text of the Second Amendment.**

---

[3] The government says "the issue of whether Taranto's firearm is an SBR is a fact-intensive question." Dkt. 73 at 19. But Mr. Taranto's threshold arguments turn solely on the meaning of the NFA. Such pure legal questions can be adjudicated at the motion-to-dismiss stage.

In *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), the Supreme Court established a two-step test for Second Amendment challenges.  At the first step, the defendant must show that the plain text of the Second Amendment covers the restricted conduct.  *Id.* at 18.  The Second Amendment's operative clause protects "the right of the people to keep and bear Arms."  U.S. Const. amend. II.  Here, the government has charged Mr. Taranto with "*possess[ing]* a firearm . . . that is not registered to him in the National Firearms Registration Record."  *See* Superseding Indictment, ECF No. 45 at 1 (emphasis added).  The Second Amendment's plain text indisputably covers possessing arms.  *See* U.S. Const. amend. II ("the right of the people to keep and bear Arms shall not be infringed").  And the term "arms" refers to "[w]eapons of offence, or armour of defence." *District of Columbia v. Heller*, 554 U.S. 570, 581 (2008).  Braced pistols plainly fall within this definition.  Therefore, Mr. Taranto easily clears *Bruen*'s first step because he has been charged with possessing a braced pistol.  The Second Amendment "presumptively protects" his alleged conduct.  *Bruen*, 142 S. Ct. at 2130.

The government disagrees for reasons that are unmoored from the Second Amendment's text.  The government argues that Mr. Taranto's "claim fails at the outset because, unlike the petitioners in *Bruen*, he has never proffered that he possessed the [braced pistol] *for the purpose of lawful self-defense*." Dkt. 73 at 28.  The term "self-defense" appears nowhere in the text of the Second Amendment and so is irrelevant to the plain text question at *Bruen*'s First Step.  Furthermore, if Mr. Taranto were required to proffer that he possessed the braced-pistol "for the purpose of lawful self-defense," then he would be required to admit an element of the offense against him.  In other words, to assert his Second Amendment rights, he would have to waive his Fifth Amendment ones.  The law simply does not require this.  *See, e.g.*, *United States v. Quailes*, 688 F.Supp.3d 84, 196 (M.D. Pa. 2023); *United States v. Harper*, 689 F. Supp. 3d 16, 28 (M.D. Pa.

2023); *United States v. Williams*, -- F. Supp. 3d--, 2024 WL 731932, at *12 (E.D. Mich. Feb. 22, 2024); *United States v. Newkirk*, No. 2:20-cr-623, 2024 WL 3518109, at *7 (D. N.J. July 23, 2024).

The government also argues that braced pistols are not "arms" because they are not "in common use" today.   The phrase "in common use," however, is found nowhere in the text of the Second Amendment.   And *Heller* has already given us the definition of arms, "[w]eapons of offence," *Heller*, 554 U.S. at 581, which braced pistols obviously meet.

To be fair, *Heller* and *Bruen* do discuss an "in common use" test, but it derives not from text but from historical tradition.[4]   As a result, the "in common use" standard has no role to play at *Bruen*'s first step, which "asks a strictly textual question."  *United States v. Perez-Gallan*, 2022 WL 16858516, at *3 (W.D. Tex. Nov. 10, 2022).   Instead, it is relevant at *Bruen* Step Two, where the Government bears the burden of establishing a robust, historical tradition of distinctly similar firearm regulation.  *See Bruen*, 142 S. Ct. at 2126; *Teter v. Lopez*, 76 F.4th 938, 949-50 (9th Cir. 2023), *rehearing en banc granted* 2024 U.S. App. LEXIS 4079 (9th Cir. Haw., Feb. 22, 2024).

### b.  Step Two:  Braced pistols are in common use and cannot be banned

Because Mr. Taranto's alleged possession of a braced pistol is covered by the plain text of the Second Amendment, the burden shifts to the government to establish a historical tradition of similar firearm regulation and prove it applies.  *See Bruen*, 597 U.S. at 24.  The parties agree about the relevant historical tradition: "common use."   More specifically, the Supreme Court has held

---

[4] *See id*. at 627(explaining that the "in common use" limitation "is fairly supported by the historical tradition of prohibiting the carrying of dangerous and unusual weapons"); *id.* (noting that limitation on firearms "not typically possessed by law-abiding citizens for lawful purposes" "accords with the historical understanding of the scope of the right."); *see also Bruen*, 142 S. Ct. at 2128 (prefacing discussion of the "in common use at the time" standard, by noting "[a]fter holding that the Second Amendment protected an individual right of armed self-defense, [*Heller*] also relied on the historical understanding of the Amendment to demark the limits on the exercise of that right").

that arms that are in "common use" for "lawful purposes" cannot be banned.  *See Heller*, 554 U.S. at 624-25.   Thus, the government bears the burden of proving that braced pistols are not commonly used for lawful purposes or—to put the same point another way—are not "dangerous and unusual." *Teter*, 76 F.4th at 949-50; *Fouts v. Bonta*, 2024 WL 751001, at *3 (S.D. Cal. Feb. 23, 2024).

The relevant inquiry for the "common use" test is "the current total number of a particular weapon that is in lawful possession, ownership, and circulation throughout the United States." *Mock III*, 697 F. Supp. 3d at 581; *see also Heller v. D.C.*, 670 F.3d 1244, 1261 (D.C. Cir. 2011); *Bianchi v. Brown*, No. 21-1255, 2024 WL 3666180, at *60 (4th Cir. Aug. 6, 2024) (en banc) (Richardson, J., dissenting).   "There are between 3 and 7 million . . . braced pistols under the ownership of law-abiding individuals for lawful purposes throughout the United States." *Mock III*, 697 F. Supp. 3d at 581. "ATF did not dispute noteworthy public comments pointing out that 'millions of 'braces' are in use' and that braced pistols are 'commonly used by millions of law-abiding Americans for various reasons.'" *Id.* at 581-82.   Indeed, the Final Rule itself references only two instances where criminals used stabilizing braces in violent shootings and 272 investigations involving braces.  *See Final Rule at 6,499.  Obviously braced pistols are in common use for lawful purposes.  *Mock III*, 2023 WL 6457920, at *9.

The government makes no attempt to argue that the quantity of braced pistols possessed for lawful purposes today is not enough to meet this standard.  Instead, the government claims that Mr. Taranto has oversimplified the common use test.  Dkt. 73 at 28.  It argues that Mr. Taranto must prove that braced pistols are commonly possessed for self-defense purposes and that he has failed to focus sufficiently on the inherent dangerousness and concealability of the weapon he is alleged to have possessed.  *Id.* at 28-30.  It also argues that braced pistols are not in common use because they are SBRs, SBRs are regulated under the NFA, and the NFA prohibits dangerous

weapons. *Id.* at 28-30. Finally, the government argues that the NFA does not ban braced pistols, but merely requires their registration. *Id.* at 30. The government's arguments are wrong for several reasons.

**First,** Mr. Taranto does not need to prove that braced pistols are commonly possessed for "self-defense" purposes to meet the "in common use" test. Dkt. 73 at 28. The government fundamentally misreads *Heller*. In *Heller*, the Supreme Court held that the Second Amendment protects the possession of firearms "in common use" for "lawful purposes." *Id.* at 624-65, 627 (quotation omitted). *Heller* offered "self-defense" as an example of a lawful purpose—indeed, it is the prototypical example of a lawful purpose—but did not say that the right was limited only to those carrying for the express purpose of self-defense. The Supreme Court case law following *Heller* confirms this. The plaintiffs in *Bruen* asked for unrestricted licenses not just for self-defense but for "all lawful purposes" *Bruen*, 597 U.S. 1, 92 (2022) (Breyer, J., dissenting).[5] And, in *Rahimi*, the Supreme Court rejected the defendant's Second Amendment challenge not because he failed to proffer that he possessed the weapon for self-defense but because he had been found to pose a credible threat to the physical safety of another when a restraining order was entered against him and the government had established a historical tradition of disarming individuals who threaten physical harm to others. *Rahimi*, 144 S. Ct. at 1896.

As discussed above, braced pistols are obviously used for lawful purposes and the government's bold claim that they "lack usefulness except for violent and dangerous criminal purposes" is obviously false. Dkt. 73 at 30. Stabilizing braces are designed to permit "disabled

---

[5] The opinion in *Bruen* focused particularly on the plaintiffs' self-defense purpose because they had been denied a license for general self-defense purposes but granted a license for other lawful purposes (*e.g.*, recreation). *See id.* at 16 (majority) (noting that licenses covered "outdoor activities" in one instance, and "hunting and target shooting" in another). It is, thus, unsurprising that *Bruen* did not focus more closely on the plaintiffs' desire to carry firearms for other reasons.

and weaker persons to fire pistols more easily." *Mock III*, 75 F.4th at 566.  For example, combat veterans who have lost limbs have "discovered the stabilizing brace helped [them] and other physically-challenged shooters to use heavy pistols, which they would otherwise not be able to shoot properly." *FRAC*, 2024 WL 3737366, at *2.  These objectives are lawful, not criminal—nor is the simple desire by an able-bodied person for a more accurate, safe shot.  *See Mock II*, 75 F.4th at 588 (Willett, J. concurring).  In any event, braced pistols are possessed for self-defense purposes. *See, e.g.*, *Colon*, 2024 WL 309975, at *5 ("The Individual Plaintiffs allege that they depend on their firearms for defense."); *Britto v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 2023 WL 7418291, at *4 (N.D. Tex. Nov. 8, 2023) (individual plaintiffs possessed firearms for self-defense).

**Second**, the government fundamentally misunderstands the "in common use" test, which permits bans on "dangerous and unusual" weapons.  *Heller*, 554 U.S. at 627.  As the phrase suggests, the weapon must be both "dangerous *and usual*" to be banned.  *Id.* (emphasis added); *see also Caetano v. Massachusetts,* 577 U.S. 411, 411-12 (2016) (Alito and Thomas, concurring) ("[a] weapon may not be banned unless it is both dangerous and unusual.").  Dangerousness alone is not enough.

Indeed, handguns and pistols—the very weapons *Heller* and *Bruen* concluded were subject to the Second Amendment's protections—are themselves concealable and dangerous.  Handguns and unbraced pistols are self-evidently easier to hide than the firearm at issue in this case.  They are also the common firearm of choice in homicides.  *See, e.g.*, John Gramlich, Pew Research, *What the data says about gun deaths in the U.S.* (Apr. 26, 2023), https://www.pewresearch.org/short-reads/2023/04/26/what-the-data-says-about-gun-deaths-in-the-u-s/ ("[H]andguns were involved in 59% of the 13,620 U.S. gun murders and non-negligent

manslaughters for which data is available. Rifles . . . were involved in 3% of firearm murders."). In fact, a study of mass shootings found that handguns were more lethal than rifles. Carolyn Crist, *Handguns more lethal than rifles in mass shootings*, Reuters (Dec. 31, 2018, 1:45 PM), https://www.reuters.com/article/idUSKCN1OU11F/.  Yet, the Supreme Court found that handguns and pistols were in common use.

Plainly, the inherent dangerousness and concealability of a weapon is not enough to make it "dangerous and unusual."  Instead, the weapon needs to actually be out of common use (*i.e.*, unusual), which braced pistols plainly are not.

**Third**, the government errs by grouping braced pistols with all other NFA firearms and claiming, in a blanket statement, that they are all dangerous and unusual and so can be banned.  In particular, it relies on the NFA's "purpose" in regulating "certain weapons likely to be used for criminal purposes."  Dkt. 73 at 29 (quoting *United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505, 517 (1992)).  But "conclusory statements" about a particular weapon being "associated with criminals" provides "no basis for concluding that these instruments are not commonly owned for lawful purposes." *Teter*, 76 F.4th at 950.  Indeed, stabilizing braces were not even invented at the time the NFA was passed in 1934.  The NFA's broad regulatory objectives provide no insight into whether braced pistols, in particular, are in common use for lawful purposes.

The government also relies heavily on an analogy between short-barreled shotguns and SBRs.  Shortly after the NFA's passage, the Supreme Court upheld it as constitutional as applied to short-barreled shotguns.  S*ee United States v. Miller*, 307 U.S. 174, 178 (1939). *Miller* said nothing about the application of the Second Amendment to SBRs or braced pistols (which had not yet been invented).  Furthermore, the Supreme Court decided *Miller* without hearing from the defendants, whose lawyer did not submit briefing or appear for oral argument.  *Heller*, 554 U.S. at

623.  As the Supreme Court explained in *Heller*, "[i]t is particularly wrongheaded to read *Miller* for more than what it said, because the case did not even purport to be a thorough examination of the Second Amendment."  *Id.*  Whatever lasting value *United States v. Miller*, 307 U.S. 174 (1939) has, it says nothing about this case.

The decisions relied on by the government fail to restrict *Miller* to its terms as the Supreme Court has instructed, and have instead extended its holding to permit the regulation of SBRs.  In *United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018), for example, the Tenth Circuit found SBRs were not protected by the Second Amendment because the defendant had failed to "offer[ a] meaningful distinction between" short-barreled shotguns and short-barreled rifles.  *Id.*   But, in fact, there are meaningful distinctions between the two.  Short-barreled shotguns have "low, somewhat indiscriminate accuracy" and "large destructive power."  *United States v. Amos*, 501 F.3d 524, 532 (6th Cir. 2007) (McKeague, J., dissenting).  In fact, short-barreled shotguns have this in common with many of the other weapons the NFA regulates: "machinegun[s]", "smooth bore" weapons, "explosive[s]", "grenade[s]", and "poison gas." *See Mock II*, 75 F.4th at 588 (Willett, J. concurring) (noting that these weapons share the feature of inflicting indiscriminate destruction).   By contrast, "[r]earward attachments [such as a stabilizing brace], besides making a pistol *less* concealable, improve a pistol's stability, and thus a user's accuracy.  Accuracy, in turn, promotes safety."  *Id.*  The government "has not identified any historical tradition of requiring ordinary citizens to endure a lengthy, costly, and discretionary approval process just to use accessories that make an otherwise lawful weapon safer."  *Id.*

**Fifth**, the government is wrong when it claims that the NFA does not ban braced pistols but merely requires registration of them.  This is not always true and, critically, is not true here.  As Mr. Taranto explained in his initial motion, the NFA requires prospective firearm registrants to

submit an application in order to register their firearms. The NFA prohibits granting these applications where doing so would place the person "in violation of law." 26 U.S.C. § 5812. Washington, DC defines SBRs in materially similar terms to the NFA, and prohibits their possession. D.C. Code §§ 7-2502.01, 7-2502.02. The government is, thus, wrong to suggest Mr. Taranto could simply have registered the braced pistol while he was in Washington, DC. Had he applied to the ATF to register the pistol and brace he is charged with possessing, his application would have been denied because it would have placed him in "in violation of law." 26 U.S.C. § 5812. Thus, (again assuming braced pistols are SBRs) the NFA amounts to a ban on Mr. Taranto's possession of them.

In sum, NFA is unconstitutional as applied to Mr. Taranto's alleged possession of a braced pistol because braced pistols are in common use and the NFA effectively bans them in Washington, DC.

> c. **Step Two: Even if this court were to treat the NFA as something less than a full ban here, the government has still failed to carry its burden to establish that its regulations are consistent with this nation's tradition of firearm regulation**

Even if this Court were to treat the NFA as something less than a ban on braced pistols in Washington, DC, it still would not pass constitutional muster. NFA "firearms" are subject to a host of stringent regulatory requirements. Individual firearm owners are required to file applications to receive an NFA firearm, which are subject to a discretionary review process. When purchased by individuals, SBRs are subject to a $200 transfer tax stamp. *Id.* § 5811; 27 C.F.R. § 479.11. In addition, an NFA firearm owner is required to provide ATF with his fingerprints and photograph, 26 U.S.C. § 5812(a)(3); and subject himself to registration in a federal database, *id.* § 5841(b).

The government argues that these requirements are minimal and so do not burden Mr. Taranto's Second Amendment rights.  Dkt. 73 at 30-31.  If that weighing of the burden on the Second Amendment sounds like means-end interest balancing, it is because it is.  At Step Two, *Buren* embraced a test that examines "how" a law "burdens" the right relative to historical traditions.  In other words, courts are supposed to conduct *Bruen*'s historical inquiry by comparing the mechanics of historical and modern laws and how they relate to each other.  *Bruen* never suggested, nor endorsed, looking at where the laws fall on some overarching "burdensomeness" spectrum.  That would resurrect the very ends-means balancing it rejected. *See Bruen*, 597 U.S. at at 29 n.7 (warning that lower courts may not "engage in independent means-end scrutiny under the guise of analogical inquiry").

In addition to looking at "how" the law "burdens" the right when analogizing to historical firearm restrictions, *Bruen* and *Rahimi* direct courts to look at "why" the law burdens the right as well.  *United States v. Rahimi*, 144 S. Ct. 1889, 1898 (2024); *Bruen*, 597 U.S. at 29.  In order to survive constitutional scrutiny, the modern law must impose a "comparable burden" and be "comparably justified."  *Bruen*, 597 U.S. at 29.  Furthermore, while engaging in this analogical reasoning "a court must be careful not to read a principle at such a high level of generality that it waters down the right."  *Rahimi*, 144 S. Ct. at 1926 (2024) (Barrett, J., concurring).

That is precisely what the government does here.  Relying on pre-*Bruen* case law, the government claims that the "colonial governments substantially controlled firearms trade" by citing to a grab bag of colonial and pre-Civil War era regulation:  laws banning the sale of firearms to Native Americans, laws banning residents from selling firearms from outside the colony, barrel proofing and gunpower laws, laws taxing firearms, a single law banning the illegal trading of guns by private individuals, and muster laws.  Dkt. 73 at 32-33 (quoting *Teixeira v. City of Alameda*,

873 F.3d 670, 685 (9th Cir. 2017)).  The laws plainly "have nothing to do with the inspection or registration of firearms for crime control or to prevent shoulder fire" and thus are not analogous to the NFA's regulation of braced pistols. *Colon v. Bureau of Alcohol*, 2024 WL 1050581, at *2 (M.D. Fla. Mar. 11, 2024).  Although a historical dead ringer is not required in order for a law to pass constitutional muster, the laws relied on by the government plainly do not rise to the level of similarity required to sustain their burden.  For this additional reason, Count One must be dismissed.

## IV.   The government's prosecution of Mr. Taranto offends fundamental principles of fair notice and runs afoul of due process.

The NFA is unconstitutionally vague as applied to braced pistols and the government's interpretation of the statute in this case runs afoul of fair notice principles.[6]  The terms of the NFA are obviously difficult for not just an ordinary person to decipher but the ATF itself—as evidenced by its conflicting interpretations and its long history of concluding that the NFA did not apply to braced pistols.  *See* Dkt. 62 at 6-16.  It is also subject to arbitrary and discriminatory enforcement, as the ATFs conflicting conclusions also illustrate.   "The failure of 'persistent efforts . . . to establish a [governing] standard,'" including by administrative officials, "can provide evidence of vagueness." *Johnson v. United States*, 576 U.S. 591, 598 (2015); *see also Trinity Broad. of Fla., Inc. v. FCC*, 211 F.3d 618, 628 (D.C. Cir. 2000) (explaining that Courts "ask whether 'by reviewing the regulations and other public statements issued by the agency, a regulated party acting in good faith would be able to identify, with ascertainable certainty, the standards with which the agency expects parties to conform").  This case is a prototypical example of that.

---

[6] The government again wrongly label's Mr. Taranto's challenge as a facial challenge.

The government argues that the Final Rule saves its determination because it put Mr. Taranto on fair notice that the firearm he was alleged to have possessed was considered an SBR. Dkt. 73 at 39.  This position is absurd.  The government has said that it is not relying on the Rule, but instead on a private classification decision made by an ATF officer.  It cannot have it both ways.  The reason the government is taking this inconsistent position is because it cannot rely on the private classification letter for notice.  That letter was written *after* Mr. Taranto was arrested and *after* the date he was alleged to be in possession of the pistol.

Even if the government could both rely and not rely on the Final Rule, it would not help its case.  "[T]he standards set forth in the Final Rule [itself] [we]re impermissibly vague." *Mock IV*, 2024 WL 2982056, at *5 (quoting *Mock II*, 75 F.4th at 584).  "The Final Rule vests the ATF with complete discretion to use a subjective balancing test to weigh six opaque factors on an invisible scale." *Id.* (quoting Mock II, 75 F.4th at 584).  It "provides no meaningful clarity about what constitutes an impermissible stabilizing brace, and . . . it is nigh impossible for a regular citizen to determine what constitutes a braced pistol that requires NFA registration." *Id.* (quoting *Mock II*, 75 F.4th at 584-85 in part); *see also FRAC*, 2024 WL 3737366, at * (the ATF "has articulated no standard whatsoever for determining" when a stabilizing brace's rear surface area would allow the shouldering of a weapon); *id.* at 8 (explaining that ATF's power point was arbitrary because it provided no explanation for its decision).

Furthermore, the Final Rule was subject to immediate legal challenge. *See* Dkt. 63 at 14. At the time Mr. Taranto allegedly possessed the braced pistol, the rule had been enjoined by the Fifth Circuit as to the parties in that litigation.  Order, *Mock v. Garland*, No. 23-10319 (5th Cir. May 23, 2023).  More injunctions soon followed.  *See, e.g.*, *NRA*, 2024 WL 1349307, at *7–*8; *Colon*, 2024 WL 309975, at *11–*18; *Texas v. ATF*, 700 F. Supp. 3d at 569; *Mock III*, 697 F. Supp.

25

3d at 576.  At this point, the rule has been vacated in its entirety.  *See Mock IV*, 2024 WL 2982056.

A vague rule that no longer exists cannot provide the notice that the Constitution requires.  For this

additional reason, Count One must be dismissed.

**V.    The NFA violates the Supreme Court's fee jurisprudence.**

Taxes on constitutionally protected activities are only permissible if they are tailored "to

meet the expense incident to the administration of the act and to the maintenance of public order

in the matter licensed." *Bauer v. Becerra*, 858 F.3d 1216, 1225 (9th Cir. 2017) (quoting *Cox v. New*

*Hampshire*, 312 U.S. 569, 577 (1941)).  "Put another way, imposing fees on the exercise of

constitutional rights is permissible when the fees are designed to defray (and do not exceed) the

administrative costs of regulating the protected activity." *Kwong v. Bloomberg*, 723 F.3d 160, 165

(2d Cir. 2013).

Here, Mr. Taranto has put forth evidence from the NFA's legislative history showing that

the $200 dollar tax on NFA firearms was designed to suppress firearm ownership and not to defray

administrative costs.  Def. Mot. at 41-42.  The government has offered no evidence to the contrary.

Instead, it faults Mr. Taranto for failing to come forward with evidence that the $200 fee makes

the possession of a braced pistol prohibitively expensive.  Dkt. 73 at 41-42.

The government misunderstands the law.  A fee is unconstitutional if it is not tailored to

administrative expenses regardless of whether it is prohibitively expensive.  *See Murdock v.*

*Pennsylvania*, 319 U.S. 105, 113-14 (1943) (striking down a license tax that was "not a nominal

fee imposed as a regulatory measure to defray the expenses of policing the activities in question");

*Eastern Connecticut Citizens Action Group v. Powers*, 723 F.2d 1050, 1056 (2d Cir.1983)

("Licensing fees used to defray administrative expenses are permissible, but *only to the extent*

*necessary for that purpose*.") (emphasis added); *Fernandes v. Limmer*, 663 F.2d 619, 633 (5th Cir.

1981) (invaliding a $6 per day fee for permit to distribute religious literature in a municipal airport

because of failure to restrict use of fee receipts to expenses of licensing process).  If a fee is prohibitively expensive, that might provide an *alternate* avenue to challenge it even if the fee is properly tied to administrative expenses.  *See Kwong*, 723 F.3d at 166-67 (assuming for the sake of argument that it would be).  But it is not a prerequisite.

In any event, the $200 fee *is* prohibitively expensive.  It was so at the time it was enacted in the 1930s and remains so today.  The NFA's $200 fee is nearly twice the cost of a stabilizing brace today.  Dkt. 73 at 41 (explaining that a SBTEVO attachment costs $125).  Since the issuance of the Final Rule, the maker of Mr. Taranto's braced pistol—SB Tactical—saw its brace sales plummet 97%.  *See* Second Supplemental Declaration of Jeff Creamer, *Firearms Regul. Accountability Coal., Inc. v. Garland*, 1:23-cv-00024-DLH-CRH (D.N.D. Oct. 9, 2023), Dkt. 95-2.  Another brace manufacturer, Maxim, has said "there is essentially zero demand for stabilizing braces now."  Fourth Declaration of David Dahl, *Mock v. Garland*, 4:23-cv-00095-O (E.D. Tex. Aug. 18, 2023), Dkt. 75-1. Firearm retailers have ceased to offer them for sale.  *See* Declaration of Jahde Clark, *Mock v. Garland*, 4:23-cv-00095-O (E.D. Tex. Aug. 18, 2023), Dkt. 75-2; Declaration of Bert Irslinger, *Mock v. Garland*, 4:23-cv-00095-O (E.D. Tex. Aug. 18, 2023), Dkt. 75-3.  For this final reason, Count One must be dismissed.

**CONCLUSION**

The government has repeatedly lost challenges to the propriety of its classification of braced pistols as NFA firearms. At this point, its Final Rule no longer exists. It cannot get around these decisions simply by saying it is not relying on the Final Rule, just all the ideas in it. That position is as preposterous as it is disingenuous, and the Court should not countenance it. For that and the myriad of other reasons articulated above, Mr. Taranto respectfully requests that the Court dismiss Count One.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER


_____/s/_____
Courtney L. Millian
Elizabeth Mullin
Shelli Peterson
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500