UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Case No. 23-cr-229 (CJN) |
| | : | |
| TAYLOR FRANKLIN TARANTO, | : | |
| | : | |
| Defendant. | : | |

**GOVERNMENT'S NOTICE OF INTENT AND MOTION TO ADMIT EVIDENCE PURSUANT TO FEDERAL RULE OF EVIDENCE 404(b)**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully gives notice that it intends to admit certain evidence pursuant to Federal Rules of Evidence 401 and 404(b). Specifically, the Government intends on offering the following evidence during its case-in-chief under 404(b) as relevant to the defendant's intent, opportunity, knowledge, absence of mistake, or lack of accident in conveying a false bomb threat and unlawfully possessing firearms, large-capacity magazines, and ammunition:

- Taranto's June 18, 2023, video recording at Piney Branch Elementary School in Takoma Park, Maryland, including his statements about Congressman Jamie Raskin, which included the comment, "I didn't tell anyone where he lives 'cause I want him all to myself."

- The Telegram messages described in the government's August 11, 2023, sealed supplemental proffer of facts.

- Taranto's June 29, 2023, video recording at the Kalorama neighborhood of Washington, D.C., and the posts and comments he made on Truth Social and Telegram that day.

**BACKGROUND**

On January 6, 2021, thousands of people comprising a mob of rioters attacked the U.S. Capitol while a joint session of Congress met to certify the results of the 2020 presidential election. Taranto joined a number of rioters who streamed into the U.S. Capitol Building that day. He unlawfully entered the Capitol, made his way toward the Speaker's Lobby where another rioter was shot, scuffled with police officers as he and other rioters were ushered out, and he remained on the Capitol Grounds. ECF No. 1. After the riot, Taranto returned to his home in the State of Washington, where he continued to promote conspiracy theories about the events of January 6.

In June 2023, Taranto returned to Washington, D.C., driving through the city and the surrounding region in his van. Defendant engaged in erratic behavior that intensified on June 28, 2023, when he livestreamed himself and suggested that he had outfitted his vehicle with a detonator. He made several statements indicating that he intended to blow up his vehicle at the National Institute of Standards and Technology (NIST). He stated that he was headed to NIST and that his van was "self-driving." He stated that he was "just going one way for this mission, to hell." He remarked that the vehicle was capable of "driv[ing] by itself" and that he would "not need to be anywhere near it when it goes off." Taranto said he had "been working on a detonator, but [he didn't] really need one for this." U.S. Capitol Police obtained a copy of this footage and issued a "be-on-the-lookout" alert to several law enforcement agencies, informing them of Taranto's van and his comments about a "detonator."

Later that day, on June 29, 2023, former President Donald Trump published what he claimed was the address of former President Barack Obama on a social media platform. Taranto re-posted the address on the same platform and thereafter started livestreaming from his van on his YouTube channel. Taranto broadcast footage of himself as he drove through the Kalorama

neighborhood in Washington, D.C., claiming he was searching for "tunnels" he believed would provide him access to the private residences of certain high-profile individuals, including former President Obama. He left his van and walked around the neighborhood, which contains restricted areas protected by the United States Secret Service. He walked through the nearby woods and stated, "Gotta get the shot, stop at nothing to get the shot." After noticing the presence of the Secret Service he said, "If I were them, I'd be watching this, watching my every move." He also said, "So yeah, more than likely, these guys also all hang for treason" and "I control the block, we've got 'em surrounded." When Secret Service agents approached him, Taranto fled, but he was apprehended and placed under arrest.

Shortly following his arrest, officers located Taranto's van and multiple law enforcement agencies responded to the scene. Law enforcement officials created a perimeter around Taranto's van to minimize the potential harm to members of the public. Two MPD K9 handlers responded to the scene, including a bomb-sniffing dog. Mindful of the possible existence of an explosive device or detonator, members of the Metropolitan Police Department and FBI Special Agent Bomb Technicians conducted a safety sweep of the van for hazardous or dangerous materials. A lawful search was then conducted of Taranto's van, which was parked near the scene of his arrest in Kalorama. While entering the van and searching a backpack inside, an agent was careful to avoid potential "booby traps." Law enforcement officials recovered two firearms, some large-capacity magazines, and hundreds of rounds of ammunition, but did not find evidence of a detonator or explosive device.

## LEGAL STANDARD

Federal Rule of Evidence 404(b) provides that evidence of "other crimes, wrongs, or acts" is not admissible to prove a defendant's character, but is admissible for any non-propensity

3

purpose, including—but not limited to—motive, intent, plan, knowledge, and absence of mistake. *See United States v. Bowie*, 232 F.3d 923, 926, 930 (D.C. Cir. 2000) (citing Fed. R. Evid. 404(b)). As the D.C. Circuit has instructed, Rule 404(b) is a rule of "inclusion rather than exclusion." *Bowie*, 232 F.3d at 929. Specifically, "[a]lthough the first sentence of Rule 404(b) is 'framed restrictively,' the rule itself 'is quite permissive,' prohibiting the admission of 'other crimes' evidence 'in but one circumstance' — for the purpose of proving that a person's actions conformed to his character." *Bowie*, 232 F.3d at 929–30 (*quoting United States v. Crowder*, 141 F.3d 1202, 1206 (D.C. Cir. 1998) (en banc) ("Crowder II")); *accord United States v. Cassell*, 292 F.3d 788, 792 (D.C. Cir. 2002) ("[A]ny purpose for which bad-acts evidence is introduced is a proper purpose so long as the evidence is not offered solely to prove character") (quoting *United States v. Miller*, 895 F.2d 1431, 1436 (D.C. Cir. 1990) (emphasis in original)).

There is a two-pronged test for determining whether evidence of prior crimes is admissible under 404(b). First, the evidence must be "probative of a material issue other than character." *Miller*, 895 F.2d at 1435 (citation omitted). Second, the evidence is subject to the balancing test of Federal Rule of Evidence 403, so that it is inadmissible only if the prejudicial effect of admitting the evidence "substantially outweighs" its probative value. *Id*. Furthermore, it is not enough that the evidence is simply prejudicial; the prejudice must be "unfair." *Cassell*, 292 F.3d at 796 (quoting *Dollar v. Long Mf'g, N.C., Inc.*, 561 F.2d 613, 618 (5th Cir. 1977) for the proposition that "[v]irtually all evidence is prejudicial or it isn't material. The prejudice must be "unfair."); *United States v. Pettiford*, 517 F.3d 584, 590 (D.C. Cir. 2008) ("[T]he Rule focuses on the danger of *unfair* prejudice, and gives the court discretion to exclude evidence only if that danger substantially outweigh[s] the evidence's probative value.") (citations and punctuation omitted) (emphasis in original). Moreover, when potentially prejudicial evidence is admitted during a bench trial, there

is "little danger of any prejudicial impact." *United States v. Sperl*, 458 F. App'x 535, 543 (6th Cir. 2012); *see also United States v. Sebolt*, 554 F. App'x 200, 206 (4th Cir. 2014) ("[I]n the context of a bench trial, there is less concern that the finder of fact will utilize [Rule 404(b)] evidence for an improper purpose.").

Admission of 404(b) evidence is permitted in the Government's case-in-chief, regardless of whether that issue is even disputed by the defense. *See Bowie*, 232 F.3d at 932. Indeed, even "a defendant's offer to stipulate to an element of an offense does not render the government's other crimes evidence inadmissible under Rule 404(b) to prove that element, even if the defendant's proposed stipulation is unequivocal, and even if the defendant agrees to a jury instruction of the sort mentioned in our earlier opinion." *Crowder II*, 141 F.3d at 1209.

Finally, in a criminal case, the prosecution is required to "provide reasonable notice" to the defense of 404(b) evidence it intends to offer at trial, including "the permitted purpose for which the prosecutor intends to offer the evidence and the reasoning that supports the purpose." This motion provides the requisite notice.

## ARGUMENT

**I.   Taranto's June 18, 2023, statements should be admitted into evidence.**

Evidence of the threatening statements defendant made on June 18, 2023, are highly probative for non-propensity purposes and the risk of unfair prejudice is low, especially in light of the defendant's representations that he will seek a bench trial. The evidence should therefore be admitted.

On Sunday, June 18, 2023, Taranto used his YouTube channel to livestream himself and several other people at an elementary school in Takoma Park, Maryland. The video, entitled "Piney Branch Elementary School J6th presentation (NOT for kids!)," which is several hours long,

depicted Taranto and his associates walking around the school, entering the gymnasium, and using a projector to display a film related to January 6. In that livestream, while answering questions from his internet audience, Taranto stated that he specifically chose the elementary school for its proximity to Congressman Jamie Raskin's home and that he was targeting Raskin because "he's one of the guys that hates January 6 people, or more like Trump supporters, and it's kind of like sending a shockwave through him because I did nothing wrong and he's probably freaking out and saying shit like, 'Well he's stalking me.'" Taranto further commented, "I didn't tell anyone where he lives 'cause I want him all to myself," and "That was Piney Branch Elementary School in Maryland . . . right next to where Rep. Raskin and his wife live." The statements reflect Taranto's motivation for being at the school: to send "shockwaves" through his intended target. A few days later, on June 28, 2023, Taranto livestreamed himself and indicated that he had a detonator in a car that would drive itself to NIST.

      The evidence of Taranto's June 18 statements are properly admissible in connection with the false bomb threat he conveyed on June 28. First, the defendant's location in Takoma Park, Maryland on June 18, 2023 establishes that he was located near both the District of Columbia and NIST (in Gaithersburg, MD) ten days prior to the threats he is alleged to have communicated on June 28, 2023. The June 18 statements also show that when Taranto was livestreaming in June 2023, he was trying to intimidate the targets of his threats. Taranto also conveyed to his online audience that he wanted to be the exclusive perpetrator of this intimidating behavior ("I want him all to myself."). The statements show that he was motivated by a desire to instill fear in others and to be solely responsible for instilling that fear. This conduct bears directly on Taranto's motivation and intent when just a few days later he livestreamed to an online audience statements suggesting

6

that his car was equipped with a "detonator" and that it would "go off" when Taranto was at a safe distance.

The June 18, 2023, evidence thus serves legitimate non-propensity purposes with high probative value. It establises defendant's intent to convey false or misleading information on June 28, 2023. It establishes he had the opportunity to convey that information via his close geographic proximity to both the District of Columbia and NIST just over a week prior to June 28, 2023. It demonstrates that defendant knowingly engaged in threatening behavior. And it shows that defendant was motivated by a desire to threaten the personal safety of others. All are relevant for establishing a violation of 18 U.S.C. § 1038(a)(1). The June 18 statements establish a distinct pattern of conduct that could support a factfinder establishing knowledge, intent, and motivation. *Cf. United States v. Dodd*, No. 22-30275, 2023 WL 3318038, at *2 (5th Cir. May 9, 2023) (prior conduct similar to charged hoax offense established "pattern of conduct" and could support "finding of knowledge, intent, and identity").

And for a bench trial, there is little danger of unfair prejudice to the defendant. *See Sperl*, 458 F. App'x at 543, *Sebolt*, 554 F. App'x at 206. There is little risk that the Court will misuse the evidence to a find a propensity for threatening behavior. The probative value of the June 18, 2023, statements therefore cannot be outweighed by the risk of unfair prejudice. *See Pettiford*, 517 F.3d at 590 (court has discretion to exclude evidence only if danger of unfair prejudice substantially outweighs evidence's probative value). The June 18, 2023, statements should therefore be admitted.

### II.     Taranto's Telegram messages should be admitted into evidence.

For similar reasons, Taranto's Telegram messages establish a pattern of conduct that supports a finding of knowledge, intent, and motivation in connection to the false bomb threat. Because the government's August 11, 2023, supplemental proffer is under seal, the government incorporates by reference the factual proffers contained in that document. The statements Taranto made on April 23, May 6, May 7, and May 13 of 2023 establish a pattern of conduct that tends to show his knowledge, intent, and motivation in connection with the false bomb threat. Again, because the Court will act as the factfinder, there is little risk of unfair prejudice and the probative value of this evidence cannot be outweighed by that low risk. *See Pettiford*, 517 F.3d at 590. The Telegram messages should therefore be admitted.

### III.    Taranto's June 29, 2023, livestream footage, Truth Social posts, and Telegram messages should be admitted into evidence.

Evidence about Taranto's whereabouts on June 29, 2023, and his statements, posts, and messages are highly probative for non-propensity purposes and the risk of unfair prejudice is low. The evidence should therefore be admitted.

On June 29, 2023, former President Donald Trump posted what he claimed was the address of former President Barack Obama on the social media platform Truth Social. Taranto used his own Truth Social account to re-post the address. On Telegram, Taranto stated, "We got these losers surrounded! See you in hell, Podesta's and Obama's." Shortly thereafter, Taranto began livestreaming from his van on his YouTube channel. Taranto broadcast himself as he was driving through the Kalorama neighborhood of Washington, D.C. Taranto parked his van on the street and began walking around the neighborhood, continuing to film. Taranto made several references to "the Podestas" and stated several times that he is trying to get an interview. Taranto said he

intended to access or enter the private residences of his subjects. For example, Taranto panned the camera to show several sewer grates on the street, calling them "entrance points," and stating that the grates were an "entrance" to reach "them." In the video, he stated:

> "So if you go down there, there's obviously tunnels down there. I don't know how close they'll get you in terms of access."
>
> "We're gonna find a way to the tunnels, underneath their houses."
>
> "We're looking for tunnel access so we can get the interview, in case they try to weasel their way out. No in or out now! See, First Amendment, just say First Amendment, free speech. Free, it's free."

Throughout the video, Taranto repeatedly attempted to couch his actions in terms of "First Amendment" or free speech. When initially approached by Secret Service, Taranto stated, "Hello, just trying to get an angle, for First Amendment, free speech. Thanks. That's Secret Service, she's alright." He also said, "See how it works? Just say, 'First Amendment.'"

Taranto made additional concerning statements during the video including the following statements about getting a "shot":

> "Gotta get the shot, stop at nothing to get the shot. This is where other people come to get the shot."
>
> "We're gonna see what we can get, as a shot. If I were them, I'd be watching this, watching my every move."
>
> "This is where everyone goes to get the shot. It's just me today though. This is an easy way around. Yeah, they can't stop me from walking through here. Just don't step foot on the street."

Regarding getting an "angle," Taranto states, "Let's see what angles we can get," and, "Just trying to get an angle, for First Amendment, free speech." Additional concerning statements included:

> "I don't have any ID, so in case I get detained or something, they're just going to have to use their cellphone to figure out who I am."

> "So yeah, more than likely, these guys also all hang for treason. See how I said that? You gotta be very safe and careful. Someone warned me."
>
> "I control the block, we've got 'em surrounded"
>
> "Oh, is this intimidating? I don't think so."

The June 29, 2023, footage, posts, and messages have probative value for the firearms offenses and the false bomb threat. For the firearms offenses, the evidence shows motive, intent, opportunity, and a plan in connection with his possession of the firearms, large-capacity magazines, and ammunition. For example, Taranto's posts about Podesta's or former President Obama's residences, his statements about accessing the residences or surrounding them, and his references to getting a "shot" or "angle" are relevant to prove that he knowingly possessed or carried the firearms, magazines, and ammunition. His attempts to veil his discussion of shots and angles as First Amendment speech do not diminish the probative value of the statements—these are words that are associated with the use of firearms. These statements therefore also help establish that he intended to possess and carry the firearms recovered from his vehicle.

The June 29, 2023, evidence also has probative value in connection with the false bomb threat he made on June 28, 2023. Taranto's statements, posts, and messages on June 29, 2023, show that his pattern of threatening conduct continued after he made his false bomb threat. His presence near the residence of a prominent political figure, his attempts to make intimidating comments, and his statements to an online audience on June 29, 2023, demonstrate that Taranto was knowingly engaging in threatening or intimidating behavior. That bears directly on questions about what Taranto intended and what motivated him when he stated the day before that his car was equipped with a "detonator" and that it would "go off" at NIST. For a bench trial, there is little

risk of unfair prejudice and the probative value of the June 29 evidence cannot be outweighed by that low risk. *See Pettiford*, 517 F.3d at 590. The June 29 evidence should therefore be admitted.

## CONCLUSION

Accordingly, the government respectfully requests that the Court permit at trial the introduction of its proffered evidence of other crimes, wrongs, or acts.

        Respectfully submitted,

        MATTHEW M. GRAVES
        UNITED STATES ATTORNEY
        DC Bar No. 481052

By: */s/ Carlos A. Valdivia*
     CARLOS A. VALDIVIA
     DC Bar No. 1019242
     ALLISON K. ETHEN
     MN Bar No. 0395353
     SAMUEL WHITE
     NC Bar No. 44908
     Assistant United States Attorneys
     601 D Street, NW
     Washington, D.C. 20530
     (202) 252-7508
     Carlos.Valdivia@usdoj.gov