# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Case No. 23-cr-229 (CJN) |
| | : | |
| TAYLOR FRANKLIN TARANTO, | : | |
| | : | |
| Defendant. | : | |

## GOVERNMENT'S BRIEF REGARDING THE
## LEGAL STANDARDS FOR HOAXES

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this brief in response to the Court's recent questions about the legal requirements of the hoax charge. With regard to the mens rea requirement, the Court should not require more than general intent when determining whether Taranto intentionally conveyed false information. Additionally, the "reasonable belief" in the bomb hoax should be evaluated objectively, considering all the information available to law enforcement up to the moment that FBI bomb technicians determined that Taranto's van did not contain a detonator or explosive device.

## BACKGROUND

### *Procedural Posture*

The Court has held in abeyance the defendant's constitutional as-applied challenge for the hoax charge and has heard the evidence presented in the government's case-in-chief. The Court has also held in abeyance its decision on defendant's motion for acquittal pursuant to Rule 29. On May 15, 2025, the Court raised questions about the hoax charged in Count Six and allowed the parties an opportunity to brief the issues raised. The Court raised: (1) whether the First Amendment

imposes a mens rea requirement for hoaxes that is more demanding than the recklessness standard in true threats cases; and (2) whether the objective reasonable person evaluating the hoax must limit themselves to information that is available only to the person perceiving the hoax at the time the hoax is conveyed.

### *The Evidence of a Hoax*

The evidence has shown that on June 28, 2023, Taranto livestreamed himself in his van and suggested that he had outfitted his vehicle with a detonator or explosive device. He made several statements indicating that he intended to blow up his vehicle at the National Institute of Standards and Technology (NIST). He stated that he was headed to NIST and that his van was "self-driving." He stated that he was "just going one way for this mission, to hell." He remarked that the vehicle was capable of "driv[ing] by itself" and that he would "not need to be anywhere near it when it goes off." Taranto said he had "been working on a detonator, but [he didn't] really need one for this." While sitting in the driver's seat, he held up a steering wheel lock, indicating that it was his backup plan to drive his van into the NIST neutron lab without a driver. He drove to Alexandria,Virginia, where he parked his van in the middle of the road and ran alongside a busy street shouting, "Run!" while informing his viewers that this would cause people to believe they faced an emergency. U.S. Capitol Police viewed this footage and issued a "be-on-the-lookout" alert to several law enforcement agencies, informing them of Taranto's comments about a "detonator" and using his van to attack NIST. U.S. Capitol police also increased security for Rep. Jamie Raskin due to Taranto's prior statements about the representative, including that he wanted Raskin all to himself, which were made in livestream videos recorded prior to June 28, 2023, and viewed by law enforcement personnel in tandem with the June 28 livestream.

The next day, on June 29, Taranto broadcast footage of himself as he drove through the Kalorama neighborhood in Washington, D.C., claiming he was searching for "tunnels" he believed would provide him access to the private residences of certain high-profile individuals, including former President Obama. Taranto left his van—which law enforcement considered a potential car bomb—and walked around the neighborhood and through the nearby woods. When Secret Service agents approached him, Taranto fled, but he was apprehended and placed under arrest.

Shortly following his arrest, officers located Taranto's van and multiple law enforcement agencies responded to the scene. Law enforcement officials created a two-block perimeter around Taranto's van to minimize the potential harm to members of the public. Two MPD K9 handlers responded to the scene, including a bomb-sniffing dog. Mindful of the possible existence of an explosive device or detonator, FBI bomb technicians conducted a visual safety sweep of the van's exterior and windows for hazardous or dangerous materials. A lawful search was then conducted of Taranto's van. Special Agent Rothman entered the van and searched a backpack near the driver's seat. He cut the backpack open to avoid potential "booby traps," and observed two firearms, thirteen magazines, and hundreds of rounds of ammunition, all of which he removed from the backpack. Special Agent Rothman searched the entire backpack and looked in small spaces that could contain a commercial or improvised detonator, which have the capacity to break bones and rip flesh when they explode. After the bomb technicians completed their sweep, law enforcement officials recovered two firearms, some magazines, and ammunition. The van contained no evidence of a detonator or explosive device.

### *The Charge Against Defendant*

On February 14, 2024, a grand jury charged that:

<u>COUNT SIX</u>

> On or about June 28 and 29, 2023, within the District of Columbia and elsewhere, TAYLOR TARANTO did intentionally convey false and misleading information under circumstances where such information may reasonably have been believed, that indicated that an activity would take place that would constitute a violation of Chapter 40 of Title 18 United States Code (malicious damaging of any building or vehicle, in violation of 18 U.S.C. § 844(f)(1)), specifically, that he would maliciously damage or destroy, or attempt to damage or destroy, by means of an explosive, the National Institute of Standards and Technology.
>
> (False Information and Hoaxes, in violation of Title 18, United States Code, Section 1038(a))

ECF No. 45.

### *The Language of the Statute*

18 U.S.C. § 1038(a)(1) provides that:

> Whoever engages in any conduct with intent to convey false or misleading information under circumstances where such information may reasonably be believed and where such information indicates that an activity has taken, is taking, or will take place that would constitute a violation of [certain enumerated crimes, including anti-terrorism statutes] . . . .

### LEGAL STANDARD

Assuming that Rule 29 applies in bench trials, the Court must determine whether, "viewing the evidence most favorably to the government and according the government the benefit of all legitimate inferences therefrom, a reasonable [factfinder] must necessarily have had a reasonable doubt as to the defendants' guilt." *United States v. Weisz*, 718 F.2d 413, 437 (D.C. Cir. 1983). "Thus a judgment of acquittal is appropriate only when there is no evidence upon which a reasonable [factfinder] might fairly conclude guilt beyond a reasonable doubt." *Id.* at 438. The

government incorporates by reference the Rule 12 standard articulated in its opposition to defendant's motion to dismiss Count Six (ECF No. 72).

## ARGUMENT

For Taranto's bomb hoax, the statute does not require the subjective mens rea for a "true threat," as mandated by *Counterman v. Colorado*, 600 U.S. 66 (2023). The statute requires only that the government prove that Taranto had the general intent to convey false information. Moreover, the mens rea is independent of the objective reasonableness test. Under that objective test, the question does not turn on defendant's subjective intent or whether the recipient of the false information actually believed the hoax. Relatedly, the objective test does not require a contemporaneous belief in the hoax. But even under more demanding standards, the government has met its burden.

### I.    The Government Does Not Need to Prove that Defendant Intended Others to Believe his Hoax

The freedom of speech protected by the First Amendment does not allow the perpetrator of a hoax to disregard traditional limitations on certain categories of unprotected speech. *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 383 (1992). Terroristic hoaxes, like other unprotected speech, are inherently harmful communications that "constitute 'no essential part of any exposition of ideas.'" *Id.* at 385. First Amendment precedent generally supports an objective test for such unprotected speech. *See Counterman v. Colorado*, 600 U.S. 66, 113 (2023) (Thomas, J., dissenting); *see, e.g.*, *Cohen v. California*, 403 U.S. 15, 20 (1971) (objective test for fighting words); *Pope v. Illinois*, 481 U.S. 497, 500-501 (1987) (three-prong test for obscenity defined in objective terms); *In re R. M. J.*, 455 U.S. 191, 202–03 (1982) (objective falsity to evaluate misleading advertising)). *But see Counterman*, 600 U.S. at 81–82 (imposing a recklessness standard to true threats); *Brandenburg*

*v. Ohio*, 395 U.S. 444, 447 (specific intent for incitement due to its proximity to political speech). Accordingly, the prohibition against terroristic hoaxes need not turn on a defendant's unreasonable subjective mindset.

To convict under § 1038(a)(1), the government does not need to prove that defendant intended his audience to "reasonably believe" his false information or that they reasonably believed that terrorist activity would take place. *See United States v. Castagana*, 604 F.3d 1160, 1163 (9th Cir. 2010) ("[I]t makes little sense to say that a perpetrator can intend that anything be 'reasonably believed.'"); *see also United States v. Chipunov*, No. 23-2046, 2025 WL 1098556, at *1 (9th Cir. Apr. 14, 2025) (rejecting subjective mens rea for true threat in 1038 case); *United States v. Stallings*, No. 19-11300, 2023 WL 3534445, at *6 (5th Cir. May 18, 2023), cert. denied, 144 S. Ct. 366 (2023) (adopting *Castagana*). Whether the circumstances were such that the livestream's viewers may reasonably have believed Taranto was preparing to drive a car bomb into NIST is a question wholly independent of Taranto's intentions. *See Castagana*, 604 F.3d at 1163–64 ("[T]his reasonableness requirement removes from consideration he subjectivity of the actor's intent and replaces it with an objective standard.").

Although the scienter requirement in the statute is unambiguous, "the legislative history of the statute and common sense support this interpretation." *Castagana*, 604 F.3d at 1164. The Stop Terrorists and Military Hoaxes Act of 2004 was passed in the wake of post-September 11 acts of terrorism and terroristic hoaxes, after Congress rejected an amendment that would have imposed a much stricter scienter requirement. *See* H.R. Rep. 108-505 at 27, 118 Stat. 3638. Arguing against a heightened requirement, the original sponsor of the bill argued that a more demanding standard could render the legislation useless because hoaxes are not necessarily intended to cause harm or injury. *Id.* at 34. The real issue, instead, is whether the hoax could be reasonably believed. *Id.*

6

One of the hypotheticals posed by the Court was whether someone would be criminally liable for joking about having a bomb at an airport, specifically, by asking their traveling companion, in a deadpan way, "Did you bring the bomb?", prompting law enforcement to detain the individual and search their luggage. In that case, assuming that bombing an airport is an enumerated offense under § 1038(a)(1), this statement would meet the elements of a terroristic hoax—because it would tend to inspire the kind of fear and diversion of resources that § 1038(a)(1) tries to discourage. The subjective intent of the individual should not dispel liability for creating tangible harm.

The question of constitutionality essentially is whether § 1038(a)(1) proscribes speech that is valued by society or chills speech that is in fact protected. *See Counterman*, 600 U.S. at 78 (2023) (noting concerns about chilling protected speech). In cases where speech has a potentially harmless meaning, a defendant may introduce evidence about the relevant context. And, with a general intent requirement, conviction for terrostic hoaxes requires proof beyond a reasonable doubt that defendant intentionally conveyed the false information and that the circumstances allowed a reasonable belief in the hoax. *See United States v. Williams*, 553 U.S. 285, 305–06 (2008) (high burden of proof addresses "fact that close cases can be envisioned"). Appellate review offers another significant layer of protection for defendants with First Amendment claims. *See Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 504-508 (1984) (review includes "independent" evaluation of a verdict's constitutional viability).

For these reasons, this case should not turn on Taranto's subjective intent and what he meant when he stated he would drive a car bomb into a NIST lab that housed a neutron reactor.

## II.    The Reasonableness Requirement

The caselaw interpreting § 1038(a)(1) supports an objective reasonableness standard that does not turn on the subjective experiences of the people receiving the hoax. The "reasonable person standard is an objective one, not based on the actual people involved in [the] case." *United States v. Keyser*, 704 F.3d 631, 64 (9th Cir. 2012); *see also United States v. Brahm*, 520 F. Supp. 2d 619, 629–30 (D. N.J. 2007) ("[T]he 'reasonably believed' language in § 1038(a)(1) requires the use of an objective, reasonable person standard in determining whether a false or misleading statement is criminally culpable."). To the extent that threats cases are instructive, other jurisdictions have looked to the effect on a reasonable person rather than the subjective reaction of the actual person who received the threat. *See, e.g.*, *United States v. Turner*, 960 F.2d 461, 465 (5th Cir. 1992) (in an 18 U.S.C. § 876 case—threats by mail—the question was whether the offending letter was sufficient to cause "a reasonable recipient, familiar with the context of the communication, to interpret it as a threat" (internal brackets, quotation marks, and citation omitted)).

Section 1038(a)(1) does not require a showing that the information comprising the hoax was, in fact, reasonably believed to be true or accurate. The statute instead articulates a standard of objective reasonableness that does not turn on whether a particular recipient happened to actually believe that a bomb hoax or similar harm was truly occurring. The question is whether the false or misleading information "may reasonably be believed." Nor does the statute require a contemporaneous reasonable belief that a terroristic event is underway. The verb "indicates" in the statute is linked to the subject "information," meaning that the relevant question is whether the *information* indicates that an attack may have occurred, is occurring, or will later take place.

In the Court's hypothetical joke about the bomb at the airport, it seems unlikely that—without more—a single statement to a child would sustain a conviction under § 1038(a)(1). If, on the other hand, the statement was made mid-flight, or with vigor, then perhaps the reasonableness prong would be satisfied. But here the case is far clearer. The defendant made the statements about a detonator and his car "going off" over the course of 90 minutes. The statements were accompanied by alarming conduct, like holding up a steering wheel lock to demonstrates the means for turning the car into a driverless weapon and running alongside a busy street to show how he would cause others to believe in an emergency. The June 28 conduct was preceded by menacing behavior and followed by him seeking a way to gain access to the residence of a former president. The reasonable belief in the hoax is analyzed with information derived from evidence of the conduct at the core of the hoax and evidence that places the hoax in its context.

In this case, the objective analysis includes at a minimum the information available to law enforcement when Taranto stated he would drive a car bomb to the neutron reactor housed at the NIST campus. It includes Taranto's pre-June 28 statements about members of congress, like, wanting Rep. Raskin "all to [him]self." It includes June 28 statements like, "Coming at you [Rep.] McCarthy. Can't stop what's coming. Nothing can stop what's coming." It includes the fact that Taranto stopped his car in the middle of the road to rehearse a false emergency. And it includes the conduct that Taranto livestreamed on June 29, such as stating that he had the Podestas "surrounded." Even without Taranto's private messages, the evidence establishes that the objective observer could have reasonably believed Taranto's bomb hoax. That is true whether the facts are seen through the lens of a law enforcement officer or by an ordinary person. The Court should therefore consider all facts that were known to law enforcement up until FBI bomb technicians determined that Taranto's van did not contain a detonator or explosive device.

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court find the

defendant guilty of Count Six.

Respectfully submitted,

Jeanine Ferris Pirro
UNITED STATES ATTORNEY

By: */s/ Carlos A. Valdivia*
CARLOS A. VALDIVIA
DC Bar No. 1019242
SAMUEL WHITE
NC Bar No. 44908
Assistant United States Attorneys
601 D Street, NW
Washington, D.C. 20530
(202) 252-7508
Carlos.Valdivia@usdoj.gov